IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| WILLIAM SCOVIN<br><br>    Plaintiff,<br><br>v.<br><br>GREAT-WEST LIFE & ANNUITY INS. CO., ONE HEATH PLAN, INC., AUERBACH, POLLAK & RICHARDSON, INC., HUGH REGAN, LEWIS COHEN, ROBERT DRAKE and A. JONES YORKE,<br><br>    Defendants. | CIVIL ACTION NO.: 02CV01161(AWT)<br><br><br><br><br><br>JANUARY 12, 2006 |

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

James M. Moriarty (ct 21876)
Kelley Drye & Warren LLP
  Their Attorneys
Two Stamford Plaza
281 Tresser Boulevard
Stamford, Connecticut 06901-3229
Telephone: (203) 324-1400
Facsimile: (203) 327-2669
E-mail: jmoriarty@kelleydrye.com

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................................... ii
PRELIMINARY STATEMENT .................................................................................................... 1
STATEMENT OF FACTS ............................................................................................................. 4
ARGUMENT .................................................................................................................................. 9
   I.   NONE OF THE INDIVIDUAL DEFENDANTS ARE ERISA FIDUCIARIES .......... 9
      A.   An Individual Is Not An ERISA Fiduciary Simply Based On His Status As An Officer Or Director ................................................................................. 9
      B.   Regan did not Exercise any Discretionary Authority or Control over the Plan .................................................................................................................. 10
      C.   Cohen Did Not Exercise Any Discretionary Authority Or Control Over The Plan ......................................................................................................... 11
      D.   Yorke Did Not Exercise Any Discretionary Authority Or Control Over The Plan ......................................................................................................... 13
   II.   SCOVIN'S STATE LAW CLAIMS RELATE TO AN ERISA PLAN AND ARE PREEMPTED .................................................................................................... 13
      A.   Scovin's CUTPA Claim Provides An Alternative Enforcement Mechanism And Is Preempted By ERISA ....................................................... 14
      B.   Scovin's State Common Law Causes Of Action Relate To And Are Dependent Upon The Plan And Are Preempted .............................................. 16
   III.   NEITHER REGAN, COHEN NOR YORKE MADE ANY REPRESENTATIONS TO SCOVIN REGARDING THE PLAN OR ANYTHING ELSE ................................................................................................... 17
      A.   A Misrepresentation Claim Fails As A Matter Of Law When The Defendants Have Not Made Any Representations Upon Which The Plaintiff Relied ................................................................................................. 17
   IV.   SCOVIN HAS NOT SUFFERED COMPENSABLE EMOTIONAL DISTRESS ..................................................................................................................... 18
   V.   THE COURT SHOULD NOT IGNORE THE CORPORATE EXISTENCE OF APR ............................................................................................................................. 21
   VI.   THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE BREACH OF CONTRACT CLAIM AS NO CONTRACT EXISTS ............................................................................................... 23
CONCLUSION ............................................................................................................................ 24

# TABLE OF AUTHORITIES

## CASES

Angelo Tomasso, Inc. v. Armor Construction & Paving, Inc.,
 187 Conn. 544, 447 A.2d 406 (1982) ............................................................. 21, 22

California Division of Labor Standards Enforcement v.
 Dillingham Const., N.A., Inc., 519 U.S. 316 (1997) ............................................ 14

Callahan v. Unisource Worldwide, Inc.,
 2003 WL 1714369 (D. Conn. March 27, 2003) ................................................... 16

Carrol v. Allstate Insurance Co., 262 Conn. 433, 815 A.2d 119 (2003) ................... 19, 20

Case v. Hospital of St. Raphael, 38 F. Supp. 2d 207 (D. Conn. 1999) ..................... 15, 16

Daley v. Aetna Life & Casualty Co., 249 Conn. 766, 734 A.2d 112 (1999) ..................... 17

Glynn v. Bankers Life and Casualty Co., 297 F. Supp. 2d 424 (D. Conn. 2003) ......... 14, 15

Herman v. NationsBank Trust Co., 126 F.3d 1354 (11th Cir. 1997) ............................. 12

In re Luna, 406 F.3d 1192 (10th Cir. 2005) .................................................................. 12

Ingersoll-Rand Co. v. McClendon, 498 U.S. 133 (1990) ............................................. 13

Leonard v. Commissioner of Revenue Serv.'s,
 264 Conn. 286, 823 A.2d 1184 (2003) ............................................................. 17, 18

LoPresti v. Terwilliger, 126 F.3d 34 (2d Cir. 1997) ...................................................... 12

New York State Conf. of Blue Cross & Blue Shield Plans v.
 Travelers Insurance Co., 514 U.S. 645 (1995) ...................................................... 14

Owen v. Georgia-Pacific Corp.,
 389 F. Supp. 2d 382 (D. Conn. 2005) ..................................................................... 16

Pilot Life Insurance Co. v. Dedeaux, 481 U.S. 41 (1987) .............................................. 13

Providence Health Plan v. McDowell, 385 F.3d 1168 (9th Cir. 2004) ............................ 14

## STATUTES

29 C.F.R. §2509.75-8 ............................................................................................ 10, 13

29 U.S.C. §§1002(21) ...................................................................................... 9, 10, 11, 12, 13

29 U.S.C. §1144(a) ..................................................................................................... 13

Defendants Hugh Regan ("Regan"), Lewis Cohen ("Cohen") and A. Jones Yorke ("Yorke") (collectively, the "Individual Defendants") respectfully submit this Memorandum of Law in support of their Motion for Summary Judgment.

## PRELIMINARY STATEMENT

Plaintiff William Scovin ("Scovin") commenced this action in July 2002 in an effort to require defendants Great-West Life & Annuity Insurance Company ("Great-West") and One Health Plan, Inc. ("One Health") to pay for expenses Scovin incurred in connection with a surgical procedure he underwent *after* he received a pre-certification authorization from Great-West, acting in its capacity as the third party administrator for the Auerbach, Pollak & Richardson, Inc. Health Care Plan (the "Plan"), for the procedure. For reasons known only to Scovin, he also chose to sue the Individual Defendants and Robert Drake ("Drake"). These individuals, like Scovin, were former employees or directors of Auerbach, Pollack & Richardson ("APR"). Significantly, Scovin did not bring suit against Terri Spahn ("Spahn"), the Plan Administrator, Michael Benvenuto ("Benvenuto"), the former Chief Financial Officer of APR or Joseph Padilla ("Padilla"), the former Chief Operating Officer of APR.

In his initial complaint, Scovin alleged causes of action against the Individual Defendants for fraud and intentional infliction of emotional distress. Scovin also asserted a breach of contract action against Regan. Scovin's own deposition testimony, together with the testimony of the Individual Defendants, convincingly demonstrated that he could not prevail on any of these causes of action. Instead of withdrawing his claims against the Individual Defendants and finalizing his settlement with Great-West and One Health,

however, Scovin filed his Amended Complaint. With the Amended Complaint, Scovin added numerous causes of action against the Individual Defendants for such things as Negligent Management of an ERISA Plan under state law, fraud and breach of contract that find no refuge in any recognized law.

The Amended Complaint alleges ERISA causes of action against the Individual Defendants under the theory that, since they were officers and/or directors of APR, they must be fiduciaries for purposes of ERISA. The law does not accept that kind of conclusory leap -- ERISA does not impose liability upon an individual simply based upon his status as an officer or director. To prevail on his ERISA claims Scovin must *prove* that each of the Individual Defendants exercised discretionary authority or control over the management, administration or assets of the Plan. He cannot even raise an issue of fact that they did so.

Scovin has also attempted to allege a number of state law causes of action, including negligent misrepresentation, fraud, negligent infliction of emotional distress, breach of contract, violation of CUTPA and negligent management of the Plan. There is no dispute that the Plan was governed by ERISA. All of Scovin's state law claims relate to the Plan and the CUTPA claim provides an improper alternative enforcement mechanism. The state law claims are preempted by ERISA and the Individual Defendants are entitled to summary judgment on them.

Even if however the state common-law claims for fraud and negligent misrepresentation were not preempted, the Individual Defendants are still entitled to summary judgment. Scovin's own deposition testimony demonstrates that none of the Individual

Defendants ever made *any* statement to him regarding the Plan and that all of his and/or his spouse's conversations with APR regarding the Plan were with Spahn, the Plan Administrator. Put simply, Scovin was not misled, either intentionally or negligently, by any of the Individual Defendants.

Scovin has also alleged causes of action for breach of contract, negligent infliction of emotional distress and piercing the corporate veil. Scovin did not have a contractual relationship with any of the Individual Defendants. Moreover, Scovin's own deposition testimony conclusively demonstrates that he has not suffered emotional distress. Scovin testified that his alleged emotional distress manifested itself in general stress and some loss of sleep. He further testified that the treatment for his alleged emotional distress consisted of <u>one</u> visit to his physician and the taking of some medication for a short period of time. Scovin simply did not suffer any cognizable emotional distress and even if he did, the emotional distress was not caused by the Individual Defendants.

Lastly, Scovin asks the Court to disregard APR's corporate existence and hold the Individual Defendants liable for the debts of APR. There is simply no evidentiary support on the record for such a drastic remedy.

The Individual Defendants should never have been named as defendants in this action. They have been forced to spend significant time and money to defend themselves against these frivolous allegations which have <u>expanded</u> in the face of Scovin's own testimony clearly demonstrating that he cannot prevail. There are simply no genuine issues of material fact necessitating a trial on any of the causes of action asserted against the Individual Defendants and they are entitled to judgment as a matter of law.

## STATEMENT OF FACTS

Scovin was employed by APR as a research analyst from August 1999 to January 2001 (Defendants' Statement of Undisputed Facts ("DSUF"), ¶1).[1] APR was engaged in the business of investment banking and buying and selling securities for retail brokerage customers (Id., ¶4). Regan was APR's president and served on the Board of Directors of APR and Auerbach Financial Group ("AFG"), the holding company for APR (Id. ¶¶6-7). Yorke was a member of the Board of Directors of APR and AFG until his resignation in June 2001 (Id., ¶11). During his tenure on the respective Boards, APR afforded Yorke the opportunity to utilize an office in APR's New York office space from which he managed his own personal investments (Id., ¶12). Yorke did not receive a salary from APR and had no executive responsibility. Cohen was employed by APR from the Fall of 1998 until June 2001 (Id., ¶8). During his employment with APR, Cohen served as its Controller and a Financial and Operations Principal ("FINOP") and reported to APR's CFO, Benvenuto (Id., ¶¶8-10). As Controller, Cohen was charged with, among other things, paying APR's bills, including invoices he received from APR's Denver office related to the Plan (Id., ¶9). Cohen followed the directions given to him by Benvenuto as to which invoices needed to be paid immediately and which invoices could wait to be paid (Id., ¶10).

In December 2000, APR entered into a transaction with non-party eVision USA.Com, Inc. ("eVision") pursuant to which eVision acquired a forty percent (40%) interest in APR in exchange for APR acquiring assets of eVision's broker/dealer subsidiary, American Frontier Financial Corporation ("AFFC") (DSUF ¶¶13-15). As a result of the eVision

---

[1] References to Defendants' Statement of Undisputed Facts are to Defendants' D. Conn. Civ. L. R. 56(a)(1) Statement submitted herewith.

transaction, APR went from a forty (40) person firm to a two hundred (200) person firm with a number of branch offices (Id., ¶22). In addition to AFFC's registered representatives, APR also acquired eVision's human resources personnel, including Spahn and Padilla (Id., ¶¶19-21). Spahn had been the Human Resources Manager at eVision and retained that title upon her move to APR (Id., ¶¶19, 35). Spahn reported to Padilla and was in frequent contact with Benvenuto (Id., ¶¶21, 33).

At the time of the eVision transaction, APR offered its employees health care coverage through Oxford (DSUF ¶25). eVision offered its employees health care coverage through a plan with Great-West (Id., ¶26). As a result of the redundancy in health care coverage, APR decided to move the small group of individuals on the Oxford plan to the Great-West plan (Id., ¶30). Neither Regan, Cohen nor Yorke were involved in making the decision to have all of APR's employees receive health care benefits via the Great-West plan (Id., ¶¶31-32). That decision was made by the human resources group in Denver (Id., ¶30). APR's employees who had been receiving their health care benefits from Oxford were informed of the switch to Great-West by Benvenuto (Id., ¶33).

When eVision established its plan with Great-West in August 2000, it was required to submit an application for group contract (DSUF ¶27). Once this application was approved by Great-West, eVision entered into a Services Contract with Great-West (Id., ¶27). Great-West then prepared a Summary Plan Description ("SPD") describing the benefits available to plan participants (Id., ¶28). The SPD names eVision as the plan sponsor and Spahn as the Plan Administrator (Id., ¶29). After the eVision Transaction, Great-West simply changed the name of the eVision plan to the APR plan. Great-West did not require APR to

submit a new application for group contract nor did it require APR to execute a new or amended Services Contract (Id., ¶34). The SPD also remained unchanged with Spahn remaining as Plan Administrator (Id., ¶35).

Scovin's employment with APR terminated in January 2001 (DSUF ¶1). Upon that termination, Scovin requested that APR pay for his health care coverage for a period of two (2) months (Id., ¶36). APR agreed to that request. (Id.). At the conclusion of the two (2) month period, Scovin chose to continue his participation in the Plan by exercising his COBRA rights (Id., ¶37). In order to enroll in the Plan through COBRA, Scovin was required to complete certain forms. Scovin and/or his spouse spoke with Spahn about these forms, completed them and sent them to Spahn in APR's Denver office (Id., ¶38). All of Scovin's communications with APR regarding the Plan and his rights under it were with Spahn (Id., ¶39).

In late May, 2001, a NASD arbitration panel issued an award against APR in an aggregate amount of nearly $3,000,000. APR was required to immediately book this award as a liability on its balance sheet. As a result, APR could no longer meet its net capital requirement and was forced to cease all trading activity (DSUF ¶40)[2]. APR was thus unable to generate any income and could not meet its basic operating expenses (Id., at ¶42). APR did not anticipate the result reflected by the May 2001 arbitration award; that award essentially put APR out of business (Id., ¶41). After the issuance of the arbitration award, Regan explored all avenues to allow APR to remain viable (Id., ¶44). During this same time period,

---

[2] "The purpose of the net capital rule is to ensure that a broker-dealer has sufficient liquidity to protect the assets of its customers and to be able to cover its indebtedness to other broker-dealers." SEC Release No. 34-51046 (Jan. 14, 2005). A broker-dealer is prohibited from conducting any transactions when it cannot meet its net capital requirements.

Cohen worked to file the necessary reports regarding APR's net capital issues with the NASD and other regulatory bodies (Id., ¶45). Unbeknownst to the Individual Defendants, at about this same time, Scovin was seeking and obtaining authorization from Great-West to undergo a surgical procedure (Id., ¶47).

APR's last payroll was made on June 15, 2001 (DSUF ¶43). From that date, through the summer of 2001, Regan and others continued to work at APR without pay in an effort to deal with the multitude of regulatory issues facing APR, as well as with the transfer of its 22,000 customer accounts to new introducing brokers (Id., ¶46). In addition, Spahn continued in her role as APR's Human Resources Manager, sending memorandum to the Individual Defendants updating them on the status of various human resources issues, including the outstanding premiums on the Plan (Id., ¶¶50, 58)). Spahn also drafted at least one letter to an APR provider of group health services informing the provider that APR would be canceling its group policy effective June 30, 2001 as its Albany branch office had closed (Id., ¶51).

On July 2, 2001, Great-West employee Allison Zellner ("Zellner"), who was Great-West's Senior Customer Service Manager for the APR account and was in frequent contact with APR's human resources group, sent an email to her Great-West colleagues (DSUF ¶¶48-49, 52). By this email, Zellner informed her colleagues that she has confirmed that APR has shut down:

> just received confirmation that this company has been shut down and did not make payroll Friday. They will most likely be in bankruptcy. Please put all claims on hold if they are not already and I will forward more information when I receive it.

(Id., ¶52). One week later, on July 9, 2001, Zellner's Great-West colleague, Christy Metros Bougie ("Bougie"), sent an email to Zellner and others at Great-West responding to Zellner's July 2, 2001 email with the observation: "since they [APR] have had a NSF, we can place this group on hold. Pat will start the process of collecting information for legal" (Id., ¶53). On the same day, Great-West (through One Health) sent a medical benefits fax setting forth the benefits available under the Plan. This medical benefits fax, which was requested by Scovin or one of his medical providers, does not provide the recipient with any information regarding the current status of the Plan, including the fact that it had been placed on hold and that Great-West had confirmed that APR had shut down (Id., ¶54).

On July 13, 2001, Spahn's employment with APR terminated (DSUF ¶56).[3] Spahn faxed a memo to Great-West informing it that her employment with APR was terminating (Id.). On that same date, Great-West <u>approved</u> Scovin for five (5) days of acute rehabilitation at Danbury Hospital (Id., ¶57). Great-West approved Scovin for this acute rehabilitation despite the fact that it was aware that APR had shut down, it had put APR's claims on hold and it had received notice from Spahn, the Plan Administrator, that her employment was terminating.

None of the Individual Defendants ever had any discussions with anyone at Great-West about the administration of the Plan or anything else for that matter (DSUF ¶¶59, 61-63). The first correspondence addressed to Regan from Great-West was in September 2001 (Id., ¶59). This correspondence, which was essentially a final invoice, was apparently faxed to APR's Denver office despite the fact that Spahn had specifically informed

---

[3] Scovin alleges that his surgery took place on or about July 12, 2001. (See Declaration of James M. Moriarty in support of Motion for Summary Judgment, ("Moriarty Decl."), sworn to January 12, 2006, Ex. 1, at ¶32).

-8-

Great-West to send all correspondence to APR's New York office (Id., ¶¶56, 59). At the same time that Great-West was sending this final bill to APR, it was sending out notices to Plan members that their health care coverage would continue through September 2001 (Id., ¶60).

None of the Individual Defendants ever made any representations to Scovin about the Plan (DSUF ¶¶61-63). All of Scovin's communications with APR about the Plan were with Spahn (Id., ¶39). Indeed, Scovin's first communication with Regan and Cohen regarding his issues related to the Plan occurred in February 2002, in the form of letters demanding that his health care bills be paid by APR (Id., ¶¶74-75). Scovin did not send a demand letter to Yorke.

## ARGUMENT

### I.
### NONE OF THE INDIVIDUAL DEFENDANTS ARE ERISA FIDUCIARIES

**A.    An Individual Is Not An ERISA Fiduciary Simply Based On His Status As An Officer Or Director**

Scovin purports to state causes of action against the Individual Defendants under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1001, *et seq*, for Denial of Benefits (Second Cause of Action) and Breach of Fiduciary Duty (Tenth Cause of Action). To prevail on these claims Scovin must prove that each of Messrs. Regan, Cohen and Yorke are ERISA fiduciaries. See 29 U.S.C. §§1002(21)(A) & 1109. In order to satisfy this burden, Scovin must do much more than simply point to the fact that Regan was the president of APR, Cohen was the controller of APR and Yorke was a member of APR's Board of Directors. Indeed, it is axiomatic that an individual is <u>not</u> a fiduciary under ERISA

simply based upon his status as an officer or director of a corporation. 29 CFR §2509.75-8 (D-4)&(D-5).

> The term "fiduciary" is statutorily defined in 29 U.S.C. §1002(21)(A):
>
>> a person is a fiduciary with respect to a plan to the extent (1) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (3) he has any discretionary authority or discretionary responsibility in the administration of such plan. . . .

An individual who performs purely ministerial functions for an employee benefit plan is not considered a fiduciary. 29 CFR §2509.75-8 (D-2).

**B.      Regan did not Exercise any Discretionary Authority or Control over the Plan**

Regan was the president of APR from 1993 through the time it ceased conducting business (DSUF ¶6). At no point during that period did he ever exercise any authority or control, discretionary or otherwise, with respect to the management, control, administration or assets of any of APR's health care plans, including the Plan (Id., ¶31). Moreover, after the eVision Transaction, the Plan was administered by Spahn who reported to Padilla and was in frequent contact with Benvenuto (Id., ¶21, 33). Indeed, the SPD specifically provides the Plan Administrator – Spahn – with discretionary authority over the Plan:

> The Plan Administrator has complete authority to control and manage the Plan. The Plan Administrator has full discretion to determine eligibility, to interpret the Plan and to Determine whether a claim should be paid or denied, according to the provisions of the Plan as set forth in this booklet.

(Moriarty Decl. Ex.10, at p. 5).

Regan never met with or had any discussions with any representative of Great-West regarding the Plan (DSUF ¶61). Regan was never provided copies of the Great-West Master Application, Service Agreement or any other documents or materials related to the Plan (Id., ¶¶59, 61). Moreover, the fact that Spahn sent memoranda to Regan noting that Plan premiums were past due does not constitute the requisite control or authority over the Plan or its assets required to hold Regan liable as a fiduciary. See 29 U.S.C. §1002(21)(A). Indeed, Regan can only be held liable as a fiduciary if Scovin can prove that he meets the definition of fiduciary in section 1002. Scovin cannot meet this burden. There is no genuine issue of material fact necessitating a trial on the Second and Tenth Causes of Action with respect to Regan and he is entitled to judgment as a matter of law on those Counts.

C.   **Cohen Did Not Exercise Any Discretionary Authority Or Control Over The Plan**

Scovin cannot meet his burden of establishing that Cohen was an ERISA fiduciary. Cohen played no role in the decision to move APR's employees to the Great-West plan and did not exercise any authority or control, discretionary or otherwise, with respect to the management, control, administration or assets of any of APR's health care plans, including the Plan. Part of Cohen's job responsibilities with APR was to pay its bills. In connection with this responsibility, Cohen performed the purely ministerial function of paying Plan invoices on behalf of APR. Cohen received invoices from Spahn in Denver and paid them. (Id., ¶9). Cohen did not exercise any discretion with respect to the amount to be paid; all he did was issue an APR check and/or execute a banking authorization to cover the amount of the invoice. Moreover, Cohen reported to Benvenuto who directed Cohen as to what invoices needed to be paid immediately and what invoices could wait for payment (Id., ¶10).