IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| WILLIAM SCOVIN<br><br>Plaintiff,<br><br>v.<br><br>GREAT-WEST LIFE & ANNUITY INS. CO., ONE HEATH PLAN, INC., AUERBACH, POLLAK & RICHARDSON, INC., HUGH REGAN, LEWIS COHEN, ROBERT DRAKE and A. JONES YORKE,<br><br>Defendants. | CIVIL ACTION NO.: 02CV01161(AWT)<br><br><br><br><br>JANUARY 12, 2006 |

**DEFENDANTS' LOCAL RULE 56(A)1 STATEMENT**

Pursuant to D. Conn. Civ. L. R. 56(a)1, Defendants Hugh Regan ("Regan"),

Lewis Cohen ("Cohen") and A. Jones Yorke ("Yorke") (collectively, the "Individual

Defendants") respectfully submit their Statement of Undisputed Facts in support of their

motion for summary judgment.

       1.     Plaintiff William Scovin ("Scovin") is an individual residing at 35 Canfield Drive, Bridgewater, Connecticut 06752. Scovin was employed by Auerbach, Pollak & Richardson, Inc. ("APR") as a research analyst from August 1999 to January 2001. *(Scovin Tr. p. 5(2-4)); p. 12(3-10); p. 15(15-16)). (References to Scovin Tr. are to the October 12, 2005 deposition of William Scovin. Excerpts from the Scovin Tr. are attached to the Declaration of James M. Moriarty ("Moriarty Decl."), Sworn to January 12, 2006 and submitted in support hereof, as Ex. 2).[1]*

       2.     Defendant Great-West Life & Annuity Insurance Company ("Great-West") has a principal place of business in Greenwood Village, Colorado. Great-West is in the business, of among other things, providing health insurance products and services to employers. *(Fry Tr. p. 4(6-10)). (References to Fry Tr. are to the August 24, 2005 Fed. R.*

---

[1] Citations to deposition transcripts appear as follows: deponent's name, transcript page number and transcript line in parenthesis.

*Civ. P. 30(b)(6) deposition of Great-West and One Health Plan, Inc. at which Ms. Patricia Fry testified on behalf of Great-West and One Health Plan, Inc. Excerpts from the Fry Tr. are attached to the Moriarty Decl. as Ex. 3).*

3.      One Health Plan, Inc. ("One Health") was a subsidiary of Great-West. One Health was merged into Great-West in either 2002 or 2003. *(Fry Tr. p. 11(17) - 12(13))).*

4.      APR was a Corporation that was principally engaged in the business of investment banking and buying and selling securities for retail brokerage customers. *(Scovin Tr. p. 11(15) - 16(1)).*

5.      During the relevant time period, non-party Auerbach Financial Group ("AFG") was a sixty percent owner of APR. *(Regan Tr. p. 7(15) - 8(6); 17(6)-19(5)). (References to Regan Tr. are to the August 16, 2005 deposition of Hugh Regan. Excerpts from the Regan Tr. are attached to the Moriarty Decl. as Ex. 4).*

6.      Regan is an individual who resides at 269 West 72nd Street, New York, New York, 10023. Beginning in late 1993, Regan served as President of APR and served as a member of the Board of Directors of both APR and AFG. *(Regan Tr. p. 3(4-6); 10(25) - 11(15); 19(16-18)).*

7.      During his tenure at APR, Regan, who was a Series 24 General Securities Principal, concentrated his efforts on investment banking activities. The day-to-day operations of the business were required to be handled by individuals within APR who had the appropriate regulatory licenses to conduct those activities. *(Regan Tr. p. 21(17-25); 24(4) - 25(4)); 114(11-18)).*

8.      Cohen is an individual who resides in New Jersey. Cohen was employed by APR from the Fall of 1998 through the end of June 2001. During his tenure at APR Cohen served as Controller and Financial and Operations Principal (FINOP). *(Cohen Tr. p. 6(5) - 7(13). ((References to Cohen Tr. are to the September 1, 2005 deposition of Lewis Cohen. Excerpts from the Cohen Tr. are attached to the Moriarty Decl. as Ex. 5).*

9.      In his position as Controller and FINOP, Cohen was charged with filing APR's FOCUS Reports and paying its bills. In connection with these responsibilities, Cohen received invoices related to APR's health care plan from its Denver office and caused APR to pay those invoices. *(Cohen Tr. p. 13(18-22); 15(14-21)).*

10.     In or about October 2000, non-party Michael Benvenuto ("Benvenuto") assumed the position of Chief Financial Officer of APR. Cohen reported to Bevenuto and was directed by Benvenuto as to which of APR's invoices needed to be paid immediately and which invoices could wait for payment. *(Cohen Tr. p. 6(17-24); 15(14) - 16(4); 35(20) - 36(1)).*

11.    Yorke is an individual who resides in New York, New York. Yorke served as a member of the Board of Directors of AFG from 1998 until June 2001 and served as a member of the Board of Directors of APR from December 2000 until June 2001. During his tenure on the AFG Board, Yorke served as its Chairman. *(Yorke Tr. p. 7(24) - 8(25); 9(12-18)). (References to Yorke Tr. are to the August 16, 2005 deposition of A. Jones Yorke. Excerpts from the Yorke Tr. are attached to the Moriarty Decl. as Ex. 6).*

12.    During his tenure on the AFG and APR Boards of Directors, Yorke spent three to four days per week at the New York City offices of APR. Yorke spent this time at APR's offices managing his own personal investments. *(Yorke Tr. p. 6(12) - 7(19)).*

13.    Non-party eVision USA.Com, Inc. ("eVision") was a Colorado Corporation and parent company of non-party American Frontier Financial Corporation ("AFFC"). *(See Share Purchase Agreement ("SPA") between eVision, AFFC and APR, Bate stamped 0311-0325, at 0311, attached to the Moriarty Decl. as Ex. 7).*

14.    AFFC was a Colorado Corporation and subsidiary of eVision that was primarily engaged in the business of buying and selling securities for retail customer accounts. *(See Id.).*

15.    In December, 2000 APR entered into a transaction with eVision wherein eVision acquired a forty percent (40%) ownership interest in APR in exchange for APR acquiring assets of AFFC (hereinafter the "eVision Transaction"). *(Regan Tr. p. 17(6) - 19(5); Ex. 7 at section 1.01 and 2.01).*

16.    Prior to the eVision Transaction, the APR Board of Directors consisted of three members: Regan, Yorke and John Sands, who served as Chairman. *(Regan Tr. p. 20(8-11)).*

17.    Pursuant to the terms of the eVision Transaction, eVision had the right to nominate two individuals to the APR Board of Directors. eVision exercised this right, increasing the size of the APR Board of Directors from three to five. *(Moriarty Decl. Ex. 7, at section 3.01; Regan Tr. p. 19(6-15); 20(4-7)).*

18.    Marc Koplik, Esq. served as the secretary of the APR Board of Directors. *(Regan Tr. p. 41(12-14)).*

19.    Non-party Terri Spahn ("Spahn") was the Human Resources Manager of eVision. Spahn became the Human Resources Manager of APR as a result of APR's assumption of AFFC's assets. *(Regan Tr. p. 44(25) - 45(5); Drake Tr. p. 99(19) - 100(3)). (References to Drake Tr. are to the June 29, 2005 deposition of Robert Drake. Excerpts from the Drake Tr. are attached to the Moriarty Dep. as Ex. 8).*

20.    Spahn worked out of eVision's Denver office which moved over to APR following the completion of the eVision Transaction. *(Regan Tr. p. 21(2-10)).*

21.    Non-party Joseph Padilla ("Padilla") was an employee of eVision to whom Spahn reported. Padilla became an employee of APR as a result of APR's assumption of AFFC's assets and served as director of brokerage operations, which is the equivalent of Chief Operating Officer. Spahn continued to report to Padilla after their employment changed from eVision to APR. *(Drake Tr. p. 86(1-16); Regan Tr. p. 82(18-21)).*

22.    Prior to the completion of the eVision Transaction, APR was a forty (40) person firm. As a result of the eVision Transaction, APR grew to a two hundred (200) person firm with fifteen (15) branch offices. *(Regan Tr. p. 24(22) - 25(4)).*

23.    Prior to the eVision Transaction, administration of APR's health care plan was handled by Alexander Baldwin. *(Regan Tr. p. 22(8-17)).*

24.    After the eVision Transaction, responsibility for administering APR's health care plan was transferred to Padilla and Spahn in the Denver office. *(Regan Tr. p. 129(16-22)).*

25.    APR provided health care coverage to its employees through Oxford. *(Regan Tr. p. 21(2-4)).*

26.    eVision provided health care coverage to its employees with Great-West serving as third party administrator pursuant to a Services Contract between Great-West and eVision dated on or about August 1, 2000. *(See Services Contract by and between Great-West and eVision, Bate stamped GW 000452-465 attached to the Moriarty Decl. as Ex. 9).*

27.    Prior to Great-West entering into the Services Contract with eVision, Great-West required eVision to submit an application for group contract. *(Fry Tr. p. 34(7-20)).*

28.    In connection with the health care coverage provided by eVision through Great-West, Great-West prepared a Summary Plan Description ("SPD") describing the benefits available to participants in the eVision health care plan, with information provided by eVision. *(Fry Tr. p. 42(5-25); 45(3-18); eVision USA.Com, Inc. PPO/POS Booklet (Summary Plan Description), Bate stamped SCOV0002-30 attached to the Moriarty Decl. as Ex. 10).*

29.    The SPD specifically names eVision as the Plan Sponsor and Terri Spahn as the Plan Administrator. *(Moriarty Decl. Ex. 10, at p. 23 under the heading "ERISA General Information.").*

30.    After the eVision Transaction, APR decided to move the small group of APR employees who received benefits through Oxford over to the Great-West plan since a vast majority of the employees of the combined companies were already on that plan. This decision was made by the human resources group in Denver. *(Regan Tr. p. 21(5-10); Drake Tr. p. 41(7-24)).*

31.    Regan did not participate in the decision to move APR employees to the Great-West Plan. *(Regan Tr. p. 21(5) - 22(7); 115(22) - 116(16)).*

32.    Cohen did not participate in the decision to move APR employees to the Great-West plan. *(Cohen Tr. p. 12(11-25)).*

33.    Benvenuto advised APR employees that the health care plan was changing from Oxford to Great-West. *(Drake Tr. p. 39(19) - 40(1); 42(6-24)).*

34.    Great-West did not require APR to submit an application for group contract, nor did it require APR to execute a new or amended Services Contract. Great-West simply changed the name of the eVision plan to the APR plan. *(Fry Tr. p. 46(5) – 47(3), 55(4) - 56(16)).*

35.    Terri Spahn remained the plan administrator after the Plan's name was changed from the eVision USA.com Plan to the Auerbach, Pollak & Richardson, Inc. Plan. *(Fry Tr. p. 57(18-21)).*

36.    Upon the termination of his employment from APR, Scovin requested that APR provide him with two months of health care coverage at its expense. APR agreed to Scovin's request and paid for his health care coverage for the requested two month period. *(Scovin Tr. p. 21(6) - 22(6)).*

37.    At the conclusion of the two month period during which APR paid for Scovin's health care coverage, Scovin chose to exercise his COBRA right to continue to participate in APR's health care plan. *(Scovin Tr. 48(9-24)).*

38.    In connection with his enrollment in the APR plan via COBRA in early April 2001, Scovin and/or his spouse had conversations with Spahn and sent all necessary COBRA documentation to Spahn's attention in Denver. *(Scovin Tr. 48(9) - 51(13)).*

39.    All of Scovin's communications with APR regarding its health care plan were with Spahn. *(Scovin Tr. p. 51(5-13)).*

40.    In late May, 2001, a NASD arbitration panel issued an award against APR in an aggregate amount of nearly $3,000,000. APR was required to immediately book this award as a liability on its balance sheet. As a result, APR could no longer meet its net capital requirement and was forced cease all trading activity. *(See NASD Dispute Resolution, Inc. Award in Case No. 98-04806 (Woodley v. Auerbach, Pollak & Richardson, Inc., et al.), attached to the Moriarty Decl. as Ex. 11; (Cohen Tr. p. 8(12) - 9(5); Regan Tr. p. 74(20) - 75(4); Drake Tr. p. 66(19) - 69(9)).*

41.    APR did not anticipate the result reflected by the May 2001 arbitration award; that award essentially put APR out of business. *(Yorke Tr. p. 17(13-21)).*

42.     As a result of the arbitration award and subsequent net capital requirement issues, APR was unable to generate any income and could no longer meet its basic expenses such as payroll and rent. *(Regan Tr. p. 78(13) -79(25); Cohen Tr. p. 17(9-18)).*

43.     APR's last payroll was made on June 15, 2001. *(Cohen Tr. p. 17(22) - 18(4); Drake Tr. p. 45(23-25)).*

44.     During early Summer 2001, Regan, who during 2001 had already been successful in obtaining $1.4 million of capital for APR, worked to bring in additional capital to allow APR to remain viable. *(Regan Tr. p. 77(9-19); 102(2) - 103(12)).*

45.     Cohen worked to file the necessary reports regarding APR's net capital issues with the NASD and other regulatory bodies. *(Cohen Tr. p. 8(12) - 9(11)).*

46.     During this same period of time and continuing through the summer of 2001 Regan and others continued to work at APR without pay in an effort to deal with the multitude of regulatory issues facing APR, as well as with the transfer of its 22,000 customer accounts to new introducing brokers. *(Regan Tr. p. 25(5) - 26(2)).*

47.     On or about June 8, 2001, Great-West sent a letter to Scovin certifying him for a three day length of stay at Danbury Hospital. *(See 06/08/2001 letter from Great-West (One Health) to Scovin, Bate stamped SCOV0173, attached to the Moriarty Decl. as Ex. 12).*

48.     Allison Zellner ("Zellner") was Great-West's senior customer service manager for the APR account. In her role as senior customer service manager, Zellner was in frequent contact with APR. *(Fry Tr. p. 59(2-24)).*

49.     On or about June 20, 2001, Zellner submitted an internal change of address form, changing the address of APR's Denver office to a new address within Denver. Terri Spahn is listed as the Plan Administrator on such form. *(See June 20, 2001 Great-West Life & Health Transmittal Form, Bate Stamped GW00618-619 attached to the Moriarty Decl. as Ex. 13).*

50.     On June 29, 2001, Spahn sent a memorandum to Regan, copied to Yorke, Cohen and Richard Cushing, setting forth APR's outstanding human resources issues, including that the premiums to Great West, among numerous other entities, were outstanding. *(June 29, 2001 Memorandum from Spahn to Regan, Bate stamped 0384-0385, attached to Moriarty Decl. as Ex. 14).*

51.     On June 29, 2001, Spahn drafted a letter to Capital District Physician's Health Plan with respect to group policy number 003132 stating that the group policy should be canceled effective June 30, 2001 as APR's Albany, New York branch office has closed.

*(June 29, 2001, Letter from Spahn to Martha Mabeus at Capital District Physicians' Health Plan, Bate stamped 0347, attached to the Moriarty Decl. as Ex. 15).*

52. On July 2, 2001, Zellner sent an email to other Great-West personnel with the subject: "Auerbach 390075". In the email, Zellner informed her colleagues that she "just received confirmation that this company has been shut down and did not make payroll Friday. They will most likely be in bankruptcy. Please put all claims on hold if they are not already and I will forward more information when I receive it." *(See July 2, 2001 email from Allison Zellner to various recipients, Bate stamped GW000844, attached to the Moriarty Decl. as Ex. 16).*

53. On July 9, 2001, Christy Metros Bougie of Great-West sent an email to her colleagues, including Zellner, in response to Zellner's July 2, 2001 email. In this email, Bougie states that "since they [APR] have had a NSF, we can place this group on hold. Pat will start the process of collecting information for legal." *(See July 9, 2001 email from Christy Metros Bougie to various recipients, Bate stamped GW000843-44, attached to the Moriarty Decl. as Ex. 17).*

54. Also on July 9, 2001, Great-West (through One Health) sent a medical benefits fax setting forth the benefits available under the APR plan. This medical benefits fax, which would have been requested by Scovin or one of his medical providers, does not provide the recipient with any information regarding the current status of the plan, including the fact that it had been placed on hold and that Great-West had confirmed that APR had shut down. *(Fry Tr. p. 78(12) - 80(6); One Health Plan Medical Benefits Fax, Bate stamped SCOV 0502-503, attached to the Moriarty Decl. as Ex. 18).*

55. On July 12, 2001 Scovin underwent bilateral hip replacement surgery at Danbury Hospital. *(See Moriarty Decl., Ex. 1, at ¶32).*

56. On July 13, 2001, Terri Spahn faxed a memo to Jeffrey Scott of Great-West informing him that, effective immediately, Spahn was no longer employed by APR. Spahn directed Great-West to send all future correspondence directly to APR's New York office, but she did not provide Great-West with the name of any individual at APR to whom such correspondence should be directed. *(July 13, 2001 Memorandum from Spahn to Jeffrey Scott of Great-West, Bate stamped GW 000208-212, attached to the Moriarty Decl. as Ex. 19).*

57. Also on July 13, 2001, Great-West approved Scovin for five days of acute rehab at Danbury Hospital. *(Fry Tr. p. 81(25) - 83(9); Great-West screen shot dated July 13, 2001, Bate stamped GW 000823, attached to the Moriarty Decl. as Ex. 20).*

58. On July 16, 2001, Spahn sent a memorandum to Regan and Cohen informing them of a number of outstanding human resources issues, including the fact that APR's payroll had not been met and that APR had not made premium payments to Great-

West, among other entities.  *(July 16, 2001 Memorandum from Spahn to Regan and Cohen, Bate Stamped 0389-0391, attached to the Moriarty Decl. as Ex. 21).*

       59.     Great-West did not send any correspondence to Regan until September 2001, when it faxed a final bill to the APR Denver office.  This final bill eventually found its way to APR's New York office, which had long since ceased conducting business.  *(Letter from Great West to Hugh Regan, Bate Stamped 0145 and APR-0087, attached to the Moriarty Decl. as Ex. 22; Regan Tr. p. 84(3-15)).*

       60.     Great-West sent notices to participants in the APR health care plan informing them that their coverage would continue through September, 2001.  *(Drake Tr. p. 165(20) - 166(14)).*

       61.     Regan never spoke with any representatives of Great-West or One Health regarding the administration of the APR health care plan.  *(Fry Tr. p. 94(2-24)).*

       62.     Cohen never received any correspondence from Great-West or One Health and never spoke with any representatives of either of those entities.  *(Cohen Tr. 24(23-25)).*

       63.     Yorke never received any correspondence from Great-West or One health and never spoke with any representatives of either of those entities regarding the administration of the APR health care plan.  *(Fry Tr. p. 94(2-24)).*

       64.     Regan never made any representations to Scovin regarding the APR health care plan that Scovin participated in via COBRA.  *(Scovin Tr. p. 33(16) - 36(7)).*

       65.     Cohen never made any representations to Scovin regarding the APR health care plan that Scovin participated in via COBRA.  *(Scovin Tr. p. 33(16) - 36(7)).*

       66.     Yorke never made any representations to Scovin regarding the APR health care plan that Scovin participated in via COBRA.  *(Scovin Tr. p. 33(16) - 36(7)).*

       67.     Scovin did not inform Regan that he was to undergo bilateral hip replacement surgery in July 2001.  *(Scovin Tr. p. 62(18-22)).*

       68.     Scovin did not inform Cohen that he was to undergo bilateral hip replacement surgery in July 2001.  *(Scovin Tr. p. 62(18-24)).*

       69.     Scovin did not inform Yorke that he was to undergo bilateral hip replacement surgery in July 2001.  *(Scovin Tr. p. 62(18) - 63(1)).*

       70.     Scovin never entered into a contract with Regan.  *(Scovin Tr. p. 21(6)-22(10)).*

71.    Scovin's alleged emotional distress manifested itself in a loss of sleep and general stress. *(Scovin Tr. p. 43(1-21)).*

72.    Scovin has had one doctor appointment with a general practitioner for treatment of his alleged emotional distress. *(Scovin Tr. p. 44(3-17)).*

73.    Scovin took medication for his alleged emotional distress for a short period of time but did not seek any other medical treatment. *(Scovin Tr. p. 44(18) - 45(9)).*

74.    On or about February 15, 2002, Scovin sent a letter to Cohen at his home address demanding that APR pay his health care claims. This was the first correspondence from Scovin to Cohen regarding the APR health care plan. *(Scovin Tr. p. 64(10) - 65(8)).*

75.    On or about February 15, 2002, Scovin sent a letter to Regan demanding that APR pay his health care claims. This was the first correspondence from Scovin to Regan regarding the APR health care plan. *(Scovin Tr. p. 67(7-21)).*

THE DEFENDANTS
LEWIS COHEN, HUGH REGAN AND
A. JONES YORKE

By:_____
James M. Moriarty (ct 21876)
Kelley Drye & Warren LLP
    Their Attorneys
Two Stamford Plaza
281 Tresser Boulevard
Stamford, Connecticut 06901-3229
Telephone: (203) 324-1400
Facsimile: (203) 327-2669
E-mail: jmoriarty@kelleydrye.com
    and

Richard G. Cushing (ct15997)
Cushing Law Firm, P.C.
420 East 54th Street
New York, New York 10022
Telephone: (212) 371-8880
Facsimile: (212) 704-6288
E-mail: richard.cushing@trautman.com.

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing was

served via overnight courier this 12th day of January, 2006 on all counsel of record as follows:

Kevin M. Greco, Esq.
Stephanie A. McLaughlin, Esq.
Peter M. Nolin, Esq.
Sandak Hennessey & Greco
707 Summer Street
Stamford, Connecticut  06901
(203) 425-4200
(203) 325-8608 (facsimile)
*Attorneys for William Scovin*

Christopher G. Barnes, Esq.
Jeffrey L. Williams, Esq.
Jorden Burt
175 Powder Forest Drive,
Suite 201
Simsbury, Connecticut  06089
(860) 392-5018
(860) 392-5058 (facsimile)
*Attorneys for Great-West Life & Annuity Insurance. Co.
and One Health Plan, Inc.*

Mr. Robert Drake
558 Lime Rock Road
Lakeville, Connecticut 06039
*(Pro se)*

James M. Moriarty