1      paid."

2  A  Correct.

3  Q  What representations did Mr. Regan make to you
4      specifically with respect to these allegations?

5  A  Mr. Regan made no direct representations. Miss Spahn
6      did, and obviously Great-West did. Mr. Regan
7      employed Miss Spahn.

8  Q  Mr. Regan employed Miss Spahn? Or APR employed Miss
9      Spahn?

10  A  Auerbach, Pollak & Richardson, and whatever the
11      newly-emerged entity was, from the merger with the
12      EVision Brokerage in Denver, employed Miss Spahn.

13      Mr. Regan was in some way, shape or
14      form, whatever the official title, the chief
15      executive of that entity.

16  Q  Now, with respect to the same Paragraph Number 27,
17      what specific representations did Mr. Cohen make to
18      you with respect to these facts or these allegations?

19  A  I reiterate what I said about Miss Spahn and the
20      administration of my communication with Auerbach,
21      Pollak & Richardson NUCO.

22  Q  That doesn't answer my question, though. With
23      respect to Mr. Cohen, what specific representations
24      did he make that repeatedly assured --

25  A  I did not communicate with Mr. Cohen.

WILLIAM A. SCOVIN

```
1    Q    Okay.  One way or the other with respect to these
2         allegations of Paragraph 27?
3    A    Correct.
4    Q    What about with respect to Mr. Yorke?
5    A    I did not communicate with Mr. Yorke.
6    Q    And Paragraph 28:
7              "The plaintiff" would be you
8         "relied upon the above representations and conduct
9         of the defendants, their agents and servants to his
10        financial detriment."
11             What conduct of Mr. Yorke did you
12        rely upon as alleged in Paragraph 28?
13   A    I relied upon the word of the Plan Administrator.
14        The Plan Administrator proceeds from and is given
15        authority by the officers of the company to conduct
16        business with the Plan.
17   Q    Okay.  Are you a lawyer, Mr. Scovin?
18   A    No, sir, I am not.
19   Q    Do you have any formal legal training?
20   A    No, sir, I do not.
21   Q    With respect to Paragraph 28, what specific
22        representations did Mr. Cohen make to you that you
23        relied upon?
24   A    Again, no representations other than what I heard
25        from Miss Spahn.
```

WILLIAM A. SCOVIN

| | | |
|---|---|---|
| 1 | Q | Okay. And what did you hear from Miss Spahn? |
| 2 | A | That we had a -- that there was a healthcare plan. |
| 3 | Q | And the same question with respect to Mr. Yorke -- |
| 4 | | Yorke? -- I'm sorry, Mr. Regan -- What specific |
| 5 | | representations did Mr. Regan make to you that you |
| 6 | | relied upon? |
| 7 | A | There was nothing specific from Mr. Regan. |
| 8 | Q | Okay. If you turn to Paragraph 33 which is on the |
| 9 | | next page. |
| 10 | A | Yes. |
| 11 | Q | In the middle of that paragraph, it says that the |
| 12 | | defendant pre-approved your medical care and |
| 13 | | treatment when they knew or should have known that it |
| 14 | | would be unreasonable to do and that such conduct |
| 15 | | would financially harm you and would violate their |
| 16 | | fiduciary obligations to you. |
| 17 | | Mr. Regan never pre-approved your |
| 18 | | medical treatment; correct? |
| 19 | A | Correct. |
| 20 | Q | And Mr. Cohen never pre-approved your medical |
| 21 | | treatment? |
| 22 | A | Correct. |
| 23 | Q | Nor did Mr. Yorke? |
| 24 | A | Correct. |
| 25 | Q | If you turn to the Ninth Cause of Action again. It's |

WILLIAM A. SCOVIN

1  Q   If you turn to the next page, the Eleventh Cause of
2      Action against all defendants for "Infliction of
3      Emotional Distress."
4               In what ways has the emotional
5      distress that you have suffered manifested itself?
6  A   Am I required to answer that question?
7  Q   Yes.
8               ATTORNEY NOLIN: You got a claim
9      for emotional distress. You have to say how you had
10     emotional distress.
11  A   We have had tension in the family. We have had to
12     spend, especially in the first year after the
13     operation, many hours on the telephone talking to
14     healthcare providers explaining the situation, trying
15     to fend off collection proceedings and collection
16     activities.
17              There has been loss of sleep.
18     There have been threats against our financial
19     standing. The general level of stress that
20     accompanies suddenly being inflicted with a large
21     financial obligation for which one had not planned.
22  Q   You said there were threats against your financial
23     standing. Who made the threats against your
24     financial standing? Let me ask you a more pointed
25     question.

WILLIAM A. SCOVIN

| | | |
|---|---|---|
| 1 | A | The hospital, Danbury Hospital, as a pointed example, |
| 2 | | wanted to put a lien on my house originally. |
| 3 | Q | Have you seen any doctors in connection with this |
| 4 | | emotional distress that you have suffered? |
| 5 | A | I had one doctor's visit, yes. |
| 6 | Q | Okay. Who was that doctor? |
| 7 | A | Am I required to answer that? |
| 8 | | ATTORNEY NOLIN: If you are going |
| 9 | | to claim it as part of the litigation, yes. |
| 10 | A | Dr. Roger Carlin C-A-R-L-I-N. |
| 11 | Q | What type of doctor is Dr. Carlin? |
| 12 | A | A general practitioner. |
| 13 | Q | Do you recall when that visit was specifically for |
| 14 | | the emotional distress? |
| 15 | A | I do not recall. |
| 16 | Q | Okay. It was only one visit, you said? |
| 17 | A | Yes. |
| 18 | Q | Okay. Did Dr. Carlin prescribe any medications? |
| 19 | A | Lexipro. |
| 20 | Q | Is it something that you are still taking? |
| 21 | A | No. |
| 22 | Q | How long did you take that for? |
| 23 | A | I don't recall. A short period. |
| 24 | Q | What is Lexipro indicated for? |
| 25 | A | Anxiety, stress. |

WILLIAM A. SCOVIN

| | | |
|---|---|---|
| 1 | Q | Did you see any other doctor? Psychiatrist? |
| 2 | | Psychologist? |
| 3 | A | No. |
| 4 | Q | Are there any other ways that you can think of, other |
| 5 | | than what you have already testified to, as to how |
| 6 | | this emotional distress manifested itself? And by |
| 7 | | "manifest itself," I am talking about either |
| 8 | | psychologically or physically. |
| 9 | A | No. |
| 10 | Q | You can put the Complaint to the side. |
| 11 | A | Thank you. |
| 12 | Q | You have testified today a few times, or at least you |
| 13 | | have mentioned the name Terri Spahn. Who was Terri |
| 14 | | Spahn? |
| 15 | A | She was presented to me as the Administrator of the |
| 16 | | Plan. |
| 17 | Q | Okay. And the Plan would be the -- |
| 18 | A | EVision/POS Great-West Auerbach Plan. |
| 19 | Q | Was it the EVision Plan that subsequently became the |
| 20 | | APR Plan? |
| 21 | A | Yes. |
| 22 | Q | And who presented Miss Spahn to you as the |
| 23 | | Administrator of that Plan? |
| 24 | A | I believe -- I don't recall. No, I don't recall. |
| 25 | Q | Okay. |

WILLIAM A. SCOVIN

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Where is Dr. Roger Carlin located? |
| 3 | A | Danbury, West Street. |
| 4 | Q | Is he still practicing there? |
| 5 | A | Yes. |
| 6 | Q | Do you still see Dr. Carlin on a regular basis, or as need be? |
| 8 | A | As need be. |
| 9 | Q | The Exhibit 3, do you recognize that document? |
| 10 | A | Yes. |
| 11 | Q | Okay. And can you tell me what that is? |
| 12 | A | That is a letter and a Cobra Application Form sent to Terri Spahn. |
| 14 | Q | And it's not signed, but the name Connie M. Scovin is on the bottom. Is that your wife? |
| 16 | A | She is my wife. |
| 17 | Q | And it's dated April 5th, 2001? |
| 18 | A | Yes. |
| 19 | Q | See the fourth line down? |
| 20 | A | Yes. |
| 21 | Q | As of April 5th, your wife is corresponding with Terri Spahn, and she is sending the completed Cobra Election Form for Great-West? |
| 24 | A | Yes. |
| 25 | Q | So as of April 5th, you were aware that the Plan had |

```
 1              changed to Great-West?
 2    A         Yes.
 3    Q         Okay.  And were you in the process of obtaining the
 4              Cobra coverage through Great-West?
 5    A         Yes.
 6    Q         You just don't recall -- strike that.
 7                        Do you recall having any
 8              conversations with Miss Spahn prior to April 5th?
 9    A         I do not recall clearly, but --  I do not recall
10              clearly.
11    Q         Okay.  It's likely that either yourself or your wife
12              spoke to her prior to April 5th in order to obtain
13              the Cobra information; correct?
14    A         It's believable.
15    Q         Okay.  Do you know one way or the other if your wife
16              spoke to Miss Spahn prior to April 5th?
17    A         I do not recall.
18    Q         Okay.  If you look down in the second paragraph of
19              the letter:
20                        To verify our telephone
21              conversation, we need to send a monthly premium
22              directly to you," "you" being Terri Spahn "for
23              $729.79 made out to Auerbach, Pollak & Richardson to
24              arrive by the first of the month."
25    A         Correct.
```

WILLIAM A. SCOVIN

1  Q   Okay. So based on that, do you recall your wife
2      having any telephone conversations with Miss Spahn
3      prior to April 5th?
4  A   No, I do not recall.
5  Q   Do you recall your wife informing you that she had
6      spoken to Miss Spahn prior to that time?
7  A   I don't recall.
8  Q   Okay. You can put that aside.
9              ATTORNEY MORIARTY: Mark this as
10     Defendant's Scovin 4.
11             (Whereupon Letter to Terri Spahn
12     dated April 20, 2001 with Copy of Check for $729.79
13     was duly marked Defendant's Exhibit Scovin 4 for
14     Identification.)
15 Q   Take a look at the document, Mr. Scovin, and tell me
16     if you recognize this.
17 A   Yes.
18 Q   This is another letter from Connie Scovin, your
19     spouse, to Terri Spahn?
20 A   Yes.
21 Q   Dated April 20th, 2001?
22 A   Yes.
23 Q   And if you look at the second sentence again, it
24     says:
25             "As we originally discussed, we

| | | |
|---|---|---|
| 1 | | will send a monthly premium directly to you" being |
| 2 | | Miss Spahn "for $729.79 made out to Auerbach, Pollak |
| 3 | | & Richardson to arrive by the first of the month." |
| 4 | A | Yes. |
| 5 | Q | Okay. Now, all of the communications between either |
| 6 | | yourself or your spouse and APR regarding the APR |
| 7 | | Health Plan were with Miss Spahn; correct? |
| 8 | A | Correct. |
| 9 | Q | Okay. And there were no communications with |
| 10 | | Messrs. Regan, Cohen and Yorke -- |
| 11 | A | Correct. |
| 12 | Q | -- regarding the Healthcare Plan? |
| 13 | A | Correct. |
| 14 | Q | Okay. You can put that one to the side, too. |
| 15 | | ATTORNEY MORIARTY: Mark this one |
| 16 | | as 5. |
| 17 | | (Whereupon E-Mail to William Scovin |
| 18 | | dated April 30, 2001 was duly marked Defendant's |
| 19 | | Exhibit Scovin 5 for Identification.) |
| 20 | A | I read the document. |
| 21 | Q | Do you recognize this document, Mr. Scovin? |
| 22 | A | Yes, I do. |
| 23 | Q | Tell me what it is. |
| 24 | A | It is an informal transcript of a record, a record of |
| 25 | | a three-way conversation between myself, Terri Spahn |

WILLIAM A. SCOVIN

| | | |
|---|---|---|
| 1 | Q | Before 7/19/01, which is the date of the letter? |
| 2 | A | I believe, but I'm still not clear as to the actual |
| 3 | | date of the surgery off the top of my head, |
| 4 | | Counselor. |
| 5 | Q | Do you recall the approximate time frame as to when |
| 6 | | you were in the hospital in connection with the |
| 7 | | surgery? |
| 8 | A | It would have been mid-July. |
| 9 | Q | Okay. And again, on this letter, this letter is not |
| 10 | | addressed to Messrs. Regan, Cohen or Yorke; correct? |
| 11 | A | Correct. |
| 12 | Q | And they are not copied on this letter? |
| 13 | A | Correct. |
| 14 | Q | And their names don't appear anywhere in this letter? |
| 15 | A | Correct. |
| 16 | Q | You never sent them a copy of this letter? |
| 17 | A | Correct. |
| 18 | Q | Prior to your surgery in mid-July, did you ever |
| 19 | | contact Mr. Regan and tell him that you were going to |
| 20 | | be going into the hospital for bilateral hip |
| 21 | | replacement? |
| 22 | A | I do not recall contacting Mr. Regan. |
| 23 | Q | What about Mr. Cohen? |
| 24 | A | I do not recall contacting Mr. Cohen. |
| 25 | Q | What about Mr. Yorke? |

WILLIAM A. SCOVIN

| | | |
|---|---|---|
| 1 | A | I do not recall contacting Mr. Yorke. |
| 2 | | ATTORNEY MORIARTY: Can we take a |
| 3 | | break. |
| 4 | | ATTORNEY NOLIN: It's your |
| 5 | | deposition. |
| 6 | | (Whereupon there was a brief recess |
| 7 | | at this time.) |
| 8 | A | I wanted to clarify a misstatement I made earlier in |
| 9 | | this proceeding. |
| 10 | Q | Okay. |
| 11 | A | I had forgotten about Dennis McAlpine. When you |
| 12 | | asked me about the lines of reporting after the |
| 13 | | manager who had originally hired me left Auerbach, I |
| 14 | | was thinking in terms of that period immediately |
| 15 | | following his departure. |
| 16 | | I forgot about Dennis McAlpine who |
| 17 | | arrived a few months before I left, but I don't |
| 18 | | remember the exact time frame. |
| 19 | Q | Okay. |
| 20 | A | So, please, I did not mean to mislead. |
| 21 | Q | And I appreciate you correcting your testimony on the |
| 22 | | record. |
| 23 | A | Yes. |
| 24 | Q | And just so the record is clear -- |
| 25 | A | Yes. |

WILLIAM A. SCOVIN

| | | |
|---|---|---|
| 1 | Q | -- when you first started at Auerbach, you reported |
| 2 | | to this individual John whose name you -- last name |
| 3 | | you can no longer recall. And then at some point, he |
| 4 | | left, and then you believe you reported to Mr. Regan |
| 5 | | in a de facto manner; and then at some point |
| 6 | | thereafter, Mr. McAlpine became your supervisor; is |
| 7 | | that correct? |
| 8 | A | Correct. |
| 9 | Q | Okay. |
| 10 | | ATTORNEY MORIARTY: Let's mark this |
| 11 | | as Defendant's 9. |
| 12 | | (Whereupon Letter to Lewis Cohen |
| 13 | | from William A. Scovin dated February 15, 2002 was |
| 14 | | duly marked Defendant's Exhibit Scovin 9 for |
| 15 | | Identification.) |
| 16 | Q | For the record, this exhibit bears Production Numbers |
| 17 | | SCOV 159 through 161. |
| 18 | A | I read the document. |
| 19 | Q | Do you recognize this document? |
| 20 | A | Yes, I do. |
| 21 | Q | Tell me what it is. |
| 22 | A | This is a Demand Letter sent to Mr. Lewis Cohen |
| 23 | | demanding recognition of my -- or payment of my |
| 24 | | healthcare benefits under the Plan. |
| 25 | Q | Okay. It's dated February 15, 2002? |

WILLIAM A. SCOVIN

| | | |
|---|---|---|
| 1 | A | It is. |
| 2 | Q | Okay. Is this the first correspondence from you to |
| 3 | | Mr. Cohen regarding your healthcare benefits? |
| 4 | A | I believe so, but I don't recall clearly. |
| 5 | Q | Okay. If there was any other correspondence that you |
| 6 | | had in your custody, possession or control, that |
| 7 | | would have been provided to counsel? |
| 8 | A | That is correct. |
| 9 | Q | Okay. And did Mr. Cohen respond to this letter? |
| 10 | A | I do not recall a response from Mr. Cohen. |
| 11 | Q | Why did you send this Demand Letter to Mr. Cohen? |
| 12 | A | Advice of counsel. |
| 13 | Q | Okay. Who was your counsel at that time? |
| 14 | A | Mr. Peter Nolin and Mr. Kevin Greco. |
| 15 | Q | It was Sandak, Hennessey & Greco? |
| 16 | A | Yes. |
| 17 | Q | Okay. You can put that to the side. |
| 18 | | ATTORNEY MORIARTY: Mark this one |
| 19 | | as 10. |
| 20 | | (Whereupon Letter to Hugh Regan |
| 21 | | from William Scovin dated February 15, 2002 was duly |
| 22 | | marked Defendant's Exhibit Scovin 10 for |
| 23 | | Identification.) |
| 24 | A | I have read the document. |
| 25 | | ATTORNEY MORIARTY: For the record, |

WILLIAM A. SCOVIN

```
 1         recite what I remember his letter saying?
 2   Q     We will strike that question.
 3                   Did you have any conversations with
 4         Mr. Regan after you sent him this letter in February
 5         of 2002?
 6   A     No, I did not, that I recall.
 7   Q     Okay.  Do you recall any conversations with Mr. Regan
 8         prior to sending him this letter in February 2002?
 9         And I am talking about between --
10   A     The time frame, please?
11   Q     That would be good.  January 2001 when you left
12         Auerbach and February 15, 2002.
13   A     I do not recall.
14   Q     Okay.  Was this the first correspondence that you
15         sent to Mr. Regan regarding your healthcare benefits
16         under the APR Plan?
17   A     I do not recall.  It is likely.
18   Q     Okay.
19   A     It is likely.
20   Q     That this is the first correspondence?
21   A     Yes, it is likely.
22   Q     Okay.  You can put that to the side.
23                   ATTORNEY MORIARTY:  Let's mark this
24         one as 11.
25                   (Whereupon Letter to Michael
```

GOLDFARB & AJELLO COURT REPORTING SERVICE
24 East Avenue, New Canaan, Connecticut 06840
203-972-8320