46

1  seen it before.

2      Q.  And had you seen it prior to your involvement in

3  this litigation?

4      A.  I don't think so, no.

5      Q.  For the record, the exhibit bears Bates GW000637

6  through 638.  If you look at the top of the document,

7  it's entitled "Application for Amended Group Coverage."

8  And do you know what an application for amended group

9  coverage is?

10      A.  Just what it says.  I don't know anything more

11  than what the title implies.

12      Q.  You don't know what that means?

13      A.  It's an application for amended group coverage.

14      Q.  Why would one submit an application for amended

15  group coverage?

16      A.  To change the coverage.

17      Q.  And if you look down here on this document --

18  it's dated January 1, 2001 -- it says, administrative

19  changes and then underneath that it says, E-Vision

20  USA.com name changed to Auerbach, Pollak & Richardson,

21  Inc.

22          Do you see that?

23      A.  Yes.

24      Q.  And there is no references on here as to the

25  actual coverage itself being changed, correct?

**GOLDFARB AND AJELLO (203) 972-8320**

47

1    A.   No.

2    Q.   The reference is solely to a name change?

3    A.   Yes, that appears to be, yes.

4    Q.   If you look at the next page, which is Bates

5    stamp 638, it's a document entitled "Administrative

6    Amendment," and it's page number 2 where the first page

7    is page number 1 so it looks like the document goes

8    together.  It says, "Administrative Amendment Signature

9    Pages."

10           Do you know why there is no signature on here?

11   A.   No, I don't.

12   Q.   Do you know if there is a signed application for

13   amended group coverage with respect to the name change,

14   E-Vision plan to the Auerbach, Pollak & Richardson plan?

15   A.   Could you repeat the question please?

16   Q.   Sure.  Do you know if there is a signed

17   application for amended group coverage with respect to

18   the name change from the E-Vision plan to the Auerbach,

19   Pollak & Richardson plan?

20   A.   I don't know.

21   Q.   Do you have any reason to believe that if there

22   was such a signed amendment, it would not have been

23   produced?

24   A.   No.

25   Q.   So you believe it would have been produced?

**GOLDFARB AND AJELLO (203) 972-8320**

55

1    services contract between Great-West and E-Vision dated

2    August 2000?

3        A.   Yes.

4        Q.   Do you know if Auerbach, Pollak & Richardson was

5    required to enter into a services contract in connection

6    with this name change?

7        A.   I don't know that.

8        Q.   If such a contract existed, though, it's your

9    belief it would have been produced?

10       A.   Yes.

11       Q.   And if you look at page Bates 465 of that

12   services contract, there is the application for group

13   contract which we discussed earlier?

14       A.   Yes.

15       Q.   In connection with this name change, was

16   Auerbach, Pollak & Richardson required to submit an

17   application for group contract to Great-West?

18       A.   I don't know.

19       Q.   If such an application was submitted by

20   Auerbach, Pollak & Richardson, it's your belief it would

21   have been produced?

22       A.   Yes.

23       Q.   If you look at Defendants' Exhibit 6, which is

24   the stop-loss contract in connection with this name

25   change, do you know if Auerbach, Pollak & Richardson or

56

1    did Auerbach, Pollak & Richardson enter into a stop-loss

2    contract with Great-West?

3        A.    I don't know.

4        Q.    Is it your belief that if such a stop-loss

5    contract between Auerbach, Pollak & Richardson and Great-

6    West existed, it would have been produced?

7        A.    Yes.

8        Q.    And do you know if -- strike that.

9            Did any of the clients of Great-West enter into

10   stop loss contracts with One Health?

11       A.    I don't think so, no.

12       Q.    So the stop-loss contracts were strictly with

13   Great-West as far as you remember?

14       A.    As far as I recall, yes.

15       Q.    Was the same true of the services contracts?

16       A.    Yes.

17       Q.    Okay.  If you look in Exhibit 7 which is the

18   E-Vision USA.com, Inc. summary plan description that we

19   discussed before --

20       A.    Yes.

21       Q.    -- in connection with this name change, was a

22   new summary plan description prepared?

23       A.    I don't know.

24       Q.    Is it your belief that if a new summary plan

25   description had been prepared or an amended summary plan

**GOLDFARB AND AJELLO (203) 972-8320**

57

1  description had been prepared, it would have been

2  produced?

3      A.   Yes.

4      Q.   And in connection with this name change, as we

5  saw before in the page ending in Bates SCOV0026, plan

6  administrator is Terry Spahn?

7      A.   Yes.

8      Q.   Are you aware of whether the plan administrator

9  changed in connection with this name change?

10     A.   Yes, it did.

11     Q.   And who became the plan administrator?

12     A.   I believe we were directed to Hugh Regan.

13     Q.   At what point in time?

14     A.   Somewhere in the July 2001 time frame.

15     Q.   Do you know if there were any specific documents

16  appointing Mr. Regan as the plan administrator?

17     A.   I did not see any specific documents.

18     Q.   Is it your recollection that up until the July

19  2001 time frame that Ms. Spahn was the plan

20  administrator?

21     A.   That's my understanding, yes.

22     Q.   You can put that to the side.

23     A.   Just to go back, when I said that I didn't see

24  any documents appointing Hugh Regan, that was a specific

25  reference to a specific document appointing him, a formal

**GOLDFARB AND AJELLO (203) 972-8320**

59

1    A.    Yes.

2    Q.    Who is Allison Zellner?

3    A.    She is a customer service manager in our Denver

4    sales office.

5    Q.    Is she currently employed by Great-West?

6    A.    I believe so.

7    Q.    Are you basing your knowledge of Ms. Zellner on

8    what is listed here on the e-mail?

9    A.    That and I worked with her in the past.

10    Q.    Now, as of May 23, 2001, she was a senior

11    customer service manager.  What's a senior customer

12    service manager's duties?

13    A.    They work directly with an employer client with

14    issues with regard to the -- the employer's health plan.

15    Q.    Would the senior customer service manager be the

16    person that is the primary contact for employer client?

17    A.    They are a contact; I don't know that I would

18    say they are the primary contact.

19    Q.    Who would be the primary contact?

20    A.    I don't know that there is a primary contact.

21    Q.    Would the senior customer service manager be

22    somebody who is in frequent contact with the client

23    customer?

24    A.    In most situations, yes.

25    Q.    And if you look at the e-mail, it says:  Terry

**GOLDFARB AND AJELLO (203) 972-8320**

78

1      Q.   Do you know what steps, if any, Great-West or

2  One Health took in this July 2, 2001 time frame to ensure

3  that individuals who had already been pre-certified for

4  procedures were aware that the company had been shut down

5  and would likely be in bankruptcy and their claims were

6  going to be put on hold?

7              MR. BARNES:  Same objection.

8      A.   I'm not aware of any.

9      Q.   You can put that one to the side.  Let me know

10  if you need to take a break at any point in time.

11     A.   I'm fine.

12             MR. MORIARTY:  Mark this.

13             (Defendants' Exhibit 17, Pages stamped

14             SCOV0502-SCOV0503, marked for identification, as

15             of this date.)

16     A.   Okay.

17     Q.   Do you recognize this document?

18     A.   Yes.

19     Q.   Can you tell me what this is?

20     A.   This is a medical benefits fax of what we call a

21  fax-back regarding health plan coverage, a synopsis of

22  coverage for an employee.

23     Q.   For the record, Defendants' Exhibit 17 is Bates

24  stamped SCOV0502 through SCOV0503.

25             Is this another document that you've become

**GOLDFARB AND AJELLO (203) 972-8320**

79

1    familiar with in your role in this litigation?

2        A.    Yes.

3        Q.    Who would request a medical benefit fax?

4        A.    Could you repeat the question?  Sorry.

5        Q.    Sure.  Who would request a medical benefits fax?

6        A.    An individual or provider could request, a

7    member or provider could request one of these by calling

8    through our automated system, using the right prompts,

9    and then asking -- through the prompts, asking for the

10   information to be faxed to them.

11       Q.    And the employee here is listed as William

12   Scovin --

13       A.    Yes.

14       Q.    -- who is the plaintiff in this action?

15       A.    Yes.

16       Q.    So this would have been requested by either

17   Mr. Scovin or one of his medical providers?

18       A.    Yes.

19       Q.    It's dated July 9, 2001?

20       A.    Yes.

21       Q.    And this is a week after Ms. Zellner's e-mail

22   saying she's confirmed that Auerbach has been shut down,

23   correct?

24       A.    Yes.

25       Q.    Is there anything --

80

1          MR. BARNES:  Object to the form of the
2          question.
3      Q.  Is there anything in this fax indicating that
4  the benefits under the Auerbach, Pollak & Richardson plan
5  had been put on hold?
6      A.  No, not about the hold.
7      Q.  Okay.  Put that one aside.
8          MR. MORIARTY:  Mark this.
9          (Defendants' Exhibit 18, Page stamped
10         GW0000823, marked for identification, as of this
11         date.)
12     Q.  Before we get to that, I want to ask you a
13 couple of follow-up questions.
14         Do you know if -- this fax that is dated July 9,
15 do you know if at this point Mr. Scovin had been informed
16 that Great-West had confirmed that Auerbach had been shut
17 down and that all claims were on hold?
18         MR. BARNES:  Object to the form of the
19         question.
20     A.  Can you repeat it?
21     Q.  Sure.  Do you know if as of this fax dated July
22 9 anybody at Great-West or One Health had informed
23 Mr. Scovin that it, meaning Great-West, had confirmed
24 that Auerbach had been shut down and all claims were on
25 hold?

81

1              MR. BARNES:  Same objection.

2      A.   I'm not aware of anything.

3      Q.   Do you know if anybody at Great-West or One

4  Health informed Mr. Regan on or about July 9 that

5  Mr. Scovin had requested this medical benefits fax?

6      A.   I'm not aware of any contact with Mr. Regan.

7      Q.   Same question with respect to Mr. Yorke.

8      A.   No, I'm not aware.

9      Q.   Mr. Cohen?

10     A.   I'm not aware of any contact with Mr. Cohen.

11     Q.   And do you know when Mr. Scovin had the surgery

12 which forms the basis of this lawsuit?

13     A.   Later in July, mid-July I believe.

14     Q.   So it's your recollection it was after the date

15 of this fax?

16     A.   I believe so, yes.

17     Q.   You can put that one aside and go on to 18.

18     A.   Okay.

19     Q.   Do you recognize this document?

20     A.   Yes, I do.

21     Q.   And this is another document that you have come

22 to recognize in connection with your work on this

23 litigation?

24     A.   Yes.

25     Q.   For the record, Defendants' Exhibit 18 is Bates

82

1  stamped GW000823.  Can you tell me what this document is?

2      A.   This is a screen print of our, Great-West's

3  medical management documentation system that indicates

4  contact with the hospital that Mr. Scovin was in.  It

5  reflects two different contacts with the hospital.

6      Q.   Okay.  If you look at the top one, it's dated

7  July 13, 2001, correct?

8      A.   Yes.

9      Q.   And the time is 10:21:06 a.m.?

10     A.   Yes.

11     Q.   In the notes, it says, "Total hip replacement.

12 Hsp -- which I'm assuming is hospital -- wants to move

13 patient to acute rehab in the hospital for estimated

14 five-day LOSPEND 2SOBC."

15          Do you know what that means?

16     A.   Five-day LOS is length of stay; PND is pend; 2

17 SOBC, I'm not sure what the SOBC is.

18     Q.   Neither am I.  Basically what's going on here is

19 the hospital wants to move Mr. Scovin to acute rehab, and

20 they're seeking the approval of Great-West to do so,

21 correct?

22     A.   They are requesting the medical necessity of

23 that move to rehab, yes.

24     Q.   And then if you look underneath the box, it

25 says, "request approved."

**GOLDFARB AND AJELLO** (203) 972-8320

83

1        Is that referring to the request to move

2   Mr. Scovin to acute rehab?

3        A.   The -- are you referring to the second box?

4        Q.   In between the two boxes.

5        A.   Oh, yes, yes, the request's approved, yes.

6        Q.   And this is 7/13/2001 so it's 11 days after

7   Ms. Zellner's internal e-mail stating that Auerbach,

8   Pollak & Richardson had been shut down, correct?

9        A.   Yes.

10       Q.   You can put that to the side.

11            MR. MORIARTY: Mark this.

12            (Defendants' Exhibit 19, Pages stamped

13            GW000208-GW000212, marked for identification, as

14            of this date.)

15       A.   Okay.

16       Q.   Are you ready?

17       A.   Um-hum.

18       Q.   For the record, Defendants' Exhibit 19 is Bates

19   stamped GW000208 through GW000212.

20            Do you recognize this document?

21       A.   Yes.

22       Q.   Do you recall seeing this document prior to

23   becoming involved in this litigation?

24       A.   No.

25       Q.   This is a fax cover sheet with a fax or some

**GOLDFARB AND AJELLO (203) 972-8320**

94

1      A.   I don't know.  I don't recall seeing anything.

2      Q.   Okay.  You can put that aside.  To the best of

3  your knowledge, Great-West never had any conversations

4  with Mr. Regan regarding the administration of the

5  Auerbach, Pollak & Richardson health plan, correct?

6      A.   I'm not aware of any.

7      Q.   Same question with respect to Mr. Yorke.

8      A.   I'm not aware of conversations with Mr. Yorke.

9      Q.   And you are not aware of anybody at Great-West

10  or One Health having those conversations regarding the

11  administration of the Auerbach, Pollak & Richardson plan?

12      A.   I'm not aware of them, no.

13      Q.   Same question for Mr. Regan because I left out

14  One Health.

15           You are not aware of at Great-West or One Health

16  having conversations with Mr. Regan regarding the

17  administration of the Auerbach, Pollak & Richardson plan,

18  correct?

19      A.   I don't recall any.

20      Q.   You don't recall anybody telling you that they

21  had such a conversation?

22      A.   Not that I recall.

23      Q.   Same question with respect to Mr. Cohen.

24      A.   I don't recall.

25      Q.   Mr. Scovin filed complaints with several