Page 18

1    A.    December 20th.

2              MR. CUSHING:  Pardon me.  Yeah.

3    A.    Now, eVision in the end of 2000 acquired a

4  stake in Auerbach, Pollack & Richardson in exchange for

5  assets of their broker-dealer operations.  That's how they

6  paid for their stake, they bought into us.

7    Q.    They bought into you by providing certain

8  assets?

9    A.    Correct.

10   Q.    And they purchased a certain percentage of

11 shares of --

12   A.    Correct.

13   Q.    -- of Auerbach Financial?

14   A.    No.  Auerbach, Pollack, Richardson, Inc.

15   Q.    Of APR.  And who did they buy those shares

16 from?

17   A.    The company.  They were issued them by the

18 company.

19   Q.    So these were newly issued shares?

20   A.    Correct.

21   Q.    What percentage of APR's outstanding shares

22 did eVision obtain in that transaction?

23   A.    They did a designed two-stage transaction,

24 first 24.9 percent and then 15.1 percent 60 days later for

25 a total of 40 percent of newly issued, not outstanding.

6f0a7b5d-db76-4efd-8f9d-ebf08b12f8c4

Page 19

1    So they ended up owning 40 percent of Auerbach, Pollack,

2    Richardson, Inc.

3        Q.    And they had 40 percent as of when,

4    February 2001?

5        A.    Yes.

6        Q.    And after that transaction the officers in

7    APR changed?

8        A.    The officers in APR changed at not even

9    after, at the time of the transaction.

10       Q.    Okay.  How did that change?

11       A.    The board of directors was expanded to

12   include two eVision representatives and the operating

13   officers and the supervisory personnel, and the titles

14   were based out of Denver, they had a far larger operation

15   than we did.

16       Q.    Well, who was the president of APR after

17   that transaction?

18       A.    I remained the president of APR.

19       Q.    Who was the treasurer after that

20   transaction?

21       A.    The corporate treasurer?

22       Q.    Yes.

23       A.    Offhand I don't know.  I think the attorney

24   Mark Koplik I believe was corporate treasurer.

25       Q.    Who was the corporate secretary after?

6f0a7b5d-db76-4efd-8f9d-ebf08b12f8c4

Page 20

1     A.     Excuse me, maybe he was corporate secretary.

2  I'm not sure who was corporate treasurer, I'm not sure if

3  we had one or small private company.

4     Q.     And how big was the board of directors after

5  you added the two people from eVision?

6     A.     I believe it was five at that point for

7  Auerbach, Pollack & Richardson.

8     Q.     And who were the three non-eVision members

9  of the board at that point?

10    A.     I think Mr. Sands was chairman, Mr. Yorke

11 was vice-chairman, and I was a director.

12    Q.     So it would be fair to say that Auerbach

13 Financial still had control of APR?

14    A.     Auerbach Financial Group?

15    Q.     Yes.

16    A.     It still owned a majority of the shares at

17 that point.

18    Q.     And it also controlled three out of five

19 seats in the board of directors?

20    A.     I wouldn't use the word "control"; it had

21 three representatives on the board of directors.

22    Q.     And as result of that transaction did you

23 obtain any interest in the eVision entities?

24    A.     Who's "you"?

25    Q.     Personal.

6f0a7b5d-db76-4efd-8f9d-ebf08b12f8c4

1      A.      No, I did not.

2      Q.      Prior to that transaction the Auerbach APR

3  health plan was through Oxford; correct?

4      A.      To my recollection, yes.

5      Q.      And who made the decision to switch that?

6      A.      The decision to switch was done out of

7  Denver.

8      Q.      And who made the decision to switch?

9      A.      I would imagine Joe Padilla and Terri Spahn

10 and the people who handled health care in Denver.

11     Q.      At that time APR continued to be a separate

12 company, correct, it was not merged into any other entity?

13     A.      It remained the same company that it was, it

14 wasn't merged into any other entity, no.

15     Q.      And you were still president?

16     A.      Yes, I was president.

17     Q.      So are you saying that you had no role in

18 approving the switch of health care providers?

19     A.      None.  In the eight years I had been with

20 Auerbach, I had never been involved in health care, and

21 things that are presented to me are handled by people who

22 handle those areas, so if it's mentioned to me, the

23 decision is left with those parties, it is not within my

24 Series 24 realm of activity.  Those are financial and

25 other administrative duties.

Page 22

1    Q.    But certainly as president you could veto

2    that when you didn't approve of the transaction?

3    A.    Again, nine years or however many years I

4    was with Auerbach, I was never involved with health care.

5    I would have no reason to review or veto.  It was handled

6    by the people that handled it, their recommendation was

7    whatever was done.

8    Q.    Who did it before the transaction with

9    eVision?

10    A.    Whoever handled our health plan in

11    Connecticut where I was based in New York, as you may

12    recall.  So I believe it was Alexander Baldwin for years.

13    And in fact we hadn't been with Oxford.  We were with

14    somebody else who I don't recall.  So, switches occur, we

15    just get notified.  And everybody gets pitched by whoever

16    thinks it's better or representatives of the company, of

17    the provider.

18    Q.    But ultimately isn't it the responsibility

19    of the officers and the board of directors to decide who

20    you're going to use for health care?

21    A.    Not in my book it isn't, not in a small

22    firm.  We're a broker-dealer.  My responsibility relates

23    to brokerage activities, and my supervisory

24    responsibilities relate to trading and research and

25    securities and customers.  Those are administrative and

6f0a7b5d-db76-4efd-8f9d-ebf08b12f8c4

Page 24

1    have been given to people who were involved in health care

2    and benefits in general, as would hosts of other

3    correspondence that are sent to presidents.

4          Q.      And who made the decision in terms of hiring

5    and firing employees?

6          A.      What kind of employees?

7          Q.      Any type of employees of the company.

8          A.      In the brokerage business, our business,

9    branch managers at branch level, regional managers, the

10   benefits employees packages were all handled out of

11   Denver.  Joe Padilla did all the interviewing and

12   screening of new employees, although administrative people

13   can be hired in various branches for various reasons by

14   managers.

15         Q.      And you as president didn't participate in

16   decisions to hire or fire people?

17         A.      On occasion I certainly participated in,

18   particularly as it related to trading or investment

19   banking or research or those areas.

20         Q.      Not operations, though?

21         A.      Well, over what period of time?

22         Q.      Talking 2000/2001.

23         A.      2000, Auerbach, Pollack & Richardson was a

24   40-person firm, so I don't know if we even hired or did

25   anything with any personnel.  In 2001 it was a 200-person

6f0a7b5d-db76-4efd-8f9d-ebf08b12f8c4

Page 25

1  firm, the bulk of which were in the 15 eVision branches

2  and based in Denver, and they were 90 percent deciders on

3  who was hired and fired.  We would be advised periodically

4  of a new addition, and that would be fine.

5       Q.    When did APR cease doing business?

6       A.    Probably should define that.

7       Q.    When did you cease to be an officer of APR?

8       A.    My last paycheck was in mid-June of 2001.  I

9  was around the premises for awhile after that because we

10 have -- I have a fiduciary duty to address customer

11 matters and regulatory matters, so I continued to act in

12 whatever capacity I could for no compensation on customer

13 and regulatory matters, although I was not collecting a

14 pay check or in effect serving as an officer, per se.

15      Q.    When did you cease performing this function

16 for no pay?

17      A.    My last paycheck was in June, June 15th,

18 2001.

19      Q.    When did you cease performing these

20 functions for no pay, as you said?

21      A.    Over the summer of 2001, I would say we had

22 a host of matters to address, 22,000 customer accounts,

23 regulatory issues, trading desk shutdowns, state

24 notifications and a host of other matters, so that was, I

25 think, all completed by -- almost all completed by the end

Page 26

1   of August 2001 right up to 9/11, which completely knocked

2   anything for a loop at that point.

3           Q.      Where was APR's office located in New York?

4           A.      450 Park Avenue.

5           Q.      And that's where your office was?

6           A.      Yes.

7           Q.      When did you vacate that office?

8           A.      That was a matter of litigation with the

9   landlord, and I believe the officers were -- we were

10  evicted, and the officers were vacated around October of

11  2001, perhaps.  After litigation, of course.

12          Q.      And did APR move its New York office to some

13  new address after that date?

14          A.      No, APR really wasn't operating any further.

15          Q.      You say not operating, what did you do to

16  close down APR?

17          A.      22,000, or however many accounts it was,

18  were notified by clearing houses through us and through

19  the NYC, and the firm filed a BDW, broker-dealer

20  withdrawal.  Notices at the time were sent to all state

21  regulators by the financial operations principals and to

22  all the employees at the time, and it unwound is what

23  happened to the broker-dealer.

24          Q.      When was the BDW notice sent?

25          A.      I'm not involved in that, I think that was

6f0a7b5d-db76-4efd-8f9d-ebf08b12f8c4

Page 41

1    Q.    When did you come to learn that it was a
2  self-funded plan?

3    A.    In this case.

4    Q.    In June of 2001 when you indicated you had a
5  board meeting and the board members resign, who was at
6  that meeting?

7    A.    I actually didn't indicate that.  I said I
8  think there was a plan for a board meeting, I don't know
9  if it was ever held, but I think board members got
10  together and advised of their resignations, and that may
11  have been to the corporate secretary at the time.

12    Q.    And who do you recall being the corporate
13  secretary?

14    A.    Mark Koplik.

15    Q.    And where is Mr. Koplik now, do you know?

16    A.    He is at his law firm, I would imagine.

17    Q.    Which is where?

18    A.    In New York City, and -- I think it's in
19  New York City, yes, Henderson Koplik.

20    Q.    Have you spoken to Mr. Koplik about this
21  case?

22    A.    Very limited basis.

23    Q.    What limited basis?

24    A.    I continued to do work with Mr. Koplik in
25  other matters, he knows I'm in some cases about health

6f0a7b5d-db76-4efd-8f9d-ebf08b12f8c4