1  believe the term sheet says.
2      Q.    Did they ever put any money in?
3      A.    The entities associated with them put in
4  approximately $800,000 during that period.
5      Q.    And this would have been May of 2001?
6      A.    No.  It would have been earlier than that,
7  and as late as May 2001, yeah.
8      Q.    Why would they have put money in if the
9  transaction had never actually been signed up?
10     A.    It had been signed.
11     Q.    A letter of intent had been signed?
12     A.    In March a binding letter of intent and then
13  an amended one in May.
14     Q.    Why didn't they complete the transaction?
15     A.    I'd like to know that.  There were issues
16  that they elected not to the pursue, I guess.
17     Q.    Did it have anything to do with the fact
18  that you had to cease your trading activity?
19     A.    You have to ask them.
20     Q.    What did they tell you, what did they claim?
21     A.    It isn't to do with that.
22     Q.    What do they claim?
23     A.    That they had the right to walk away.
24  That's the detailed legal answer required.
25     Q.    You've mentioned Terri Spahn before, was she

1  the person in charge of the health care plan once you
2  completed your transaction with eVision?
3      A.   When we did our transaction with eVision, it
4  is my understanding that Terri Spahn was the health care
5  plan administrator, et cetera for the firm in Denver.
6      Q.   Did there come a time when she resigned the
7  position?
8      A.   I would imagine yes, of course.
9      Q.   When was that?
10     A.   I think in about July of 2000 -- 2001,
11 sorry.
12     Q.   How did you come to learn that she had
13 resigned?
14     A.   I believe everybody in Denver resigned or
15 left.
16     Q.   When was that that everybody in Denver
17 resigned or left?
18     A.   Again, I didn't -- I said I believe
19 everybody in Denver left, and I believe it was summer of
20 2001.
21     Q.   Did the Denver office close?
22     A.   I don't know the circumstances of how it
23 continued itself or what went on.
24     Q.   Did you have any conversations with her
25 about terminating the health plan for APR?

1  because of a capital shortfall, is that correct?
2      A.    The reason FINOPs had elected to take a
3  voluntary cease was because the net capital was not
4  sufficient.
5      Q.    Because you have to have a certain amount of
6  net capital to meet the requirements of the NASD?
7      A.    Yes.
8      Q.    And when the arbitration award was reversed,
9  that changed the books and records of the company in terms
10 of the amount of capital you had listed, correct?
11              MR. CUSHING:  I'm going to object to
12          that, that's a presumption.  I'm going to
13          object to that phrasing of the question,
14          there's a presumption in your question that
15          was a triggering event.
16     A.    Right.  First I'm not a financial and
17 operation principle, not a FINOP.  Second, no, the
18 reversal of the arbitration had nothing to do with the
19 capital.
20     Q.    What caused the capital problem that caused
21 your financial operations people to voluntarily suspend
22 trading?
23     A.    Again, they take a voluntary cease of
24 certain brokerage operations' trading.  The capital
25 calculations again are done by FINOPs, so it can be a host

1  of things. And that includes liabilities and allowable
2  assets. The triggering event was an unfavorable
3  arbitration ruling out of Florida which came in late May,
4  which you have to book.
5      Q.   Was that a different arbitration than the
6  one that ultimately you appealed with Jenkins Gilchrist?
7      A.   Yes.
8      Q.   When was it that cash flow became a problem
9  in terms of paying employees of APR?
10     A.   The final payroll I don't know if it was
11 fully met, and throughout the spring there were cash flow
12 issues that I remember because of the burden of the
13 eVision operation and the absorbing it.
14     Q.   You said the burden of the eVision, is that
15 because you suddenly had so many more offices, you had a
16 higher cash flow roll that you had to put out?
17     A.   There were a lot -- it was a lot larger
18 operation, so they had substantial overhead on a host of
19 things associated with their activities, staff and
20 pay-outs and things.
21     Q.   Was that unexpected when you did the
22 transaction with them in December of 2000?
23     A.   I would say so, yes.
24     Q.   And you said you recall a final payroll you
25 had a problem meeting, when was that final payroll?

Page 77

1  the financial person. That also was -- the clearing house
2  was working with the Denver people, and I just don't know
3  if we received any or they retained. Once you cease
4  operations, clearing houses then have their
5  responsibilities, so I don't know whether we received
6  future settlement checks, as they're called, from the
7  clearing houses. I think that itself was to become a
8  matter of dispute, whether they owed us money back then.
9       Q.    During June and July, were you trying to
10 recapitalize APR?
11      A.    Was I personally?
12      Q.    Yes.
13      A.    During June and July I think the hope was
14 that the arbitration award would come in, which would
15 stabilize things, that the SBI transaction would close,
16 which was intended to finance the growth of the firm, and
17 if that didn't happen, find alternatives to, so, yes, I
18 entertained, as numbers of us did, trying to find new
19 sources of capital or groups to join to put in money.
20      Q.    As part of that process were you looking at
21 the financial structure of APR, you personally?
22      A.    No. That wouldn't be that -- you would
23 first have to have people who were interested at all.
24      Q.    To your recall did APR ever give notice to
25 its employees that you were going to cease paying into the

1  employee health plan?

2  A. I'm not aware that that happened, and I
3  don't know if that ever was noticed by the people who
4  handle that.

5  Q. So you're not aware of any notice being
6  given?

7  A. I'm not aware that that happened.

8  Q. You're not aware that Auerbach ceased paying
9  its health plan?

10  A. Other than this case, which is what I'm
11  being advised now, I'm not aware of any of that; I
12  wouldn't be involved or know of any of that.

13  Q. When you knew that you had problems with
14  cash flow, you were still president of the company;
15  correct?

16  A. Yes.

17  Q. Did you make any inquiry about what was
18  being paid and wasn't being paid?

19  A. No, it's not my area, that's a financial
20  area, so it is not my area.

21  Q. So did you continue to pay your landlord?

22  A. Not that I understand from the litigation.

23  Q. When was a decision made --

24  MR. CUSHING: Objection. Are we
25  talking about the landlord of the office

1           premises at 450 Park?
2                   MR. NOLIN: That would be fine.
3      A.   It is my understanding he was not paid.
4      Q.   When was the payment stopped to that
5  landlord?
6      A.   I don't know.
7      Q.   Who made the decision to stop paying the
8  landlord?
9      A.   I don't know a decision was made to not pay
10 him or not. Whether the resources were there or not may
11 have been the issue, not I.
12     Q.   And nobody reported to you that: We don't
13 have enough money to pay our landlord?
14     A.   When you take a voluntary cease, you don't
15 have enough money to operate. So my area, again, goes
16 directly to the broker-dealer activities and their dealing
17 with the regulators. The parties who deal with the other
18 areas, deal with the other areas.
19     Q.   And did anybody tell you you had a cash-flow
20 problem and that you couldn't pay your New York City
21 landlord?
22     A.   Not specifically, the firm -- people in the
23 firm were aware that we were in a cash-flow problem,
24 obviously, we ceased operations, we're not generating
25 income.