Page 82

1  A.  I didn't say benefits, I said there were a
2  host of bills to be paid routinely, as in any cash-flow
3  thing, you periodically hear about the need to pay bills,
4  so that's all.  To the extent that I would ever be
5  involved in those kind of issues.
6  Q.  Who would you normally hear that from?
7  A.  You would probably here from Mike Benvenuto
8  during that period.  Joe Padilla in Denver if it's
9  referring to the larger operations, things they wanted to
10 get done.  So those two gentlemen.
11 Q.  When did Mr. Benvenuto leave APR?
12 A.  I don't know, I think in early June of 2001.
13 Q.  When did Mr. Padilla leave APR?
14 A.  I think he was there until July of 2001.
15 Q.  And what was Mr. Benvenuto's title?
16 A.  He was the CFO during that whole process,
17 served as CFO.
18 Q.  What was Mr. Padilla's title?
19 A.  He was a director of brokerage operations,
20 as I recall, the equivalent of COO, which is what he was
21 at eVision.
22 Q.  Who is Gail Fanelli?
23 A.  Gail Fanelli worked in New York in reception
24 in general office management.
25 Q.  P or F?

```
                                                          Page 84
1        A.    She was helping out quite a bit during that
2   period, I think she was on unemployment looking for work.
3        Q.    All right.  Showing you what was marked as
4   Exhibit 2, which is a letter from Great-West that is
5   addressed to you, sir.  Do you recall seeing that in
6   September of 2001?
7        A.    No.  I don't think I saw it in September of
8   2001.  I might have, but I think I saw it after that.
9        Q.    When do you think you saw it?
10       A.    Somewhere, it may have been the end of
11  September, I don't know.  This is missing the fax line on
12  the top, as you know.
13       Q.    Okay.
14       A.    So this was faxed over to us from Denver,
15  from the Denver office where it was sent.
16       Q.    And was Mr. Cohen still at the company in
17  the September of 2001 time period; was he still working
18  out of the New York office?
19       A.    Mr. Cohen also was not on payroll and was
20  not -- he may have been coming and going and I think also
21  looking for work, or may have found it by then, I don't
22  know.
23       Q.    And why was that he would direct them to
24  contact you?
25       A.    I don't know that to happen.  I see a note
```

1   the stake in AFG, so they collateralized it with shares.
2          Q.    How much money did Auerbach Financial put in
3   in the period from January 1st, 2001, through July of
4   2001, apart from what they got from SBI?
5          A.    I don't know the answer to that, I think
6   about a million four or five.
7          Q.    And where did that --
8          A.    Over a million dollars.
9          Q.    Where did that money come from?
10         A.    Former lenders to the firm, to Auerbach
11  Financial Group.
12         Q.    Former lenders?
13         A.    Yes, people who had lent in the past to the
14  firm.
15         Q.    And who were they?
16         A.    That includes my mother, mother's family.
17         Q.    Anybody else?
18         A.    In that period, I don't think so, no, I
19  don't think I did.  I had run out, so --
20         Q.    And how much did your mother's family lend
21  to the firm at that time?
22         A.    I don't know the answer to that over time,
23  but it was, during that period it was I think north of a
24  million dollars.
25         Q.    And they were lending to APR or to Auerbach

1  Financial?
2      A.   Auerbach Financial Group.
3      Q.   And then the money went into APR?
4      A.   Correct.
5      Q.   And it went in as how, unsecured or loan?
6      A.   No. The promissory notes are secured notes,
7  all those notes by the assets, but the money from Auerbach
8  Financial Group goes in as equity, as new capital, so
9  standard way of handling broker-dealers.
10     Q.   Did any of the loans, any of those loans get
11 repaid?
12     A.   No.
13              MR. CUSHING: Off the record.
14              (OFF THE RECORD)
15     A.   If they had done this, we wouldn't be
16 sitting here.
17     Q.   If eVision had put in the money they were
18 required to put in?
19     A.   Correct.
20     Q.   What did you do when eVision failed to put
21 the money in?
22     A.   What can I do? We were still working on the
23 Soft Bank transaction to close on that as well, so --
24     Q.   Did you try suing eVision?
25     A.   With what? They're a shareholder, Soft Bank

Page 114

1  where everybody, the whole activity to deal with the
2  day-to-day personnel, are all that way. So yes, there was
3  a branch manager in New York, in the retail activities.
4       Q.   But that was all subsumed in the same office
5  space?
6       A.   The executive offices, the actual
7  headquarters was Stamford I think is all the material you
8  have shows, and New York was the capital markets and
9  investment banking and research where Mr. Scovin and I
10 were with some titles.
11      Q.   Well, you say the home office was Stamford,
12 but was the executive offices were in New York?
13      A.   Well, no, the home office is the executive
14 office. We're a Connecticut northeast BD, so Connecticut
15 was an executive office. However, I resided, which is not
16 unusual in investment banking firms, in New York, and I
17 worked out of New York. My focus was on investment
18 banking research and trading.
19      Q.   So where was Mr. Sands located?
20      A.   He was in New York.
21      Q.   And Mr. --
22      A.   He was in Connecticut also, he had offices
23 in both, he would go back and forth.
24      Q.   Mr. Yorke was?
25      A.   Primarily in New York, although he had at

1   one time been in Connecticut, as I had been as well.
2       Q.    Did you have an office in Connecticut as of
3   2001?
4       A.    Yes.
5       Q.    Okay.  You personally?
6       A.    Yes.  There was an -- I didn't go there very
7   often, my activity was largely banking research and
8   trading and that kind of thing and all these deals you now
9   see or you've known about.
10      Q.    And Mr. Yorke, did he also continue to have
11  an office in Connecticut after --
12      A.    I don't recall if he had a formal office or
13  not.  He was free to use the premises.  As I said earlier,
14  he only used the New York office at his convenience.
15      Q.    Is there any involvement you had with the
16  Great-West medical insurance that we haven't talked about
17  today, basically as I think you said you had none?
18      A.    No, I had no involvement with Great-West
19  other than pursuant to this case, nor with Oxford, nor
20  with any of the health care in my career there, so whoever
21  else were the providers, which I don't recollect.
22      Q.    How was the decision made to go with
23  eVision's coverage as opposed to Auerbach's coverage?
24      A.    Depending on -- it was done out of Denver,
25  and I remember being told by Mike Benvenuto and Joe

Page 116

1  Padilla it was a triple A -- I said this earlier -- and
2  better service, and it was clearly being used by more
3  people who joined us, the eVision people, so they wanted
4  it is the only thing I can gather, and we switched, and
5  that's what happened.
6       Q.    All right.  So you were advised that the
7  switch took place and why it happened, but --
8       A.    No, I was told, as I said earlier, that when
9  you switch providers, somebody comes to your office and
10 tells you how wonderful they are, and I think that
11 happened, and I don't think I even attended, so it's just
12 not an area I'm ever involved in, so that was done out of
13 Denver, and I'm sure all that correspondence and records
14 show that, and it was their policy, and in fact I don't
15 know if anybody in this case has actually seen the policy.
16 Is there a policy or is it an eVision policy?
17      Q.    There's a plan.
18      A.    There's an eVision plan?  Would you mind
19 telling us?
20      Q.    I think you have a copy of it.  Dig and try
21 to fish it out for you if you want.
22      A.    Something funny --
23            MR. CUSHING:  I think we always want
24            to see it.
25      A.    Something funny going on out there.  You

1           more questions.
2                MR. CUSHING:  I asked two questions,
3           and now you're going beyond the scope.
4                MR. NOLIN:  Okay.  You can object to
5           me going beyond the scope if you want.
6       Q.   When the decision to switch to Great-West
7   was brought to your attention, did you do anything to
8   object to that decision?
9       A.   Not that I recall, no.
10      Q.   Because it was not your sphere?
11      A.   I have never -- correct.  Again, if you're
12  advised by people that it's better or higher grade or,
13  et cetera, the same way we went with Oxford when we
14  switched with Oxford years ago, not involved, so those are
15  duties that people handle.
16      Q.   The person primarily responsible for that
17  duty was Mr. Benvenuto?
18      A.   No.  The person primarily responsible for
19  insurance and benefits was Terri Spahn and that department
20  which had four or six people in it in Denver under
21  Mr. Padilla.  Mr. Padilla provided information to
22  Mr. Benvenuto at our end.
23      Q.   Who did Mr. Padilla report to?
24      A.   I don't know if he reported to anybody.  He
25  had six licenses.  For instance, he's the ROP and the CROP