1      am trying to remember when -- just to let me know
2      that it would be fixed. You know, his posture was
3      and his nature is that he was always willing to do
4      what he could to fix things. Okay?
5                    You have to bear in mind, too, one
6      of the events that took place that created this whole
7      environment was that there was an arbitration
8      decision rendered in Florida against the firm Ashtig
9      in Florida by a woman named Eileen Woodley who was a
10     client of the firm who received a judgment in excess
11     of --
12  Q  Four or five million?
13  A  No. I thought it was somewhere in the
14     three-million-dollar range. But since the capital
15     calculations do not permit the offsetting of an award
16     versus a liability, you are required to book the
17     liability.
18                    And the explanation I received was
19     that, "Yeah. Well, we won five and a half million
20     dollars from UBS, but that does us no good because
21     you can't accrue it. You can't account for it as
22     good capital."
23                    Unfortunately, this arbitration
24     decision against you is an immediate liability which
25     is really what forced all the cessation of

|     |   |   |
|---|---|---|
| 1 |   | activities. |
| 2 |   | If that arbitration decision had |
| 3 |   | not come down in Florida, then I'm not so sure we'd |
| 4 |   | all be sitting here today. That was a catastrophic |
| 5 |   | event just by the very nature of what it represented |
| 6 |   | in hard dollars. |
| 7 | Q | The simplistic analysis, if I can try to paraphrase |
| 8 |   | what you said, is the fact that there was this |
| 9 |   | arbitration award which the company had to book as a |
| 10 |   | liability which created the underfunding? |
| 11 | A | Correct. |
| 12 | Q | So now as a result, somebody had to report to the |
| 13 |   | regulators that there was this additional liability; |
| 14 |   | and as a result, the Auerbach person, whomever |
| 15 |   | reported that, would have either said, "We are |
| 16 |   | underfunded," or the NASD would have told them, "You |
| 17 |   | are underfunded"? |
| 18 | A | Yes. |
| 19 | Q | One or the other? |
| 20 | A | It's actually the NASD already knew because they were |
| 21 |   | the forum in which the arbitration was held. But the |
| 22 |   | firm, in its responsibilities to make proper |
| 23 |   | disclosure, would have sent the notice, and I am |
| 24 |   | saying would have sent the notice that said, "We |
| 25 |   | received the decision. Our capital was "X" on this |

```
 1         day.  Now that we have booked this liability, it's
 2         now "Y" today," and that's basically where the bus
 3         stops.
 4    Q    Do you know if that was sent?
 5    A    I don't know.
 6    Q    And when did you get wind of that decision?  Was it
 7         before June 15th?
 8    A    I don't remember.  I don't remember.  I think it was
 9         all around the same time.
10    Q    All right.  And we were talking about the
11         conversation you were having with Regan.  Was that
12         part of that conversation?
13    A    I don't remember who told me that we lost.
14    Q    All right.  Well, just go back to the conversation
15         that you indicated you were having with Regan.  What
16         was the substance of that conversation?
17              You said he had --  something about
18         he wanted to make it right, and it was after you had
19         received the June 15 check, as I understand your
20         testimony.
21    A    In the conversation that I had around June the 15th
22         or shortly thereafter, was that --  you know, were
23         assurances he was in the process of either getting
24         capital or trying to force E-Vision to pony up money
25         that was apparently owed to the firm in terms of the
```

ROBERT DRAKE

| | | |
|---|---|---|
| 1 | Q | You mentioned earlier Terri Spahn? |
| 2 | A | Yeah. |
| 3 | Q | When did she leave? |
| 4 | A | I don't know. |
| 5 | Q | When did you ever speak to her? |
| 6 | | ATTORNEY WILLIAMS: Objection to |
| 7 | | form. |
| 8 | A | I didn't have that much contact with Terri Spahn. It |
| 9 | | wasn't really a necessity for me to speak to her. |
| 10 | | She handled Human Resources and benefits at the |
| 11 | | time. |
| 12 | | Her dealings would have been with |
| 13 | | Mike Benvenuto, Lew Cohen, Joe Padilla -- Joe |
| 14 | | Padilla being the ranking official, her immediate |
| 15 | | supervisor, at least as it was described to me. I |
| 16 | | had very little reason to speak to her. |
| 17 | Q | Okay. Did you ever have a conversation with her? |
| 18 | A | Once about a registration matter, I think. That was |
| 19 | | about it. |
| 20 | Q | And was that before June 15 or after? |
| 21 | A | That would have been before June 15. |
| 22 | Q | All right. Because when the company switched from |
| 23 | | Oxford to Great-West, you were required to fill out |
| 24 | | some paperwork for the new plan? |
| 25 | A | I recall filling out a new form with the personal |

| | | |
|---|---|---|
| 1 | | would have been the Comptroller Cohen. Or is it |
| 2 | | Benvenuto? |
| 3 | A | Benvenuto. |
| 4 | Q | One of those two? |
| 5 | A | Well, it depends on the nature of the question. I |
| 6 | | mean provider service questions would have been |
| 7 | | directed to the provider; and at that time, there was |
| 8 | | no -- we never had reason to believe there was a |
| 9 | | problem with the plan in general. |
| 10 | | So typically, if questions were |
| 11 | | limited to, "Am I covered for hang nail surgery?" |
| 12 | | "Is the plan in full force and effect?" And I |
| 13 | | wouldn't have any reason to discuss it with Benvenuto |
| 14 | | or Cohen while they were still an Oxford |
| 15 | | participant. |
| 16 | | And obviously, you know, I would |
| 17 | | have operated under the same premise when Great |
| 18 | | Western was involved. |
| 19 | Q | All right. So then once Great-West becomes involved, |
| 20 | | Terri Spahn becomes, what I will call, the "point |
| 21 | | person" to speak to if you have any questions, and |
| 22 | | she was employed by E-Vision? |
| 23 | A | She would be the one that you directed your question |
| 24 | | to. The nature of who -- the identity of whom she |
| 25 | | worked for, as far as I was concerned, or as far as I |

| | | |
|---|---|---|
| 1 | | was aware, was for Auerbach, Pollak & Richardson. |
| 2 | Q | She came from the E-Vision group, though? |
| 3 | A | Yes. |
| 4 | Q | And then the two companies were combined somehow, and |
| 5 | | we are a little unclear on that? |
| 6 | A | I would say, yes, we are a little unclear on that. |
| 7 | Q | All right. |
| 8 | | (Whereupon there was a brief recess |
| 9 | | at this time.) |
| 10 | Q | Are you aware that Terri Spahn resigned from the |
| 11 | | company? |
| 12 | A | I was only made aware of that at some point way after |
| 13 | | it became a fact, and I wasn't notified that she had |
| 14 | | resigned.  I wasn't part of the information loop at |
| 15 | | that point. |
| 16 | Q | Okay.  And just so I am clear, at the point after |
| 17 | | June 15, at any time until September '01, I'll say, |
| 18 | | when you received a piece of paper which indicated |
| 19 | | you were still covered under the insurance plan, did |
| 20 | | you ever have a conversation with Terri Spahn wherein |
| 21 | | she expressed concern to you about the plan's |
| 22 | | viability? |
| 23 | A | No. |
| 24 | Q | And just so I am clear, you never had that |
| 25 | | conversation between June or at any time, I'll say, |

ROBERT DRAKE

| | | |
|---|---|---|
| 1 | | any concerns to you regarding the viability of the |
| 2 | | medical plan? |
| 3 | A | No. |
| 4 | Q | Mr. Yorke, up until June 2001, did Mr. Yorke ever |
| 5 | | express any concerns to you regarding the capital |
| 6 | | viability of Auerbach? |
| 7 | A | No. |
| 8 | Q | And up until June of 2001, did Mr. Yorke ever express |
| 9 | | any concerns regarding the viability of the medical |
| 10 | | plan? |
| 11 | A | No. |
| 12 | Q | Now, you had been asked about medical payments that |
| 13 | | you did not have paid during the time period from |
| 14 | | June 2001 through September 2001. |
| 15 | | And if I recall correctly, you had |
| 16 | | said that there were some medical office visits that |
| 17 | | you had incurred expenses for, but that had not been |
| 18 | | paid by the medical program? |
| 19 | A | Yes. |
| 20 | Q | And then you said that as of September, during |
| 21 | | September, you received a letter from the insurance |
| 22 | | company saying that coverage was continued until |
| 23 | | September 15; and after that point, there would be -- |
| 24 | | there would no longer be any medical coverage; is |
| 25 | | that correct? |

ROBERT DRAKE

| | | |
|---|---|---|
| 1 | A | The notice stated that we had coverage for the period |
| 2 | | up until September 15. I don't remember the exact |
| 3 | | content. |
| 4 | | But the purpose of the document, if |
| 5 | | I understand correctly, it's basically so that you |
| 6 | | can show no lapsed coverage when you move on to your |
| 7 | | next insurance carrier. |
| 8 | | But I relied on that document to |
| 9 | | say, "Well then, if you tell me I was covered until |
| 10 | | September 15, you have the obligation to make |
| 11 | | payments on all the payments, even if minor amounts." |
| 12 | | Mine amounted to several hundred dollars. |
| 13 | | That was my posture when I filed |
| 14 | | the Complaint with the State of New York. |
| 15 | Q | In that letter, was there any discussion regarding |
| 16 | | payment of premium? |
| 17 | A | My letter to the State of New York did not make any |
| 18 | | references to payment of premiums. |
| 19 | Q | Not the letter to the State or New York. The letter |
| 20 | | that you received from the insurance company. |
| 21 | A | I don't recall that it did. |
| 22 | Q | Okay. Is that meaning that there was no reference, |
| 23 | | or you just can't recall whether it was in there? |
| 24 | A | I don't recall whether or not it was in there. I |
| 25 | | don't believe that it was. But like I said, I |

GOLDFARB & AJELLO COURT REPORTING SERVICE
24 East Avenue, New Canaan, Connecticut 06840
203-972-8320