UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| _____ ) | |
| ) | |
| WILLIAM SCOVIN ) | |
| ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | CIVIL ACTION NO. |
| v. ) | 3:02 CV 01161 (AWT) |
| ) | |
| GREAT-WEST LIFE & ANNUITY INS. CO., ) | |
| ONE HEALTH PLAN, INC., AUERBACH, POLLAK ) | |
| & RICHARDSON, INC., HUGH REGAN, ) | |
| LEWIS COHEN, ROBERT DRAKE, A. JONES ) | APRIL 3, 2006 |
| YORK ) | |
| **Defendants.** ) | |
| _____ ) | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS REGAN, COHEN, and YORKE'S MOTION FOR SUMMARY JUDGMENT

**I.    PRELIMINARY STATEMENT**

Plaintiff, William A. Scovin ("Scovin"), pursuant to Rule 56 of the Federal Rules of Civil

Procedure and The Local Rules of this District, submits this Memorandum in Opposition to

Defendants' Summary Judgment dated January 12, 2006.  This memorandum is accompanied by

Plaintiff's Rule 56(a)(2) Statement dated April 3, 2006 which disputes the Defendants' claim that

no genuine issues of material fact for trial exist and submits Plaintiff's Statement of Issues of

Material Fact for which Plaintiff contends there are issues to be tried.

1

In their Motion, Defendants argue that they are not ERISA fiduciaries subject to regulation under federal law.  At the same time, Defendants assert that they cannot be held liable under state law because all such claims against it are preempted under ERISA.  The fiduciary status of each Defendant is a factual issue.  Moreover, taking the Defendants' arguments to conclusion, and regardless of the level of the Defendants' involvement in the cabal which deprived Scovin of his medical benefits, Defendants' argument exempts them from any liability under any legal theory.

Plaintiff contends that factually and legally, Defendants are fiduciaries under ERISA and exposed to liability for breach of their fiduciary duties and obligations.  If factually the Defendants are not fiduciaries, then Defendants are outside the ambit of ERISA regulation.  If that is so, Defendants cannot use ERISA to shield themselves from Plaintiff's state law claims.

Additionally, under Rule 56(f), Defendants have prejudiced the Plaintiff's ability to respond to their Motion by untimely producing pertinent investigative documents and findings from the Department of Labor ("DOL").  Defendants produced the documents just 3 days before their Summary Judgment after withholding the documents for over 2 ½ months. Defendants had disclosed only portions in violation of the Court's Orders.  During that time, Defendants requested a settlement dialogue, and for judicial economy, Plaintiff agreed to not waste money and time on pleadings and discovery until a good faith effort was made.  Now, after withholding key documents through settlement efforts until disclosing them at the 11th hour, Defendants moved for judgment on all counts and object to discovery on these issues.  This calculated conduct was designed to gain an unfair advantage in the case.  Accordingly, for all of these

2

reasons, Defendants' Motion for Summary Judgment should be denied or, should it appear to the

satisfaction of the Court pursuant to Rule 56 (f), order a continuance to permit any additional

discovery.

## II.     FACTUAL BACKGROUND

From August 1999 through January 2001, Scovin worked for Auerbach, Pollak, and

Richardson, Inc., ("Auerbach"), a small securities firm with offices in Stamford, Connecticut and

New York City.  While there, Auerbach paid for Scovin's benefits, including an insured medical

plan with Oxford Insurance Co. ("Oxford").  (Plaintiff's Statement, (hereinafter "PS"), Exh. 7,

Scovin Affidavit).  Scovin was advised that in late 2000 Auerbach would merge with another

firm known as Evision USA.Com, Inc.,/American Frontier ("Evision") based in Colorado.  (Id.)

In December of 2000, Auerbach and Evision completed a merger agreement.  All the

Evision employees became Auerbach employees.  Terri Spahn, a former Evision employee in the

Human Resources Department, began working at Auerbach.  (PS, para. 2).  Thereafter,

beginning in January 2001, all of Auerbach's finances, payments, capital funding, etc. occurred

through the office in New York. (PS, para. 2).  Defendant Regan, President of Auerbach, and

Defendant Cohen, the Comptroller and financial operations principal, were responsible for the

financial decisions of Auerbach.  (PS, para. 2, 3, 23, 24).  They were listed on Auerbach's broker

dealer license as control persons.  (PS, para. 5).

Regan performed, among other things, many of the company's administrative

obligations, acts, and services regarding its employees and company benefits.  He was

responsible for running Auerbach and everything related to it. (PS, para. 2, 6).  Defendant

Regan's responsibilities included, hiring personnel and reporting deficiencies in capital. (PS, para. 10). Regan also handled and controlled employee payroll problems. (Id.).

As noted, Defendant Lewis Cohen was Auerbach's Comptroller and Financial Operations Officer ("FINOP"). (PS, para. 7). Cohen, with Regan, decided what bills were to be paid. (PS, para. 23). He was authorized to and responsible for, by example, decisions concerning the viability of and suspension of Auerbach's 401(k) plan and for suspending Auerbach's activities and notifying its employees. Cohen managed payroll matters, including deduction of payments for benefits from employee wages. (PS, para. 18-20, 23). Regan was privy to and involved with these decisions, and was copied on documents related to such decisions. (PS, para. 18). Cohen exercised considerable control over the finances of the company.

Additionally, Regan and Cohen were responsible for and knew of the company's bookkeeping and accounting and segregation of funds to pay for employee medical expenses. (PS, para. 3, 10, 11, 12, 15, 16, 18, 23, 25). Regan routinely kept the company going by directing that Cohen not pay the bills. (PS, para. 24). Regan specifically authorized Cohen as to what checks to write to Great-West to fund benefit payments under the Auerbach Health Plan and in some cases, Cohen made the decision on his own under his general authority granted to him by Regan. (PS, para 23).

Defendant Yorke was a member of the Board of Directors. He was covered under Auerbach's medical plans. In his capacity while working with Auerbach, he met with Auerbach clients and assisted in procuring deals. He was also a counselor to Defendant Regan. (PS, Exh. 20, Yorke Depo, p. 9(4). In addition to that responsibility, he engaged in financial negotiations

for Auerbach with clients.  For example, Yorke traveled with Regan to Hong Kong to meet with principals to procure a financial deal. ( PS, para. 8).  Yorke was involved in the day to day operation of the business and regularly met with staff and clients.  (PS, para 8).   In that regard, he was intimately involved in the decision making processes of Auerbach and its finances.

In January 2001, Scovin resigned from Auerbach.  At his exit interview from Auerbach, Regan as president of the company, agreed that they would pay for Scovin's coverage during February and March 2001.  (PS, para 21). Scovin told Regan that he would opt for COBRA coverage thereafter.  (Id.).  Significantly, Regan did not advise Scovin that Auerbach had decided to cancel its own health insurance coverage with Oxford and would replace that with a self funded administrative service Health Plan provided through Great-West.  Near the end of March 2001, Scovin had not heard from Auerbach regarding COBRA documentation, procedures or payment methods for obtaining health insurance.  (PS, Exhibit 7, Scovin Affidavit).

Auerbach had been providing health insurance to its employees through an insured Plan with Oxford.  After the Evision merger, Auerbach adopted Evision's medical plan, which was self funded.  In other words, rather than providing Health Insurance, Auerbach itself became responsible for the payment of the cost of the medical claims incurred by its employees/ members.  (PS, para. 38-39).  Under order and direction of Regan, the Oxford medical plan was switched to this self insured plan with Great-West.  (PS, para. 37, 38).  Regan authorized the name change on the medical Plan from Evision to Auerbach.  (PS, para. 32).  On February 27, 2001, Regan terminated Auerbach's Health Care Plan with Oxford.  (PS, para. 39).  Spahn was not involved with the switch.  (PS, para 39).

5

In April 2001, in furtherance of the switch to Great-West, Cohen set up and executed the Auerbach Employee Benefits-Banking Authorization letter permitting Great-West Ins. Co. to directly draw from Auerbach's Fleet bank account for the medical expenses due Great-West on a monthly basis. (PS, para 31).  Cohen made it retroactively effective to August 1, 2000 to incorporate the prior Evision Plan.  (Id.).  Defendants Regan and Cohen exercised discretion and control over the then in effect Auerbach Health Plan.  (PS, para. 57, 60, 68, 69, 70, 75, 78, 86).

After inquiring about COBRA, Scovin was referred to Terri Spahn.  Ms. Spahn worked out of Auerbach's Denver, Colorado office (taken over from American Frontier) in the Human Resources Department for the combined companies.  (PS, para. 2).  In April 2001, Ms. Spahn advised Scovin that Auerbach stopped using Oxford and was shifting its employees to Evision's existing health insurance plan (the "Health Plan") which was provided by Great-West effective April 1.  (PS, Exh. 7, Scovin Affidavit).  Ms. Spahn sent Scovin a description of the Health Plan coverage and the appropriate application forms.  Scovin was not provided with the Summary Plan Description setting forth all of his rights under ERISA (the "SPD").  (Id.).  Scovin was not advised the new Health plan was self funded by Auerbach.  (Id.).  Scovin believed that, in making COBRA payments, he was purchasing a Health Plan in which Great-West was serving as an insurer not just an administrator.

Thereafter, beginning in April 2001 and through August 2001, Scovin paid $729.79 each month for his Health Plan coverage.  (PS, Exh. 7, Scovin Affidavit).  Initially, during April, May and June 2001, Scovin's payments were made directly to Auerbach in Denver and then sent to Cohen by Spahn or her colleague.  (PS, Exh. 17).  Beginning in July 2001 Scovin made the

payments to a company known as COBRASERV in Florida. (PS, Exh. 7, Scovin Affidavit). COBRASERV was a company that was retained by the Defendants for the purpose of collecting and processing payments under COBRA plans. (PS, Exh. 7; and PS, para. 92, 94).

Scovin wanted to ensure continued coverage because he had an existing medical condition that required treatment. For several years, Scovin had suffered from intensely painful hip dysplasia. In the Spring of 2001, Scovin and his physicians determined that surgical replacement of both hips was needed. (PS, Exh. 7, Scovin Affidavit). In May and June 2001, Scovin underwent a number of tests, autologous blood extractions and specialist consultations. At relevant times, Scovin, the physicians or medical providers or hospital obtained pre-certification from Great-West that the procedures were medically necessary. (PS, Exh. 7, Scovin Affidavit).

Earlier in 2001, Auerbach was experiencing financial problems. Employees were leaving and cash flow was a concern. (PS, para. 41–52). In May 2001, Auerbach suffered an adverse arbitration award, which despite an appeal, meant Auerbach had to cease trading under NASD rules. Without the ability to trade, Auerbach's cash flow dried up and there was no money for payroll or expenses. (PS, para. 8). Thus, from early 2001, and certainly from May 2001 forward, Defendants were aware that insufficient funds existed to run the company and pay for its benefits. (PS, para 46, 50, 52, 55, 57). Defendant Yorke claims he knew the company was going out of business and consulted with Regan. (PS, para. 63, 64, 65). Regan issued an urgent letter reporting Auerbach's deficiency in capital. (PS, Para. 43). Before then Regan personally pumped in $1.4 million to keep Auerbach running. (PS, Para. 47). Cohen and Regan routinely

kept the company going by not paying bills.  (PS, para. 23, 24).

Scovin learned from industry sources in approximately May 2001, that Auerbach was ordered by securities regulators to halt its trading business as a result of a capital problem. Scovin was not advised that Auerbach was unable to pay its obligations or that there would be any cessation in the COBRA health insurance coverage he was paying for each month.  (PS, Exh. 7, Scovin Affidavit).  Despite their knowledge that the company was in financial jeopardy, that employees were leaving, and that bills were not being paid, Defendants never advised Scovin to seek other medical coverage or that there was any problem with the Health Plan for which he was paying. (PS, Exh. 7, Scovin Affidavit).

By June of 2001, Scovin was finalizing arrangements to proceed with his double hip replacement surgery.  (PS, Exh. 7, Scovin Affidavit).  In accordance with the procedures disclosed to him, he sought formal pre-certification from Great-West, which he received by letter dated June 8, 2001.  (Id.).  Great-West authorized a three day stay at Danbury Hospital under the care of his admitting physician, Craig Foster, MD.   As noted in the certification letter, Scovin understood that he needed to confirm eligibility and coverage immediately prior to the time the treatments were to be rendered.  (Id.).  Accordingly, he, his surgeons, and the hospital made calls to Great-West at the time of his admission to ensure his coverage for the operation.  In all such calls he was cleared to proceed with the operation and was not told of any problem or limitation in his coverage or the Health Plan.  (Id.).

Defendants controlled the Health Plan.  They and they alone had the authority to make final decisions on disputed claims under the Health Plan.  (PS, para. 68).   Around mid June

2001, Spahn told Regan to shut down the Health Plan because the Health Plan could not pay claims if Auerbach would not pay Great-West. (PS, para. 57). Spahn asked them for permission to close the Health Plan and/or to provide notice to its members of the risk that future claims would not be paid. (PS, para. 57). Regan instructed Spahn not to issue such notice and he refused to notify Health Plan participants of the problems, or that any medical services received after June 15, 2001 might not be paid for by Auerbach. (PS. para. 57-60). Regan said that he would take care of the unpaid claims. (PS, para. 57). After Auerbach's last payroll of June 15th, Defendants Cohen, Regan, Yorke, Drake and others continued with Auerbach and performed a variety of company functions. Regan remained in Auerbach's New York offices through approximately October 2001. (PS, para. 61). Among other things, Regan continued with his employment related duties after June 2001. Regan claims he performed fiduciary duties to address customer and regulatory matters and continued to act in whatever capacity he could. (Id.).

The last official Auerbach payroll was June 15, 2001. Not all of Auerbach's June 15th payroll cleared or was good. No payroll occurred after that. (PS, para. 58). After June 15, 2001, Auerbach received residual commissions from sales that had occurred earlier. (PS, para. 59).

Defendants took no steps to wind down Auerbach despite its cash flow collapse. (PS, para. 62, 63). Defendants did, however, direct Spahn to cancel payroll and terminate Ceridian, the independent company administering the company's payroll. (PS, para. 66, 67). Defendants wanted to not pay employees rather than have payroll checks bounce. (PS, para. 71). Spahn was laid off/resigned in writing on June 29, 2001. She identified and explained many pending human

9

resource issues, including the need to fund the Health Plan, to Regan, Cohen, Yorke, and

Attorney Richard Cushing.  (PS, Exh. 24 and PS, para. 68-71).  Spahn memorialized that Regan

had, again, ordered her to perform certain HR related functions and instructed her not to cancel

the Health Plan.  (Id., and PS, para. 55, 60, 68, 71, 74).

On July 12, 2001, Scovin underwent bilateral hip replacement surgery, followed by

intensive physical therapy.  The operation was successful.  ( PS, Exh. 7, Scovin Affidavit).

Throughout this time, Great-West was contractually obligated to perform its services--namely--

certify the medical necessity of requesting members' treatment.  (PS, para. 103).  Scovin's

medical necessity of surgery was precertified by Great-West in July just before his operation.

(PS, para 101).  If Defendants had terminated the Health Plan, Scovin would not have been

precertified.  (PS, para. 102).  If Scovin knew that the Health Plan was on hold or in jeopardy, he

could have postponed his operation until he had obtained other coverage.  (PS, Exh. 7, Scovin

Affidavit).  In total, Scovin incurred $94,220.49 in medical expenses, which he believed should

have been 90% to 100% covered by his Auerbach Health Plan.  (PS, Exh. 7, Scovin Affidavit).

On July 16, 2001, Spahn again wrote/faxed to Regan and Cohen even though she had

resigned on June 29th.  Spahn recapped the multiple outstanding insurance and human resource

issues.  (PS, Exh. 27).  She explained, among other things, that based on the past due premiums,

the Auerbach medical claims had been placed on permanent hold and again suggested that Regan

cancel the Health Plan.  (PS, para. 75).  She also advised Regan and Cohen that the current

arrangement with Great-West was that after the policy was cancelled, two months of premiums

would remain due.  If these premiums were not met, then the medical expenses would default to

the employee for payment, which would be the "worst case scenario."  Spahn reiterated that

Great-West was willing to pay the claims, if Auerbach funded them, and then close out the

account in proper fashion.  (Id., PS, para. 108).   She shipped the HR records to Regan and the

Health Plan invoices to Cohen in New York.  (PS, para. 76, 77).  She forwarded a separate file of

outstanding medical claims to Cohen.  (PS, Exh. 27 and PS, para. 77).

　　　Scovin had continued to forward his monthly COBRA payments in the amount of

$729.79 to Auerbach/COBRASERV for his medicals.  (PS, Exh. 31).  In late July, Scovin sent

his August 2001 payment to COBRASERV.  (PS, Exh. 31).  The payment was accepted and

deposited but was never returned by Auerbach.  (PS, Exh. 7, Scovin Affidavit and PS, para. 92,

94, 96, 97).  As of August 2001, Regan and Cohen were still the contact persons under the

Health Plan.  (PS, para. 86).  Despite receiving and cashing Scovin's COBRA payments,

Defendants did not forward the payments to Great-West to fund the Health Plan.  (PS, para. 97,

98).

　　　The Auerbach Health Plan was not fully funded from May to October 2001.  (PS, para.

44).  No notice of the financial problems, lack of funding, or any problem with the Health Plan

was ever given to Scovin.  (PS, para. 51-55, 68, 71, 74, 84).  Great-West was not authorized to

close down the Health Plan for Auerbach.  (PS, para. 100, 101).

　　　After being advised that Great-West was refusing to pay the medical expenses because

the Health Plan was on administrative hold, Scovin submitted complaints to the Insurance

Commissioners of Colorado, Connecticut, and New York.  Scovin received a letter from Great-

West, dated October 24, 2001, stating that the Health Plan had been terminated in September

because Auerbach had not funded it.  (PS, Exh. 38).  Great-West confirmed that its role was limited to a "record keeper" and a "claims payment agent" for Auerbach.  (Id.).

In early 2002 after months of trying to get a formal determination from both Great-West and Auerbach, Scovin finally was provided with the SPD by Great-West.  Auerbach simply failed to respond. (PS, Exh. 7, Scovin Affidavit).

In furtherance of his complaint to the Department of Labor ("DOL"), an investigation was opened.  Mr. George Maul was the investigator who interviewed many witnesses.  (PS, Exh. 2, Bates #1220-1221 and Exh. 39, Spahn Depo, p. 95(23), 96(20).  On July 11, 2003, the DOL concluded that Defendants Regan and Cohen exercised discretionary control over the Health Plan and were, therefore, fiduciaries under ERISA.[1]  (PS, Exh. 34 and 35).  Furthermore, the DOL found that the Defendants improperly retained employee and COBRA contributions to the Health Plan.  (Id.). The DOL continued that the Defendants were also parties in interest under ERISA and liable for the payment of the claims and for retaining contributions.  (Id.).

Scovin's claim for benefits has never been denied by any Health Plan fiduciary.  No one has ever asserted his care was not medically necessary or that his treatment was not covered by the Health Plan.  (PS, para. 89, 90, 91).  The sole reason his medical costs have not been paid is that Auerbach stopped funding the Health Plan, resulting in an administrative hold" followed by Great-West's termination of its relationship with Auerbach.  (PS, para. 89, 91, 99, 108).

Scovin brings this action by way of an Amended Complaint dated November 1, 2005

---

[1] The DOL documents were withheld by the Defendants in violation of discovery orders as discussed in Section III.E. of this memorandum.

against Auerbach, Regan, Cohen, Yorke, Drake, and Great-West.  As to Regan, Cohen, and

Yorke, Plaintiff, in substance, asserts equitable claims for payment of his medical expenses

under the Health Plan, breach of fiduciary duty under ERISA and various state law claims arising

primarily from the Defendants' failure to notify, disclose, and/or for misrepresentations about

limitations on the available coverage arising from Auerbach's failure to fund the insurance plan,

for accepting Scovin's premium payments, cashing and keeping the payments, and not funding

the Health Plan or paying for his medicals.

## III.    <u>ARGUMENT</u>

While Defendants Regan Cohen and Yorke would have this Court take an illogical and

mechanical view of the law, Plaintiff's position is based on a more logical reading of ERISA

which is supported by recent case law[2].   Plaintiff simply asserts that a genuine issue of fact

exists as to whether the Defendants exercised discretion and control with respect to the Health

Plan or its assets.  In other words, the first issue is whether the Defendants were fiduciaries under

the Health Plan.  If so, a genuine issue exists as to whether the Defendants breached their duties

to Scovin and other Health Plan participants when they, among other things, refused and/or

failed to notify the Health Plan members of funding problems, and allowed the participants to

incur medical expenses at a time when they knew or should have known that the Health Plan was

not being funded, and that the Health Plan would not have funds available to pay the claims.

Moreover, this conduct occurred while they continued to accept the Plaintiff's medical premium

---

[2] It should be noted that by way of a Summary Judgment dated May 5, 2003, Co Defendant Great-West argued the same position as the instant Defendants.  The Court denied Great-West's Motion.

payments yet continued to not notify him, fund the Health Plan, or pay for his expenses.[3] If, as

Defendants so strenuously argue, they are not fiduciaries under the Health Plan and ERISA, then

Scovin believes that Defendants are outside of the ambit of ERISA and are not entitled to invoke

the ERISA's preemption doctrine.  The doctrine has evolved to prevent state law claims against

those parties who *are subject to* ERISA regulation and the remedies provided there under.

### A.     SUMMARY JUDGMENT STANDARD

A motion for summary judgment may not be granted unless the Court determines that

there is no genuine issue of material fact to be tried and that the moving party is entitled to

judgment as a matter of law.  Fed.R.Civ.P. Rule 56(c).  An issue is "genuine" if there is

sufficient evidence such that a reasonable jury could return a verdict for either party.  *Anderson

v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it may affect the

outcome of the suit under governing law.  (Id.).

The burden of demonstrating the absence of a genuine dispute as to a material fact rests

with the party seeking summary judgment, in this case the Defendants.  *See Adickes v. S.H.

Kress & Co.*, 398 U.S. 144, 157,(1970).  Defendants must identify those portions of the

pleadings, depositions, answers to interrogatories, admissions, and/or affidavits which they

believe demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986).

---

[3] In the Preliminary Statement of their memo, Defendants suggest that Terri Spahn, Michael Benvenuto, or Joseph Padilla are at fault for the Plaintiff's damages and should be named as Defendants as well.  Clearly, Defendants cannot dictate who should be named as Defendants in an action.  If these individuals were responsible, Defendants could and would have cited them in as parties to the action.  They did not.  Moreover, neither Spahn, Benvenuto, or Padilla had any authority over the Health Plan, all such employees were under the corporate control of Regan, Cohen, and Yorke, and both Spahn and Benvenuto left Auerbach before Plaintiff's surgery.

The party faced with a properly supported summary judgment motion must come forward with extrinsic evidence, i.e., affidavits, depositions, answers to interrogatories, admissions, etc., which are sufficient to establish the existence of the essential elements to that party's case, and the elements on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322. The Court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. *McLee v. Chrysler Corp*., 109 F.3d 130, 134 (2d Cir.1997). Thus, in this case, all ambiguities are resolved in favor of the Plaintiff.

On the record before this Court, no doubt exists that the Defendants have not met their burden to justify summary judgment. Defendants have not met their burden of establishing the absence of a genuine dispute as to material facts to be tried on each of Plaintiff's claims. Accordingly, this Court may properly deny the Defendants' motion on the grounds that Defendants have failed to meet the basic requirements to prevail under Fed.R.Civ.P. Rule 56(c).

### B.     <u>ISSUES OF FACT EXIST AS TO DEFENDANTS' STATUS</u>

In the Amended Complaint, Plaintiff alleged that Defendants Regan, Cohen, and Yorke were fiduciaries under ERISA. Plaintiff continues that the Defendants breached their fiduciary duties by, among other things, permitting Scovin to proceed with his surgery when they knew or should have known that the Health Plan was on administrative hold, had not been properly funded, and could not pay for Scovin's treatments. *See e.g.,* Amended Complaint, ¶¶ 36-42, 54. Plaintiff has also asserted that the Defendants accepted and used his monthly COBRA payments but never provided the medical coverage. *See e.g.,* Amended Complaint, ¶¶ 19-25. In response,

15

Defendants deny that they are fiduciaries under the Health Plan.  In fact, despite correspondence and testimony to the contrary, each Defendant contends that they had nothing whatsoever to do with the medical benefits or funding of the Health Plan in this case.  Thus, on the face of the pleadings, there is a genuine issue of material fact in dispute for trial on whether the Defendants were ERISA fiduciaries and may be held liable under ERISA for breach of their fiduciary duty.

In their motion, Defendants assert that they exercised no discretionary authority over the Health Plan and thus were not ERISA fiduciaries.  Defendants cite to the definition under 29 U.S.C. Section 1002 (21) (A) which, in pertinent part states that if a person exercises *any* discretionary authority or discretionary control over a plan or the management of its assets, then said person is a fiduciary.  *See* Defendants' Memorandum, p10.  Although the starting point for reasoned analysis of fiduciary status is the agreement between the parties, ERISA also extends fiduciary liability to functional fiduciaries.  Not only the persons named as fiduciaries by a benefit plan may be fiduciaries owing obligations to the members, but also anyone who exercises *any* discretionary control or authority over the Plan's management, administration, or assets. *See*, 29 U.S.C. Sections 1102(a), 1002(21)(A); *see also Mertens v. Hewitt Assoc.*, 508 U.S. 248, 251(1993).  It is well established that ERISA contains its own definition of the term "fiduciary." Pursuant to 29 U.S.C. § 1002(21)(A):

> a person is a fiduciary with respect to a plan to the extent
> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,
> (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or
> (iii) he has any discretionary authority or discretionary responsibility in the

administration of such plan.

The operative word under either sub section (i) or (iii) is "any."  Thus, if Defendant Regan, Cohen, or Yorke exercised *any* discretion or authority regarding the management of the Health Plan, its administration, or the management or disposition of the assets thereof, then a fiduciary status exists.  *See also* 29 C.F.R. § 2510.3-21; 29 C.F.R. § 2509.75-8.  Additionally, failing to ensure that Plaintiff's claims were paid and by retaining Plaintiff's Health Plan contributions, Defendants violated ERISA Sections 404(a)(1)(A),(B) and (D) and Sections 406(a)(1)(B), (D) and 406 (b)(1) which codify Defendants obligations and handling of the assets.

"[W]hether ...an... entity is an ERISA fiduciary must be determined by focusing on the function performed, rather than on the title held."  *Blatt v. Marshall & Lassman*, 812 F.2d 810, 812 (2d Cir.1987).  Further, when courts distinguish fiduciary duties from purely ministerial ones, they look to more than job titles or contract terms.  Thus, the parties' use of the magic words "purely ministerial" does not avoid fiduciary responsibility.  *See IT Corporation v. General American Life Insurance Co.*, 107 F.3d 1415, 1420 (9th Cir. 1997).  For the courts, the issue is not just how the duties are characterized, but what the duties actually encompass.  (Id.).  Therefore, the issue is not a question of law but is rather a question of fact which is not particularly well suited to determination on the basis of a summary judgment motion.

Further, where an actor has any control over disposition of plan money, he is a fiduciary.  *See IT Corporation*, 107 F.3d at 1421.  An actor has control over plan money where he can deplete the account by writing checks.  (Id.). The right to write checks on plan funds is "authority or control respecting management or disposition of its assets."  (Id.).  "An entity need not have

17

absolute discretion with respect to a benefit plan in order to be considered a fiduciary." *Blatt v. Marshall & Lassman*, 812 F.2d 810, 812 (2d Cir. 1987). A person need only have "sufficient control over at least a part of the [Plan] assets to create a fiduciary relationship." *United States v. Glick*, 142 F.3d 520, 528 (2d Cir.1998).

      1.      **<u>Regan Exercised Discretionary Authority and Control Over the Health Plan</u>**

In this case, the record is replete with references to Defendant Regan's exercise of discretion and control. A review of the testimony and exhibits indicates that Defendant Regan's exercise of authority and control over the Health Plan and its financing qualifies him as a fiduciary under the applicable definitions of ERISA.

Regan was the President of Auerbach which was located in New York where all of the finances originated and where the bills were paid. He was intimately familiar with and involved with the company's funds. The testimony from Auerbach employees, Defendant Drake and Terri Spahn of the HR Department, outline that Regan was responsible for the financial decisions regarding the Health Plan. During a Department of Labor interview, investigator George Maul notes that Cohen stated that Regan routinely kept Auerbach going by simply not paying bills. (PS, Exh. 2, #1216). Spahn testified that Regan had the final authority under the Health Plan to make final decisions on disputed claims. (PS, para. 68). Clearly, Regan exercised discretionary authority and control over the Health Plan.

Moreover, with the Health Plan in obvious jeopardy and having not been funded for months, in the wake of claims being placed on hold and no money coming into the company after being undercapitalized, Spahn requested permission from Regan to terminate the Health

Plan and notify the members.  Regan specifically instructed her not to cancel the Health Plan with Great-West and not to notify the employees.  (PS, para. 56, 57, 68).  Spahn was forced to follow Regan's directive.

A review of the documents alone, without testimony, evidences Regan's control.  In writing, Regan personally terminated Auerbach's medical Health Plan with Oxford on February 27, 2001 (PS, Exh. 16) in furtherance of a health insurance memo from Terri Spahn reminding him that the Oxford renewal was set for March 2001.  (PS, Exh. 15).  Regan was responsible to provide notice on Auerbach's financial concerns.  (PS, Exh 18).  He notified Auerbach employees of financial concerns involving payroll.  (PS, Exh. 33).  Regan directed Spahn to notify Ceridian Employer Services to suspend payroll.  (PS, Exh. 22 and Exh. 39, Spahn Depo, p. 46 (25).  He was sent payment notices from Great-West.  (PS, Exh. 30).  Ultimately it was Regan who was in control of Auerbach's finances and what monies were to be paid to whom. The facts show that Regan also violated Sections 404(a)(1)(A),(B) and (D) and Sections 406(a)(1)(B), (D) and 406 (b)(1).

Finally, the DOL itself made a finding that Regan was a fiduciary and violated ERISA. (PS, Exh. 34).  Beyond question, Defendants have not met their burden of establishing that no genuine issue of material fact exists so as to warrant summary judgment.

### 2.    Cohen Exercised Discretionary Authority and Control

In this case, Cohen, like Regan, exercised discretionary authority and control regarding the Health Plan and its funding.  He too, by ERISA definition, was a fiduciary.

Cohen was the Financial Operations Principal.  He was responsible for and knew about

the segregation of funds for employee medical expenses.  (PS, para. 11, 18).  Cohen made

decisions on his own under the general authority granted to him by Regan.  (PS, Exh. 2, #1198

and PS, para. 24).  As Comptroller, Cohen was required to be aware of Auerbach's revenue

stream in terms of sustainability. (PS, para. 30).  Cohen had the authority to make final decisions

on disputed claims under the Plan.  (PS, para. 68).

    With respect to documents, a review of the Exhibits evidences Cohen's control so as to

withstand the Defendants' motion.  Cohen exercised decision making over Auerbach's financial

affairs and contributions.  For example, Cohen personally suspended the company's 401(k)

match contributions.  (PS, Exh. 5).  Cohen restricted Auerbach's activities affecting company

finances, trading, accounts, etc.  (PS, Exh. 6).  Cohen personally authorized Great-West to

directly draw on Auerbach's bank account to fund the Health Plan.  He gave such authorization

retroactive to August 1, 2000.  (PS, Exh. 10).  Cohen was the primary officer responsible for the

Health Plan's funding.  He directed and signed checks directly to Great-West.  (PS, Exh. 13).

The funds came from a separate account set up for the healthcare premiums.  Money was placed

into this account by Cohen.  Spahn sent Cohen Scovin's COBRA payments. (PS, Exh. 17).

Cohen received and deposited the COBRA checks for Health Plan participants. (PS, Exh. 17, 31,

32).

    Cohen made financial and payroll decisions for Auerbach.  He made decisions to suspend

payroll and cancel Auerbach's Capital District Physician's Health Plan.  (PS, Exh. 22, 23).  He

was directly sent memos and also was copied on Terri Spahn's HR and Insurance memos

detailing what they needed to do.  In her memos, Spahn requested instructions on how to

20

proceed. (PS, Exh. 24, 27). Great-West listed Cohen as a contact person. (PS, Exh. 9).

There is no dispute that Plaintiff's medical bills were not paid. Similarly, no dispute exists concerning the fact that the Defendants accepted and negotiated Plaintiff's COBRA checks through August 2001, well after his surgical bills were incurred. (PS, Exh. 7 and 31). The Defendants did not forward the COBRA payments which they received to Great-West to cover Plaintiff's claims. (PS, Exh. 11, Fry Depo, p. 148(14-23). Regan testified that Cohen handled the COBRA checks received after June through October 2001[4]. (PS, Exh. 8, Regan Depo, p. 89 (3-19). Similarly, the premiums deducted from employee paychecks for their 401(k) were kept. (PS, para. 68).

As a control person of Auerbach, Cohen was advised by Terri Spahn about capital deficiencies. (PS, Exh. 39, Spahn Depo p. 9(18), 29(17). Another Auerbach officer named Benvenuto left in April/May 2001 and after that all transactional and financial issues were controlled by Lewis Cohen. (PS, Exh. 39, Spahn Depo p. 30(9), 142(24)-143(3).

Cohen, like Regan, was investigated by the DOL. In its finding about Cohen, the DOL applied the same ERISA definitions which Defendants now reference in defense of this case. The DOL, charged with enforcing ERISA, found and confirmed that Cohen was a fiduciary. It confirmed that Cohen violated his fiduciary obligations, including the failure to ensure that the medical claims were paid and by retaining contributions to the Health Plan in violation of ERISA sections 404(1)(A), (B), and (D), as well as 406(1)(B)(D) and 406(b)(1). In other words, as a

---

[4] In that Regan's comment(s) about Cohen arguably implicate Cohen; and Cohen's comments to the DOL investigator implicate Regan, query whether a conflict of interest exists in connection with defense counsel's representation of the multiple defendants in this case.

fiduciary, the DOL faulted Cohen for keeping the employee COBRA contributions and not paying the claims.  (PS, Exh. 35).

The evidence reveals that Cohen exercised discretionary authority and control over the Health Plan and its funding.  He fits the definition of a fiduciary under ERISA.  Certainly, the evidence is sufficient so as to rebut the Defendants' claim that no issue of fact exists that Cohen exercised any discretion or control.  Defendants have failed to sustain their burden.

3.      **Yorke Exercised Discretionary Authority and Control**

In this case, Defendant Yorke exercised sufficient discretionary authority and control regarding the Health Plan and its funding.  He too, by ERISA definition, was a fiduciary.

Defendant Yorke was on Auerbach's Board of Directors.  He was covered under Auerbach's medical plan.  Yorke, however, was not merely an outside director, while working with Auerbach, he met with Auerbach clients and assisted in procuring deals.  He traveled with Regan on client matters.  Yorke was involved in the day to day operation of the business and regularly met with staff and clients.  (PS, para. 8).  He was also a counselor to Defendant Hugh Regan.  (PS, Exh. 20, Yorke Depo. p. 9(4).  In that regard, he was intimately involved in the decision making processes of Auerbach and its finances.

Defendant Yorke was well aware of Auerbach's financial problems in early 2001.  He knew that Regan had been able to infuse Auerbach with capital in early 2001.  Regan reportedly had pumped in $1,400,000 before the adverse May 2001 NASD judgment of $3,000,000.  With the difficult financing issues, Yorke claims he knew Auerbach was doomed.  Specifically, Yorke discussed his resignation with Regan and the reasons commensurate therewith in a June/July

Board meeting.  (Exh. 20, Yorke Depo. p. 19 (11-25)-20 (1-8).  Yet there is no documentary

evidence that Yorke ever resigned.  Yorke claims he was advised that the Health Plan was being

terminated. (Exh. 20, Yorke Depo. p. 22 (7).  Yorke testified that he first became aware that

Auerbach was not making its payments to the Health Plan at the time he was told the Health Plan

was terminating.  Thus, Yorke, as Regan's counselor, knew that the Health Plan was not being

funded, but there is no evidence he ever did anything about it.

      Yorke also was aware that certain issues needed to be dealt with in connection with

Auerbach.  Yorke believed that Cohen, Regan, and Drake would handle the issues on winding up

the company. (Exh. 20, Yorke Depo. p. 18 (6-15).  In other words, he disregarded or passed

along his responsibilities to those he was counseling.  Certainly, discussions concerning the

obligations in issue occurred and logical inferences can be made in connection therewith.

      Like she did with Regan and Cohen, Terri Spahn of Auerbach's HR Department sent the

June 29, 2001 memorandum to Yorke on the urgent human resource and Health Plan issues

facing Auerbach in late June 2001.  (PS, Exh. Exh. 24).  Spahn asked the Defendants, including

Yorke, for instructions on how to proceed with, among other things, the insurance, the 401(k),

and payroll issues for Auerbach.  Clearly Spahn, of Auerbach's HR Department and familiar

with the Health Plan, believed that Yorke had the authority and capacity to make the necessary

decisions and that is why she copied him on her memorandum.

      In addition, Spahn informed Yorke of her being laid off in June.  As of a July 13th fax, a

date after Plaintiff's surgery, Spahn's records show Defendant Yorke was still employed by

Auerbach. (PS, Exh. 26).  Obviously, Yorke's involvement included personnel, finances, and

authority over the financial obligations of the company, one of which was the Health Plan. Clearly, an issue of fact exists so as to prevent summary disposition of the Plaintiff's claims.

## C.    ERISA DOES NOT PREEMPT PLAINTIFF'S STATE LAW CLAIMS

Assuming that any Defendant prevails in his claim that he is not a fiduciary under ERISA, then this Court should find that Scovin's state law claims against the Defendant(s) for negligence, negligent misrepresentation, negligence in connection with the management of the Health Plan, unfair and deceptive practices under CUTPA, and fraud and deceit, negligent infliction of emotional distress, piercing the corporate veil, and breach of contract are not preempted under ERISA. On page 14 of their Memorandum, Defendants argue that ERISA preempts Plaintiff's CUTPA claim (Seventh Count), and on page 16, argue that Plaintiff's claims of Negligent Misrepresentation (Fifth Count), Fraud (Eighth Count), Negligent Infliction of Emotional Distress (Ninth Count), Breach of Contract (Twelfth Count), and Negligent Management of the Health Plan (Sixth Count) are preempted[5]. Defendants are incorrect.

It has been noted that the scope and interpretation o f the preemption doctrine is a "quagmire of ERISA law." *See Napoletano v. CIGNA Healthcare of Connecticut, Inc*., 238 Conn. 216, 233 (1996), cert. denied, 520 U.S. 1103 (1997). Defendants seek to capitalize on the uncertainty surrounding ERISA preemption to induce this Court into making a simplistic and reflexive decision in favor of preemption. Most if not all the cases citied by the Defendants involve issues concerning the relationships between plans, fiduciaries and beneficiaries, all of whom are directly within the ambit of ERISA's intended scope of regulation and hence

---

[5] Defendants do not argue that the Eleventh Count (Pierce the Corporate Veil) is preempted.

preemption.  If Defendants are not fiduciaries as they contend, then Defendants fall outside of

ERISA.  If that is so, then Defendants should be exposed to Plaintiff's common law claims and

the cases Defendants cite are inapposite.

In enacting ERISA, Congress intended to "protect… the interests of participants in

employee benefits plans and their beneficiaries…by establishing standards of conduct,

responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for

appropriate remedies" 29 U.S.C. § 1001(b).  Preemption of state law works toward that end by

subjecting plans and plan sponsors to a uniform body of law and minimizing the administrative

and financial burdens of complying with conflicting directives among states and between states

and the federal government.  *See New York State Conference of Blue Cross & Blue Shield v.*

*Travelers Insurance Co.*, 514 U.S. 645, 656-657 (1995), quoting *Ingersoll-Rand Co., v.*

*McClendon,* 498 U.S. 133, 142 (1990).

Based on these principles several courts have acknowledged that ERISA will not preempt

claims under state laws of general application that are the basis for claims directed at parties who

are not governed by ERISA.  Thus, the Tenth Circuit has held that ERISA has no bearing on

those laws "which do [ ] not affect the relations among the principal ERISA entities, the

employer, the plan, the plan fiduciaries and the beneficiaries as such." *Woodworkers Supply,*

*Inc., v. Principal Mutual Life Insurance Co.,* 170 F.3d 985, 990 (10th Cir. 1999), quoting *Hospice*

*of Metro Denver, Inc., v. Group Health Insurance of Okla., Inc.,* 944 F.2d 752, 756 (10th Cir.

1991).  "As a corollary, actions that affect the relations between one or more of these plan

entities and an outside party similarly escape preemption." (Id.). quoting *Airparts Co., v. Custom*

*Benefit Services of Austin*, 28 F.3d 1062, 1064 (10th Cir. 1994).  Moreover, there is nothing

inherent in a defendant's status as an insurer which mandates preemption.  *Woodworkers Supply,*

*Inc.* 170 F.3d at 992.

    This Tenth Circuit analysis follows and relied upon the prior analysis of the Fourth

Circuit in *Coyne & Delany Company v. Selman*, 98 F.3d 1457, (4th Cir. 1996).  In *Coyne &*

*Delany* the court reached a similar conclusion that an insurance advisor which was not yet acting

in a fiduciary capacity could not use ERISA preemption to insulate itself from common law

claims including misrepresentation claims.  98 F.3d at 1471.  The Fourth Circuit expressly noted

that Congress did not intend to preempt "traditional state-based laws of general applicability

[that do not] implicate the relations among the traditional ERISA plan entities,  including the

principals, the employer, the plan, the plan fiduciaries, and the beneficiaries." (Id.)., at 1469,

quoting, *Custer v. Sweeney*, 89 F.3d 1156, 1167 (4th Cir. 1996). While other courts had followed

this approach, *see e.g., Reder v. Travelers Plan Administrators of Connecticut*, 44 F. Supp.2d 92

(D. Mass 1999), until recently the Second Circuit had focused on the breadth of ERISA

preemption and permitted preemption to extend even to parties whose conduct was not regulated

by ERISA.  *E.g., Plumbing Industry Board v. E.W. Howell Co., Inc.*, 126 F.3d 61 (1997).

    In *Gerosa v. Savasta & Co., Inc*., 2003 WL 21135687 (2d Cir. May 19, 2003), this

Circuit has under gone a major and very recent reversal in its prior analysis of ERISA

preemption and expressly overruled prior law which had opted for a more broadly preemptive

analysis of state laws which regulate non-ERISA activities.  The Court in *Gerosa* has expressly

followed the Fourth Circuit's analysis in cases like *Coyne & Delany* and reoriented its

presumptions against ERISA preemption.[6] "In conducting that analysis, we begin with the
assumption that "Congress does not intend to supplant state law,", (citing, a presumption that is
particularly strong for 'state action in fields of traditional state regulation,'" (Id.)., quoting *New
York State Conference of Blue Cross & Blue Shield v. Travelers Insurance Co.*, . 514 U.S. at
654-55, citing, *Maryland v. Louisiana*, 451 U.S. 725, 746, (1981); *Hillsborough County v.
Automated Med. Labs., Inc*., 471 U.S. 707, 719; *Rice v. Santa Fe Elevator Corp*., 331 U.S. 218,
230, (1947). As *Gerosa* notes:

> we begin with the presumption that Congress does not intend to displace state law,
> especially in traditional areas of state control.. Regulating the professions, particularly
> under a rubric of professional malpractice, is a traditional state function. ERISA's
> principal goal is to "protect ... the interests of participants in employee benefit plans and
> their beneficiaries."

Id. (Citations omitted). In allowing a claim against an actuary of a plan even when an ERISA
claim might also exist, *Gerosa* ultimately concluded, "that especially in light of our presumption
in favor of preserving traditional state law, Congress cannot have intended to preempt the
Trustees' unexceptional state-law claims. Any other result would threaten the very purposes
Congress had in mind when it enacted ERISA". (Id.).

In *NYS Health Maintenance Org. Conference v. Curiale*, 64 F.3d 794, 798-99 (2d

---

[6]*Gerosa* ruled that the preemption analysis in *Diduck v. Kaszycki & Sons Contractors, Inc*., 974 F.2d 270 (2d
Cir.1992), however, is no longer consistent with prevailing Supreme Court precedent. "Indeed, several of our sister
circuits have noted that *Travelers* occasioned a significant change in preemption analysis, and required careful
reconsideration of any preexisting precedent dependent on the expansive view of "related to" that held sway before
it." *See Trustees of AFSTR Health Fund v. Bondi*, 303 F.3d 765, 773 (7th Cir. 2002); *Ariz. State Carpenters Pension
Trust Fund v. Citibank*, 125 F.3d 715, 723 (9th Cir.1997) 723; *Coyne & Delany*, 98 F.3d at 1469 n. 14; *cf. Cicio v.
Does*, 321 F.3d 83, 99 (2d Cir 2003)("[T]he Supreme Court has ... thrown 'cold water' on the idea that state
regulation of health and safety is necessarily preempted even when it overlaps with rights protected by ERISA."
(quoting *Pegram v. Herdrich*, 530 U.S. 211, 237, (2000))."

Cir.1995), the Court again recognized that ERISA's preemptive breath did not extend to laws of general application if their effect upon ERISA plans is incidental.  In *Geller v. County Line Auto Sales, Inc.,* 86 F.3d, 18, 23 (2d Cir. 1996), the Court held that a common law fraud claim was not preempted by ERISA even though it arose out of defendant's improper administration of the Plan.  Recently, in *Mortgage Lenders Network USA, Inc. v. Coresource, Inc*., 335 F.Supp.2d 313 (2004), the Court permitted the plaintiff to recover under a claim of common law breach of fiduciary duty against the Defendant's argument that ERISA preempted the claim.  The Court ruled that plaintiff's common law breach of fiduciary duty claim was not preempted because, among other things, such a claim is only incidentally connected to the ERISA plan and does not impact the regulation of ERISA.

The approach adopted by the *Geller* and *Gerosa* Courts, as well as other circuits, should be controlling here.  If as Defendants contend, they were not acting as an ERISA fiduciary, then Defendants act outside the ambit of relationships regulated by ERISA.  This would be so because the Defendants would not be acting as a beneficiary, sponsor, administrator, plan, or fiduciary under ERISA.

In addition, the reasoning in *Geller,* and other decisions, finds that preemption is inappropriate and evidences that Plaintiff Scovin's common law claims are viable.  While, for example, the heading to Plaintiff's Sixth Cause of Action is labeled "Negligent Management of the Plan" and Defendants challenge this heading, a review of the allegation reveals that Count Six sounds in a claim based on the Defendants mismanagement and breach of their common law fiduciary duties.  In Paragraphs 1-76 of the Amended Complaint, Plaintiff asserts the basis of the

mismanagement and breach of duty.  Among other things, Plaintiff alleges in paragraph 20 that

Regan agreed to provide his medical benefits and COBRA continuation.  That Plaintiff paid

COBRA payments to and which were negotiated by Auerbach and its officers in paragraphs 23-

24.  That he was not advised of Health Plan changes and that Auerbach had capital problems.

Paragraphs 25-29.  That the Defendants knew of the adverse status of the Health Plan as set forth

in Paragraph 29-30, 39.  In paragraphs 40-42, Plaintiff continues that despite their knowledge,

Defendants took no steps to advise Scovin, notify him, close down or terminate the Health Plan

despite their obligations to Scovin.  Scovin continues that the breach of their duties and conduct,

and omissions as alleged in paragraphs 47-48 caused him harm, financial loss, and emotional

distress.  These paragraphs are incorporated into the Sixth Count which Plaintiff titled

"Negligent Management of the Plan By All Defendants Under State Law."  While Defendants

argue that the "heading" of Count Six is novel, a basic reading of the allegations set forth therein

reveals that it constitutes a common law claim of a breach of their fiduciary obligations.  As

noted above, Courts recognize that common law breach of fiduciary duty claims are not

preempted by ERISA.

Scovin's unexceptional state law claims for common tort relief on theories of negligence,

negligent misrepresentation, negligence in connection with the management of the Plan, unfair

and deceptive practices under CUTPA, fraud and deceit, negligent infliction of emotional

distress, piercing the corporate veil, and breach of contract should not be preempted.  Scovin's

alternative state law claims and remedies should remain if this Court finds that any Defendant is

not subject to ERISA regulation because such Defendant was a fiduciary.   Any other analysis

29

would leave Scovin an ERISA beneficiary without relief against a party he alleges was a

principal in depriving him of healthcare coverage for which he paid and plainly deserves.

### D.    THE SUFFICIENCY OF PLAINTIFF'S COMMON LAW CLAIMS

Defendants argue that some, but not all of Plaintiff's common law counts fail because

Scovin cannot meet his burden on the necessary elements.  Defendants contend that Plaintiff's

Fifth (Misrepresentation), Eighth (Fraud), Ninth (Emotional Distress), Eleventh (Pierce the

Corporate Veil) and Twelfth (Breach of Contract) Counts are insufficient.  Throughout their

Memorandum, Defendants constantly argue that they had no control over any aspect of

Auerbach, its financing, its financial integrity, or the Plan.  Plainly, this is untrue.

### 1.    Pierce the Corporate Veil

With respect to Plaintiff's Eleventh Count, Defendants state that they had no control over

APR and "Scovin can not point to a scintilla of evidence to support this frivolous claim."

Defendants' Memorandum, p. 22.  As Defendants should know, the issue before the Court is

whether a factual issue exists when viewed in the light most favorable to the Plaintiff.

As regards facts outlining the Defendants' authority and control, Plaintiff respectfully

points the Court to the discussions in the Fact Section and Section II above which outline the

issue and establish that an issue of fact exist.  Of particular importance is that Defendants, with

knowledge of the adverse financial status in April/May 2001, decided what expenses were to be

paid and kept the company going by not paying certain bills.  (PS, para. 9-11, 18-25).  They were

internal conspirators running the company at the expense of the employees' pay and benefits.

Defendants directed and controlled 401(k), insurance, and payroll payments.  (PS, para. 30-46).

Spahn answered to the directives of Regan and Cohen concerning payroll, 401(k) contributions, and with respect to the Health Plan. Regan personally cancelled the Oxford Health Plan. Spahn asked Cohen, Regan, and Yoke for instructions on what to do with the numerous HR issues she faced, in particular regarding the Plan, and they directed her.

After it ceased trading operations, Defendants claim that Auerbach had no money. Even though Defendants claim that Auerbach was no longer in business, Regan *personally* paid $100,000-$150,000 to Appeal the arbitration decision. (PS, Exh. 8, Regan Depo p. 69 (6)-70 (2). Thus after the trading ban was imposed, Cohen, Regan and Yorke continued to run Auerbach with some hope they could rejuvenate it for their own benefit after they had terminated payroll and forced most if not all low level employees to resign.

Most significant for this analysis is the complete lack of corporate formality with which Regan, Yorke and Cohen ran Auerbach. By their own admissions they did not pay bills timely to keep Auerbach running. Ms. Spahn testified that these Defendants used employee 401(k) contributions for other purposes. It is apparent that Scovin's COBRA payments were diverted to uses other than paying for his health care. Defendants have failed or refused to produce any books or records of the company. Thus no checking or bank records have been produced. The boxes of documents Terri Spahn sent directly to Regan's office are "missing." No minutes have been produced of the shareholder meetings or meetings of the Board of Directors and officers such as Yorke and Cohen suspiciously are undocumented. The evidence, thus, clearly raises a factual issue as to whether Auerbach was ever a true corporation or rather merely a shell run for the benefit of Regan, Yorke, and Cohen.

31

Defendants have no records to show where Scovin's post surgery COBRA payments went after the Company ceased doing business. Defendants received commissions after June 15th. Defendants kept Scovin's insurance payments. Defendants did not pay Great-West. (PS, para. 97-98) .So where is Plaintiff's money? Defendants have refused to account.

With these issues outstanding and viewed in a light most favorable to the Plaintiff, an issue of fact exists as to whether Regan, Yorke, and Cohen are liable on piercing the corporate veil theory. Defendants have not met their burden to support a disposition of this claim.

## 2.    Plaintiff's Negligent Misrepresentation and Fraud Claims

Defendants argue on page 17 of their Memorandum that Plaintiff's Fifth (Negligent Misrepresentation) and Eighth (Fraud and Deceit) Counts fail because Defendants made no representations to the Plaintiff. The law is well established that both representations *and* omissions or non disclosures give rise to such claims.

In the incorporated paragraphs of Counts Five and Eight of the Amended Complaint, Plaintiff explains the relationships and duties owed by the Defendants. Paragraph 68-70 expand this further. Paragraphs 71 asserts that the Defendants negligently omitted telling Scovin of the Health Plan's financial dilemma and paragraphs 72-74 continue that their failures and omissions caused him harm. In the Amended Complaint paragraph 48, Plaintiff notes that Defendants' failures deprived Plaintiff of obtaining alternative insurance coverage that would have covered his expenses.

Early on under the common law, parties could remain silent if no duty existed between individuals to disclose. As the law evolved, a duty to disclose arose in situations where a

fiduciary relationship exists, or where in a business relationship, for example, the party knows

that certain facts are material or when a situation occurs rendering new facts to be material.

Nondisclosure is a failure to disclose facts. *Haddad v. Clark,* 132 Conn. 229, 233 (1945).

To constitute misrepresentation or fraud by nondisclosure, there must be a failure to disclose

known facts and, an occasion or circumstance which imposes a duty to speak. Id.; *see also*

*Watertown Savings Bank v. Mattoon,* 78 Conn. 388, 393 (1905); *Behrmann v. Behrmann*, 110

Conn. 443, 446 (1930); *Ceferatti v. Boisvert*, 137 Conn. 280, 283 (1950); Restatement Torts,

Second, Section 551.  A nondisclosure of pertinent information is as deceptive of an act as an

affirmative misrepresentation.  *See Bailey Employment System v. Hahn*, 545 F. Supp. 62, 67 (D.

Conn.).

Based on the above discussions, it is clear that the Defendants exercised control and

authority over many aspects of the Health Plan.  Regan agreed to Scovin's continuation under the

Health Plan and under COBRA.  In furtherance thereof, Scovin's monthly checks were accepted

through August 2001, after his surgery and months after Auerbach's trading activities ceased.

These Defendants controlled Auerbach's finances.  Defendants exercised control over what to

pay and what not to pay.  Defendants routinely kept Auerbach going by not paying the bills.

They knew both Auerbach and the Health Plan were in jeopardy during April and May 2001, and

certainly in June.  Spahn told them that the Health Plan was not funded.  She asked permission to

shut the Health Plan down and to notify the members.  Her request was specifically denied.

Clearly, with the status of Auerbach and their knowledge, these Defendants had a duty to

among other things, notify the Plaintiff.  They should not have accepted his payments and kept

them without paying the Health Plan.  Their nondisclosure in the face of their duty to disclose

information to Plaintiff, and their duty to return his COBRA payments if not paying his claims,

clearly constitute misrepresentation and fraud.

### 3.    Emotional Distress

Defendants argue that Plaintiff's claim in Count Nine for Emotional Distress does not lie

because Scovin's distress was not foreseeable and was not severe.  Defendants' Memorandum, p.

19.  Under the standard of review before the Court, the severity of and recovery of damages for

emotional distress is clearly an issue of fact for the jury.  Not one for summary judgment.

Recovery for emotional distress does not depend upon proof of either an ensuing physical

injury of a risk of harm from physical impact.  *Montinieri v. Southern New England Telephone*,

175 Conn. 337, 345 (1978).  An award for mental or emotional distress is valid even though not

based expert medical testimony or on incurred medical expenses.  *See Oakes v. New England*

*Dairies, Inc*. 219 Conn. 1, 15 (1991).  The test is whether the amount awarded falls within the

necessarily uncertain limits of just damages.  Id., *see also Berry v. Loiseau*, 223 Conn. 786, 811

(1992) (fear of reprisal, sleep disturbances, stress disorder was sufficient).

In *Buckman v. People Express, Inc.*, 205 Conn. 166 (1987), the Connecticut Supreme

Court upheld the trial court's decision in connection with plaintiff's emotional distress claim that

his employer failed to comply with an insurance statute titled C.G.S. Section 38-262d.  The

*Buckman* plaintiff became withdrawn, depressed, unable to eat or sleep, teary, and felt

inadequate as a husband and father.  Id. at 167-68.  The jury awarded $50,000 for the emotional

damages.  While reducing the amount, the *Buckman* Court noted that the evidence presented at

34

the trial was sufficient to establish a claim for emotional distress.  Id. at 175.

As stated, Defendants were well aware of Auerbach's financial status and the fact that if the Health Plan was not funded, claims would not be paid.  Cohen specifically knew that Scovin made COBRA payments through a Spahn memo dated May 1, 2001. (PS, Exh. 17 and 22).  They directed payroll to stop and insurance cancellations.  (PS, Exh. 22 and 23).  On June 29, 2001 Spahn apprised them of the HR concerns and that DOL claims would be likely.  (PS, Exh. 24).  In her July memo, Spahn reiterated the HR issues and again confirmed that employees' bills would "default" to the member.  She warned the Defendants to expect lawsuits for collecting premiums and not paying claims.  (PS, Exh. 27).  The Defendants' conduct created an unreasonable risk which was not only expressly explained to them, but one that would have been otherwise foreseeable.

Scovin testified that due to the unexpected high medical bills and unavailability of coverage, family related distress and tension occurred.  (PS, Exh. 37, Scovin Depo, p. 43-44).  As a father of young children and husband, under the circumstances with no job, extensive medical bills, and now no family medical coverage, one can appreciate the severity of Scovin's anxiety and tension.  For Defendants to characterize it as not severe is disingenuous.

Moreover, collection agencies were after Scovin.  A foreclosure action was commenced on the family home.  (PS, Exh. 40, Application Filed In Danbury Court).  Scovin treated with a physician who prescribed medication.  He took Lexipro for the anxiety and stress. (PS, Exh. 37, p. 44 (18-25).  Arguably, Plaintiff's emotional distress exceeds that of the Plaintiff in *Buckman* where the jury awarded $50,000 in damages.  Scovin has sufficiently plead a viable claim.

4.    **Breach of Contract**

Finally, Defendants argue that Plaintiff's Twelfth Count fails because no contract existed with the Plaintiff.  No dispute exists that Regan promised Scovin medical coverage when he left. Scovin continued the coverage with his COBRA payments which Defendants accepted.  The Defendants ran the company and its finances.  They decided what to pay and what not to.

When he left, Scovin was insured with Oxford.  No one told Scovin that they switched to a self funded Health Plan.  Scovin believed that had an insured product.  Scovin performed his end of the agreement--namely--he paid his monthly premiums.  The Defendants took his payments but failed to pay or provide the expected insurance.  They breached the agreement.

Moreover, every contract contains an implied covenant of good faith and fair dealing requiring that neither party do anything to injure the right of the other to receive the benefits of the contract.  The Connecticut Supreme Court stated that the concept of good faith and fair dealing is "[e]ssentially . . . a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended."  *See, e.g., Verrastro v. Middlesex Insurance Co.*, 207 Conn. 1798, 190 (1988); *Magnan v. Anaconda Industries, Inc.*, 193 Conn. 558, 567 (1984).

Even if there was no oral or written contract expressed in words, there still could be a contract based on conduct if the plaintiff establishes that the plaintiff and the defendant agreed, by actions or conduct, to provide him a Health Plan subject to COBRA payments,. To determine whether this contract exists, the fact finder will ultimately consider whether the conduct and acts of the parties show an agreement based upon the acts and conduct of the parties, it can be

determined that the Defendants agreed to these terms, and that the Defendants breached that

agreement, the Plaintiff should recover. *See Bershtein, Bershtein & Bershtein v. Nemeth,* 221

Conn. 236, 241-42 (1992); *Coelho v. Posi-Seal International, Inc.*, 208 Conn. 106, 111-12

(1988); *Brighenti v. New Britain Shirt Corp.*, 167 Conn. 403, 406-07 (1974).

In this case, the parties conduct evidences a contract. Scovin's made premium payments

for his medical expenses and Defendants accepted them and, apparently, initially paid for

Scovins' claims. Thereafter, they continued to accept his payments but did not provide the

benefit as agreed. Defendants' breach caused damage to the Plaintiff as alleged.

## E.  THE COURT SHOULD DENY SUMMARY JUDGMENT BASED ON DEFENDANTS' DISCOVERY TACTICS

Fed. R. Civ. P. Rule 56(f) expressly permits this Court to deny summary judgment or

delay it until such time as Plaintiff is afforded his basic rights to discovery. Especially in

circumstances such as this where Defendants have failed to comply with discovery, withheld

information and documents, and violated a Court discovery order, the Court should deny

summary judgment.

On July 5, 2005, Plaintiff moved the Court to compel the Defendants' production of

documents. On August 5th and 9th, the Defendants produced a total of approximately 163 pages

of background and other redacted information. In reliance on Defendants counsel's

representations that no documents existed, Plaintiff deposed Defendant Regan on August 16,

2005, Defendant Yorke on August 16, 2005, and Defendant Cohen on September 1, 2005.

During their depositions, the Defendants asserted no knowledge as to any corporate/personal

records, of the facts and circumstances surrounding the subject claim or Plan, or as to any

documents relating to this matter.  Defendants were not credible.

On September 16, 2005, *after* the Defendants' depositions and the September 13th oral argument before the Court on Plaintiff's July 5th Motion to Compel, the Defendants produced what appeared to be the missing pages from prior discovery, along with some additional documents bearing new Bates stamp numbers.

On September 16, 2005, the Honorable Magistrate Judge Donna F. Martinez ordered these Defendants to produce the requested documents and to provide affidavits precisely detailing the efforts made to obtain the documents.  On October 12, 2005, Defendants responded to the Court's Order by producing 48 pages.  Defendants had produced a limited set of documents duplicating these same Bates numbers which created confusion in the discovery.

Also per the Court's Order, Cohen and Yorke produced affidavits outlining their search efforts for responsive documents.  The Court ordered the affidavits because, among other things, Defendants claimed to have no documents despite having 12 boxes shipped to their offices in July 2001 by Terri Spahn, having an attorney serve as Auerbach's corporate secretary, and having their current counsel, attorney Cushing, copied during 2001 by Terri Spahn, notified of employee resignations, and involved in Auerbach's corporate affairs.  Attorney Cushing was copied on faxes and directly sent faxes concerning the financial status of Auerbach as well as of the viability of the subject Health Plan.  He may be a witness in the case.  Defendants' affidavits remain insufficient inquiry for documents from Attorney Cushing, or Auerbach's secretary, Marc Koplik, Esq. was made despite Plaintiff's request and the Magistrate Judge's order.

38

On October 24, 2005, Defendants produced an additional 40 pages consisting of Defendant Regan's tax returns for 2000 and 2001. Regan produced no affidavit as to his search efforts. Plaintiff's counsel requested Regan's affidavit but such was not provided[7]. Defense Counsel maintained that there were no more responsive documents.

With no additional disclosures, Plaintiff filed the Amended Complaint dated November 1, 2005 in reliance of defense counsel's representations. On November 3, 2005, Defendants disclosed 1000 additional pages of documents. These documents were purported to be the "complete" set of documents in the same form as received by Defendants from the DOL. Many documents were duplicative of prior disclosures.

On January 9, 2006, Defendants' forwarded Plaintiff another 432 pages of documents bearing Bates #1122-1554. These were included with a cover letter alerting that Defendants were filing a Motion for Summary Judgment. A review of Defendants' January 9, 2006 production reveals that Defendants had the documents since around October 20, 2005 but refused to disclose them until January 9, just 3 days before the filing of their summary judgment. Again, many were duplicative but a few were new and highly relevant.

Defendants filed their Summary Judgment 3 days later on January 12, 2006. Most troubling, Defendants had hand picked their November 3rd production. Existing in the untimely January 9th disclosure are the DOL's conclusions that Regan and Cohen *were fiduciaries* under the subject Plan, *were responsible* for Plaintiff's medical bills, and *had violated* ERISA. These

---

[7] Plaintiff filed a Motion for Sanctions on February 10, 2006. Thereafter, Regan's affidavit, identical to Cohen and Yorke's appeared on February 15, 2006. It too remains inadequate. Plaintiff's motion is pending before the Court.

significant agency conclusions were sent *directly* to Regan and Cohen back in July 2003.  These same Defendants maintained in their 2005 depositions that they possessed *no* responsive documents.  Defendants individually received these weighty documents in July 2003, *after* this action was commenced and defense counsel purposefully withheld them from Plaintiff until the eve of this motion.  Defendants withheld these against the Court's September 16, 2005 Order.

Defendants' calculated omissions further consist of the DOL's investigator's notes of interviews with the Defendants and witnesses in the case.  (PS, Exh. 2).  These notes are the backbone to the DOL's investigator's July 2003 conclusions that Defendants are fiduciaries.  The interviews contain many statements addressing the Defendants' control and authority, as well as their decisions not to terminate the Plan and to not notify members of the problems.  They contain references that the Auerbach attorney(s) handled the business matters.  The company dealings necessarily included, among other things, information regarding the purported winding up of Defendant Auerbach's financials, business, and benefits which are germane to this litigation.  Files from the Auerbach attorneys have not been referenced in affidavits or produced.

Defendants withheld these documents with full knowledge that Plaintiff was filing an Amended Complaint which was to be done after the completion of the outstanding discovery.  Defendants withheld documents while conducting good faith "settlement" discussions.  Defendants withheld documents with the knowledge that they would be filing a Motion for Summary Judgment as to all counts of Plaintiff's Amended Complaint.  Defendants withheld these documents up until the eve of the filing of their summary judgment motion.  Due to the Defendants' intentional conduct, Plaintiff has been prejudiced because Plaintiff will now need to

revisit the DOL's decision to redact the names of the witnesses in the investigation.  Such steps

take an extended amount of time and could have been filed by the Plaintiff back in November

with Defendants' disclosure.  The question remains what other information was given by

Defendants which they now claim to know nothing about, or have not disclosed including what

would be disclosed if Defendants produced all non-privileged documents from the files of

Attorney Cushing and Attorney Koplick.

This discovery is essential to Plaintiff's claims against the Defendants.[8]  The failure to

produce characterizes Defendants' stall and hinder tactics in this litigation.  Because of

Defendants' cat and mouse games, Plaintiff has been prejudiced.  Therefore, Plaintiff requests

that the Court deny the Defendants' Motion for Summary Judgment.


**PLAINTIFF, WILLIAM A. SCOVIN**

By_____/s/_____
        Kevin M. Greco (ct 13195)\
        Peter M. Nolin (ct 06223)
        **Sandak Hennessey & Greco LLP**
        707 Summer Street
        Stamford, Ct 06901
        (203) 425-4200
        (203) 325-8608 (fax)
        kgreco@shglaw.com

---

[8] The discovery includes obtaining the redacted information from the DOL and possibly deposing those witnesses, and deposing Defendants' counsel from 2001, Attorney Cushing, which was requested and noticed long ago. Defendant's counsel verbally objected and simply did not appear.

**CERTIFICATION**

        I hereby certify that a copy of the foregoing was mailed, postage prepaid, on this 3rd day of April, 2006 to:

Christopher G. Barnes, Esq.
Jorden Burt
175 Powder Forest Drive, Suite 201
Simsbury, CT  06089

James M. Moriarty, Esq.
Mark S. Gregory, Esq.
Kelley Drye & Warren LLP
Two Stamford Plaza
281 Tresser Boulevard
Stamford, CT  06901

Robert G. Cushing, Esq.
Cushing Law Firm
420 East 54th Street
New York, NY  10178

Robert Drake
558 Lime Rock Road
Lakeville, CT  06039


                             _____/s/_____
                             Kevin M. Greco