UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WILLIAM SCOVIN | ) | |
| | ) | |
| **Plaintiff** | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 3:02CV01161(AWT) |
| GREAT-WEST LIFE & ANNUITY INS. CO., | ) | |
| ONE HEALTH PLAN, INC., AUERBACH, | ) | |
| POLLAK & RICHARDSON, INC., HUGH | ) | |
| REGAN, LEWIS COHEN, ROBERT DRAKE, | ) | |
| A. JONES YORKE | ) | |
| | ) | |
| **Defendants.** | ) | **APRIL 3, 2006** |

PLAINTIFF'S LOCAL RULE 56(a)(2) STATEMENT

Plaintiff, William A. Scovin ("Scovin"), submits this statement pursuant to Local Rule 56(a)(2) in Objection and Response to the Rule 56(a)(1) Statement of the Defendants Regan Cohen and Yorke Statement titled Defendants Local Rule 56(a)1Statement.

**Plaintiff's Responses to Defendants Statements of Undisputed Material Facts:**

1.      Scovin admits Paragraph 1 of Defendants' Rule 56 Statement.

2.      Scovin admits Paragraph 2 insofar as it alleges that Great-West has a principal place of business in Colorado and insofar as said Paragraph states that Defendant Great-West provided health related services in connection with the facts of this case.  Plaintiff denies said Paragraph insofar as it states or suggests that Great-West provided health insurance in connection with this matter.

3.      Scovin admits that Ms. Fry testified as per the allegations of Paragraph 3.

1

4.      Scovin admits the allegations set forth in Paragraph 4.

5.      Scovin denies the allegations set forth in Paragraph 5.

6.      Scovin admits Paragraph 6 of the Defendants' Statement.

7.      Scovin admits that Defendant Regan has a Series 24 but denies the remainder of said Paragraph 7 and denies said Paragraph insofar as it alleges or suggests that Regan was not involved or responsible as set forth in Plaintiff's Amended Complaint. (Plaintiff's Rule 56a(2) Statement, hereinafter "Plaintiff's Statement" Para. 3, 4, 5, 6, 9, 10, 39, 41, 50).

8.      Scovin admits Paragraph 8 of the Defendants' Statement insofar as it alleges that Cohen resides in New Jersey and was a Controller and FINOP.  Plaintiff denies the remainder of said Paragraph and denies said Paragraph insofar as it alleges or suggests that Cohen was not involved or responsible as set forth in Plaintiff's Amended Complaint or that he stopped working as of June 2001. (Plaintiff's Statement, Para. 3, 7, 18, 19, 20, 23, 25, 33, 60, 74, 84).

9.      Scovin admits that the allegations set forth in Paragraph 9 appear to be a portion of Cohen's responsibilities in connection with the health care plan but denies said Paragraph insofar as it seeks to limit same or otherwise suggests that Cohen was not involved or responsible as set forth in the Plaintiff's Amended Complaint.  (Plaintiff's Statement, Para. 3, 7, 18, 19, 20, 23, 25, 33, 60, 74, 84).

10.     Scovin admits that Cohen testified that for some period of time, Michael Benvenuto assumed a position at APR and that Cohen testified that he reported to Benvenuto at some points in time.  Plaintiff denies said Paragraph insofar as it alleges or suggests that Benvenuto was employed during all relevant time periods in that he left in approximately May

2001.  Plaintiff further denies said Paragraph insofar as it attempts to limit or absolve Cohen of his obligations as set forth in the Amended Complaint or insofar as it alleges or suggests that it was Benvenuto's responsibility at the pertinent time(s) to direct or decide what needed to be paid or what invoices could wait for payment.  (Plaintiff's Statement, Para. 18, 19, 20, 23, 25, 26, 27, 28, 29, 40, 44, 65, 66, 69).

11.     Scovin admits the allegations of Paragraph 11 but denies said Paragraph insofar as it alleges or suggests that Yorke resigned in writing in June of 2001.

12.     Scovin admits the allegations of Paragraph 12 insofar as it states that Yorke testified that he spent 3-4 days at the New York offices of APR.  Plaintiff denies the remainder of said Paragraph insofar as it alleges or suggests that Yorke had no role in the decisions of APR or otherwise suggests that Yorke was not involved or responsible as set forth in Plaintiff's Amended Complaint. (Plaintiff's Statement, Para. 8).

13.     Scovin admits the allegations of Paragraph 13.

14.     Scovin admits the allegations of Paragraph 14.

15.     Scovin admits the general allegations of Paragraph 15.  Plaintiff denies said Paragraph insofar as it alleges or suggests that APR did not continue to be a separate company or the entity involved in this matter. (Plaintiff's Statement, Exh. 7, Scovin Affidavit).

16.      Scovin admits the allegations of Paragraph 16.  Plaintiff denies said Paragraph insofar as it alleges or suggests that APR did not continue to be a separate company or the entity involved in this matter.

17.     Scovin admits the allegations of Paragraph 17.  Plaintiff denies said Paragraph insofar as it alleges or suggests that APR did not continue to be a separate company or the entity involved in this matter. (Plaintiff's Statement, Exh. 7, Scovin Affidavit).

18.     Scovin admits that Regan testified as to the allegations in Paragraph 18 and Plaintiff objects to this claimed fact because Defendants have refused to produce the books and records of APR.

19.     Scovin admits the allegations of Paragraph 19 insofar as it alleges that non-party Terri Spahn was employed in the Human Resources Department at APR.  Plaintiff denies said Paragraph insofar as it alleges or suggests that APR did not continue to be a separate company or the entity involved in this matter.  Plaintiff denies the remainder of said Paragraph insofar as it alleges or suggests that Spahn controlled the Plan or that the Defendants had no control or role in the decisions of APR or otherwise suggests that the Defendants were not involved or responsible as set forth in Plaintiff's Amended Complaint.  (Plaintiff's Statement, Para. 3, 9, 11, 13, 14, 17, 18, 19, 20, 23, 25, 30, 31, 38, 39, 40, 41, 43, 47, 48, 54, 56, 60, 61, 70, 74, 77, 83, 84).

20.     Scovin admits the allegations of Paragraph 20.  Plaintiff denies said Paragraph insofar as it alleges or suggests that Spahn did not work for APR or that APR did not continue to be a separate company or the entity involved in this matter. (Plaintiff's Statement, Exh. 7, Scovin Affidavit).

21.     Scovin admits the allegations of Paragraph 21 insofar as they allege that non-party Padilla was an employee of eVision, and that Padilla became an employee of APR and served as Director of Brokerage Operations which is the equivalent of Chief Operating Officer.  Said

4

Paragraph is denied insofar as it alleges that Spahn reported to Padilla or otherwise did not report to Cohen and Regan, or that the Defendants, not Spahn, were in control of the decisions and exercised discretion over the Plan and the finances in connection therewith.  (Plaintiff's Statement, Para. 30, 31, 37, 39, 40, 54, 56, 57, 59, 66, 67, 68, 69, 70, 73, 74).  In addition, Plaintiff denies said Paragraph insofar as it alleges or suggests that APR did not continue to be a separate company or the entity involved in this matter

   22. Scovin admits the allegations of Paragraph 22.  Plaintiff denies said Paragraph insofar as it alleges or suggests that APR did not continue to be a separate company or the entity involved in this matter. (Plaintiff's Statement, Exh. 7, Scovin Affidavit).

   23. Plaintiff admits the allegations of Paragraph 23 insofar as it alleges that Regan testified, in non-definitive terms, that he believed at some point before Oxford Insurance, Alexander Baldwin assisted in the transaction of an APR Health Plan.  Plaintiff denies said Paragraph insofar as it alleges or suggests that Regan had no role, control, or involvement therein or otherwise attempts to absolve Regan of his obligations as set forth in the Amended Complaint or insofar as it alleges or suggests that it was Baldwin's responsibility at the pertinent time(s) to direct or decide the Health Plan issues, financial issues, etc.  (See Plaintiff's Statement, Para. 23, 32, 38, 39).

   24. Scovin admits the allegations in Paragraph 24 insofar as they allege that after the eVision transaction, Spahn was involved in certain tasks for APR out of the Denver office- namely- limited to getting employees on and off the plan and sending the invoices to Cohen in New York.  (Plaintiff's Statement, Para 68).   Plaintiff denies said Paragraph insofar as it alleges

that Padilla administered the Plan or suggests that the Defendants were not involved in, controlling of, exercising discretion over, or responsible for the Health Plan as set forth in Plaintiff's Amended Complaint or for participating in the administration, including, but not limited to, the decisions of notification and payment concerning the Health Plan. (Plaintiff's Statement, Para. 54, 56, 59, 60, 67, 68, 69, 70, 73, 74, 84, 85, 93, 94, 95).

25.    Scovin admits the allegations in Paragraph 25 insofar as it alleges that APR provided health care coverage to its employees through Oxford during a certain earlier period of time but denies said Paragraph in that it is open ended as to time and there is no evidence Oxford provided health care during the relevant time period of May through October 2001.

26.    Scovin denies Paragraph 26 of the Defendants' Statement.  Scovin denies that he can determine that the unsigned copy of "Services Contract" purportedly entered into between Great-West and eVision USA.Com, Inc. attached to the motion are authentic as required under Local Rule 56(a)(3).

27.    Scovin admits that Fry testified as to the allegations in Paragraph 27 but that she continued that she does not know if an application exists today.

28.    Scovin admits that Fry testified as to the allegations in Paragraph 28 but denies said Paragraph insofar as it suggests that Scovin had a copy of the booklet at any relevant time. (Plaintiff's Statement, Exh. 7, p. 2).

29.    Scovin admits the allegations in Paragraph 29 insofar as it alleges that some prior time, an eVision SPD existed which appears to list eVision as the Plan Sponsor with Terri Spahn as the Plan Administrator.  Plaintiff denies said Paragraph insofar as it alleges or suggests that

the Defendants were not involved in, controlling of, exercising discretion over, or responsible for

the Health Plan as set forth in Plaintiff's Amended Complaint or for participating in the

administration, including, but not limited to, the decisions of notification and payment

concerning the Health Plan. (Plaintiff's Statement, Para. 54, 56, 59, 60, 67, 69, 70, 73, 74, 84, 85,

93, 94, 95). Plaintiff denies said Paragraph insofar as it alleges or suggests that APR did not

continue to be a separate company or the entity involved in this matter. (Plaintiff's Statement,

Exh. 7, Scovin Affidavit).

30.    Scovin admits Paragraph 30 insofar as it alleged that at some point, APR's health

benefits and/or plan was moved from an insured Oxford plan to a self insured plan with Great-

West providing certain services to Auerbach in connection therewith. Plaintiff denies the

remainder of said Paragraph insofar as it alleges or suggests that the Defendants did not control,

exercise discretion over, involve themselves with or ultimately exercise responsibility for the

Health Plan, or insofar as said Paragraph suggests that the Defendants were not responsible as set

forth in Plaintiff's Amended Complaint or for participating in the decisions, financing, and

Plan's administration, including, but not limited to, the discretionary decisions of notification

and payment concerning the Health Plan. (Plaintiff's Statement, Para. 30, *see also* Para. 3, 6, 11,

18, 19, 23, 25, 37, 39, 54, 56, 59, 60, 67, 69, 70, 73, 74, 84, 85, 93, 94, 95).

31.    Plaintiff denies the allegations as set forth in Paragraph 31. (Plaintiff's Statement,

Para. 32, 38, 39).

32.    Plaintiff denies the allegations as set forth in Paragraph 32. (Plaintiff's Statement,

Para. 3, 6, 11, 18, 19, 23, 25, 37, 39, 54, 56, 59, 60, 67, 69, 70, 73, 74, 84, 85, 93, 94, 95).

33.    Plaintiff denies the allegations as set forth in Paragraph 33.

34.    Plaintiff admits that Ms. Fry generally testified concerning her knowledge as to an application for group contract to Great-West but denies said Paragraph as Fry testified that she did not know if APR was required to submit an application to Great-West.  Plaintiff further denies said Paragraph insofar as it alleges or suggests that the Defendants neither requested nor authorized the change.  (Plaintiff's Statement, Para. 32).

35.    Plaintiff admits that Terri Spahn's remained named as a Plan Administrator as alleged in Paragraph 35.  Plaintiff denies said Paragraph insofar as it alleges or suggests that the Defendants did not control, exercise discretion over, involve themselves with or ultimately exercise responsibility for the Health Plan, or insofar as said Paragraph suggests that the Defendants were not responsible as set forth in Plaintiff's Amended Complaint for participating in the decisions, financing, and Plan's administration, including, but not limited to, the discretionary decisions of notification and payment concerning the Health Plan.  (Plaintiff's Statement, Para. 68, *see also* Para. 3, 6, 11, 18, 19, 23, 25, 32, 37, 39, 54, 56, 59, 60, 67, 69, 70, 73, 74, 84, 85, 93, 94, 95).

36.    Plaintiff admits the allegations as set forth in Paragraph 36 as represented by Regan but Plaintiff denies he was ever advised that the Health Care Plan was a self funded APR plan which provided no insurance for employee health claims.  Insofar as Paragraph 36 alleges or suggests that Defendant Regan was not involved or did not otherwise make the decisions in connection therewith, said Paragraph is denied.

37.     Plaintiff admits the allegations as set forth in Paragraph 37 insofar as said allegations occurred in connection with and with the help and participation of Auerbach and the Defendants.  (Plaintiff's Statement, Exh. 7, Scovin Affidavit).

38.     Plaintiff admits the allegations as set forth in Paragraph 38 insofar as on that page of Scovin's deposition, Scovin testified that his wife sent a completed Cobra Election Form for Great-West in early April 2001.  The remainder of said Paragraph is denied.

39.     Plaintiff denies the allegations as particularly set forth in Paragraph 39.  Plaintiff testified and other Defendants testified that Plaintiff spoke to, for example, Regan during an exit interview and spoke to Defendant Drake about the APR Health Plan. (Plaintiff's Statement, Exh. 7, Scovin Affidavit; Exh. 1, Drake Depo. p. 71 (1).

40.     Plaintiff admits said Paragraph insofar as it alleges or suggests that in May 2001, an NASD arbitration panel award in an aggregate amount of nearly $3,000,000 required APR to book the award as a liability on its balance sheet.  Plaintiff denies said Paragraph insofar as it alleges or suggests that such was the only financial concern of Auerbach as the company had been having financial problems and the company was closing down.  (Plaintiff's Statement, Para. 41, 46, 47; Exh. 8, Regan Depo. p. 61 (13-16), 73 (10); Exh. 20, Yorke Depo. p. 17 (7).

41.     Plaintiff admits Paragraph 41 insofar as it alleges that Yorke testified that he felt that the firm was going out of business and that the adverse award came out of the blue and caused the firm to have no choice as a broker/dealer but to report the capital issue.  Plaintiff denies said Paragraph insofar as it alleges or suggests that APR was not having financial problems and financial issues with regards to earnings besides the May 2001 award. (Plaintiff's

Statement, Para. 41, 46, 47, Exh. 8, Regan Depo. p. 61 (13-16), 73 (10); Exh. 20, Yorke Depo. p. 17 (7).  In addition, Plaintiff admits said Paragraph insofar as it alleges or suggests that certain broker/dealer activities had ceased but not that the company was closing down. (Exh. 8, Regan Depo. 61 (13-16).

  42. Plaintiff admits Paragraph 42 insofar as it alleges that as a result of the Arbitration award and net capital requirement issues, certain broker/dealer activities had ceased but not that the company was closing down.  Plaintiff denies said Paragraph insofar as it alleges or suggests that APR was not having financial problems and financial issues with regards to earnings besides the May 2001 award. (Plaintiff's Statement, Para. 41, 46, 47, Exh. 8, Regan Depo. p. 61 (13-16), 73 (10); Exh. 20, Yorke Depo. p. 17 (7).

  43. Plaintiff admits Paragraph 43 insofar as it alleges or suggests that the last formal payroll of APR occurred on June 15, 2001.  Plaintiff denies said Paragraph insofar as it alleges or suggests that all of APR's payroll, bills, payments, health care costs, etc. were met up through June 15, 2001 or that no additional monies came into APR after that.  (Plaintiff's Statement, Para. 58, 93, 94).

  44. Plaintiff admits Paragraph 44 insofar as it alleges or suggests that Regan and his family members had contributed approximately 1.4 million into APR and that during the summer of 2001, Regan continued to work in a variety of capacities at APR, one of which was to bring in additional capital.  Plaintiff denies said Paragraph insofar as it alleges or suggests that the Defendants did not control, exercise discretion over, involve themselves with or ultimately exercise responsibility for the Health Plan, or insofar as said Paragraph suggests that the

Defendants were not responsible as set forth in Plaintiff's Amended Complaint for participating in the decisions, financing, and Plan's administration, including, but not limited to, the discretionary decisions of notification and payment concerning the Health Plan. (Plaintiff's Statement, Para. 3, 6, 11, 18, 19, 23, 25, 37, 39, 54, 56, 59, 60, 67, 69, 70, 73, 74, 84, 85, 93, 94, 95).

45.     Plaintiff admits Paragraph 45 insofar as it alleges that Cohen testified that he filed a financial focus report for the period of June 1st to June 15th.  Plaintiff denies the remainder of said Paragraph and denies said Paragraph insofar as it alleges or suggests that Cohen was not involved or responsible as set forth in Plaintiff's Amended Complaint. (Plaintiff's Statement, Para. 3, 7, 18, 19, 20, 23, 25, 33, 60, 74, 84).

46.     Plaintiff admits Paragraph 46 insofar as it alleges that Regan testified that he received his last paycheck on June 15, 2001 but remained with APR into at least September 2001 acting in, among other things, a fiduciary duty to address customer matters and regulatory matters and a host of matters including, 22,000 customer accounts.  Plaintiff admits said Paragraph insofar as it alleges or suggests that certain broker/dealer activities had ceased but not that APR was closing down. (Plaintiff's Statement, Exh. 8, Regan Depo. p. 61 (13-16) or insofar as it suggests that no additional monies were coming into Auerbach or that the Defendants did not accept and cash Plaintiff's COBRA payments.  (Plaintiff's Statement, Para. 58, 89, 90, 91, 93, 94, 95).

47.     Plaintiff admits the allegations in Paragraph 47 but denies said Paragraph insofar as it fails to state the complete contents of the letter.  The letter speaks for itself.  Plaintiff further

denies said Paragraph insofar as it alleges that that the certification was anything other than what Great-West had been contracted by Auerbach to do, such as certify the medical necessity of patient requests. (Plaintiff's Statement, Para. 100). Plaintiff denies said Paragraph insofar as it alleges or suggests that the Defendants were not involved with, in control of, and/or had discretion over the Health Plan or Plaintiff's medical expenses, or insofar as said Paragraph suggests that the Defendants were not responsible as set forth in Plaintiff's Amended Complaint for participating in the decisions, financing, and Plan's administration, including, but not limited to, the decisions of notification and payment(s) concerning the Health Plan and Plaintiff's medicals.

48.     Plaintiff admits Paragraph 48 insofar as it alleges that Ms. Fry testified that Allison Zellner is a Customer Service Manager for Great-West. Plaintiff further admits said Paragraph insofar as it alleges that Fry testified that the senior Customer Service Manager, in most situations, is in frequent contact with the client customer. Plaintiff denies said Paragraph insofar as it alleges or suggests otherwise.

49.     Plaintiff admits the allegations in Paragraph 49 including that APR switched offices in Denver because it had been evicted from its other office. Plaintiff denies said Paragraph insofar as it alleges or suggests that name change was not requested, ratified, accepted, or otherwise authorized by the Defendants or insofar as said Paragraph suggests that he Defendants were neither involved in the decision(s) nor ultimately responsible for the Health Plan, or are not responsible as set forth in Plaintiff's Amended Complaint or for participating in the decisions, financing, and Plan's administration, including, but not limited to, the decisions of

notification and payment(s) concerning the Health Plan and Plaintiff's medicals. (Plaintiff's Statement, Para. 32). Plaintiff also denies said Paragraph to the extent it suggests that Terri Spahn worked at APR's new address in Denver after June 20, 2001.

50.     Plaintiff admits the allegations in Paragraph 50 but denies said Paragraph insofar as it fails to state the complete contents of the letter. The letter speaks for itself. Plaintiff denies said Paragraph insofar as it alleges or suggests that the Defendants were neither involved in the decision(s) of nor ultimately responsible for the Health Plan or insofar as said Paragraph suggests that the Defendants were not responsible as set forth in Plaintiff's Amended Complaint for participating in the decisions, financing, and administration of the Health Plan, including, but not limited to, the decisions about beneficiary notification and the making of payment(s) concerning the Health Plan and Plaintiff's medicals.

51.     Plaintiff admits Paragraph 51 of the Defendants' Statement in that the letter appears to be an unsigned copy of a letter by Terri Spahn believed to be sent pursuant to the directives from the Defendants. In the absence of an affidavit from any representative of the Defendants, Scovin denies that he can determine that the copy of an unsigned letter attached to the motion is authentic or otherwise confirm who drafted it.

52.     Plaintiff admits the allegations in Paragraph 52 but denies said Paragraph insofar as it fails to state the complete contents of the string of emails referenced. (Plaintiff's Statement, Para. 84, 85).

53.     Plaintiff admits the allegations in Paragraph 53 but denies said Paragraph insofar as it fails to state the complete contents of a string of emails referenced.  (Plaintiff's Statement, Para. 84, 85).

54.     Plaintiff admits the general allegations of Paragraph 54 but denies said Paragraph insofar as Defendants' general paraphrasing of the Form and testimony is not complete and the document speaks for itself.

55.     Plaintiff admits the allegations in Paragraph 55.

56.     Plaintiff admits Paragraph 56 insofar as it alleges that Ms. Terri Spahn faxed Exhibit 19 of Defendants' Statement but the document speaks for itself.  Plaintiff denies said Paragraph insofar as it alleges or suggests that Ms. Spahn was employed at APR up through July 13, 2001 as she was considered laid off / had resigned in writing by way of her June 29, 2001 memo.  (Plaintiff's Statement, Para. 67).

57.     Plaintiff admits Paragraph 57 insofar as it alleges some of the information contained in Exhibit 20 of Defendants' Statement but the document speaks for itself.  Plaintiff further denies said Paragraph insofar as it alleges that that the certification was anything other than what Great-West was contracted to do by Auerbach, including certifying medical necessity. (Plaintiff's Statement, Para. 100).  Plaintiff denies said Paragraph insofar as it alleges or suggests that the Defendants were not involved with, in control of, and/or exercised discretion over the Health Plan or Plaintiff's medical expenses, and insofar as said Paragraph suggests that the Defendants were not responsible as set forth in Plaintiff's Amended Complaint for participating in the decisions, financing, and administration of the Health Plan,, including, but not limited to,

the decisions about beneficiary notification and the making of payment(s) concerning the Health

Plan and Plaintiff's medicals. Plaintiff denies said Paragraph insofar as it alleges or suggests that

the Defendants were neither involved in the decision(s) nor ultimately responsible for the Health

Plan or insofar as said Paragraph suggests that the Defendants were not responsible as set forth in

Plaintiff's Amended Complaint for participating in the decisions, financing, and Plan's

administration, including, but not limited to, the decisions about beneficiary notification and the

making of payment(s) concerning the Health Plan and Plaintiff's medicals.

58.    Plaintiff admits Paragraph 58 insofar as it alleges some of the information

contained in Exhibit 21 of Defendants' Statement but the document speaks for itself.  Plaintiff

denies said Paragraph insofar as it alleges or suggests that the Defendants were neither involved

in the decision(s) nor ultimately responsible for the Health Plan or insofar as said Paragraph

suggests that the Defendants were not responsible as set forth in Plaintiff's Amended Complaint

for participating in the decisions, financing, and administration of the Health Plan, including, but

not limited to, the decisions about beneficiary notification and the making of payment(s)

concerning the Health Plan and Plaintiff's medicals.

59.    Plaintiff admits Paragraph 59 insofar as it alleges that Great-West faxed a letter to

Regan, a copy of which is attached to Defendants' Statement as Exhibit 22 but the document

speaks for itself.  The remainder of said Paragraph is denied.  (Plaintiff's Statement, Para. 72, 84,

85, 94, 95).

60.    Plaintiff denies said Paragraph insofar as it alleges that medical coverage was

available at that time because the Defendants were not funding the Plan.  (Plaintiff's Statement,

Para. 44, 53, 54, 56, 59, 67, 69).  Paragraph 60 is admitted insofar as it alleges that Drake

testified that Great-West sent a notice to him stating that he had coverage for the period up until

September 15 but that he did not remember the exact content but that the purpose of the letter

was to show no lapse in coverage when you moved to the next insurance carrier.  Plaintiff denies

said Paragraph insofar as it alleges or suggests that the Defendants were neither involved in the

decision(s) nor ultimately responsible for the Health Plan or insofar as said Paragraph suggests

that the Defendants were not responsible as set forth in Plaintiff's Amended Complaint for

participating in the decisions, financing, and administration of the Health Plan, including, but not

limited to, the decisions of notification and the making of payment(s) concerning the Health Plan

and Plaintiff's medicals.

61.     Plaintiff admits Paragraph 61 insofar as it alleges that Fry testified that she did not

recall any conversations that Great-West had with Regan regarding the administration of the

APR Health Plan but denies said Paragraph insofar as it alleges or suggests otherwise.  Plaintiff

denies said Paragraph insofar as it alleges or suggests that the Defendants did not control,

exercise discretion over, or involve themselves with or ultimately exercise responsibility for the

Health Plan or insofar as said Paragraph suggests that the Defendants were not responsible as set

forth in Plaintiff's Amended Complaint for participating in the decisions, financing, and

administration of the Health Plan, including, but not limited to, the decisions about beneficiary

notification and the making of payment(s) concerning the Health Plan and Plaintiff's medicals.

62.     Plaintiff denies Paragraph 62 as alleged.  (Plaintiff's Statement, Para. 15, 18, 23,

31, 33).

63.    Plaintiff admits Paragraph 63 insofar as it alleges that Fry testified that she was not aware of any conversations that Great-West had with Yorke regarding the administration of the APR Health Plan but denies said Paragraph insofar as it alleges or suggests otherwise. Plaintiff denies said Paragraph insofar as it alleges or suggests that the Defendants did not control, exercise discretion over, or involve themselves with or ultimately exercise responsibility for the Health Plan or insofar as said Paragraph suggests that the Defendants were not responsible as set forth in Plaintiff's Amended Complaint for participating in the decisions, financing, and Plan's administration, including, but not limited to, the decisions about beneficiary notification and the making of payment(s) concerning the Health Plan and Plaintiff's medicals.

64.    Plaintiff denies Paragraph 64 in that Regan told Plaintiff he would be insured by APR in his exit interview and Regan is responsible for all representations Spahn made about such Health Plan.

65.    Plaintiff denies Paragraph 65 in that Cohen is responsible for all representations Spahn made about such Health Plan.

66.    Plaintiff denies Paragraph 66 in that Yorke is responsible for all representations Spahn made about such Health Plan.

67.    Plaintiff admits Paragraph 67.

68.    Plaintiff admits Paragraph 68.

69.    Plaintiff admits Paragraph 69.

70.    Plaintiff denies the allegations in Paragraph 70.

71. Plaintiff admits Paragraph 71 insofar as it alleges a portion of the emotional distress claimed as damages by the Plaintiff. (Plaintiff's Statement, Exh. 37 Scovin Depo. p. 43-44).

72. Plaintiff admits Paragraph 72 insofar as it alleges that Plaintiff, at the time of his deposition, had seen a doctor on one occasion for emotional distress. Id.

73. Plaintiff admits Paragraph 73 insofar as it alleges that Scovin testified in his deposition that at he took medication for his emotional distress for a short period of time and did not see any other doctors. . Id.

74. Plaintiff admits Paragraph 74 insofar as Scovin testified that he believed that it was his first correspondence to Cohen but that he was not sure.

75. Plaintiff admits Paragraph 75 insofar as Scovin testified that he did not recall but that it was likely.

**Plaintiff's Statement of Issues of Material Facts for Which Plaintiff Contends There are Genuine Issues to be Tried**

1. Scovin contends there is a genuine issue of material fact as to whether Defendants Regan, Cohen, and Yorke were obligated as, among other things, fiduciaries under the Auerbach Health Plan and under ERISA such that they may be liable under ERISA for equitable relief and/or for a claim of breach of fiduciary duties under ERISA.

2. All of Auerbach's finances, payments, capital funding, etc. occurred through the office in New York. (Exh. 3, Cohen Depo. p. 13 (6-25), 24(12); Exh. 39, Spahn Depo, p. 18(17-23). Terri Spahn, who worked in Auerbach's Human Resources after it took over

Evision/American Frontier, had no responsibility for funding Auerbach's medical plan. No one in the Denver office controlled the finances or funding regarding the Auerbach Health Plan. (Exh. 39, Spahn Depo p. 14(5-11), 29(7-16).

3.      Cohen and Regan were responsible for the financial decisions of Auerbach. (Exh. 3, Cohen Depo, p. 35(11)-36(4). Regan often told Cohen what bills to pay and which ones could wait. (Id.). Cohen, was a financial principal of the firm. (Exh. 1, Drake Depo. p. 13 (4), p. 17 (19), p. 59 (5); Exh. 39, Spahn Depo. p. 18(6), 34(19).

4.      The Defendants were familiar with Auerbach's bookkeeping, accounting, and segregation of funds. (Exh. 1, Drake Depo. p. 103 (9); Exh. 39, Spahn Depo p. 29(7-16).

5.      Cohen and Regan were listed on Auerbach's broker/dealer form (Form "BD") as the control persons. (Exh. 1, Drake Depo. p. 90 (24)-91 (6).

6.      As President of Auerbach, Defendant Regan performed, among other things, many of the company's administrative acts and services regarding its employees. He was responsible for running Auerbach and everything related to it. (Exh. 2, Bates #1208; Exh. 3, Cohen Depo. p. 35 (9).

7.      Defendant Lewis Cohen was Auerbach's Controller and Financial Operations Officer ("FINOP"). (Exh. 3, Cohen Depo. p. 6 (5-14).

8.      Defendant Yorke was a member of the company's Board of Directors. (Exh. 20, Yorke Depo. p. 6 (22). He was involved in Auerbach's operations and traveled with Regan to Hong Kong to meet with principals to procure a financial deal. (Exh. 20, Yorke Depo. p. 14 (11). Yorke was directly involved in the day to day operation of the business and regularly met with

clients and staff.  (Exh. 37, Scovin Depo. p. 109(3)-113(6). He was a counselor to Defendant

Regan.  (Exh. 20, Yorke Depo. p. 9(4).

9.      Defendant Regan was running Auerbach in 2001.  (Exh. 3,  Cohen Depo. p. 35 (9-

14); Exh. 2, Bates #1208; Exh. 37, Scovin Depo. p. 107(4-7).

10.      Defendant Regan's responsibilities further included, among other things, hiring

personnel and reporting deficiencies in capital.  (Exh. 1, Drake Depo. p. 48 (16); Exh. 18, Bates

#0189).  Regan also handled and controlled employee payroll problems. (Exh. 33, Bates #1425).

11.      Auerbach's President Hugh Regan and comptroller, Lewis Cohen, were

responsible for and knew of the company's bookkeeping and accounting and segregation of

funds to pay for employee medical expenses.  (Exh. 1, Drake Depo. p. 102 (9)-103 (12).  Ms.

Terri Spahn, of Auerbach's HR department reported to Regan and apprised Defendants Cohen

and Regan in at least April and May 2001 about paychecks coming back unpaid and the failures

to make premium payments on the insurance plan.  (Exh. 39, Spahn Depo, p. 10(15)-11(22),

14(10), 19(6-18).

12.      Drake was hired by Defendant Regan.  (Exh. 1, Drake Depo. p. 48 (18).

13.      Defendant Drake, served in a capacity as overseeing the Operations Manager and

the Compliance Officer of Auerbach.  (Exh. 1, Drake Depo. p. 19 (6).

14.      Drake, however, reported to Regan and Regan was directly responsible for

Drake's conduct.  (Exh. 1, Drake Depo. p. 114 (8-11).  Drake was aware of the capital situation

of Auerbach.  (Exh. 37, Scovin Depo p. 124(14-23).

15.     Defendant Cohen handled, among other things, Auerbach's books and records and paid the bills.  (Exh. 3, Cohen Depo. p. 11 (3-22), 24, 35(18-19).

16.     All of the financial decisions were made in Auerbach's New York office at which Regan, Cohen and Yorke were based.  (Exh. 1, Drake Depo. p. 13 (16), 62 (23); Exh. 3, Cohen Depo. p. 24; Exh. 39, Spahn Depo, p. 18(17-23).

17.     Drake was also a trustee for Auerbach's 401(k) Plan.  (Exh. 4, Bates #1175-1176).

18.     Defendant Cohen was responsible for deciding what bills were to be paid and/or was authorized to and responsible for, by example, decisions concerning the viability of and suspension of Auerbach's 401(k) plan.  Regan was privy to and involved with these decisions and was copied on documents related to these as well.  (Exh. 5, Bates #1231).  As an HR Administrator, Spahn had no control or authority regarding the premium payments for healthcare.  Cohen did.  (Exh. 39, Spahn Depo p. 29(2)-30(3).

19.     Cohen was responsible, with others, for suspending Auerbach's activities and notifying its employees.  (Exh. 6, Bates #1238).

20.     Cohen was one of the Auerbach executives responsible for managing payroll matters, including deduction of payments for benefits from employee wages.  (Exh. 2, Bates #1203).

21.     After Scovin left Auerbach's employ, Auerbach, acting through Regan, agreed to pay his medical insurance until March 2001.  (Exh. 7, Scovin Affidavit).  In his exit interview

with Regan, Scovin mentioned that he would be going to COBRA after March.  (Exh. 37, Scovin Depo p. 117 (3)-118 (7).

22.     After that and through August 2001, Scovin sent monthly payments to Auerbach and then to COBRASERV, an outside company which collected the payments under COBRA, for his medical benefits.  (Exh. 7, Scovin Affidavit).  Scovin believed Auerbach was providing him with an insured Health Plan and Regan, Yorke, Cohen and Auerbach never advised him that the Health Plan he was paying for after April 2001 was self funded.  (Exh. 37, Scovin Depo p. 121 (1)-123 (15).

23.     Regan specifically authorized Cohen as to what checks to write to Great-West to fund benefit payments under the Auerbach Health Plan and in some cases, Cohen made the decision on his own under the general authority authorized to him by Regan.  (Exh. 2, Bates #1198; Exh. 3, Cohen Depo. p. 24(3-12), 35(11)-36(4).

24.     Cohen stated that Regan routinely kept the company going by not paying bills on a timely basis.  (Exh. 2, Bates #1216).

25.     Notice to the employees of financial operational difficulties was issued by the chief executives, namely, Defendants Cohen and Regan. (Exh. 1, Drake Depo. p. 90 (15-25)-91 (1-6).

26.     Mr. Benvenuto, an officer of Auerbach, told Regan of the cash flow problems in the spring of 2001.  (Exh. 8, Regan Depo. p. 80 (1-9).

27.     Benvenuto left Auerbach in the end of the first quarter of 2001, in approximately March/April or May 2001.  (Exh. 1, Drake Depo. p. 185 (1-8); Exh. 39, Spahn Depo, p. 30(9).

After Benvenuto left Auerbach, all of the transitional and financial issues were controlled by Defendant Cohen. (Exh. 39, Spahn Depo p. 142(24)-143(3).

28.    Cohen reported directly to Regan. (Exh. 3, Cohen Depo. p. 36 (2-4).

29.    Cohen was also a direct contact for Auerbach with Great-West on the Health Plan. (Exh. 2, Bates #1210-1212; Exh. 9, Bates #0457).

30.    Auerbach's operating officers, Cohen and Regan, were required under NASD rules to be aware of the firm's capital condition and revenue stream in terms of sustainability. (Exh. 1, Drake Depo. p. 28 (10-14).

31.    Sometime in early April 2001, Cohen set up and executed the Auerbach Employee Benefits-Banking Authorization letter permitting Great-West Ins. Co. to directly draw from Auerbach's Fleet bank account for the medical expenses due Great-West on a monthly basis. (Exh. 10, Bates #GW 000199-000200). Cohen made it retroactively effective to August 1, 2000 to incorporate the prior Evision Health Plan. (Id., see also Exh. 11, Fry Depo. p. 110 (22) - 111 (23).

32.    The name change on the Health Plan from Evision to Auerbach had occurred on January, 1, 2001. (Exh. 12, Bates #0926). Patricia Fry, a Great-West corporate witness, testified that Regan authorized the Health Plan's name change from Evision to Auerbach. (Exh. 11, Fry Depo. p. 53 (23)-54 (4), 98 (5).

33.    The Auerbach Health Plan was a self funded plan and Cohen also cut checks to Great-West for the medical premiums due for the health insurance. (Exh. 11, Fry Depo. p. 100 (14); Exh. 13, Bates #0471, 1544, 1546; Exh. 2, Bates #1218; Exh. 37, Scovin Depo p. 113(9).

34.    The funds for the Auerbach Health Plan's payment of the medical costs came from the New York office where Regan, Cohen, and Yorke were and earlier, had come from the Connecticut office.  (Exh. 11, Fry Depo. p.142).

35.    Cohen prepared the firm's focus or financial reports and for the period of June 6, 2001 to June 15, 2001, Auerbach income was -$244,931.  (Exh. 3, Cohen Depo. p. 8 (11), Exh. 14, Bates #0158/APR0100, Focus Report).

36.    In 2000 and for some time prior, Auerbach provided health insurance to its employees through an insured plan provided by Oxford.  (Exh. 7, Scovin Affidavit).

37.    During January of 2001, Terri Spahn, an employee of Auerbach in the human resources department, informed Regan in writing on, among other things, an update on the proposed transfer of the medical plan from Oxford to Great-West.  (Exh. 15, Bates #0381-0382).

38.    Under the order and direction of Regan, Auerbach's Health Plan then under Oxford, was switched from Oxford into a self-insured arrangement with Great-West serving as a third party administrator.  (Exh. 2, Bates #1221, para 7; Exh. 39, Spahn Depo p. 96 (7)-99 (2), p. 171 (16)-172 (4).

39.    Defendant Regan, in writing, personally terminated Auerbach's Oxford Health Plan by letter dated February 27, 2001.  (Exh. 16, Bates #1494, 2/27/01 letter from Regan). Spahn was not involved in the process to transfer Auerbach's Oxford coverage to the Great West self insured plan. (Exh. 39, Spahn Depo p. 21 (20)-22 (21).

40.     As early as May 1, 2001, Spahn was forwarding to Defendant Cohen the COBRA check payments that she received from the Auerbach Health Plan participants, including the Plaintiff William Scovin.  (Exh. 17, Bates #0348; Exh. 39, Spahn Depo p. 77 (20)-78 (13).

41.     Regan, as a control person, was well aware in the spring of 2001, and clearly in May 2001, that the financial status of Auerbach was in jeopardy and that cash flow was an issue. (Exh. 8, Regan Depo. p. 73, 75, 78).

42.     Defendants knew that the finances of Auerbach were unlikely to improve as of May 2001 and Auerbach's employees had begun leaving during early 2001 to find other jobs. (Exh.1, Drake Depo. p. 93 (5-7), Exh. 3, Cohen Depo. p. 17-18).

43.     By way of a May 31, 2001 letter, Regan, the President and CEO, issued an urgent letter reporting Auerbach's deficiency in net capital.  (Exh. 18, Bates #0189/APR 0060[1]).

44.     The Auerbach Health Plan with Great-West was not funded from July 1, 2001 through October 2001 and there is some evidence that the Health Plan was not fully funded for months before that period.  (Exh. 19, Bates #0900, 0897).

45.     When Auerbach suspended trading activities in May 2001, because of its capital problems (Exh. 8, Regan Depo. p. 35 (15-18), there was insufficient money for payroll or expenses in June 2001.  (Exh. 8, Regan Depo. p. 79-80).  Thus, from April/May 2001 forward, Defendants were aware that insufficient funds existed to run the company and pay for Auerbach's employee's salaries and benefits.

---

[1] Defendants have Bates stamped different documents with the same number of #0189).

46. Defendant Yorke was well aware of Auerbach's financial problems in early 2001. (Exh. 20, Yorke Depo. p. 17 (7-25).

47. Regan claims he had contributed $1,400,000 to Auerbach before an arbitration award entered for $3,000,000 in May 2001. (Exh. 20, Yorke Depo. p. 17 (9).

48. Yorke claims he discussed his resignation and the reasons therefore in a June/July Board meeting but there are no company records to prove he ever resigned. (Exh. 20, Yorke Depo. p. 19 (11-25)-20 (1-8).

49. Yorke claims he was advised that the Auerbach Health Plan was being terminated in June or July 2001 but there are no records of this communication and no evidence the Health Plan was ever terminated by Auerbach. (Exh. 20, Yorke Depo. p. 22 (7).

50. Yorke testified that he first became aware that Auerbach was not making its payments to the Health Care Plan at the time he was told the Plan was terminating. (Exh. 20, Yorke Depo. p. 16 (20). Thus, Yorke knew that the Plan was not being funded before he claims to have resigned.

51. Yorke claimed that Cohen, Regan, and Drake would handle the issues on winding up the company. (Exh. 20, Yorke Depo. p. 18 (6-15).

52. In addition to knowing that no money was coming in to the company because its trading was suspended under the NASD's rules, Regan and Cohen were aware that the insurance bills were not being paid. (Exh. 8, Regan Depo. p. 81 (16-23); Exh. 39, Spahn Depo, p19 (18).

53.    Despite having this knowledge that Health Insurance and other bills were not being paid, Regan and Cohen gave no public notice.  (Exh. 8, Regan Depo. p. 35, 36; Exh. 20, Yorke Depo. p. 19 (13).

54.    Defendants provided no notice to Scovin or any Auerbach employees other than Spahn, that they were not funding the Health Plan.  (Exh. 8, Regan Depo. p. 78 (2-7), p. 81 (4).

55.    In late June 2001, Terri Spahn advised Regan and Cohen that Auerbach's insurance plans were two or three months past due and in jeopardy of cancellation.  She also advised the Defendants of the failure to meet payroll, the failure to fund employee IRA's, and other financial concerns.  (Exh. 21, Bates #0383).  In May 2001 Auerbach had been evicted from its offices in Denver and Spahn was working and sent the email from her home to Regan and his Assistant Gail Fanelli.  (Exh. 39, Spahn Depo p. 32 (18)-33 (11)).

56.    Spahn reported and was directed by Regan and Cohen.  Spahn kept in contact with others at Auerbach, such as to Joe Padilla before he left Auerbach.  Padilla would speak directly with Regan or Cohen.  (Exh. 39, 19, 30 (16), 135 (20)).  Padilla had, however, no role with Auerbach's Health Plan with Great-West. (Exh. 39, Spahn Depo, p. 30 (23-25)).

57.    Around mid June 2001, Spahn asked Regan for permission to shut down the Health Plan because the Plan was not paying claims.  (Exh. 39, Spahn Depo p. 40(5)-41(7), 76 (20)-77 (11); 102 (24)-103 (8).  Spahn recommended proper notification to the Health Plan beneficiaries including Scovin.  Regan ordered Spahn not to cancel the Auerbach Health Plan as she suggested.  (Id.).  Regan told Spahn that he would take care of the unpaid claims.  Id.; (Exh. 2, Bates #1210-1212).

58.    Some but not all of Auerbach's June 15, 2001 payroll cleared and was paid.  (Exh. 3, Cohen Depo. p. 17-18).  No payroll was paid after that.  (Exh. 1, Drake Depo. p. 61 (23).

59.    After June 15, 2001, Auerbach received residual income/commissions from customers.  (Exh. 8, Regan Depo. p. 76 (24).

60.    Regan refused to notify the Auerbach Health Plan participants that any medical benefits received after June 15, 2001 might not be reimbursed by Auerbach and the Auerbach Health Plan.  (Exh. 2, Bates #1210-1212).

61.    After Auerbach's last payroll of June 15, 2001, Cohen, Regan, Drake and others continued with the company and performed a variety of company related functions.  For example, Regan remained in Auerbach's New York offices through approximately October 2001.  Among other things, Regan performed various duties after June 2001 and had a "fiduciary duty to address customer and regulatory matters so [he] continued to act in whatever capacity he could…" (Exh. 8, Regan Depo. p. 25 (10-11), p. 25 (17-25)–26 (1-11).  Cohen was there through at least July 2001 and Drake reported to NASD that Cohen stayed with Auerbach until October or November 2001.  (Exh. 39, Spahn Depo p. 171(5); Exh. 3, Cohen Depo. p. 10(3).

62.    Regan took no step during that period to wind down the company and neither did the Board of Directors.  (Exh. 8, Regan Depo. p. 27 (14-25), p. 28 (1-14).

63.    Yorke, however, knew of the responsibility to wind up the company and was sure that he discussed it with Regan in the June 2001 timeframe.  (Exh. 20, Yorke Depo. p. 9 (12-25)-10).

64.     Yorke confirmed that before the May 2001 decision which created Auerbach's capital problem, cash flow at Auerbach was a problem.  (Exh. 20, Yorke Depo. p. 17 (3-21).

65.     Yorke, a counselor to Regan, knew in June 2001 that Auerbach might be going out of business. (Exh. 20, Yorke Depo. p. 9 (4), 17 (15).

66.     By way of letter dated June 28, 2001, per directive from the Auerbach's New York office and with a copy to Regan and Cohen, Terri Spahn notified Ceridian Employer Services, a company administering Auerbach's payroll, that payroll processing and related services of Ceridian were suspended. (Exh. 22, Bates #1240).

67.     By way of a June 29, 2001 letter, Ms. Spahn notified Capital District Physicians' Health Plan in Albany New York that Group Number 003132 should be cancelled as the branch office in Albany was closed and to contact the New York office directly.  She copied Regan and Cohen on this documentation reflecting their involvement in the process.  (Exh. 23, Bates #0347).

68.     On June 29, 2001, Terri Spahn notified Defendants Regan, Cohen, and Yorke in writing that because she had not been paid, she considered herself laid off and advised them of many of the other pending human resource issues.  (Exh. 24, Bates #0384-0385).  These HR issues included, among other things, that Defendants had deducted money from Auerbach employee checks for 401(k) policies and for AFLAC policies but not credited the employee accounts.  (Exh. 24; Exh. 39, Spahn Depo p. 61(4-25).  Spahn's authority as an administrator of the Plan was essentially limited to getting employees on and off Auerbach's Plan and forwarding premium payment invoices and COBRA checks which she received to Cohen.  She had no

authority or control over Auerbach's financial accounts or the Plan, and was not authorized to make decisions on disputed claims. (Exh. 39, Spahn Depo p. 29(7-16), p. 47(13), 48(12), p. 63(7-13), p. 97(16), 108(21)-109(1). In fact, Spahn constantly asked Defendants for instructions on HR issues. (Exh. 24, Bates #0385). In addition to their financial fiduciary obligations, Defendant Regan as president of Auerbach and Chief Financial Officer Defendant Lewis Cohen had the authority to make final decisions on disputed claims under the Auerbach Health Plan. (Exh. 39, Spahn Depo p. 98 (7-15).

69.    Also on June 29, 2001, Spahn notified Auerbach's counsel, Richard Cushing of her resignation and the pending human resource issues. (Exh. 24, Bates #0384-0385; Exh. 25, Bates #1510-1511).

70.    In that June 29, 2001 memo, Spahn emphasized a variety of employee related issues to Regan, Cohen, Yorke and Cushing, including payroll, insurance benefits, including the Health Plan, tax issues, 401(k) benefits, etc. (Exh. 24, Bates #0384-0385).

71.    Similarly, in her memo, Spahn memorialized the fact that Regan specifically instructed her to, among other things, not process payroll for the June 30th period. (Exh. 24, Bates #0384). Regan ordered Spahn to not process payroll because he would rather simply not pay the employee instead of bouncing checks. (Exh. 39, Spahn Depo, p. 39(7-11). Spahn implemented Regan's directive in a letter to Ceridian payroll services. (Exh. 39, Spahn Depo p. 46, 8-25).

72.    Scovin was insured under Auerbach's Plan and underwent bilateral hip surgery on July 12, 2001. (Exh. 7, Scovin Affidavit). Based on Regan's directives, Spahn was unable to

notify plan members that the Auerbach Health Plan had been placed on hold because it was not being funded. (Exh. 39, Spahn Depo p. 41 (23)-42(2), 76(20)-77(4).

73.    By way of a July 13, 2001 fax to Great-West, Spahn detailed all of the termination dates for the employees that had recently left Auerbach and again, copied Regan and Cohen.  As of July 13, 2001, Defendants Regan, Cohen, and Yorke were still working for Auerbach and were still in the Health Care Plan.  (Exh. 26, Bates #GW 000208-212.).

74.    Around July 15, 2001, Spahn also prepared COBRA continuation benefit notices to send to the Plan participants.  She did not send the notices because Regan would not terminate the Health Plan and Regan would not authorize her to send the notices.  (Exh. 2, Bates #1220).

75.    By way of a memo dated July 16, 2001 to Regan and Cohen, after her June 29th resignation, Spahn further recapped the multiple outstanding insurance and human resource issues.  She explained, among other things, that based on the past due premiums, the Auerbach Health Plan had been placed on permanent hold and again suggested that the Health Plan be formally terminated.  She continued that the current arrangement with Great-West was that after the policy is cancelled, 2 months of premiums would remain due.  If these premiums were not met, then the medical bills outstanding would default to the employees for payment, which would be the worst case scenario.  She affirmed to the Defendants that employees would be forced to file suit against them for not making payments.  Ms. Spahn reiterated that Great-West was willing to pay the claims and close out the account in proper fashion.  (Exh. 27, Bates #1507-1509).  Still, Defendants did nothing.

76.     As of July 16, 2001, Ms. Spahn had boxed all of the employee records, various HR files, and records on the Health Plan and mailed them from her Denver office to Regan in New York.  (Exh. 27, Bates 1508; Exh. 2, Bates #1211).

77.     In the July 16, 2001 memo, Spahn explained that she was sending Cohen a file with all of the unpaid Health Plan invoices and listed the 12 boxes of records which she forwarded to Regan in New York.  (Exh. 27, Bates 1508).

78.     Regan stated that he would make everything right and that he was going to recapitalize the company.  (Exh. 1, Drake Depo. p. 83 (21). After Auerbach ceased trading and had no employees, Regan personally paid $100,000-150,000 to fund an appeal of the arbitration decision.  (Exh. 8, Regan Depo. p. 69(6)-70(2).

79.     Although the records were received in New York, Regan refused to open them and/or ignored them.  (Exh. 8, Regan Depo. p. 96 (4-9).  After the boxes were received, Spahn called Regan and told him that the boxes contained forms indicating that the insurer would not pay claims until the Plan was funded.  (Exh. 2, Bates #1212).

80.     Defendants claim to not know what happened to the 12 boxes and they have not been produced through discovery.

81.     Regan vacated the New York office in October 2001.  (Exh. 8, Regan Depo. p. 26 (10).

82.     In fact, Regan refused to open any of the mail sent to him in New York after June 15, 2001 through October.  (Exh. 8, Regan Depo. p. 96 (4-9).

83.    As of August 2001, Alison Zellner of Great-West reported that Auerbach still had not sent a termination letter to terminate the Health Plan.  (Exh. 11, Fry Depo. p. 126 (11-15); Exh. 28, Bates #GW000207).

84.    Auerbach never closed down or otherwise gave notice of termination of the Health Plan to Great-West.  (Exh. 11, Fry Depo. p. 127 (24).

85.    Ms. Zellner, of Great-West, requested and documented that Defendants refused to close down the Health Plan.  (Exh. 11, Fry Depo. p. 125 (8)-126 (15); Exh. 36, Zellner Email, Bates #GW000841-000844).

86.    As of August 2, 2001, Defendants Regan and Cohen were still contact persons in New York for the Health Plan.  (Exh. 29, Bates #0457).  Regan was the Plan Administrator sometime in the July 2001 time frame.  (Exh. 11, Fry Depo. p. 57 (12).

87.    Regan or Cohen never informed Great-West that they disputed their connection with the Auerbach Health Plan.  (Exh. 11, Fry Depo. p. 130 (9) – 131 (8).

88.    Invoices were sent to Regan for payment, including the final bill from Great-West.  (Exh. 30, Bates # APR0056-0059).

89.    Great-West denied payment of Scovin's medical expenses because there were insufficient funds in the Auerbach account.  (Exh. 11, Fry Depo. p. 144 (13-22), 146 (3-20).

90.    The Health Plan itself never issued a denial to Scovin for the medical claims. (Exh. 11, Fry Depo. p 145 (5-10).

91.    Under the Health Plan, Defendants continue to owe for medical expenses which Scovin incurred and which Great-West certified for medical necessity.  (Exh. 11, Fry Depo. p. 147 (2-5).

92.    Once eligible for COBRA benefits, Scovin sent his COBRA check payments to Auerbach and then directly to COBRASERV (Exh. 31, Bates SCOV 0209-0211, 0216-0217). Auerbach used COBRASERV to collect and process COBRA payments.  (Exh. 11, Fry Depo. p. 120-122).

93.    Scovin's checks were cashed.  (Exh. 31, Bates SCOV 0209-0211, SCOV 0217-0217).

94.    After receiving the COBRA payments from COBRASERV, Auerbach was required to forward them to Great-West for payment of the Auerbach members' medical expenses.  (Exh. 11, Fry Depo. p. 123 (1-15).

95.    Even through October 2001, Great-West continued to send their Statements and billing invoices to Regan in the New York office.  (Exh. 30, Bates #APR0056).

96.    Despite not funding the medical plan, Auerbach and the Defendants accepted Plaintiff's COBRA serve payments for medical expenses, and negotiated checks as late as November 2001.  (Exh. 32, Bates #0972-0976, 1550-1554).

97.    Form employee COBRA checks sent to Auerbach by COBRASERV and received after June 2001 through October 2001 were deposited into Auerbach accounts.  Cohen normally did that. (Exh. 8, Regan Depo. p. 89 (3-19).

98.    Auerbach did not forward the payments received from COBRASERV to Great-West. (Exh. 11, Fry, Depo. p 148 (14-23).

99.    Great-West never received any notice to close down the Auerbach Health Plan and so Great-West, terminated its administrative services contract with Auerbach. (Exh. 11, Fry Depo. p. 127 (15)-128 (3).  In other words, Auerbach accepted the premiums from Scovin and kept them for other usage.  Similarly, Auerbach kept $25,000 of employee 401(k) contributions which were deducted from employee paychecks before June 2001.  (Exh. 39, Spahn Depo p. 56(24)-58(10), p. 59(18)-60(7).

100.    Great-West did not have the power or authority to close down the Auerbach Health Plan itself.  (Exh. 11, Fry Depo. p. 128 (10-18).

101.    Great-West was authorized by Auerbach to perform certain services, one of which was to certify the medical necessity of the member's treatment.  (Exh. 11, Fry Depo. p. 88 (20)-89 (21); p. 116 (20)-117 (25); Exh. 38, October 24, 2001 letter).  In addition, Auerbach had sole possession and control over employee contributions, including COBRA premiums.  (Exh. 38, October 24, 2001 letter).

102.    If the Defendants had closed down the Auerbach Health Plan in June 2001, Great-West would not have provided the pre-certification for Scovin's medical treatments.  (Exh. 11, Fry Depo. p. 129 (9-19).

103.    Without notice of termination, Great-West was contractually obligated to provide plan members with certifications such as the Plaintiff's.  (Exh. 11, Fry Depo. p. 130 (1-7).

104.    Plaintiff Scovin's medical bills have not been paid.  (Exh. 7, Scovin Affidavit). Scovin was placed into collections and his medical providers instituted litigation. (Exh. 40).

105.    On July 11, 2003, after investigation, the Department of Labor issued a finding that Regan, as President and CEO of Auerbach, among other things, exercised discretion and control over the Auerbach Health Plan, was a fiduciary under ERISA, and violated ERISA by retaining contributions to the Auerbach Health Plan.  (Exh. 34, Bates #1185-1187).

106.    On July 11, 2003, after investigation, the Department of Labor issued a finding that Cohen, as Senior Vice President and Comptroller of Auerbach, among other things, exercised discretion and control over the Auerbach Health Plan, was a fiduciary under ERISA, and violated ERISA by retaining contributions to the Plan.  (Exh. 35, Bates #1188-1190).

107.    The Colorado Insurance Department determined that the defendants were responsible to advise Scovin of the termination of the Auerbach Health Plan and for funding the Health Plan and it was not the fault of Great-West. (Exh. 11, Fry Depo. p. 95 (5).

108.    If the medical premiums had been paid by the Defendants, the claims for medical services by Scovin's hospital, doctors and medical suppliers would have been paid by the Auerbach Health Plan.  (Exh. 39, Spahn Depo, p. 78(22), 125(16).

109.    Scovin contends there is a genuine issue of material fact as to whether Defendants can rely upon the Summary Plan Description ("SPD"), the services contract and stop-loss contract when none of these documents were ever disclosed to Scovin before he incurred the medical expenses claimed herein.

110.    Assuming Defendants are not fiduciary under ERISA, Scovin contends there is a genuine issue of material fact as to whether Defendants breached their common law duties to advise Scovin that the Auerbach Health Plan was not being funded hold prior his July 12, 2001 hip surgery.

111.    Assuming Defendants are not fiduciaries under ERISA, Scovin contends there is a genuine issue of material fact as to whether the Defendants had a duty to pay Scovin's medical claim in whole or in part prior to the time Great-West terminated its relationship with APR in September 2001.

112.    Assuming Defendants are not fiduciaries under ERISA, Scovin contends there is a genuine issue of material fact as to whether Defendants properly accounted for funds within the Auerbach Health Plan during the period when Scovin was entitled to benefits under the Health Plan and/or made COBRA payments, during the period from May through September 2001.

113.    Assuming Defendants are not fiduciaries under ERISA, Scovin contends there is a genuine issue of material fact as to whether Defendants misrepresented the true state of coverage when they failed to terminate the Auerbach Health Plan, notify the participants of the Plan, and thereby permitted Scovin to proceed with his surgery and follow up treatments in July 2001, when Defendants knew or should have known that the Health Plan was not being funded or was otherwise unfunded.

114.    Assuming Defendants are not fiduciaries under ERISA, Scovin contends there is a genuine issue of material fact as to whether Defendants themselves misrepresented to Scovin that

this was an insured plan or otherwise failed or omitted to advise or disclose to Scovin that this was a self funded plan without assets or actuarial integrity.

115.    Assuming Defendants are not fiduciaries under ERISA, Scovin contends there is a genuine issue of material fact as to whether the Defendants accepted his COBRA payments and paid themselves, used, or otherwise directed that Scovin's payments be used for purposes other that funding the Health Plan and/or for paying Scovin's medical expenses; or that they otherwise neglected, failed or refused, or intentionally kept his payments and did not pay Scovin's medical providers, despite their knowledge that they were obligated to do so.

116.    Assuming Defendants are not fiduciaries under ERISA, Scovin contends there is a genuine issue of material fact as to whether the Defendants' conduct as alleged in the complaint constitutes a violation of the Connecticut Unfair Trade Practices Act.

117.    Assuming Defendants are not fiduciaries under ERISA, Scovin contends there is a genuine issue of material fact as to whether the Defendants are liable for the legal obligations of APR under  piercing the corporate veil theory, in that Defendants controlled APR, used it as their alter ego, failed to properly wind down the Auerbach Health Plan despite their conscious decision not to fund that Plan.

PLAINTIFF, WILLIAM A. SCOVIN

By_____/s/_____
    Kevin M. Greco (ct 13195)
    Peter M. Nolin (ct 06223)
    Sandak Hennessey & Greco LLP
    707 Summer Street
    Stamford, CT  06901
    (203) 425-4200
    (203) 325-8608 (fax)
    kgreco@shglaw.com

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was mailed, postage prepaid to the following counsel and pro se parties on this 3rd day of April, 2006.

Christopher G. Barnes, Esq.
Jorden Burt
175 Powder Forest Drive, Suite 201
Simsbury, CT  06089

James M. Moriarty, Esq.
Mark S. Gregory, Esq.
Kelley Drye & Warren LLP
Two Stamford Plaza
281 Tresser Boulevard
Stamford, CT  06901

Robert G. Cushing, Esq.
Cushing Law Firm
420 East 54th Street
New York, NY  10178

Robert Drake
558 Lime Rock Road
Lakeville, CT  06039

_____/s/_____
Kevin M. Greco