IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| WILLIAM SCOVIN<br><br>Plaintiff,<br><br>v.<br><br>GREAT-WEST LIFE & ANNUITY INS. CO., ONE HEATH PLAN, INC., AUERBACH, POLLAK & RICHARDSON, INC., HUGH REGAN, LEWIS COHEN, ROBERT DRAKE and A. JONES YORKE,<br><br>Defendants. | CIVIL ACTION NO.: 02CV01161(AWT)<br><br><br><br><br><br><br><br><br><br><br><br>APRIL 20, 2006 |

## DECLARATION OF JAMES M. MORIARTY

James M. Moriarty declares as follows:

1. I am an attorney admitted to practice in this Court and am associated with the law firm of Kelley Drye & Warren LLP, counsel for defendants Hugh Regan ("Regan"), Lewis Cohen ("Cohen") and A. Jones Yorke ("Yorke") (collectively the "Individual Defendants") in this matter. I make this Declaration in further support of the Individual Defendants' Motion for Summary Judgment with respect to all of the causes of action asserted against them by Plaintiff William Scovin in his Amended Complaint.

2. I submit herewith, in further support of the Individual Defendants' Motion for Summary Judgment, certain documents and testimony which are identified below.

3. Attached hereto as *Exhibit 1* is a copy of a September 12, 2003 letter Plaintiff sent to the Department of Labor ("DOL"). This letter was obtained from the DOL pursuant to a Freedom of Information Request. The DOL provided the letter with certain

information redacted. It is clear, however, from the body of the letter, that it was submitted to the DOL by Plaintiff.

      4.      Attached hereto as *Exhibit 2* are excerpts from the March 17, 2006 deposition of Terri Spahn.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 20th day of April 2006 at Stamford, Connecticut.

                                                  */s/ James M. Moriarty*
                                                  James M. Moriarty

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing was served via first class mail, postage prepaid this 20th day of April, 2006 on all counsel of record as follows:

>Kevin M. Greco, Esq.
>Stephanie A. McLaughlin, Esq.
>Peter M. Nolin, Esq.
>Sandak Hennessey & Greco
>707 Summer Street
>Stamford, Connecticut 06901
>(203) 425-4200
>(203) 325-8608 (facsimile)
>*Attorneys for William Scovin*
>
>Christopher G. Barnes, Esq.
>Jeffrey L. Williams, Esq.
>Jorden Burt
>175 Powder Forest Drive,
>Suite 201
>Simsbury, Connecticut 06089
>(860) 392-5018
>(860) 392-5058 (facsimile)
>*Attorneys for Great West Life & Annuity Insurance. Co.*
>*and One Health Plan, Inc.*
>
>Mr. Robert Drake
>558 Lime Rock Road
>Lakeville, Connecticut 06039
>**(Pro se)**

_/s/ James T. Moriarty_
James M. Moriarty

CT01/MORIJA/227090.1

# Exhibit 1



September 12, 2003

Mr. Francis Clisham
Regional Director – New York Region
Employee Benefits Security Administration
33 Whitehall Street
Suite 1200
New York, NY 10004

Mr. Clisham:

I request that the Employee Benefits Security Administration take immediate and decisive action on the complaint I have filed with your office concerning the failure of my former employer, Auerbach, Pollack & Richardson, to fund the health care plan into which I had made five monthly premium payments under COBRA, on time and in full, in the year 2001. My complaint was formally filed in December 2001.

Auerbach's failure to fund the plan has resulted in approximately $100,000 of medical expenses for which I am now personally responsible. I have been essentially unemployed since February 2001, and do not have the financial resources to pay these bills. It is my well-informed belief that many of the former employees of Auerbach – both active employees and employees who were paying for health benefits under COBRA – have suffered from unpaid medical claims to varying degrees. The situation was badly exacerbated by the willingness of Auerbach's administrator – Great-West Life – to accept COBRA payments to the Plan and to pre-certify medical procedures for months after it knew Auerbach was not paying into its health plan.

While I have filed my own personal litigation against the Company's former executives, my complaint cannot have the same weight as an action by your Department, which has the mandate under Federal law to fight abuses such as these.

Mr. Clisham, I realize your Department has limited resources with which to stand watch over the trillions of dollars in the many private sector benefits plans in the United States. I would not waste the valuable time of you or your people if I did not firmly believe that my former employer has abused the laws and regulations badly and egregiously, and caused significant harm to my family and the family of many of its former employees.

At the very least, I would ask you with deepest urgency to consider composing and filing an amicus brief, which would at least indicate to the Federal court in which I have brought suit that the Department has seen this case, and has determined that Auerbach and its former officers have acted in bad faith and in clear violation of our nation's labor laws.

In order to give you context in which to judge the level of abuse involved in this case, I would like to provide you with a summary of the important events that led to my complaint. (Please be aware that the full recitation of the facts is given in the attached affidavit that my attorneys and I have filed with the federal court. This affidavit stands as the definitive record of what we believe were the facts):

I left Auerbach at the end of ███████████. I elected to pay for health insurance under COBRA. The Company had agreed to pay for my family medical benefits for the months of February and March 2001. At the time, health coverage was provided through Oxford Health Plans. Effective April 2001, Auerbach switched to a self-insured plan administered by Great-West Life; the name of the plan was OneHealth Plan PPO.

From April through August 2001, I paid for full-family coverage under COBRA. All my payments were made in full and on time. From conversations I have had with employees who were at Auerbach at that time and with other industry sources, I believe that sometime in May 2001 securities regulators told Auerbach to cease operations and wind down its business. Again, as I have been told, by mid-June 2001, all employees except for a handful of senior managers had left the company. However, there was never any official communication, written or oral, with myself or (insofar as I know) any former employee, regarding the company closing down or the treatment of the employee benefits plans. I continued to receive invoices for COBRA payments for my insurance up to the beginning of September, and we continued to see doctors and receive medical care, and they continued to accept OneHealth. In short, we were given every indication that the plan was active. Effective September 1, 2001, my family and I switched our healthcare coverage to MedSpan Health Options and withdrew from the OneHealth Plan.

In the spring of 2001, my orthopedists told me that I needed to have both hips replaced due to painful joint deterioration. I underwent surgery and subsequent physical therapy in July 2001. At all points, the physicians, surgeons, hospital and I conferred with Great-West to obtain pre-certification, and in every case, Great-West approved the preliminary procedures and acknowledged they would be accepted under my healthcare Plan. Both my surgeons and I were given authorization codes for this treatment by Great-West.

In September 2001, I received a call from the hospital indicating that the health plan was not honoring the hospital invoices. I called the plan administrator, Great West Life Insurance – OneHealth PPO, and was told the plan was on "administrative hold" – no further explanation provided. In time, I learned that Auerbach had not funded its healthcare plan. I was left responsible for approximately $100,000 in medical bills, with my only recourse lying with personal litigation against Great West and Auerbach, and enforcement by the US Department of Labor.

0294

2



I would like to point to some of the facts of this case that illustrate how the situation was mismanaged:

- If the plan had been properly terminated, I would have had the opportunity to enroll in the Connecticut State Guaranteed Pool, which would have paid for my procedures, thus avoiding the current financial catastrophe.

- Despite protests from Auerbach's former senior management that they "did not know what was going on" with the Company's benefits plans, any former employee will testify that Auerbach was essentially governed by its President and major shareholder, Hugh Regan. The only people with whom he kept counsel were Jones York (a shareholder and director of the Company), Lewis Cohen (the controller) and Robert Drake (the compliance officer and the last person to remain employed by Auerbach). Teri Spahn, the human resources administrator at the time of Auerbach's demise, told me in telephone conversations that:
    - At the time she left Auerbach, she was aware that Great-West had sent Auerbach several demands for payment, and that Great-West had placed the Plan on "administrative hold" but had not cancelled it.
    - Spahn advised me that in May-June 2001, she requested that Auerbach close the Plan in an orderly fashion, but that Hugh Regan had refused.
    - Upon her resignation, Ms. Spahn shipped numerous boxes of documents containing all of the records of the Plan to Regan at his New York Auerbach office.

- I am not a lawyer, but it is my understanding that most federal case law points to the assumption that the sponsoring company of a benefits plan is de facto the fiduciary – which, by extension, makes the corporate officers de facto fiduciaries.

- To the best of my knowledge, Auerbach never made an effort to officially terminate its plans, or to communicate with active or former employees in any fashion – there was no notice of layoffs, nor any letter explaining that Auerbach had been forced to cease operations. In short, there was never a discussion of the fate of the benefits plans.

- To the best of my knowledge, the Company itself never filed for bankruptcy – neither Chapter 7 nor Chapter 11. There was absolutely no way for former employees paying COBRA premiums to know that the plans would no longer be funded or serviced.

- Auerbach itself cashed my monthly coverage payments for the months of April, May and June 2001. According to instructions we received from the Company sometime in May or June 2001, our coverage checks for July and August 2001 were made out to CobraServ-CAP, a service bureau which was hired by Great



   West to collect payments and who cashed those checks. Yet, by information and belief, securities regulators had instructed Hugh Regan and Auerbach to wind down operations in May 2001, and almost all employees had walked out the doors by mid-June 2001.

- I have been told by many former colleagues who were still active employees at Auerbach at the time it collapsed, that their voluntary contributions to the 401(K) savings plan were never deposited, and appear to be lost forever. Others have told me that income taxes and FICA were withheld from their paychecks, but never paid to the government.

I have no way to determine whether the actions of Auerbach and its senior executives were intentional or not. I have already stated that in conversations with Ms. Spahn, she claimed to have tried to persuade Mr. Regan to pursue specific treatments and course of action for the benefits plans. Also, sometime in late 2001, I had a conversation with Robert Drake, who at that time was stationed in Stamford, Connecticut and was apparently the only active Auerbach employee remaining. At that time, he told me that he knew about medical claims made by Auerbach employees and ex-employees from July through September 2001, but felt that the responsibility for payment lay with Great West. ("If they have a client that is in default, not paying its premiums, then they should be smart enough to terminate coverage.").

I worked for Auerbach from August 1999 through January 2001. In all that time, Auerbach seemed to be financially troubled. On many occasions, services such as document printing, online stock quotes, securities industry databases and conference call bureaus were interrupted or terminated because the providers felt that Auerbach was not paying its bills or failing to pay in full and on time. At times, paychecks bounced for lack of sufficient funds, forcing employees to wait for payment beyond their scheduled pay dates. Many employees, including myself, had outstanding travel and business expenses that were approved but never paid.

Finally, I entreat you, Mr. Clisham, to consider the bad precedent that is set by Auerbach and other employers like it. Self-insurance is becoming a slimy crack into which the unethical employers of the country can slither. When ERISA was passed into law, Congress could not have anticipated the extent to which undercapitalized and unethical employers would be able to use the vague wording of the law's language to avoid keeping promises to their employees – and their families. Companies that misuse or misappropriate the money in benefits plans and subsequently go out of business are a major cause of personal financial hardship throughout the U.S. In the mid-1990's a report written under a grant from the Robert Wood Johnson Foundation found that self-insured benefits plans have led to lower quality benefits plans and a significant increase in the



number of employees left without recourse to justice when their employer fails to meet its promises or goes out of business.

Auerbach's failures to meet its obligations to its benefits plans have caused financial hardship to me and many other former employees. It is distinctly possible that I may never be able to pay the incurred medical bills in full. I beseech you to take the most aggressive action that your office can – preferably that of enforcement and litigation, but also the help that a well-reasoned amicus brief can provide to my attorneys and myself in our quest for justice on this issue.

With deepest gratitude for your time and attention to this matter, I remain

Yours truly,



Cc:

# Exhibit 2

```
 1   31889AKW
 2   UNITED STATES DISTRICT COURT, DISTRICT OF CONNECTICUT
 3   _____
     Civil Action No. 3:02CV01161(AWT)
 4   _____
 5   WILLIAM SCOVIN,
 6   Plaintiff,                          COPY
 7   vs.
 8   GREAT-WEST LIFE & ANNUITY INS. CO., ONE HEALTH PLAN, INC.,
     AUERBACH, POLLAK & RICHARDSON, INC., HUGH REGAN, LEWIS
 9   COHEN, ROBERT DRAKE, and A. JONES YORKE,
     Defendants.
10   _____
11            TELEPHONE DEPOSITION OF TERRI SPAHN
12                       March 17, 2006
13   Pursuant to Notice taken on behalf of the Plaintiff at
     1290 Broadway, Denver, Colorado 80203, at 1:06 p.m.,
14   before Kelli J. Wessels, Registered Professional Reporter
     and Notary Public within Colorado.
15
16
17
18
19
20
21
22
23
24
25
```

```
 1      A.   Yes.
 2      Q.   It is a two-page memo dated June 29th, 2001,
 3 correct?
 4      A.   Correct.
 5      Q.   And you've copied three people, correct, cc'd?
 6      A.   Yes.
 7      Q.   Jones Yorke Lewis Cohen and Richard Cushing,
 8 correct?
 9      A.   Correct.
10      Q.   We'd already seen that the fax cover sheet was
11 addressed to Regan and Yorke.  Who was Jones Yorke?
12      A.   Honestly, I don't remember what his title was.  I
13 don't remember if he was their attorney.  I don't remember
14 his title.
15      Q.   Do you know why you were copying him on this?
16      A.   Honestly, I don't remember exactly why.
17      Q.   How about Mr. Cushing?
18      A.   I don't remember why I was copying him as well.
19 I can't remember.  He might have been a compliance person,
20 but I don't remember who these people are.  Those
21 individuals were not ones that I dealt with on a regular
22 basis.  I also could have been instructed to copy them by
23 Gail Fanelli, Hugh Regan's assistant.  I don't remember.
24      Q.   Did you have fairly frequent communications with
25 Gail Fanelli during this period?
```

1  that was deducted for employee deferrals for the 401(k)
2  plan and it has not been funded to John Hancock. What
3  does that mean?
4      A.   Employees made their personal contributions to
5  the 401(k) plan. That money was deducted out of paychecks
6  but then not turned over to John Hancock to be disbursed
7  to individual accounts.
8      Q.   So the money went from the employees to Auerbach
9  and then Auerbach did not put it into their 401(k) plans?
10     A.   Correct.
11     Q.   So Auerbach essentially got the 25,000 from its
12 employees?
13     A.   Yes.
14     Q.   Was that ever corrected to your knowledge?
15     A.   To my knowledge it was not. To my knowledge.
16 Now there were department of labor claims ERISA claims
17 filed based on ERISA violations, and I do not know the
18 outcome of those claims.
19     Q.   Where was the 25,000 going during this period of
20 time?
21     A.   I know -- I don't know. The way we were set up
22 it would have gone either to Auerbach into one of their
23 accounts. I don't know what they did with it.
24     Q.   Would it be fair to say they were essentially
25 stealing money from their own employees?

```
 1   Richardson, the company sponsoring the plan.
 2           My question is prior to January 2001, who would
 3   have been the plan sponsor in the fiduciary sense?
 4       A.  It would have been American Frontier Financial.
 5       Q.  And then you said the authority to make rested
 6   with Mrs. Regan and Cohen.  They came into the picture in
 7   2001 with Auerbach, correct?
 8       A.  Yes.
 9       Q.  Now, who, in your view, had that authority prior
10   to January 2001?
11       A.  Robert Trapp and Gary Cook.
12       Q.  Who was Mr. Trapp?
13       A.  The president of American Frontier Financial.
14   And Gary Cook, CFO.
15       Q.  What happened with Mr. Trapp's position after the
16   Auerbach division transaction?
17       A.  He, like Gary Cook, stayed with E-Vision in a
18   capacity -- still a lead capacity, but I'm not sure of
19   titles.  I'm not sure what any titles would have been.
20       Q.  Did you ever have any discussions with Mr. Regan
21   where he told you that in fact you did not have the
22   authority to make final decisions on disputed claims?
23       A.  No, we did not have that discussion.
24       Q.  Did you have that discussion with Mr. Cohen?
25       A.  No.  We did not talk about the authority for --
```

```
 1  of disputed claims.
 2      Q.   To your knowledge, did Mr. Regan ever make a
 3  decision with respect to disputed claims under the plan?
 4      A.   To my knowledge, no.
 5      Q.   What about Mr. Cohen, to your knowledge?
 6      A.   No, I don't know what was ever presented to them
 7  directly.
 8      Q.   You can put that document to the side.
 9           I ask the court reporter to mark as the next
10  exhibit the document bearing Bates No. Scov-0212 through
11  213.
12      A.   Okay.
13      Q.   Do you recognize this document?
14      A.   It looks like a letter to me from Bill Scovin.
15      Q.   Do you recall receiving this letter from
16  Mr. Scovin?
17      A.   Yes, probably.
18      Q.   Dated February 15th, 2002?
19      A.   Yes.
20      Q.   And if you look at page -- the second page of the
21  letter which is Bates stamp Scov023.
22      A.   Yes.
23      Q.   You see on the bottom there is a domestic return
24  receipt?
25      A.   Yes.
```

```
 1   putting people on and off the plan, that would be done in
 2   Denver, correct?
 3        A.   Yes.
 4        Q.   The only thing done in New York would be to
 5   either write a check or transfer funds into the account?
 6        A.   Correct.
 7        Q.   If you go to the next page --
 8        A.   Okay.
 9        Q.   -- there's a paragraph that is entitled:  Life
10   and LTD?
11        A.   Yes.
12        Q.   If you look at the second sentence, We should
13   have confirmation of the rates by Thursday, January 25,
14   2001, at which time Jodie has prepared a letter approved
15   by Mike, Joe, and myself to go out to all new employees
16   explaining the benefits of the plans.  The benefits of the
17   plans would be the life and long-term disability plans,
18   correct?
19        A.   Correct.
20        Q.   Who is the Mike that is being referred to there?
21        A.   Probably Mike Benvenuto.
22        Q.   And Joe?
23        A.   Joe Padilla.
24        Q.   And myself refers to you, correct?
25        A.   Yes.
```

```
 1      A.   Not in any decision making capacity.  I mean, the
 2 environment was such that we were all trying to figure out
 3 what we were going to do next.  I mean, we didn't even
 4 know if we were going to have an office to go to.
 5      Q.   What do you mean the environment was such that
 6 you were trying to figure out --
 7      A.   Well, we were being evicted, paychecks were
 8 bouncing, premiums weren't getting paid.  I mean, it
 9 affected all of us.
10      Q.   Do you believe that Auerbach intentionally
11 bounced paychecks?
12      A.   No, I don't believe it was intentional.
13      Q.   Do you believe it was intentional that the
14 premiums on the health insurance plans were not paid?
15      A.   I believe there was no money and they couldn't
16 figure out what to do about that.
17      Q.   Do you know why there was no money?
18      A.   No, I don't.
19      Q.   Are you familiar with the net capital
20 requirements that a broker/dealer has to maintain?
21      A.   In general, yes.
22      Q.   Do you know if Auerbach was in violation of its
23 net capital at any point in time?
24      A.   There is a memo in this documentation that that
25 sort of refers to that.
```

Case 3:02-cv-01161-AWT    Document 174-2    Filed 04/21/2006    Page 18 of 18

Page 166
Terri Spahn                                                  March 17, 2006

```
 1      A.   That's correct.
 2      Q.   In fact, you simply say to them you might then
 3 want to forward a corrected bill to the home office and
 4 request payment, correct?
 5      A.   Yes.
 6      Q.   Did you ever tell anybody at Great-West in
 7 writing that in fact you had asked Mr. Regan to terminate
 8 the plan and he had refused?
 9      A.   No, not in writing.
10      Q.   Who was the chief contact between Auerbach and
11 Great-West?
12      A.   It was Jeff Scott.
13      Q.   And who was it on the Auerbach side?
14      A.   As far as plan design?
15      Q.   As far as just general communications.
16      A.   It was usually me.
17      Q.   If you look at Exhibit 10 which is the December
18 12, 2001 interview.
19      A.   Uh-huh.
20      Q.   Bates stamped 1210 through 1212.
21      A.   Yes.
22      Q.   Read Paragraph 7 there.  The chief contact for
23 Auerbach Pollak & Richardson with Great-West was Lew
24 Cohen.  Was that a true statement?
25      A.   Yes.
```

ESQUIRE DEPOSITION SERVICES    303 E. 17TH AVENUE, SUITE 565        DENVER, CO. 80203
PHONE 303.316.0330                                                  FAX 303.832.7640