UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____
                                               )
WILLIAM SCOVIN                                 )
                                               )
                                               )
          **Plaintiff,**                       )
                                               )  **CIVIL ACTION NO.**
v.                                             )  **3:02 CV 01161 (AWT)**
                                               )
GREAT-WEST LIFE & ANNUITY INS. CO.,            )
ONE HEALTH PLAN, INC., AUERBACH, POLLAK        )
& RICHARDSON, INC., HUGH REGAN,                )
LEWIS COHEN, ROBERT DRAKE, A. JONES            )  **JUNE 28, 2007**
YORK                                           )
          **Defendants.**                      )
_____)


**PLAINTIFF'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO
DEFENDANTS REGAN, COHEN, and YORKE'S
MOTION FOR SUMMARY JUDGMENT**


**I.     PRELIMINARY STATEMENT**

Plaintiff, William A. Scovin ("Scovin"), pursuant to Rule 56 of the Federal Rules of Civil

Procedure and The Local Rules of this District, and the Order(s) of this Court, submits this

Supplemental Memorandum in furtherance of Plaintiff's Opposition dated April 3, 2006 to

Defendants' Summary Judgment dated January 12, 2006.  This Supplemental Memorandum is

accompanied by Plaintiff's Supplemental Rule 56(a)(2) Statement dated June 28, 2007 which

submits Plaintiff's Supplemental Statement of Issues of Material Fact for which Plaintiff

contends there are issues to be tried. In addition and on behalf of the Plaintiff, the undersigned also submits a Supplemental Declaration containing Exhibits 41-50 in support of Plaintiff's Opposition to Defendants' Motion.

By way of brief background, in a September 29, 2006 Order in connection with Plaintiff's Motion for Sanctions, the Court denied Defendants' January 12, 2006 Motion for Summary Judgment and ordered additional discovery from Defendants. Thereafter, Defendants produced additional documents obtained from Auerbach Pollak & Richardson's corporate secretary, Marc S. Koplik. After an additional Motion pertaining to discovery was denied, Defendants filed a RENEWED Motion for Summary Judgment by way of a Notice dated June 8, 2007. By the Court's Order dated June 19, 2007, Plaintiff's instant Response is due by July 10, 2007.

## II.   SUPPLEMENTAL FACTUAL BACKGROUND

Plaintiff incorporates by reference the Factual Background Section and facts set forth in Plaintiff's Opposition dated April 3, 2006 and supplements with the following facts.

At least as of May 3, 2000 and for some time prior thereto, the Board of Directors of Auerbach Pollak & Richardson, Inc. ("APR") elected officers, including but not limited to the following: Defendant Lewis Cohen as the FinOp and Defendant Robert Drake as Sr. V.P. Compliance/Administration. (Plaintiff's Supplemental Statement ("PSS"), ¶119). During 2000 and into 2001, the Board of Directors conducted multiple meetings and kept corporate minutes in connection therewith. (PSS, ¶¶119, 120, 125, 127, 128, 133, 137, 144).

At the Board meeting of June 5, 2000, certain corporate decisions were made by a unanimous consent and approval. First, then Chairman John Sands' resignation was submitted and accepted. (PSS, ¶120). Additionally, Defendant Hugh Regan's Employment Agreement with APR was presented to the Board and Approved. (Id., ¶121). Defendant Regan's Employment Agreement set forth his position(s) as Chairman of the Board and Chief Executive Officer of the Company at an annual salary of $240,000.00. (Id., ¶122). It also contained various bonus provisions, severance benefits, and even indemnification language regarding personal counsel fees. (Id.). At this June 5, 2000 meeting, Defendant Yorke's Employment Agreement with APR was also presented and unanimously approved. (Id., ¶123). Yorke became the Vice Chairman of the Board and the Chief Administrative Officer. (Id.). Yorke's Agreement, however, lacked the multiple bonuses and benefits of Defendant Regan's Agreement, but required him to, among other things, devote his full time and efforts during normal business hours to the business and affairs of his office at a base salary of $90,000.00. (Id., ¶124).

A review of the September 2000 Minutes of APR reveals that the Board made a number of RESOLUTIONS granting financial priority interests to certain Officers and the counsel. As a result of a victory for the achievement in the UBS Warburg arbitration, the Board made the following RESOLUTIONS:

    a) that the Corporation congratulate Richard Cushing, Esq. and Parker Chapin for the achievement in the UBS Warburg arbitration,

      b) that the Corporation grant a first priority security interest in the award to in favor of the Senior Secured Promissory notes held by Hugh Regan and his family,

      c) that the Corporation grant a security interest for its legal fees to Richard G. Cushing, as attorney, to secure the fees payable to him personally pursuant to his retainer agreement which included a right to a contingency success fee.

(Id., ¶125).

These Resolutions reflect that the APR Board members, namely, Defendants Regan and Yorke were making the financial decisions affecting the company and in turn affecting employees. In addition, the Defendants were granting security interests in company money to Defendant Regan himself and to counsel for attorney's fees.

    The APR Board met again in late 2000. At the meeting of December 22, 2000, with all Directors present, APR agreed to enter into a strategic alliance with eVisionUSA.com. (PSS, ¶127). The eVision company purchased a 40% stake in APR and paid APR with assets coming primarily from customer accounts. (Id., ¶128). From February 27, 2001 through March 2001, Defendant Regan executed documents relating to APR stock transfers, and corresponded with eVision personnel in connection with eVision's exercise of its stock options. (Id., ¶135). Defendant Regan, as President of APR instructed APR's Secretary Marc Koplik to cut APR Stock Certificates to eVision and signed and acknowledged the receipt of the Certificates. (Id., ¶129). Counsel to the Corporation, Richard Cushing, was repeatedly cc'd on these transfer

documents and faxed documents as they were executed and delivered between the respective parties. (Id.).

Defendant Regan was responsible for the appointment of Defendant Lewis Cohen as the FinOp. (PSS, ¶ 130). He also appointed another man named Michael Benvenuto to his official position as CFO/Compliance Officer but that occurred later on March 12, 2001. (Id., *see also* PSS ¶138, Bates #MK000053). Defendant Regan confirms that in their capacities, Defendant Cohen and Benvenuto were ultimately responsible for managing payroll matters, including the deduction of payments for benefits from employee wages. (Id., ¶130). Mr. Benvenuto left APR in the end of the first quarter time frame, say approximately May 2001, certainly before June of 2001. (Id., ¶130, FN2*., see also* Plaintiff's April 3, 2006 Rule 56(a)(2) Statement ("PS"), ¶25). Therefore, after May 2001 and well before Scovin's surgery in July, Benvenuto had no responsibility for managing payroll matters, deduction of payments for benefits, medicals, employee wages, etc. That job belonged to the Defendants.

In February 2001, the eVision alliance discussions and implementation continued. (PSS, ¶132). Through the February into March 2001 period, the stocks were transferred. (Id., ¶¶135, 129). Also at the APR Board Meeting on February 14, 2001, then secretary Alexander Baldwin resigned. His written resignation was accepted. (PSS, ¶¶132-133). After Baldwin resigned, Defendant Regan was elected to 2 positions, namely, as President and Treasurer of APR. (Id.,¶134). Marc S. Koplik was elected as Secretary. (Id.,¶134). Clearly, as of February 2001, with APR's mounting financial problems, Defendant Regan, as sole Director, President, and Treasurer of Auerbach Pollak & Richardson, was aware of the company's dire situation.

5

Following up with the February 14th meeting, APR had its Annual Meeting on February 26, 2001. At the Annual Meeting on February 26th, Defendant Regan was again elected as President and Treasurer, Attorney Koplik as Secretary of APR. (PSS, ¶¶136, 137). Additionally, by Unanimous Written Consent of Stockholders, Defendants Regan and Yorke, Secretary Koplik, and John Sands were elected as Directors of APR. (PSS, ¶137).

At the next APR Board Meeting on March 12, 2001, Marc Koplik continued to serve as secretary. (PSS, ¶138). With all Directors being present and with a unanimous vote, Regan continued as President and Director, and Yorke continued as Chairman and Director. (PSS, ¶138). Upon motion duly made, the Individuals set forth on Schedule A attached to the March 2001 Minutes were appointed as Operating Officers. (Id.)

APR, as a broker dealer in securities, is regulated by NASD and the SEC. APR is required to meet and fulfill mandatory capitalization requirements under federal Regulations, including for example, section 15c3-1. Because it could not fulfill its mandatory capitalization requirements, on May 29, 2001, APR took a voluntary cease under the SEC Rules. (PSS, ¶139). APR also withdrew as broker dealer participating in the securities industry by filing a form with the NASD and SEC. (Id.). APR transferred its customer accounts were to other dealers. (Id., ¶140). As of that date, Defendants were still managing APR and its finances. Beyond question, as of May 29, 2001, over 1 ½ months before Scovin's surgery, Director/President/Treasurer Regan, and Chairman/Director Yorke, and APR's FINOP Defendant Cohen knew that by ceasing to do business under SEC Rule 15.3 no income would be coming in to APR. The Defendants

must necessarily know that by transferring accounts and customers, no income would come in as well.

Despite this knowledge and their obligations to employees, the disclosed Minutes from 2000 through June 20, 2001, *after* payroll was stopped and customers transferred, reflect no conduct or discussion to advise the employees of the situation, to return employee money improperly collected, to provide notice, to terminate or authorize others to terminate the Employee Medical Plan.  (PSS,¶¶ 119, 120, 125, 127, 128, 132, 137, 144).

After APR's last payroll of June 15, 2001, some of which did not clear, the Board of Directors continued with business 5 days later on June 20, 2001.  (PSS, ¶143).  In connection therewith, Defendants Regan and Yorke, John Sands, and Marc Koplik made a number of resolutions in connection with the approval of the settlement of a litigation entitled "Woodley" and setting up a related Escrow Agreement.  (Id., ¶¶143, 144).  They executed a unanimous written consent which provided for and approved a settlement Agreement by and among Eileen Woodley, Auerbach Financial Group, Inc., and APR. (Id., ¶¶144, 145).  In addition, the written executed consent of these APR Directors approved a certain Escrow Agreement made as of the 18th day of June 2001, among these parties. (Id.).  Clearly, these Directors were still managing the financial posture of APR and disregarding the obligations and duties owed to their employees and their benefits despite having accepted, for example, Scovin's COBRA payments during that time.  (Id., ¶146, *see also* PS April 3, 2006, ¶¶20, 90, 91, 92).

At that time, the APR Board was still acting with the advice of their counsel.  The Minutes of the June 20, 2001 Resolutions reflect that under the advice of Richard C. Cushing,

counsel to the Corporation, Defendant Regan was authorized to execute and deliver any other agreements or documents relating to the Woodley Settlement. (PSS, ¶147). Although the earlier dated APR Minutes reflect the submitted resignations of Sands and Baldwin, no resignations of any Defendants exist in any corporate minutes produced by APR's Secretary Koplik. Similarly, no minutes exist reflecting any discussions/decisions as to winding up the corporate entity, or to properly notifying employees and closing down the Pension and Medical benefits. (PSS,¶¶ 119, 120, 125, 127, 128, 132, 137, 144).

### III. ARGUMENT

The Plaintiff respectfully incorporates the Arguments set forth in each section of Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment dated April 3, 2006 as if fully set forth herein. In addition, Plaintiff supplements as follows.

#### A. SUMMARY JUDGMENT STANDARD

Plaintiff respectfully refers the Court to Section III. A. of Plaintiff's Opposition dated April 3, 2006.

#### B. ISSUES OF FACT EXIST AS TO DEFENDANTS' STATUS

Plaintiff respectfully refers the Court to Section III. B of Plaintiff's Opposition dated April 3, 2006.

##### 1. Regan, Cohen, and Yorke Exercised Discretionary Authority and Control Over the Health Plan

In addition to Section III. B. 1, 2, and 3 of Plaintiff's Opposition dated April 3, 2006, the instant Supplemental Exhibits and Facts evidence the Defendants exercise of discretion and

control.

Throughout the time period in early 2001 through June 2001, Regan was the President and Treasurer of APR, and a Director. He was interwoven into all aspects of the financial decision making process. Regan served all roles in the company, namely, as President, Treasurer, and the sole Director, for a period in February 2001. (PSS, ¶¶133, 134). He remained a Director, President, and Treasurer through the rest of 2001 with Yorke, Koplik, and Sands being added as Directors. (PSS, ¶137).

Defendant Cohen was appointed as the Financial Operations Principal by Regan. As part of his position as FinOp, Defendant Regan stated that Cohen was responsible to manage employee benefits, the employee deductions commensurate therewith, and wages, which, of course, necessarily included medical deductions and COBRA payments. (PSS, ¶131)., Clearly, by Defendant Regan's own words, Cohen was responsible on many levels for the medical Plan, employee deductions, and the Plan's financial status. (Id., see also, PS, April 3, 2006, ¶¶3, 15, 18, 23, 33).

Despite his claims to the contrary, the APR Minutes reflect that Defendant Yorke was more than just a Director/Vice Chairman of the Board of APR. He was also the Chief Administrative Officer of the company. (PSS, ¶123). Moreover, Yorke's Employment Contract mandated that he devote his full time and efforts to the position. (Id., ¶124). All of the corporate Minutes reflect that "all Directors were present" evidencing that Yorke played a voting role at each meeting after discussion. Yorke signed the Resolution in June 20, 2001. (Id., ¶144Many of these decisions impacted the financial future of the business.

9

Regan explained the May 2001 financial downfall of APR to Department of Labor investigator George Maul. (PSS, ¶¶139, 140, 141). Beyond question, in May 2001, over 1 ½ months before Scovin's medical treatment and July 12th surgery, Director/President/Treasurer Regan and Director/Chief Administrator Yorke, and FINOP Defendant Cohen knew that by ceasing to do business under the SEC Rules, no income would be coming in to support APR. The Defendants necessarily knew that by transferring APR's customer accounts to other brokers, no income would come in to the company. In other words, no money means no company. At that point, their obligations to the employees could not have been clearer. Despite this, and the direct knowledge supplied to them by Terri Spahn, (*See*, PS, April 3, 2006, ¶¶ 56, 57, 68), Defendants did nothing.

Further evidence of the Defendants' discretion and control is seen in their conduct on June 20, 2001, long after APR was in jeopardy, customers transferred, and payroll had failed. As the Minutes reflect, APR Directors and Officers were still meeting as of June 20, 2001. The Defendants knew of APR'S critical financial status as they had ceased trading on May 29th and had off loaded their customers. (PSS,¶¶139, 140). With no money coming in, the Defendants still met and engaged in the execution of financial decisions. (PSS, ¶¶144, 145, 146). Yorke and Regan made the decisions to settle the Woodley litigation and create an escrow in connection with the settlement.

Moreover, the Board was making these decisions on June 20, 2001 under advice of Attorney Cushing, counsel to the corporation. (PSS, ¶147). This is the same counsel whom Terri Spahn forwarded her June 2001 Memo to outlining the HR related concerns and medical

Plan issues. (PS, April 3, 2006, ¶¶67, 68, 69, 70, 71). In that APR was still receiving advice from counsel on June 20, 2001, there can be little question as to why Terri Spahn of HR was also including counsel in her HR related letter/memo and her requests to Regan, Yorke, and Cushing for assistance on what to do.

    It defies logic that Defendants were consulting with counsel as of June 20, 2001 and settling litigation while creating an escrow account but were not talking to counsel about the viability of APR and its financial obligations.

    **C.**    **ERISA DOES NOT PREEMPT PLAINTIFF'S STATE LAW CLAIMS**

    Plaintiff respectfully refers the Court to Section III. C. of Plaintiff's Opposition dated April 3, 2006.

    **D.**    **THE SUFFICIENCY OF PLAINTIFF'S COMMON LAW CLAIMS**

    In addition to Section III. D. 1, 2, 3, and 4 of Plaintiff's Opposition dated April 3, 2006, the Supplemental Exhibits and Facts also support Plaintiff's common law claims.

    Early on in September 2000, Defendant Regan, as a Director, gave himself a security interest in a favorable arbitration award to pay of notes held by Regan and his family. (PSS, ¶125). As part of the foundation of Defendants' knowledge, no dispute exists regarding the dire financial status of APR in early 2001. That was part of the reason for the alliance with eVision and the sale/transfers of stock. (PSS, ¶¶127, 128, 129, 135). After that, in May 2001, no dispute exists that Defendants voluntarily ceased under the SEC Rules and withdrew as broker/dealers. The reason for the cease was a lack of capitalization. (PSS, ¶139).

11

Nonetheless, at the June 20, 2001 Meeting of the Board, Defendants / Directors Regan and Yorke were still cutting financial deals for themselves. Knowing that they had moved customer accounts and had ceased under the SEC Rules, they should have been winding up the affairs of APR. Instead, they met to execute a settlement agreement and escrow settlement proceeds from that settlement for their own benefit. (PSS, ¶¶145, 146, 147).

In Section III. D. 1 of Plaintiff's Opposition to Summary Judgment dated April 3, 2006, Plaintiff outlined the Defendant's complete lack of corporate formality with APR. As noted in Defendants' Opposition of April 3, 2006, the Defendants ran APR haphazardly from a financial perspective by not timely paying certain bills to keep Auerbach running; by using employee 401(k) contributions; and by diverting Scovin's COBRA payments. Consonant therewith, the Defendants failed to comply with other necessary corporate formalities. For example, Regan stated that he did not terminate the Plan or authorize anyone else to terminate it. Moreover, no reference is made in any of the various corporate Minutes of APR as to an orderly winding up of the corporation. (PSS, ¶¶119, 120, 125, 127, 128, 132, 137, 144; see also, PS, April 3, 2006 ¶62).

In fact, Regan told the DOL that he essentially did nothing as the company collapsed. Regan claims that he did not terminate the Plan, did not authorize anyone else to terminate it, and is not sure what happened to the Plan. (PSS, ¶149). Moreover, although the APR books and records were shipped to him at his office, he does not know what became of them or where they are. (Id., ¶150). The lack of any formality, coupled with the "don't look and don't tell" position of the Defendants, creates a factual issue as to whether Auerbach was ever a true corporation or

rather merely a shell run for the benefit of the Defendants.

Similarly, under Section III. D. 2 of Plaintiff's Opposition dated April 3, 2006, the Supplemental Exhibits and Facts also support Plaintiff's common law claims. As noted above, the Defendants' expressed and implied knowledge of APR's adverse financial status began in early 2001 and peaked in May 2001 when APR ceased and transferred its customers. From then forward, the company could not pay its expenses, and collapsed on June 15, 2001 when only some payroll cleared. From May 2001 forward, at a minimum, the Defendants owed a duty to their employees and those others receiving benefits and directly paying COBRA benefits. The Defendants breached their duty by, among other things, failing to warn or advise Scovin of the situation and by not paying the benefits for him. With this knowledge, the further breached by keeping his monthly COBRA payments for their own usage. As a result, Defendants are liable.

**PLAINTIFF, WILLIAM A. SCOVIN**

By_____
Kevin M. Greco (ct 13195)\
Peter M. Nolin (ct 06223)
**Sandak Hennessey & Greco LLP**
707 Summer Street
Stamford, Ct 06901
(203) 425-4200
(203) 325-8608 (fax)
kgreco@shglaw.com

## CERTIFICATION

I hereby certify that a copy of the foregoing was mailed, postage prepaid, on this 28th day of June 2007 to:

James M. Moriarty, Esq.
Mark S. Gregory, Esq.
Kelley Drye & Warren LLP
Two Stamford Plaza
400 Atlantic Street
Stamford, CT  06901

Robert G. Cushing, Esq.
Cushing Law Firm
420 East 54th Street
New York, NY  10178

Robert Drake
558 Lime Rock Road
Lakeville, CT  06039

_____
Kevin M. Greco