EXHIBIT 42

MINUTES OF MEETING OF DIRECTORS
OF
AUERBACH, POLLAK & RICHARSON, INC.

A meeting of the Board of Directors of the Corporation was held at the offices of Auerbach, Pollak & Richardson, Inc., a Connecticut corporation (the "Corporation") in Stamford, CT, on the date set forth below.

All of the Directors being present and waiving notice of the meeting, the meeting was called to order by the Chairman. Hugh Regan was chosen to act as secretary of the meeting.

RESOLVED, that the proposed Employment Agreement for Mr. Regan shall be and hereby is approved in substantially the form attached hereto; and further

RESOLVED, that each and any director or officer is authorized to execute and deliver said Agreement on behalf of the Corporation with such changes as said director or officer shall deem appropriate in his sole discretion.

RESOLVED, that the resignation of John K. Sands as Chairman be accepted with thanks for his contribution to the firm, and that Hugh Regan serve as Chairman.

RESOLVED, that the proposed Employment Agreement for A. Jones Yorke shall be and hereby is approved in substantially the form attached hereto; and further

RESOLVED, that each and any director or officer is authorized to execute and deliver said Agreement on behalf of the Corporation with such changes as said director or officer shall deem appropriate in his sole discretion.

RESOLVED, that the proposed Stockholders Agreement between Auerbach Financial Group, Inc. and the Corporation shall be and hereby is approved in substantially the form attached hereto; and further

RESOLVED, that each and any director or officer is authorized to execute and deliver said Agreement on behalf of the Corporation with such changes as said director or officer shall deem appropriate in his sole discretion.

There being no further business to come before the meeting, upon motion duly made, seconded and unanimously carried, the meeting was adjourned.

Dated: June 5, 2000

_____
Hugh Regan, Secretary of the Meeting

MK000009

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT is entered into as of July 1, 2000, by and between AUERBACH, POLLAK & RICHARDSON, INC., a corporation with its principal place of business at 450 Park Avenue, New York, NY 10022 (the "Company"), and A. JONES YORKE (the "Executive"). Unless otherwise defined, capitalized terms are used herein with the respective meanings set forth in Section 14.

### Background

The Executive is presently employed by the Company as the Vice Chairman of the Board and Chief Administrative Officer.

The Board of Directors of the Company recognizes that the Executive's contribution to the growth and success of the Company has been and is expected to be substantial. The Board desires to provide for the continued employment of the Executive and to make certain changes in his employment arrangements which the Board has determined will reinforce and encourage his continued attention and dedication to the Company. The Executive is willing to commit himself to continue to serve the Company on the terms and conditions provided herein.

Accordingly, in consideration of the premises and the respective covenants and agreements set forth herein, and intending to be legally bound hereby, the parties hereby agree as follows:

1. **Employment Period**. The Company shall employ the Executive for an initial period of one (1) year beginning on the date hereof and continuing through July 1, 2001, subject to annual review each of the years of the term of this Agreement, and, at the discretion of the Company, renewable on an annual basis with a term of one year thereafter.

2. **Employment Duties**. (a) The Company will continue to employ the Executive as the Vice Chairman of the Board and Chief Administrative Officer. The Executive agrees to continue in such employment for the duration of the Employment Period and to perform in good faith and to the best of his abilities all services which may be required of him in such offices and to be available to render such services in accordance with the Company's By-Laws, as they may be amended from time to time, and all reasonable directives and assignments issued by the Company's Board of Directors that

are consistent with the titles and responsibilities of his positions and his expertise.

(b) During the Employment Period, the Executive will devote his full time and efforts during normal business hours to the business and affairs of the company within the customary scope of his office.

(c) The Executive shall be based at the principal executive offices of the Company in Manhattan, except for required travel on Company business.

3. Compensation. (a) The Executive's base salary will be at the annual rate of Ninety-Thousand-Dollars ($90,000). The Board or an appropriate committee of the Board will review his salary at least annually beginning in the fourth fiscal quarter of 2001.

(b) The Executive's base salary will be paid at periodic intervals in accordance with the Company's payroll practices for executive employees.

(c) During the Period of Employment at the discretion of the Board, the Executive may be awarded a cash bonus or other compensation based on the profitability and the gross revenues of the Company for the prior fiscal year.

(d) The Company will deduct and withhold, from any payments to the Executive hereunder, any and all federal, state and local income and employment withholding taxes and any other amounts required to be deducted or withheld by the Company under applicable law.

4. Expense Reimbursement. The Company shall reimburse the Executive for all customary, ordinary and necessary business expenses incurred by him in the performance of his duties hereunder, promptly upon the presentation of receipts therefor.

5. Fringe Benefits. During the Employment Period, the Executive will be eligible to participate in any retirement plan, annual and long-term incentive compensation plan, stock option and purchase plan, group life insurance plan, group medical and dental insurance plan, accidental death and dismemberment plan, short-term disability program and other employee benefit plans which are made available to other executive officers and for which he qualifies.

6. Vacation. The Executive will accrue paid vacation benefits during the Employment Period in accordance with the Company policy in effect for other executive officers with a minimum of four weeks annum.

7.  **Death**. If the Executive dies during the Employment Period, the employment relationship created by this Agreement will terminate, the Executive's salary shall continue to be paid to his designated beneficiary or, if none, to his personal representative through the end of the month in which his death occurred. In addition, the Executive, or his designated beneficiary or personal representative, will be entitled to such death benefits as may be payable under Section 5.

8.  **Disability**. If the Executive becomes disabled during the Employment Period, the employment relationship created by this Agreement may be terminated by the Company pursuant to Section 9 (a) (ii). The disability of the Executive shall not constitute a breach of this Agreement by the Executive. The Executive will be deemed to be disabled if he is unable by reason of any physical or mental injury or illness substantially to perform the services required of him hereunder either for a period in excess of one hundred eighty (180) consecutive days or for a period of one hundred eighty (180) days in the aggregate during any three-hundred sixty (360) day period. In such event, the Executive will be deemed to be disabled as of the completion of such one hundred eighty (180) day period or three hundred sixty (360) day period, as the case may be.

9.  **Termination**. (a) The Executive's employment hereunder may be terminated only under the following circumstances:

    (i) The Executive's employment hereunder shall terminate upon his death.

    (ii) If the Executive is disabled within the meaning of Section 8, the Company may terminate his employment upon not less than thirty (30) days' prior written notice to him unless during such thirty-day period he resumes the performance of his duties hereunder on a full-time basis.

    (iii) The Company may terminate the Executive's employment for Cause.

(b) Any termination of the Executive's employment by the Company or by the Executive under this Section 9 (other than pursuant to Subsection 9 (a) (i) above) shall be communicated by written notice to the other party hereto in accordance with this Section 9. Such notice shall indicate the specific termination provision in this Agreement relied upon and shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of the Executive's employment.

10. **Indemnification**. (a) The indemnification provisions of the Company's Certificate of Incorporation and By-Laws will be extended to the Executive, to the maximum extent permitted by law, during the period following his termination, irrespective of a Change in Control, with respect to any and all matters, events or transactions occurring or effected during the Employment Period, or otherwise in connection with his employment by the Company or any of its subsidiaries or Affiliates.

(b)   The Company further represents and warrants to the Executive: (i) that the Executive is and shall continue to be covered and insured up to the maximum limits provided by all insurance which the Company maintains to indemnify its directors and officers (and to indemnify the Company for any obligations which it incurs as a result of its undertaking to indemnify its officers and directors); and (ii) that the Company will purchase and maintain such insurance in not less than two million dollars ($2,000,000), in effect throughout the Employment Period.

11.   <u>Definitions</u>.   When used herein, the following terms shall have the following meanings:

"Cause" shall mean (a) the willful and continued failure by the Executive substantially to perform his duties hereunder, as determined in good faith by the Board (other than any failure resulting from his disability or any actual or anticipated failure after the issuance of a notice of termination under Subsection 9(b), a termination by the Executive for Good Reason under Section 9(a)(iv), or a Change of Control after written demand for substantial performance is delivered by the Company specifically identifying the manner in which the Company believes the Executive has not substantially performed his duties and he has failed to cure the deficiency within sixty (60) days after written notice of such failure has been given by the Company to the Executive, or (b) conviction of the Executive of a felony or a crime involving moral turpitude.

"Date of Termination" shall mean (i) if the Executive's employment is terminated by his death, the date of death, (ii) if the Executive's employment is terminated as a result of his disability, thirty (30) days after notice of termination is given (provided that the Executive shall not have returned to the performance of his duties on a full-time basis during such thirty-day period), (iii) if the Executive's employment is terminated pursuant to Subsection 9(a)(iii) or (iv) above, the date specified in the notice of termination, or (v) if the Executive's employment is terminated or the Company elects not to renew this Agreement for any other reason, the effective date of termination or the last day of the then current term.

"Employment Period" shall mean the initial term and any renewal periods.

12.   <u>Entire Agreement: Amendment</u>.   This Agreement sets forth the entire agreement between the parties relating to the terms of the Executive's employment and it supersedes all prior agreements and understandings with respect to such subject matter. This agreement may only be amended by written instrument signed by the Executive and an authorized officer of the Company.

13. <u>Waiver</u>.   No term or condition of this Agreement shall be deemed to have been waived, nor shall there be any estoppel against the enforcement of any provision of this Agreement, except by written instrument of the party charged with such waiver or estoppel. No such written waiver shall be deemed a continuing waiver unless specifically stated therein, and each such waiver shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

14. <u>Severability</u>.  If any provision of this Agreement is held to be invalid or unenforceable for any reason, such invalidity or unenforceability shall not affect any other provision of this Agreement not held so invalid or unenforceable, and each such other provision shall to the full extent consistent with law continue in full force and effect. If any provision of this Agreement shall be held invalid or unenforceable in part, such invalidity or unenforceablity shall in no way affect the rest of such provision, and the rest of such provision, together with all other provisions of this Agreement, shall to the full extent consistent with law continue in full force and effect.

IN WITNESS WHEREOF the Company by its duly authorized officer and the Executive parties have signed this Agreement as of the date first set forth above.

AUERBACH, POLLAK & RICHARDSON, INC.

By:_____
    Hugh Regan

THE EXECUTIVE

_____
    A. Jones Yorke

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT is entered into as of July 1, 2000, by and between AUERBACH, POLLAK & RICHARDSON, INC., a corporation with its principal place of business at 450 Park Avenue, New York, NY 10022 (the "Company"), and HUGH REGAN (the "Executive"). Unless otherwise defined, capitalized terms are used herein with the respective meanings set forth in Section 14.

### Background

The Executive is presently employed by the Company as the Chairman of the Board and Chief Executive Officer.

The Board of Directors of the Company recognizes that the Executive's contribution to the growth and success of the Company has been and is expected to be substantial. The Board desires to provide for the continued employment of the Executive and to make certain changes in his employment arrangements which the Board has determined will reinforce and encourage his continued attention and dedication to the Company. The Executive is willing to commit himself to continue to serve the Company on the terms and conditions provided herein.

Accordingly, in consideration of the premises and the respective covenants and agreements set forth herein, and intending to be legally bound hereby, the parties hereby agree as follows:

1. **Employment Period.** The Company shall employ the Executive for an initial period of five (5) years beginning on the date hereof and continuing through July 1, 2005, and for successive one-year renewal periods thereafter. Each renewal shall be automatic unless either the Company or the Executive gives at least ninety (90) days notice of nonrenewal. Any notice of nonrenewal shall be communicated by written notice to the other party, and if the notice is given by the Company it shall indicate the specific reason for nonrenewal and shall set forth in reasonable detail the facts and circumstances which are the basis thereof.

2. **Employment Duties.** (a) The Company will continue to employ the Executive as the President, Chairman of the Board, Chief Executive Officer and, at the Executive's option, head of Investment Banking. The Executive shall have the right to appoint and/or delegate the personnel necessary to manage the day-to-day affairs of the Company. In addition, the Executive shall, in his sole discretion, have the right to choose the Company's auditors and legal counsel, as well as any other professionals or consultants necessary or desirable. The Executive agrees to continue in such employment for the duration of the Employment Period. In order to perform his duties hereunder, the Executive shall have the right to hire and maintain at all times, both an administrative assistant and an executive assistant. In addition, the Executive shall have complete and

unrestricted access to all other Company personnel, all databases, internal documents and other information, including without limitation, financial information relating to affairs of the Company in any way.

(b) During the Employment Period, the Executive will devote time to the business and affairs of the Company within the customary scope of his office.

(c) The Executive shall be based at the principal executive offices of the Company in Manhattan, or any other location in his discretion.

3. <u>Compensation.</u> (a) The Executive's base salary will be at the annual rate of Two-Hundred-Forty-Thousand-Dollars ($240,000). The Board or an appropriate committee of the Board will review his salary at least annually beginning in the fourth fiscal quarter of 2001. The Board or such committee may, in its discretion, increase the base salary of the Executive from time to time, but may not reduce his base salary. If so increased, the base salary shall not thereafter be decreased during the Employment Period.

(b) The Executive's base salary will be paid at periodic intervals in accordance with the Company's payroll practices for executive employees.

(c) During the Period of Employment the Executive shall be entitled to receive various bonus payments. In addition and from time to time, the Executive shall be entitled to receive various no-salary-based forms of compensation, including, without limitation, brokerage commissions, other commisions, finders' fees, and warrants and any other securities ("Non Salary-Based Forms of Compensation"). Annual bonus payments shall be paid not later than thirty (30) days after completion of the Company's audited financial statements for its preceding fiscal year, in an amount determined by the Board or an appropriate committee of the Board based upon performance goals established by the Board or such committee for the prior fiscal year.

(d) In addition, Executive shall automatically receive a minimum bonus payment equal to one-half of one percent (0.5%) of the gross revenues of the Company for the prior fiscal year.

(e) As additional compensation, the Executive shall be entitled to ten percent (10%) of all warrants earned by the Company for any and all transactions which close during the term of his employment and within six months following the termination of the Executive's employment. All said warrants shall be issued in the name of Executive and promptly delivered to the Executive at the closing.

(f) The Company will deduct and withhold, from any payments to the Executive hereunder, any and all federal, state and local income and employment withholding taxes and any other amounts required to be deducted or withheld by the Company under applicable law.

4. **Expense Reimbursement.** The Company shall reimburse the Executive for all customary, ordinary and necessary business expenses incurred by him in the performance of his duties hereunder, promptly upon the presentation of receipts therefor.

5. **Fringe Benefits.** During the Employment Period, the Executive will be eligible to participate in any retirement plan, annual and long-term incentive compensation plan, stock option and purchase plan, group life insurance plan, group medical and dental insurance plan, accidental death and dismemberment plan, short-term disability program and other employee benefit plans which are made available to other executive officers and for which he qualifies.

6. **Vacation.** The Executive will accrue paid vacation benefits during the Employment Period in accordance with the Company policy in effect for other executive officers with a minimum of four weeks annum. This right shall accrue from year to year.

7. **Death.** If the Executive dies during the Employment Period, the employment relationship created by this Agreement will terminate, the Executive's salary shall continue to be paid to his designated beneficiary or, if none, to his personal representative through the end of the month in which his death occurred. In addition, the Executive, or his designated beneficiary or personal representative, will be entitled to such death benefits as may be payable under Section 5.

8. **Disability.** If the Executive becomes disabled during the Employment Period, the employment relationship created by this Agreement may be terminated by the Company pursuant to Section 9 (a) (ii). The disability of the Executive shall not constitute a breach of this Agreement by the Executive. The Executive will be deemed to be disabled if he is unable by reason of any physical or mental injury or illness substantially to perform the services required of him hereunder either for a period in excess of one hundred eighty (180) consecutive days or for a period of one hundred eighty (180) days in the aggregate during any three-hundred sixty (360) day period. In such event, the Executive will be deemed to be disabled as of the completion of such one hundred eighty (180) day period or three hundred sixty (360) day period, as the case may be.

9. **Termination.** (a) The Executive's employment hereunder may be terminated only under the following circumstances:

    (i) The Executive's employment hereunder shall terminate upon his death.

    (ii) If the Executive is disabled within the meaning of Section 8, the Company may terminate his employment upon not less than thirty (30) days' prior written notice to him unless during such thirty-day period he resumes the performance of his duties hereunder on a full-time basis.

    (iii) The Executive may terminate his employment hereunder for Good Reason, if he is disabled or within six (6) months after a Change of Control.

(b) Any termination of the Executive's employment by the Company or by the Executive under this Section 9 (other than pursuant to Subsection 9 (a) (i) above) shall be communicated by written notice to the other party hereto in accordance with this Section 9. Such notice shall indicate the specific termination provision in this Agreement relied upon and shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of the Executive's employment.

(c) If this Agreement is terminated by the Company as a result of the disability of the Executive, the Company shall be obligated to continue the salary and benefits of the Executive for a period of twelve months or such greater period of time as the Board determines in its sole discretion. If the Company terminates the Executive or elects not to renew this Agreement for any other reason, the Company shall maintain in full force and effect for the Executive, for the remainder of the term of this Agreement, all employee welfare benefit plans in which the Executive was entitled to participate immediately prior to the Date of Termination provided that the Executive's continued participation is possible under the general terms and provisions of such plans. In the event that the Executive's participation in any such plan is barred, the Company shall arrange to provide the Executive with benefits substantially similar to those which the Executive would otherwise have been entitled to receive under such plans from which his continued participation is barred.

(d) The Executive shall have no duty to mitigate his damages following a termination of his employment hereunder.

10. <u>Severance Benefit</u>. (a) If the Company terminates the Executive's employment or elects not to renew this Agreement for any reason, or if the Executive terminates this Agreement for Good Reason or within six (6) months after a Change of Control, the Company shall pay to the Executive on the Date of Termination an amount equal to three (3) time the Executive's highest total compensation under this agreement, including his highest salary, highest bonus and highest Non-Salary-Based Compensation (the "Severance Benefit").

(b) If the Company terminates the Executive's employment or elects not to renew this Agreement for any reason or if the Executive terminates this Agreement for Good Reason or within six (6) months after a Change of Control, any portion of the Executive's stock options, including without limitation, options and warrants granted under any Stock Incentive Plans, that were not vested on the Date of Termination, shall become fully vested and exercisable on the Date of Termination, and the Executive shall be entitled to exercise such options, in whole or in part, from time to time and at any time during the exercise period set forth in the applicable award agreement. To the extent that this provision is inconsistent with any term or provision of the applicable award agreement, such agreement shall be deemed to be amended hereby to the extent necessary to eliminate such inconsistency. If such vesting is ineffective or prohibited by any term or condition of any plan or agreement binding on the Company or any provision of applicable law, the

Company shall take whatever steps are necessary or appropriate to confer upon the Executive the full economic benefits intended to be granted hereby, including without limitation, granting new stock options on the same terms and conditions or issuing comparable stock appreciation rights (SARs).

11. <u>Indemnification</u>. The indemnification provisions of the Company's Certificate of Incorporation and By-Laws will be extended to the Executive, to the maximum extent permitted by law, during the period following his termination, irrespective of a Change in Control, with respect to any and all matters, events or transactions occurring or effected during the Employment Period, or otherwise in connection with his employment by the Company or any of its subsidiaries or Affiliates.

12. <u>Counsel Fees and Indemnification</u>. (a) The Company shall pay, or reimburse the Executive, the reasonable fees and expenses of his personal counsel for professional services rendered to the Executive in connection with this Agreement and matters related thereto.

(b) In the event that (i) the Company terminates, or seeks to terminate the Executive's employment for any reason, and the Executive disputes the termination or attempted termination, and he prevails, or (ii) the Executive elects to terminate his employment hereunder for Good Reason or within six (6) months after a Change in Control, and the Company disputes any of its obligations to him under this Agreement, including without limitation, its obligation to pay him the Severance Benefit, and he prevails, then the Company shall pay, or reimburse to the Executive, all reasonable costs incurred by him in such dispute, including, without limitation, attorneys' fees and expenses and the fees of the arbitrators.

(c) The Company shall indemnify and hold the Executive harmless to the maximum extent permitted by law against judgments, fines, amounts paid in settlement and reasonable expenses, including attorneys' fees incurred by him, in connection with the defense of, or as a result of any action or proceeding (or any appeal from any action or proceeding) in which he is made or is threatened to be made a party by reason of the fact that he is or was an officer or director of the Company or any subsidiary or affiliate thereof, regardless of whether such action or proceeding is one brought by or in
the right of the Company to procure a judgment in its favor (or other than by or in the right of the Company). The Executive shall have the right to choose his own legal counsel and the fees of said counsel shall be paid contemporaneously. This provision shall survive any termination of employment and shall remain in effect indefinately.

(d) The Company further represents and warrants to the Executive: (i) that the Executive is and shall continue to be covered and insured up to the maximum limits provided by all insurance which the Company maintains to indemnify its directors and officers (and to indemnify the Company for any obligations which it incurs as a result of

its undertaking to indemnify its officers and directors); and (ii) that the Company will purchase and maintain such insurance in not less than two million dollars ($2,000,000), in effect throughout the Employment Period.

13. **Disputes.** Any controversy which may arise between the Executive and the Company with respect to the construction, interpretation or application of any of the terms, provisions, covenants or conditions of this Agreement or any claim arising from or relating to this Agreement shall, in the sole discretion of the Executive be arbitrated before the National Association of Securities Dealers ("NASD") pursuant to the Rules and Constitution of the NASD, or litigated before the State or Federal courts in New York County.

14. **Definitions.** When used herein, the following terms shall have the following meanings:

"Acquiring Person" means any person who alone or together with its Affiliates and Associates or any other entity or person which in the aggregate shall be the beneficial owner(s) and shall have the unrestricted right to vote fifty-one percent (51%) or more of the Company's Common Stock (other than Hugh Regan or any Affiliate of his, any employee benefit plan of the Company or of any Subsidiary, or any person or entity organized, appointed or established by the Company or any Subsidiary for or pursuant to the terms of any such plans).

"Affiliate" and "Associate" shall have the respective meanings ascribed to such terms in Rule 12b-2 of the General Rules and Regulations under the Securities Exchange Act of 1934.

"Change in Control" of the Company shall be deemed to have occurred on the earliest of the following dates: (i) the date any Acquiring Person, alone or together with its Affiliates and Associates or any other entity or person which in the aggregate shall be the beneficial owner(s) and shall have the unrestricted right to vote fifty-one percent (51%) or more of the shares of Common Stock then outstanding; (ii) the date the stockholders of the Company approve a definitive agreement (A) to merge or consolidate the Company with or into another corporation, in which the Company is not the continuing or surviving corporation or, whether or not the Company is the surviving corporation, pursuant to which any Common Stock of the Company would be converted into cash, securities or other property of another corporation, other than a merger of the Company in which holders of Common Stock immediately prior to the merger have the same proportionate ownership of common stock of the surviving corporation immediately after the merger as immediately before, or (B) to sell or otherwise dispose of all or substantially all of the assets of the Company; or (iii) the date the Continuing directors no longer constitute a majority of the Board.

"Continuing Director" means any individual who is a member of the Board, while such individual is a member of the Board, who is not an Acquiring Person, or an Affiliate or Associate of an Acquiring Person, or a representative or nominee of an Acquiring Person or of any such Affiliate or Associate and who was a member of the Board prior to the occurrence of the Change in Control, any successor of a Continuing Director, while such successor is a member of the Board, and who is not an Acquiring Person or of any such Affiliate or Associate, and is recommended or elected to succeed the Continuing Director by a majority of the Continuing Directors.

"Date of Termination" shall mean (i) if the Executive's employment is terminated by his death, the date of death, (ii) if the Executive's employment is terminated as a result of his disability, thirty (30) days after notice of termination is given (provided that the Executive shall not have returned to the performance of his duties on a full-time basis during such thirty-day period), (iii) if the Executive's employment is terminated pursuant to Subsection 9(a)(iv) above, the date specified in the notice of termination, or (v) if the Executive's employment is terminated or the Company elects not to renew this Agreement for any other reason, the effective date of termination or the last day of the then current term.

"Employment Period" shall mean the initial term and any renewal periods.

"Good Reason" shall mean (a) a failure by the Company to comply with any material provision of this Agreement which has not been cured within ten (10) days after written notice of such noncompliance has been given by the Executive to the Company, or (b) any purported termination of the Executive's employment or election not to renew this Agreement which is not effected pursuant to a notice of termination satisfying the requirements of Subsection 9(b) (and for purposes of this Agreement no such purported termination shall be effective), or (c) a diminution of the duties, rights or responsibilities of the Executive, including without limitation, those duties set forth in Section 2 of this Agreement.

15.   <u>Binding Agreement</u>. This Agreement shall be binding upon, and inure to the benefit of, the Executive and the Company and their respective successors and permitted assigns (including, without limitation, the surviving entity or successor party resulting from a Change in Control).

16. <u>Nonassignability</u>. Neither this Agreement nor any right or interest hereunder shall be assignable by the Executive, his beneficiaries, or legal representatives without the Company's prior written consent; provided, however, that nothing in this Section 19 shall preclude (i) the Executive from designating a beneficiary to receive any benefit payable hereunder upon his death, or (ii) the executors, administrators or other legal representatives of the Executive or his estate from assigning any rights hereunder to any person entitled thereto. The Company cannot assign this Agreement without the written consent of the Executive.

17. <u>Governing Law; Venue; Service of Process</u>. This Agreement in all instances shall be governed by and construed in accordance with the substantive law of the State of New York, for contracts negotiated, made and performed within the State of New York (without regard to either its choice of law or conflict of law provisions). The Company agrees to submit to the jurisdiction of the NASD in New York, New York and the State and Federal Courts in New York County. Service of process shall be effective by First Class Mail.

18. <u>Entire Agreement: Amendment</u>. This Agreement sets forth the entire agreement between the parties relating to the terms of the Executive's employment and it supersedes all prior agreements and understandings with respect to such subject matter. This agreement may only be amended by written instrument signed by the Executive and an authorized officer of the Company.

19. <u>Waiver</u>. No term or condition of this Agreement shall be deemed to have been waived, nor shall there be any estoppel against the enforcement of any provision of this Agreement, except by written instrument of the party charged with such waiver or estoppel. No such written waiver shall be deemed a continuing waiver unless specifically stated therein, and each such waiver shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

20. <u>Severability</u>. If any provision of this Agreement is held to be invalid or unenforceable for any reason, such invalidity or unenforceability shall not affect any other provision of this Agreement not held so invalid or unenforceable, and each such other provision shall to the full extent consistent with law continue in full force and effect. If any provision of this Agreement shall be held invalid or unenforceable in part, such invalidity or unenforceablity shall in no way affect the rest of such provision, and the rest of such provision, together with all other provisions of this Agreement, shall to the full extent consistent with law continue in full force and effect.

IN WITNESS WHEREOF the Company by its duly authorized officer and the Executive parties have signed this Agreement as of the date first set forth above.

AUERBACH, POLLAK & RICHARDSON, INC.

By:_____
       John K. Sands

THE EXECUTIVE


_____
       Hugh Regan