# AUERBACH, POLLAK & RICHARDSON, INC.

## STOCKHOLDERS AGREEMENT

Dated as of July 1, 2000

MK000024

## TABLE OF CONTENTS

Section 1.   Definitions

Section 2.   Parties to the Agreement; Restrictions on Transfers
    (a) Parties
    (b) Restrictions

Section 3.   Permitted Transfers by Stockholders

Section 4.   Right of First Refusal
    (a) Voluntary Transfers
    (b) Breach, Bankruptcy, Etc.
    (c) Other Stockholders' Rights
    (d) Free Transfer Period
    (e) Installment Purchase

Section 5.   Control Offers
    (a) Bring-Along Option
    (b) Drag-Along Option

Section 6.   Put Option

Section 7.   Recapitalizations, Exchanges, Etc.

Section 8.   Conditions to Company's Obligations to Repurchase Stock

Section 9.   Injunctive Relief; Remedies

Section 10.  Nondisclosure of Non-Public Information

Section 11.  Preemptive Rights

Section 12.  Amendments and Termination

Section 13.  Notices

Section 14.  Miscellaneous
    (a) Entire Agreement
    (b) Governing Law
    (c) Headings
    (d) Numbers; Gender
    (e) Severability
    (f) Counterparts

## STOCKHOLDERS AGREEMENT

STOCKHOLDERS AGREEMENT (the "Agreement"), dated as of July 1, 2000, by and among Auerbach, Pollak & Richardson, Inc., a Connecticut corporation (the "Company"), and Auerbach Financial Group, Inc., a Delaware corporation (the "Stockholder").

W I T N E S S E T H

WHEREAS, to provide continuity of management and ownership of the Company, the parties hereto desire, among other things, to restrict the transfer, and to provide for the purchase or sale, of the capital stock of the Company under certain conditions.

NOW, THEREFORE, for and in consideration of the premises, mutual covenants and agreements set forth herein, and intending to be legally bound hereby, the parties hereto agree as follows:

**Section 1.** **Definitions.**

Unless the context otherwise requires, capitalized terms used herein without definition have the following meanings:

"**Affiliate**", when used with respect to any Person, means (A), means (A) any other Person which, directly or indirectly, controls or is controlled by or is under common control with such Person; (B) any Person that is an officer of, **partner** in or **trustee** of, or serves in a similar capacity with respect to, such **Person** or of which such **Person** is an **officer, partner** or **trustee,** or with respect to which such **Person** serves in a similar capacity; (C) any **Person** that, directly or indirectly, is the beneficial owner of 10% or more of any class of equity securities of such **Person** or of which such **Person** is directly or indirectly the beneficial owner of 10% or more of any class of equity securities: and (D) any relative or spouse of such **Person** who makes his or her home with that of such **Person.** For purposes of this definition, "control" (including the correlative terms "controlling", "controlled by" and "under common control with"), with respect to any **Person,** shall mean possession, directly or indirectly, of the power to direct or cause the

direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"**Agreement**" means this Agreement, as it may be amended from time to time, together with the Exhibits and Schedules (if any) hereto, and includes any counterpart of this Agreement when signed by one or more Stockholders and delivered to the Company.

"**Board of Directors**" means the Board of Directors of the Company.

"**Business Day**" means each day on which banks are open for business in New York, New York.

"**Certificate of Incorporation**" means the Certificate of Incorporation of the Company, as amended from time to time.

"**Closing Date**" means the date on which a Closing takes place.

"**Common Stock**" means the common stock of the Company.

"**Company**" means Auerbach, Pollak & Richardson, Inc., a Connecticut corporation, and any successor corporation.

"**Control Offer**" means the terms and conditions of an offer from an independent third party in an arms-length transaction to one or more Stockholders to purchase any amount of Stock which would, either alone or when aggregated with any other Stock then held by such Control Offeror and its Affiliates, result in such Control Offeror and its Affiliates owning more than 50% of the Voting Stock of the Company.

"**Control Offeree**" means any Stockholder who is the recipient of a Control Offer.

"**Control Offeror**" means any Person making a Control Offer.

"**Control Transfer**" means any actual or proposed Transfer of Stock pursuant to a Control Offer.

"**Decedent Stockholder**" means the written notice furnished by the Company to the Stockholders of its election not to exercise its right of first refusal pursuant to Section 4(c) hereof or of its election not to exercise its right or option.

"**Estate**" means the estate of any Decedent of any Decedent Stockholder.

"**Estate Planning Transfer**" has the meaning ascribed to it in Section 3(a) hereof.

MK000027

"**Exercise Notice**" means a notice stating that the Company, a Stockholder or an Estate, as the case may be, elects to exercise its right to purchase or Transfer Stock pursuant to this Agreement, which notice shall state, among other things, the number of shares of Stock involved, the purchase and sale price therefore and the Closing Date.

"**Free Transfer Period**" means the period of time beginning on the day following the day on which a Stockholder Option Period arising under Section 4(c) hereof ends, and ending at the close of business 15 days thereafter or, if such day is not a Business Day, then the next succeeding Business Day.

"**GAAP**" means generally accepted accounting principles as in effect from time to time in the United States.

"**Liens**" means all liens, charges, encumbrances, restrictions, equities, claims and options of any kind or nature whatsoever.

"**Non-Public Information**" has the meaning ascribed to it in Section II hereof.

"**Option Period**" means the period of time (i) beginning on the day on which the Company receives (A) a Written Notice pursuant to Section 4(a) hereof or (B) actual notice of the occurrence of any of the events specified in Section 4(b) hereof and (ii) ending at the close of business (x) 45 days after such date with respect to options arising under Section 4(a) hereof, and (y) 18 months after such date with respect to options arising under Section 4(b) hereof. If the last day of an Option Period falls on a day other than a Business Day, then the Option Period shall extend until the close of business on the next succeeding Business Day.

"**Participating Stockholders**" means, with respect to each opportunity to participate in a purchase or sale of Stock arising under Sections 4(c) and 5 hereof, all Stockholders who elect to participate in such purchase or sale.

"**Permitted Transferee**" means, as the context requires, any Person to whom Stock may be or shall have been Transferred, directly or indirectly, pursuant to and in accordance with the terms and provisions of Section 3 hereof.

"**Person**" means any individual, trust or other entity.

"**Prime Rate**" means the rate announced by Morgan Guaranty Trust Company of New York ("Morgan") from time to time as its prime or reference rate, or if no such rate is announced by Morgan, then the equivalent rate announced at the at the relevant time by a New York money center bank selected by the Company.

"**Proportionate Percentage**" means, with respect to each Participating Stockholder, a percentage (expressed as a decimal fraction rounded to the nearest one-hundredth) obtained by dividing (x) the number of shares of Voting Stock owned by such

Participating Stockholder, by (y) the aggregate number of shares of Voting Stock owned by all Participating Stockholders.

"**Repurchase Price**" means the repurchase price per share of Stock calculated in accordance with **Exhibit A** hereto.

"**Repurchase Prohibited Period**" means any period of time during which the Company is prohibited from applying from applying any of its funds, property or assets to the purchase, redemption or other retirement of any Stock.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Stock**" means the shares of Common Stock from time to time outstanding.

"**Stockholder**" means each Person who is from time to time the owner of record of Stock.

"**Stockholder Option Period**" means the period of time (i) beginning on the later of (A) the day after the end of the Option Period and (B) the day a Stockholder receives a Declination Notice from the Company pursuant to Section 4(c) hereof, and (ii) ending on the close of business 15 days after such date. If such fifteen day falls on a day other than a Business Day, then the Stockholder Option Period shall extend until the close of business on the next succeeding Business Day.

"**Transfer**" means any direct or indirect sale, transfer, conveyance, assignment, pledge, hypothecation, gift, delivery or other disposition.

"**Transfer Price**" means the Stock purchase price set forth in a Written Notice given by a Stockholder pursuant to Section 4(a) hereof.

"**Voluntary Resignation**" means the voluntary resignation of an Employee Stockholder.

"**Voting Stock**" means the then outstanding Common Stock and any other securities of the Company entitled to vote generally for the election of directors.

"**Written Notice**" means the written notice given by a Stockholder pursuant to Section 4(a) hereof.

Section 2.    <u>Parties to the Agreement; Restrictions on Transfers</u>

(a)    <u>Parties</u>. Every Stockholder shall become a party to this Agreement by signing a counterpart of this Agreement and delivering it to the Company. Notwithstanding any other provision of this Agreement to the contrary, no Person shall become an owner of record of any shares of Stock, through issuance or subsequent

MK000029

Transfer pursuant to the terms and provisions hereof, and no Transfer of Stock shall be effective for any purpose, unless and until the Company shall have received a counterpart of this Agreement signed by such Person and such Transfer shall have been recorded on the Company's record of Stockholder upon surrender of the certificates or other documents representing such Stock duly endorsed. Shares of Stock shall be issued and recorded only in the names of the owners thereof or the trustee or trustees holding legal title thereto. All certificates representing shares of Stock shall be conspicuously endorsed with the following legend:

> **THE SHARES OF STOCK REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MUST BE HELD INDEFINITELY *UNLESS* REGISTERED NUMBER SUCH ACT OR UNLESS AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE. THE SALE-TRANSFER, ASSIGNMENT, VOTING, PLEDGE OR ENCUMBRANCE OF THE SHARES OF STOCK REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS AND CONDITIONS OF AN AMENDED AND RESTATED STOCKHOLDERS AGREEMENT, DATED AS OF JULY 1, 2000, AMONG AUERBACH, POLLAK & RICHARDSON, INC. AND THE HOLDERS OF ALL OF THE ISSUED AND OUTSTANDING CAPITAL STOCK THEREOF. COPIES OF SUCH AGREEMENT MAY BE OBTAINED AT NO COST BY WRITTEN REQUEST MADE BY THE HOLDER OF THIS CERTIFICATE TO THE SECRETARY OF AUERBACH, POLLAK & RICHARDSON, INC.**

Each Stockholder, by signing this Agreement, represents and warrants to the Company and to the other Stockholders that such Stockholder is acquiring or has acquired its shares of Stock for its own account for investment purposes only, and not with a view to, or for resale in connection with, the distribution thereof.

(b)  **Restrictions**. No Stockholder shall Transfer any shares of Stock owned by such Stockholder except in accordance with the terms and provisions of this Agreement. Any Transfer of Stock made in violation of the terms and provisions of this Agreement shall be void *ab initio* If a Stockholder makes a Transfer in violation of this Agreement, the Company shall have the right to purchase such Stock as described in Section 4(a) hereof.

Section 3.    **Permitted Transfers by Stockholders**

(a)  With the prior consent of the Company, which consent will not be unreasonably withhold, a Stockholder may Transfer shares of Stock (i) in the case of a Stockholder who is a natural person, (A) to members of such Stockholder's immediate family, which shall include his parents, siblings, spouse, children and grandchildren or qualified trusts for the benefit of such Persons, irrespective of the age of the beneficiaries

of such trusts (collectively, an "Estate Planning Transfer"), and (B) upon such Stockholder's death, subject to the provisions of Section 6 hereof, to the legal representatives of his Estate and any subsequent disposition by such representatives in accordance with applicable law, or (ii) in the case of a Stockholder that is not a natural person, to Affiliates of such Stockholder; provided, in each case, that (x) each such Permitted Transferee shall execute a counterpart of this Agreement and deliver it to the Company and (y) all shares of Stock so Transferred shall be held by such Permitted Transferee subject to the terms and provisions of this Agreement and shall be represented by certificates bearing the legend set forth in Section 2 hereof.

(b) With the prior written consent of the Company, which consent will not be reasonably withheld, a Stockholder may pledge his Stock to secure credit pursuant to a commercially reasonable pledge agreement which contains terms and provisions deemed reasonable by the Company and its counsel; provided, however, that (x) any such pledgee shall execute a counterpart of this Agreement and deliver it to the Company and (y) all shares of Stock so pledged shall be held by such pledgee subject to the terms and provisions of this Agreement and shall be represented by certificates bearing the legend set forth in Section 2 hereof.

(c) Any time an option to repurchase Stock from a Stockholder becomes exercisable by the Company, or an option to repurchase Stock from a Person who is no longer a Stockholder because he Transferred all of his Stock to one or more Permitted Transferees would have become exercisable by the Company had such Person remained a Stockholder, such option shall extend to all shares of Stock held by such Stockholder or such Person, as the case may be, and his Permitted Transferees.

Section 4.  **Right of First Refusal**.

(a) **Voluntary Transfers**. Except for Transfers made pursuant to and in compliance with Sections 3 or 5 hereof, whenever a Stockholder intends to voluntarily Transfer any shares of Stock at any time owned by him, such Stockholder shall deliver to the Company a written notice stating the number of shares of Stock to be Transferred and describing the terms and conditions of the intended Transfer, including the name of the proposed transferee and the Transfer Price therefor (collectively, the "Written Notice"). The Company shall have the exclusive right and option, but not the obligation, during the Option Period to purchase from such Stockholder, and, if the Company shall exercise such right and option, such Stockholder shall have the obligation to Transfer to the Company, all (but not less than all) of the shares of Stock described in the Written Notice for the Transfer Price and upon the terms and conditions set forth in the Written Notice. To exercise such right, the Company shall deliver an Exercise Notice during the Option Period to the Stockholder proposing to Transfer shares of Stock.

(b) **Breach, Bankruptcy, Etc.** If a Stockholder (i) attempts to Transfer any shares of Stock owned by him other than in compliance with the terms and provisions of this Agreement; (ii) dissolves, becomes insolvent, makes a general assignment for the benefit of creditors, admits in writing his inability to generally pay his debts as they

become due or files or has filed against him a petition in bankruptcy which is not dismissed within 30 days from the date of such filing; (iii) if such Stockholder is a natural person, he is adjudicated incompetent; (iv) has Transferred Stock to a person who, although a Permitted Transferee at the time of the Transfer of such Stock, has ceased to be a Permitted Transferee due to a divorce, annulment or similar proceeding; or (v) owns Stock which becomes subject to a right of involuntary Transfer by operation of law under circumstances not contemplated by Section 3 hereof or this Section 4(b); then in any such event the Company shall have the exclusive right and option, but not the obligation, during the Option period to purchase from such Stockholder or his legal representative (and each Permitted Transferee, if any, receiving shares of Stock once held by such Stockholder), as the case may be, and, if the Company shall exercise such right and option, such Stockholder, legal representative or Permitted Transferee, as the case may be, shall have the obligation to Transfer to the Company, all (but not less than all) of the shares of Stock owned by such Stockholder, legal representative or Permitted Transferee, as the case may be, at a price per share equal to the Repurchase Price: provided, however, that any such option arising solely under Section 4(b)(iv) hereof shall extend only to shares of Stock held (or once held) by the former Permitted Transferee of the Stockholder. To exercise such right, the Company shall deliver an Exercise Notice during the Option Period to such Stockholder, legal representative or Permitted Transferee, as the case may be.

(c)  **Other Stockholders' Rights**. In the event the Company elects not to repurchase its Stock pursuant to any right or option set forth in Section 4(a) or 4(b) hereof or is unable to do so by reason of a Repurchase Prohibited Period, the Company shall furnish written notice thereof (a "Declination Notice") to all holders of the Voting Stock, on or before the end of the Option Period. The holders of the Voting Stock (other than the Transferring Stockholder) shall have the exclusive right and option, but not the obligation, during the Stockholder Option Period to purchase all (but not less than all) of such shares of Stock on the same terms and conditions as the Company could have purchased them. Each Participating Stockholder shall be entitled to purchase up to his Proportionate Percentage of the Stock subject to each option arising under this Section 4(c). Each participating Stockholder who elects to purchase his full Proportionate Percentage of such Stock shall also be entitled to elect to purchase additional amounts of such Stock up to the amount of his recalculated Proportionate Percentage of the number of shares of Stock which the participating Stockholders purchasing less than their full Proportionate Percentages did not purchase. To exercise its rights and options under this Section 4(c), a Participating Stockholder shall deliver an Exercise Notice to the Company during the Stockholder Option Period.

(d)  **Free Transfer Period**. If upon the end of the Option Period and the Stockholder Option Period neither the Company nor the Stockholders shall have fully exercised their options to purchase Stock pursuant to this Section 4, (i) a Transferring Stockholder pursuant to Section 4(a) shall have the right to Transfer such shares of Stock *during* the Free Transfer Period on the terms and conditions set forth in the Written Notice, and (ii) a Stockholder whose shares of Stock shall have become subject to a right of involuntary Transfer pursuant to Section 4(b) hereof shall be free to dispose of such

shares in accordance with the requirements of such involuntary transfer, provided, in each case, that as a condition precedent to any such Transfer, the transferee shall execute a counterpart of this Agreement and deliver it to the Company. All shares of Stock so Transferred during the Free Transfer Period shall be held by such transferee subject to the terms and provisions of this Agreement and shall be represented by a certificate bearing the legend set forth in Section 2 hereof. Any Stock not so Transferred before the end of the Free Transfer Period shall again become subject to the restrictions set forth in this Agreement.

(e)     **Installment Period**. If the Company elects to exercise a repurchase option held by it under Section 4(b) hereof, the Company may elect to pay the portion of the Repurchase Price of such Stock through the issuance of a three-year subordinated promissory note, bearing interest at a floating rate equal to the Prime rate from the date of the Exercise Notice, and prepayable without premium or penalty. The principal of the subordinated promissory note will be payable in three equal annual installments with all accrued interest to be paid semi-annually in arrears. If the Company elects to so finance any such purchase, the Transferring Stockholder shall be entitled to have the note he receives secured by a pledge of the shares of Stock being Transferred until he receives full payment therefor.

**Section 5.     Control Offers.**

(a)     **Bring-Along Option**. Each Control Offeree shall promptly forward a written notice of any Control Offer to the Company and the other Stockholders of the Company. Such Control Offeree shall not Transfer any Voting Stock to the Control Offeror unless (i) the opportunity to participate in the Control Offer is extended to all Stockholders holding shares of Voting Stock at the same price and on the same terms and conditions, and (ii) if such Control Offer extends to less than 100% of the Voting Stock, the Control Offeror complies with clause (ii) below and each Stockholder is entitled to Transfer to the Control Offeror pursuant to the Control Offer up to such Stockholder's pro rata portion of the aggregate number of shares of Voting Stock as to which the Control Offer relates.

(i)     Each Exercise Notice evidencing a Stockholder's election to participate in a Control Transfer pursuant to this Section 5(a) shall be delivered to the Control Offeror, the Control Offeree and the Company before the earlier to occur of (x) the fifteenth day after receipt of notice of the Control Offer and (y) the last day for acceptance by the Control Offeree of the Control Offer as set forth in such notice.

(ii)     If the Control Offer extends to less than all of the Stock, the Control Offeror shall agree in writing, in advance, with the parties to this Agreement to be bound by and comply with the terms and provisions of this Agreement with respect to all future dealings in the Stock.

(iii)     All Transfers of Voting Stock by a participating Stockholder to the

Control Offeror within any period of 12 consecutive months ending on the date of a Control Offer shall be aggregated for purposes of determining the Proportionate Percentage of such Stockholder in connection with such Control Offer.

(b)  **Drag-Along Option**. If a Control Offer shall require, as a condition therefor, the Transfer of more than 66-2/3% of the then-outstanding shares of the Voting Stock, Control Offerees then owning shares aggregating at least 66-2/3% of the then-outstanding shares of the Voting Stock may require (by delivery of an Exercise Notice to the Stockholders no later than the fifth day after the receipt of the Control Offer by the Control Offerees and the tenth day prior to the Closing applicable thereto) each Stockholder to Transfer in such Control Transfer such Stockholder's pro rat portion of the Voting Stock subject thereto, at the same price and on the same terms and conditions as those on which the Control Offerees are Transferring their Voting Stock in such Control Transfer.

Section 6.    **Put Option**.

In the event that an initial public offering by the Company is not completed on or before the third anniversary of the date of this Agreement, the Stockholder shall have the right, but not the obligation, to require that the Company repurchase all of the Stock of the Stockholder at the purchase price, which purchase price shall be the greater of: (i) six-million-dollars ($6,000,000) for all of the shares of Stock currently held by the Stockholder, which amount shall be reduced in proportion to the number of shares of Stock held by such Stockholder at the time of such repurchase, and (ii) at a valuation per share of stock determined by an investment banker agreed to by the Stockholder and the Company or, if they are cannot agree, as appointed by the American Arbitration Association.

Section 7.    **Recapitalizations, Exchanges, Etc. Affecting Stock**.

The provisions of this Agreement shall apply, to the full extent set forth herein with respect to the Stock, to any and all shares of capital stock of the Company or any successor or assign of the Company (whether by merger, consolidation, sale of assets, or otherwise) which may be issued in respect of, in exchange for, or in substitution of, the Stock and shall be appropriately adjusted for any stock dividends, stock splits, reverse stock splits, combinations, recapitalization a and the like occurring after the date hereof.

Section 8.    **Conditions to Company's Obligations to Repurchase Stock**.

Notwithstanding any other provision of this Agreement to the contrary, the Company shall not be obligated to repurchase Stock if such repurchase is prohibited by, or counsel to the Company reasonably believes that such repurchase is prohibited by, any state or federal law or any rule or regulation promulgated by any state or federal regulatory body to which the Company is subject or any contract or agreement to which the Company is a party or by which it is bound. If the Company is so prohibited from

consummating any repurchase described in Section 6 hereof which it would otherwise be required to consummate, its obligation to repurchase shall automatically be reinstated as soon as such prohibition ceases to exist.

### Section 9. Injunctive Relief; Remedies.

The Stock of the Company cannot be readily purchased or sold in the open market, and for that reason, among others, the Company and the Stockholders will be irreparably damaged if this Agreement is not specifically enforced. Should any controversy arise concerning a Transfer of any shares of Stock or a breach of any other provision of this Agreement, an order or injunction may be issued restraining such Transfer or breach pending the determination of such controversy, and the resolution thereof shall be enforceable in a court of equity by a decree of specific performance. Such remedy shall, however, be cumulative and not exclusive, and shall be in addition to any other rights and remedies which the parties may have at law or in equity.

### Section 10. Nondisclosure of Non-Public Information.

Each Stockholder agrees that he shall not (a) disclose to any Person any Non-Public Information for any reason or purpose whatsoever or (b) make use of any such Non-Public Information for his own purpose or for the benefit of any Person except the Company. For purposes of this Agreement, the term "Non-Public Information" shall mean any information relating to the Company, its clients or customers or the business conducted or proposed to be conducted by them that the Stockholder may obtain or have access to, except for (i) information which is in the public domain at the time of its receipt by the Stockholder and (ii) information which, after its receipt by the Stockholder, becomes part of the public domain due to no improper act or omission of the Stockholder. The foregoing provisions of this Section 11 shall not preclude the use or disclosure by the Stockholder of Non-Public Information (x) in the performance of his rights or obligations hereunder or as an employee of the Company, except to the extent that such use or disclosure conflicts with policies or procedures developed by the Board of Directors or Chief Executive Officer of the Company, or (y) to the extent required by applicable law or court order.

### Section 11. Preemptive Rights.

(a) The Company shall not issue additional shares of capital stock without the prior written consent of the Stockholder. In the event that the Company shall propose to issue additional shares of capital stock, the Company shall give each of the holders of outstanding shares of Voting Stock fifteen (15) days written notice of such proposed issuance and each such holder shall have the right to purchase up to his Proportionate Percentage of the capital stock being issued by responding in writing or to the expiration of such notice period. Each Participating Stockholder who elects to purchase his full

Proportionate Percentage of such capital stock shall also be entitled to elect to purchase additional amounts of such capital stock up to the amount of his recalculated Proportionate Percentage of the number of shares of capital stock which the Participating Stockholders purchasing less than their full Proportionate Percentages did not purchase and the Company shall give the Participating Stockholders an additional ten (10) days written notice to indicate their interest in writing prior to the expiration of such further notice period.

(b) Notwithstanding the provisions of Section 13(a) above to the contrary, the Company may grant Common Stock options to its employees and such employees may exercise such options, without the issuance of the Common Stock involved therein triggering any preemptive rights granted under this Agreement; provided, however, that the total number of shares issued under such stock options may not exceed 10% of the outstanding Common Stock on a fully diluted basis (the approximately number of shares which the Company proposes to reserve for issuance to key employees of the Company under employee stock open and other stock incentive plans).

**Section 12. Amendments and Termination.**

(a) Except as set forth in Section 14(b) below, no amendment to this Agreement, nor any waiver or discharge of any of the terms of provisions hereof, shall be made without the prior written consent of the Company and the Stockholder.

(b) This Agreement shall terminate upon the earliest of

(i) the effective date of a registered public offering of securities of the Company pursuant to the Securities Act;

(ii) the effective date of the merger or consolidation of the Company with any other Person pursuant to a transaction in which the Company is not the surviving party and the Stockholder of the Company is not in control of the surviving party; _provided, however_, that such surviving party shall assume all obligations of the Company under any then-outstanding notes issued by the Company pursuant to Section 4(e) hereof.

(iii) the date on which Stockholder consents in writing to the termination of this Agreement; and

(iv) the tenth anniversary of the date of this Agreement.

MK000036

Section 13.  <u>Notices</u>.

(a) All notices, requests, demands and other communications required or permitted under this Agreement shall be in writing (including facsimile, telegraphic, telex or cable communication) and mailed, faxed, telegraphed, telexed, cabled or delivered:

    (i)    If to the Company, to:

        Auerbach, Pollak & Richardson, Inc.
        450 Park Avenue
        New York, New York 10022

        Attention:    Hugh Regan
                        Chief Executive Officer

    (ii)    If to the Stockholder:

        To the name and address shown on the Company's record of stockholders.

(b) Except as otherwise expressly provided in this Agreement, all notices and other communications required or permitted under this Agreement which are addressed as provided in this Section 14(i) if delivered personally against proper receipt or by confirmed fax or telex, shall be effective upon delivery and (ii) if delivered (A) by certified or registered mail with postage prepaid, (B) by Federal Express or similar courier service with courier fees paid by the sender or (C) by telegraph or cable, shall be effective two business days following the date when mailed, couriered, telegraphed or cabled, as the case may be. Any party hereto may from time to time change its address for the purpose of notices to such party by a similar notice specifying a new address, but no such change shall be *deemed* to have been given until it is actually received by the party sought to be charged with its contents.

Section 14.  <u>Miscellaneous</u>.

(a) **<u>Entire Agreement</u>**. This Agreement (including, without limitation, the Exhibits hereto) and the Certificate of Incorporation embody the entire agreement and understanding of the parties hereto relating to the subject matter hereof and supersede all prior agreements, commitments, arrangements or understandings, whether written or oral, among the parties hereto with respect to the subject matter hereof.

(b) **<u>Governing Law; Venue; Service of Process</u>**. This Agreement in all instances shall be governed by and construed in accordance with the substantive law of the State of Connecticut, for contracts negotiated, made and performed within the State of Connecticut (without regard to either its choice of law or conflict of law provisions). The

Company and the Executive shall and hereby do agree to submit to the jurisdiction of the American Arbitration Association in New York, New York and that any judgment or award of said arbitration can be presented for entry, enforcement and execution to the State and Federal Courts in New York County; and that service of process shall be effective by First Class Mail.

       (c)    **Headings**.    The headings contained herein are for convenience of reference only and shall not constitute a part hereof or define, limit or otherwise affect the meaning or interpretation of any of the terms or provisions hereof.

       (d)    **Numbers; Gender**.    Whenever the context requires, references in this Agreement to the singular number shall include the plural and, likewise, the plural number shall include the singular, and words denoting gender shall include the masculine, feminine and neuter.

       (e)    **Severability**.    Each term and provision of this Agreement constitutes a separate and distinct undertaking, covenant, term and/or provision hereof. In the event that any term or provision of this Agreement shall be determined to be unenforceable, invalid or illegal in any respect, such unenforceability, invalidity or illegality shall not affect any other term or provision of this Agreement, but this Agreement shall be construed as if such unenforceable, invalid or illegal term or provision had never been contained herein. Moreover, if any term or provision of this Agreement shall for any reason be held to be excessively broad as to time, duration, scope, activity or subject, it shall be construed, by limiting and reducing it, so as to be enforceable to the extent permitted under applicable law as it shall then exist.

       (f)    **Counterparts**.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which, when taken together, shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

                         AUERBACH, POLLAK & RICHARSON, INC.

                         By: _____

STOCKHOLDER:

AUERBACH FINANCIAL GROUP, INC.

By: _____
     Hugh Regan

MK000038