IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

WILLIAM SCOVIN

Plaintiff,

v.

GREAT-WEST LIFE & ANNUITY INS.
CO., ONE HEATH PLAN, INC.,
AUERBACH, POLLAK & RICHARDSON,
INC., HUGH REGAN, LEWIS COHEN,
ROBERT DRAKE and A. JONES YORKE,

Defendants.

CIVIL ACTION NO.: 02CV01161(AWT)

JULY 13, 2007

## SUPPLEMENTAL DECLARATION OF JAMES M. MORIARTY

James M. Moriarty declares as follows:

1.      I am an attorney admitted to practice in this Court and an associate with the law firm of Kelley Drye & Warren LLP, counsel for defendants Hugh Regan ("Regan"), Lewis Cohen ("Cohen") and A. Jones Yorke ("Yorke") (collectively the "Individual Defendants") in this matter.  I make this Supplemental Declaration in further support of the Individual Defendants' January 12, 2006 Motion for Summary Judgment with respect to all of the causes of action asserted against them by Plaintiff William Scovin ("Scovin") in his Amended Complaint.

2.      I am submitting herewith, in further support of the Individual Defendants' Motion for Summary Judgment, limited excerpts from the deposition testimony of Yorke and Regan.  This testimony goes directly to issues raised by Scovin in his June 28, 2007 Supplemental Opposition.  For ease of reference, this testimony is attached hereto as

exhibits 23 and 24 since the Individual Defendants submitted a declaration attaching exhibits 1-22 when they filed their Summary Judgment Motion in January, 2006.

3.    Attached hereto as *Exhibit 23* are excerpts from the August 16, 2005 deposition of A. Jones Yorke.

4.    Attached hereto as *Exhibit 24* are excerpts from the August 16, 2005 deposition of Hugh Regan.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

James M. Moriarty

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing was

served via overnight mail this 13th day of July, 2007 on all counsel of record as follows:

Kevin M. Greco, Esq.
Stephanie A. McLaughlin, Esq.
Peter M. Nolin, Esq.
Sandak Hennessey & Greco
707 Summer Street
Stamford, Connecticut 06901
(203) 425-4200
(203) 325-8608 (facsimile)
**Attorneys for William Scovin**

Mr. Robert Drake
558 Lime Rock Road
Lakeville, Connecticut 06039
**(Pro se)**

James M. Moriarty

CT01/MORIJA/243868.1

3

# EXHIBIT 23

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------X

WILLIAM SCOVIN                    :

                Plaintiff    ,:

       VS.                       :    NO. 02CV01161(AWT)

GREAT-WEST LIFE ANNUITY INS.     :
ET AL
                Defendants   ,:

------------------------------X

D E P O S I T I O N


        THE DEPOSITION OF A. JONES YORKE,

taken on behalf of the Plaintiff, pursuant to

the Federal Rules of Civil Procedure, before

Melodie Ajello, Registered Professional

Reporter, Notary Public within the State of

Connecticut, on the 16th day of August, 2005, at

2:34 p.m., at the offices of SANDAK, HENNESSEY &

GRECO, 707 Summer Street, Stamford, Connecticut,

06901.


        GOLDFARB AND AJELLO REPORTING SERVICES
              24 East Avenue #1372
            New Canaan, Connecticut  06840

A P P E A R A N C E S


FOR THE PLAINTIFF:

      SANDAK, HENNESSEY & GRECO
      707 Summer Street
      Stamford, Connecticut, 06901
      BY:  PETER T. NOLIN, ESQUIRE


FOR THE DEFENDANTS:

      RICHARD G. CUSHING, ESQUIRE
      420 East 54th
      New York, New York, 10022

1          A.       That's right.  I commuted up here, as a

2    matter of fact.  Enough to make you leave.

3          Q.       Where did you go to after you -- where did

4    you go after you left --

5          A.       I went to Coleman & Company.

6          Q.       Okay.  And so for a period of time you

7    ceased to be a member of the board of those two entities?

8          A.       That's correct, but my loan was still

9    intact.

10          Q.       And then you believe you came back --

11          A.       Yes.

12          Q.       -- in '98 or '99?

13          A.       Yeah.

14          Q.       What did you do at Coleman Company in the

15    intervening years?

16          A.       I was CEO.

17          Q.       What was Coleman?

18          A.       It was a broker-dealer.

19          Q.       How much of a loan did you make to Auerbach

20    Financial in '93 or '94?

21          A.       Hundred thousand dollars.

22          Q.       Did there come any time when you received

23    stock in Auerbach Financial?

24          A.       No.

25          Q.       So you have never been a shareholder of the

Page 6

1    company?

2        A.    No.

3        Q.    Has that loan ever been repaid?

4        A.    $6,000 of it.

5        Q.    When was that repaid?

6        A.    I think in 19 -- no, in 2000.  And the rest

7    of it is still out there.

8        Q.    Have you written that off as bad debt?

9        A.    Yes.

10       Q.    When did you write it off?

11       A.    I don't recall.  A couple of years ago.

12       Q.    When did you first have an office in a space

13   of Auerbach's?

14       A.    Early 1999, I guess.

15       Q.    Where did you have that office; what office

16   of Auerbach did you have your office?

17       A.    1250 Park Avenue.

18       Q.    And how often would you be at the company?

19       A.    Three or four times a week.

20       Q.    What was your role with the company

21   beginning in '99?

22       A.    I was a director.

23       Q.    Why were you at the office four times a week

24   if you were only a director?

25       A.    Because I had my personal business I did.

1      Q.      Did you pay for that office?

2      A.      No.  It was a courtesy office, I had

3    $100,000 sitting on the line.

4      Q.      And were you ever paid for being a

5    director --

6      A.      No.

7      Q.      -- from either entity?

8      A.      No.

9      Q.      What personal business were you running out

10   of there?

11     A.      That's neither here nor there.

12     Q.      I don't know that, so --

13     A.      Just my --

14     Q.      Just give me a general identified

15   description.

16     A.      Investment business, my own personal

17   investments.

18     Q.      So managing your investments?

19     A.      Yes.

20     Q.      Did you do any business for APR?

21     A.      No.

22     Q.      Did you ever bring business to the company?

23     A.      Probably some introductions to people.

24     Q.      And did there come a time when you became

25   chairman of the board?

1    was not making payments?

2         A.     No.

3         Q.     When did you first become aware that cash

4    flow was an issue for the company?

5         A.     When the $3 million hit our P&L and balance

6    sheet, that's when I knew.

7         Q.     That was a capital issue more than a cash

8    flow, you weren't writing a check for the 3 million?

9         A.     Earlier, you might remember, Hugh Regan had

10   pumped in a million four, so the company had issues with

11   regard to earnings, and that 3 million was the last thing.

12   I didn't think any more was coming in.

13        Q.     Cash flow issue was part of the reason you

14   resigned as director?

15        A.     No, I resigned because I thought the firm

16   was going to go out of business, if you want to call it

17   cash flow or whatnot.  The reason it was going out of

18   business was because they had an adverse award of

19   $3 million which came out of the blue.  We were

20   essentially shut down.  We didn't have a choice as a

21   broker-dealer.

22        Q.     And either prior to or after you resigned,

23   what, if anything, did you do to make sure that there was

24   liquidation of the company?

25        A.     I did nothing other than follow what was

# EXHIBIT 24

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------X

WILLIAM SCOVIN                    :

            Plaintiff    ,:

     VS.                         :   NO. 02CV01161(AWT)

GREAT-WEST LIFE ANNUITY INS.     :
ET AL

           Defendants   ,:

------------------------------X

D E P O S I T I O N

        THE DEPOSITION OF HUGH REGAN, taken

on behalf of the Plaintiff, pursuant to the

Federal Rules of Civil Procedure, before Melodie

Ajello, Registered Professional Reporter, Notary

Public within the State of Connecticut, on the

16th day of August, 2005, at 10:06 a.m, at the

offices of SANDAK, HENNESSEY & GRECO, 707 Summer

Street, Stamford, Connecticut, 06901.

GOLDFARB AND AJELLO REPORTING SERVICES
24 East Avenue #1372
New Canaan, Connecticut  06840

Page 13

1  have occasionally shared in warrants and investment

2  banking or part of investment banking fee closings, but in

3  general that's how I was compensated.

4          Q.     When you say warrants and investment banking

5  fees, could you explain how that compensation came to you;

6  it wasn't salary?

7          A.     No, it wasn't salary, but small firms engage

8  in investment banking transactions that involve the firm

9  being issued warrants, and those warrants are commonly

10  allocated to employees, particularly in the investment

11  banking department and/or sometimes the sales personnel or

12  in fact a lot of personnel possibly, depending on their

13  distribution plan.

14          Q.     And the investment banking fees would be

15  what, cash income that you would receive a 1099 on; how

16  would you receive that?

17          A.     No.  The investment banking fees are paid to

18  the firm, and I'm again trying to remember for the year

19  2000 if I participated in any, probably taxed and sent to

20  me as part of compensation.  Really don't recall.

21          Q.     And how much did you receive in the year

22  2000 from Auerbach, APR?

23          A.     I actually don't recall.  My salaries were

24  generally not high, and in fact the amount of money that

25  came out of the firm to me in the form of cash was very

Page 14

1    limited.  Warrants that worked out were not paid by the

2    firm, they were warrants that happened to work out in the

3    markets and may have taken years, been distributed years

4    prior, so I don't recall in the year 2000 per se what

5    happened.  What I do know, more money went in from me than

6    went out in vast multiples.

7         Q.      In the year 2000?

8         A.      I think in 2000 as well, yeah.

9         Q.      Do you have records somewhere that show what

10   you put in and what you took out of the two Auerbach

11   entities?

12        A.      I didn't take money out of Auerbach.  I made

13   loans over years to Auerbach as well as the other -- there

14   are probably records that exist that show sizeable loans

15   to Auerbach Financial.

16        Q.      Where are those records?

17        A.      They're my personal records.  They exist

18   probably at Auerbach's level somewhere in life, but those,

19   I don't know where those records would be.

20        Q.      Who is in physical possession of your

21   personal records regarding your financial investments in

22   Auerbach?

23        A.      I have copies of my promissory notes, I

24   believe.

25        Q.      And how about records of payments from you