### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | |
|---|---|
| WILLIAM SCOVIN<br>**Plaintiff,**<br><br>AUERBACH, POLLAK& RICHARDSON, INC.,<br>HUGH REGAN, LEWIS COHEN, A. JONES<br>YORK, and ROBERT DRAKE<br>**Defendants.** | )<br>)<br>)<br>)  **CIVIL ACTION NO.**<br>)  **3:02CV01161(AWT)**<br>)<br>)<br>)<br>)<br>)  **July 21, 2008** |

### JOINT TRIAL MEMORANDUM

Pursuant to the Court's Trial Memorandum Order, Plaintiff and all Defendants hereby jointly submit this Trial Memorandum.

**(1)**     **TRIAL COUNSEL:**

**For plaintiff William Scovin:**  Peter M. Nolin, Sandak Hennessey & Greco LLP, 707 Summer Street, Stamford, CT 06901, Tel. (203) 425-4200, Fax (203) 325-8608, email pnolin@shglaw.com; Kevin M. Greco, Sandak Hennessey & Greco LLP, 707 Summer Street, Stamford, CT 06901, Tel. (203) 425-4200, Fax (203) 325-8608, email kgreco@shglaw.com.

**For defendants:**

**A. Robert Drake:**  *Pro-Se*, 558 Lime Rock Road, Lakeville CT 06039, Phone 860-435-7002, Fax 860-435-6540, email rdrake@kuhnsbrothers.com.

**B. Hugh Regan:**  Richard Cushing, 420 East 54th Street, Suite 35E, New York, New York 10022, Tel. 212-371-8880, Fax 212-319-7824.

**C. A. Jones Yorke:**  Richard Cushing, 420 East 54th Street, Suite 35E, New York, New York 10022, Tel. 212-371-8880, Fax 212-319-7824.

    **D. Lewis Cohen:** Mark S. Gregory, Kelley Drye & Warren, LLP, 400 Atlantic Street, Stamford, Connecticut 06901, Tel. (203) 324-1400, Fax (203) 327-2669, email mgregory@kelleydrye.com and James M. Moriarty, Kelley Drye & Warren, LLP, 400 Atlantic Street, Stamford, Connecticut 06901, Tel. (203) 324-1400, Fax (203) 327-2669, email jmoriarty@kelleydrye.com.

**(2)**    <u>**JURISDICTION:**</u>

    This court has jurisdiction over this action pursuant 28 U.S.C. §1331 in that the remaining claims are all federal questions governed under ERISA.

**(3)**    <u>**JURY/NON-JURY:**</u>

    This case is a court case.

**(4)**    <u>**NATURE OF THE CASE:**</u>

<u>**Plaintiff's Statement:**</u>

    Plaintiff, William Scovin ("Scovin") filed this action seeking equitable relief and damages based upon the Defendants' conduct and failure to, among other things, pay his medical expenses for a July 2001 bi-lateral hip surgery and follow up treatment totaling approximately $94,220.49. Plaintiff brought claims under ERISA and state law. The Defendant Auerbach Pollak & Richardson ("APR"), has been defaulted and the Court has entered a judgment against that entity. This Court has entered summary judgment for the individual defendants on the state law claims. Thus the remaining issues for trial are all governed by ERISA. The remaining individual Defendants are Hugh Regan, (President, CEO, Director and also the Treasurer for a period of time APR), Lewis Cohen (Chief Financial Officer or "FINOP" of APR), A. Jones York ( Chief Operating Officer or "COO" of APR for a period and Director of APR) and Robert Drake ( Financial Compliance Officer of APR).

After leaving the employ of APR in January 2001, Plaintiff continued his medical benefits under COBRA through APR. APR stopped trading in May 2001 as a result of capital shortfall and applicable NASD rules. As a result, after May 2001 APR's income was essentially nonexistent. Nevertheless, the individual defendants refused to shut down APR's health plan. Plaintiff's COBRA payments beginning April 2001 were accepted and cashed by for APR by the individual Defendants through at least August 2001. As of late June 2001, the individual Defendants were in complete financial and decision making control of the APR Plan and were thus, Plan fiduciaries.

On July 12, 2001, Plaintiff underwent a medically necessary bi-lateral hip replacement surgery, after requesting and obtaining clearance to proceed with the treatment from the Auerbach medical Plan. Plaintiff's medical bills in excess of $ 94,000 were not paid by his Auerbach medical plan despite submission. Unknown to Plaintiff, the Defendants had failed to fund the Plan since the May/June 2001 time period despite accepting his COBRA payments. Moreover, Defendants refused to notify Plaintiff that the Plan was not being funded, refused to terminate the Plan, and specifically chose not to notify employees and instructed others not to notify Auerbach employees, including the Plaintiff that the Plan was without resources to pay major claims.

As a result, Plaintiff brings this action seeking his Plan benefits, injunctive relief and/or damages or other relief under ERISA based on Defendants' conduct.

**Defendants' Joint Statement:**

At its core, this case is nothing more that an effort by Plaintiff to recover allegedly unpaid medical benefits pursuant to an ERISA plan offered to Plaintiff by his former employer Auerbach, Pollak & Richardson, Inc. ("APR"). The case was filed in July 2002. Plaintiff filed an Amended Complaint on or about November 1, 2005. Pursuant to this Court's March 20, 2008 Order Granting in Part and Denying in Part Defendant's Cohen's, Regan's and Yorke's Motion for Summary Judgment, there are two remaining causes of action to be tried to the Court. Both of the remaining causes of action are brought under ERISA and both seek the same relief, i.e., recovery of unpaid medical bills.

None of the remaining Defendants, Messrs. Regan, Yorke, Drake or Cohen was, at any point in time, the administrator or a trustee of the APR healthcare plan at issue. The evidence will unequivocally show that APR employee Terri Spahn was the named administrator of the APR healthcare plan. Under well settled principles of law, a claim for denial of benefits under an ERISA plan may only be pursued against the plan, the plan administrator or trustee. Leonelli v. Pennwalt Corp., 887 F.2d 1195, 1199 (2d Cir., 1989). For reasons known only to Plaintiff and his counsel, Plaintiff chose not to include Spahn as a defendant in this action. Plaintiff's strategic litigation decisions do not transform any of the remaining defendants into the named plan administrator or otherwise create a cause of action against any of them for denial of benefits. Since none of the remaining defendants fall within any of the recognized categories of proper defendant on an ERISA denial of benefits claim, each of them is entitled to judgment on Count II of Plaintiff's Amended Complaint.

Plaintiff has also asserted a cause of action for breach of ERISA fiduciary duty. In order to prevail on this claim Plaintiff will need to prove that each of the remaining defendants exercised the requisite discretionary authority over the APR healthcare plan or its assets required

to be deemed a functional fiduciary. Plaintiff will not be able to meet this burden. Even if plaintiff could show that one or more of the remaining defendants performed ministerial tasks for the APR healthcare plan, that is not enough to cloak someone with ERISA fiduciary status. See, e.g., 29 CFR §2509.75-8; Lopresti v. Terwilliger, 126 F.3d 34, 40-41 (2d Cir. 1997).

Plaintiff's cause of action for Breach of ERISA Fiduciary Duty, Count X of the Amended Complaint, fails as a matter of law because Plaintiff's breach of fiduciary duty claim seeks the exact same relief as his denial of benefits claim, i.e., the recovery of unpaid medical benefits. Borowski v. International Bus. Machines Corp., 165 F.3d 13, 1998 WL 777457, *2 (2d Cir, Oct. 27, 1998)("[W]hen an ERISA fiduciary duty claim seeks to recover the same relief requested by a denial-of-benefits claim, the fiduciary duty claim is precluded."). Thus, each of the remaining defendants is entitled to judgment on Count X of the Amended Complaint for Breach of ERISA Fiduciary Duty.

## STIPULATIONS OF FACT AND LAW:

### a) Stipulations of fact

1.     Plaintiff William Scovin ("Scovin") is an individual residing at 35 Canfield Drive, Bridgewater, Connecticut 06752.

2.     Scovin was employed by Auerbach, Pollak & Richardson, Inc. ("APR") as a research analyst from August 1999 to January 2001.

3.     APR was a Corporation principally engaged in the business of investment banking and buying and selling securities for retail brokerage customers.

4.     At all times relevant, Defendant Hugh Regan was the President and CEO of APR. At all relevant times Regan was a Director of APR.

5.    Defendant Lewis Cohen was employed by APR and during his tenure at APR Cohen served as Controller and Financial and Operations Principal ("FINOP").

6.    At all relevant times, Defendant A. Jones Yorke served as a member of the Board of Directors of APR.

7.    During his tenure at APR, Yorke maintained an office at the New York City offices of APR.

8.    Robert Drake had served as a member of the Compliance and Operations department for APR.

9.    Up through February 2001, APR provided health care coverage to its employees including Scovin, through Oxford Health Plans which was an insured product.

### b). Stipulations of Law

1. Pursuant to 29 U.S.C. § 1002(21)(A):

a person is a fiduciary with respect to a plan to the extent

(i)  he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,

(ii)  he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or

(iii)  he has any discretionary authority or discretionary responsibility in the administration of such plan.

## (6)    PLAINTIFF'S CONTENTIONS:

Pursuant to 29 U.S.C. § 1002(21)(A), the named Defendants are Plan fiduciaries who owed and breached their duties to the Plan participants, including the Plaintiff. Under ERISA the Plan fiduciaries are liable for their misrepresentations about the status of the Plan and their failure to fund the Plan while accepting Scovin's COBRA payments.

The operative word connected to the term "discretion" under either sub section (i) or (iii) of 29 U.S.C. § 1002(21) (A): is "any." If Defendant Regan, Cohen, Yorke, or Drake exercised *any* discretion or authority regarding the management of the Health Plan, its administration, or the management or disposition of the assets thereof, then a fiduciary status exists. *See also* 29 C.F.R. § 2510.3-21; 29 C.F.R. § 2509.75-8. The facts and circumstances in this case reveal that the Defendants clearly exercised control over the Plan.

Scovin's COBRA payments were accepted for June 2001, July 2001, and in August 2001, the period after his pre-approved surgery was completed and not withstanding the fact that the Defendants knew or should have known that the Plan was on administrative hold as a result of APR's nonpayment. In June 2001, the same Defendants affirmatively and specifically instructed others APR employees, -namely- Terri Spahn - not to shut down the Plan and not to notify APR employees. In failing to fund or notify Plaintiff as early as May / June 2001 about the Plan, or to ensure that Plaintiff's claims were paid after accepting and retaining Plaintiff's COBRA Health Plan contributions through August, Defendants violated ERISA Sections 404(a)(1)(A),(B) and (D) and Sections 406(a)(1)(B), (D) and 406 (b)(1) which codify Defendants obligations and handling of the assets.

"[W]hether ...an... entity is an ERISA fiduciary must be determined by focusing on the function performed, rather than on the title held." Blatt v. Marshall & Lassman, 812 F.2d 810, 812 (2d Cir.1987). When courts distinguish fiduciary duties from purely ministerial ones, they look to more than job titles or contract terms. Thus, the parties' use of the magic words "purely ministerial" does not avoid fiduciary responsibility. *See* IT Corporation v. General American Life Insurance Co., 107 F.3d 1415, 1420 (9th Cir. 1997).

Further, where an actor has any control over disposition of plan money, he is a fiduciary. *See* IT Corporation, 107 F.3d at 1421. An actor has control over plan money where he can deplete the account by writing checks. (Id.). The right to write checks on plan funds is "authority or control respecting management or disposition of its assets." (Id.). "An entity need not have absolute discretion with respect to a benefit plan in order to be considered a fiduciary." Blatt v. Marshall & Lassman, 812 F.2d 810, 812 (2d Cir. 1987). A person need only have "sufficient control over at least a part of the [Plan] assets to create a fiduciary relationship." United States v. Glick, 142 F.3d 520, 528 (2d Cir.1998).

ERISA imposes a fiduciary duty on employers to act solely in the interest of the participants and beneficiaries. Ballone v. Eastman Kodak Co., 109 F.3d 117, 122 (2d. Cir. 1997). Material misrepresentations about the Plan are actionable under ERISA as a breach of fiduciary duty. Id. (holding that a material misrepresentation about future retirement plan changes could be actionable). Here representatives of APR acting for and on behalf of the individual Defendants acted in a manner indicating that Scovin had coverage and could proceed to undergo his bilateral hip replacement with an expectation that the Plan would pay for his treatment. The Individual Defendants specifically directed the former Plan administrator not to close the Plan even though they knew there were insufficient funds to pay claims. They knew or should have know that this conduct would mislead claimants like Plaintiff to believe they still had coverage. Defendants are now liable under ERISA for this misrepresentation, for their failure to fund the plan without notify participants and for breach of fiduciary duty.

**(7)    DEFENDANTS' JOINT CONTENTIONS:**

Defendants Robert Drake ("Drake"), Hugh Regan ("Regan"), A. Jones Yorke ("Yorke") and Lewis Cohen ("Cohen") are not and never were fiduciaries of the Auerbach, Pollak &

Richardson, Inc. ("APR") healthcare plan (the "Plan"), have no knowledge or experience in the administration of the Plan and had no communication of any kind with Great West Life and Annuity Insurance Co. or One Health Plan, Inc. (collectively "Great-West"), the third-party administrator of the Plan during the relevant time period.

During his employment with APR, Plaintiff was based in APR's New York office and maintained an office in close proximity to Regan, Yorke and Cohen as well as APR's Chairman, John Sands, whom he did not name as a defendant in this action. Plaintiff has, and at all times had, full and detailed knowledge of the Defendants' roles at APR. Indeed, because Plaintiff was fully aware of each defendant's respective position and responsibilities, he never communicated with any defendant in any way regarding employee benefits, insurance, COBRA or any other human resource related issue. Plaintiff did, however, communicate on a regular basis about the Plan and other benefits related issues with Terri Spahn (Spahn"), the named Plan Administrator.

## A.    Drake

Drake contends that he was not a fiduciary of the Plan as he held no title for the period December 3, 2000 until December 4, 2002. This was a result of a consent order agreed to by Drake in connection with a disciplinary action taken by the National Association of Securities Dealers with respect to activity that occurred while Drake was employed by another broker-dealer prior to his employment with APR. Plaintiff was advised of this at the onset of the litigation. Plaintiff was further advised that the disciplinary action required Drake to cease acting in any supervisory, managerial, or other similar position for 2 years. Drake surrendered his title and responsibilities in December 2000. Drake also contends that being identified as a "Financial Compliance Officer "is inaccurate as there is no such title recognized in any industry

regulation be it a self-regulatory organization, state securities regulation, or federal securities regulations.

### B.    Regan

Regan was not nor did he ever become a fiduciary of the Great West, Oxford or any other healthcare plan at APR during his employment with APR.  As the broker-dealer's President and General Securities Principal, his duties were at all times confined to NASD (n/k/a FINRA) related activities which do not include financial, accounting, regulatory reporting, payroll, human resource, benefits or any matter relating to the payment of bills. As a matter of fact, Regan's operational duties were focused always on the firm's Investment Banking, Corporate Finance and business development activities. During 2001, Regan's activities were almost exclusively confined to the EVision Transaction integration, the phase two Softbank Transaction and the firm's corporate finance calendar of transactions.

Regan is also owed substantial funds by APR including but not limited to salary, benefits and other compensation, payments on Senior Secured Promissory Notes and substantial out-of-pocket expenses incurred on behalf of APR. Regan's family is owed even more funds due on investments made in the form of Senior Secured Promissory Notes over a period of many years and which it continued to make as late as May, 2001, despite the financial pressures confronting APR after the EVision Transaction, in order to assist APR in completing the Softbank transaction, which contemplated the infusion of additional capital. As a member of the Board of Directors, he was only one of several, a fact readily known and available to Plaintiff through public filing and records.

CT01/MORIJA/256661.3

### C.    Yorke

Yorke was never a paid employee of APR and served only as one of up to seven (7) unpaid Directors. He was never and never became a fiduciary of the Plan, or of any other health care plan of APR and was never involved in any aspect of APR's accounting, finance, payroll, bill payment, benefits or human resource activities. As a Director, he was only one of several, a fact readily known and available to Plaintiff through public filing and records.

### D.    Cohen

Cohen was employed by APR from December 1998 to early July 2001. Cohen was APR's Financial and Operations Principal ("FINOP") and comptroller. Every securities broker dealer is required by the Financial Industry Regulatory Authority ("FINRA") (formerly NASD) rules to employ a FINOP. The primary responsibility of a FINOP is to prepare FOCUS reports. A FOCUS report is a periodic financial filing broker dealers are required to make to FINRA and the United States Securities and Exchange Commission.

In his position as APR's FINOP, Cohen prepared APR's FOCUS reports. In his position as APR's comptroller, Cohen issued checks to APR's vendors and creditors. Cohen primarily reported to APR's Chief Financial Officer who, during the relevant time, was Michael Benvenuto ("Benvenuto"). Cohen did not have any discretion with respect to the payment of APR's creditors. That discretion was vested in, among others, Benvenuto who instructed Cohen as to what vendors should be paid and in what order such payments should be made.

APR offered health care benefits to its employees. In January 2001, APR entered into a transaction by which its operations where combined with those of American Fronteer Financial Corporation ("AAFC") pursuant to an agreement between APR and EVision USA.Com, Inc. (EVision"). After this transaction was completed, the legacy APR employees were moved to

11

EVision's existing healthcare plan which was self-funded. Cohen had no role in the decision to move legacy APR employees to EVision's existing healthcare plan. Spahn was EVision's Assistant Vice-President of Human Resources. Upon the completion of the transaction between APR and EVision, Spahn assumed that same position with APR.

Spahn was the named plan administrator of the EVision healthcare plan. Spahn remained plan administrator after the legacy APR employees were transferred to the EVision healthcare plan and the plan's name was changed to Auerbach, Pollak & Richardson, Inc. Cohen had no authority over the administration of the Plan. Plan administration was indisputably vested in Spahn; the Plan administrator who had "the exclusive and full discretion and authority to determine the benefits and amounts payable."

As part of his general job responsibilities Cohen issued checks to Great-West, the Plan's third-party administrator, on behalf of APR. Cohen paid Great-West's invoices in the same manner he paid invoices from other APR creditors. Cohen did not have any discretion over the amount paid to Great-West and did not scrutinize the bills provided by Great-West for accuracy. Great-West sent monthly invoices to Spahn, who reviewed them for accuracy. After Spahn completed her review, she forwarded the invoice to APR's New York office for payment. Cohen received the invoice from Spahn and then sought permission to pay the bill. Once that permission was obtained, Cohen issued a check out of APR's general operating funds.

The contract between Great-West and EVision pursuant to which Great-West administrated the Plan authorized Great-West to transfer money from EVision's bank account on a monthly basis to pay for, among other things, claims and claims administration. To comply with this contractual obligation, that APR appears to have assumed, in the Spring of 2001, Cohen executed a banking authorization allowing Great-West to draw funds from APR's bank account.

12

Cohen did not have any discretion over the amounts drawn by Great-West nor did he segregate money to fund the Plan. In short, Cohen was nothing more than a production person who had no discretion over which of APR's creditors were paid and in what order.

In late May 2001 a NASD arbitration panel issued an award in an arbitration in which APR was a respondent. The award found APR jointly and severally liable with a co-respondent for nearly $3,000,000 in damages. Under federal law, APR was required to immediately book the NASD arbitration award as a liability. As soon as the liability was booked, APR determined that it was in violation of its statutory net capital requirements and, other than liquidating trades, APR was required to cease trading and file notification of a voluntary cease to the regulators. Cohen remained employed by APR through early July 2001.

### (8) LEGAL ISSUES:

**Plaintiff's Legal Issues:**

1. Whether the Defendants are fiduciaries under the Plan

2. Whether the Defendants breached their fiduciary duties to the Plaintiff.

3. Whether Plaintiff is entitled to equitable relief in the form of an order that the Defendants fund the Plan to the extent of the medical expenses for the Plaintiff which remain unpaid with interest, and/or are directly ordered to pay such expenses to the medical providers with any accrued interest.

4. In the alternative the extent of damages or other legal or equitable relief to which Plaintiff is entitled under ERISA.

5. The extent to which Plaintiff may recover legal fees for prosecuting this action.

**Defendants' Legal Issues:**

The following legal issues flow from the factual contentions of the parties:

CT01/MORIJA/256661.3

1.    Whether Plaintiff can maintain an action for denial of benefits under an ERISA plan against anyone other than the plan or a named plan administrator or trustee?

2.    Whether each of the defendants was a named plan administrator of the Auerbach Pollak & Richardson, Inc. health care plan ("APR Plan").

3.    Whether Plaintiff can maintain a claim for breach of an ERISA fiduciary duty when he has also asserted a claim for denial of benefits and the remedy sought is money damages?

4.    Whether each of the defendants was a fiduciary of the APR Plan, as that term is defined by ERISA.

5.    If a defendant was a fiduciary of the Plan, whether he breached any fiduciary duties owed to Plaintiff as a participant in the APR Plan.

6.    If a defendant breached fiduciary duties owed to Plaintiff as a participant in the APR Plan, whether the relief available to Plaintiff for breach of that fiduciary duty is purely equitable so that Plaintiff is precluded from recovering damages for that breach of fiduciary duty.

7.    Whether defendants are entitled to set-off $70,000 recovered by Plaintiff in a settlement with Great-West Life & Annuity Insurance Co. and One Health Plan, Inc.

8.    Whether Plaintiff is entitled to recover any alleged damages personally or whether any recovery inures to the benefit of the APR Plan.

**(9)    VOIRE DIRE QUESTIONS:**

Not Applicable.

**(10)    LIST OF WITNESSES:**

The Plaintiff anticipates that the following witnesses may testify at trial and/or their deposition testimony will be offered:

14

1.     Plaintiff:  William Scovin is expected to testify as to the facts and circumstances surrounding the allegations in the Amended Complaint, his employment with APR and the Defendants, his medical treatment and expenses, and all of the underlying facts of this matter.

2.     Defendant:  Hugh Regan:  as the President, CEO and a Director of APR, Regan is expected to testify about all aspects of APR's operations including, but not limited to, the facts and circumstances surrounding APR's makeup, finances,  income, policies, benefits, meetings, discussions, APR's cessation of active business under the SEC and NASD rules, the "so called" winding up of APR, and his responsibilities and authority over APR's employees and funding, the Plan and his fiduciary relationships to APR and the Plan, and his involvement in the decision not fund and not to terminate the Plan.  Plaintiff intends to offer all of Regan's deposition as part of its direct case.

3.     Defendant:  Lewis Cohen: as the controller and FINOP of APR, Cohen is expected to testify about all aspects of APR financial operations including, but not limited to, the facts and circumstances surrounding APR's makeup, finances,  income, policies, benefits, meetings, discussions, APR's cessation of active business under the SEC and NASD rules, the "so called" winding up of APR, and his responsibilities and authority over APR's employees and funding, the Plan and his fiduciary relationships to APR and the Plan, and his involvement in the decision not fund and not to terminate the Plan.  Plaintiff intends to offer all of Cohen's deposition as part of its direct case.

4.     Defendant:  A. Jones Yorke: As a Director and Chief Operating Officer of APR, York is expected to testify about all aspects of APR's operations including, but not limited to, the facts and circumstances surrounding APR's makeup, finances,  income, policies, benefits, meetings, discussions, APR's cessation of active business under the SEC and NASD rules, the

15

"so called" winding up of APR, and his responsibilities and authority over APR's employees and funding, the Plan and his fiduciary relationships to APR and the Plan, and his involvement in the decision not fund and not to terminate the Plan. Plaintiff intends to offer all of Yorke's deposition as part of its direct case.

5.    Defendant: Robert Drake: as the Financial Compliance Officer of APR, Drake is expected to testify as to the all aspects of APR's operations including, but not limited to, the facts and circumstances surrounding APR's makeup, finances, income, policies, benefits, meetings, discussions, APR's cessation of active business under the SEC and NASD rules, the "so called" winding up of APR, and his responsibilities and authority over APR's employees and funding, the Plan and his fiduciary relationships to APR and the Plan, and his involvement in the decision not fund and not to terminate the Plan. Plaintiff intends to offer all of Drake's deposition as part of its direct case.

6.    Richard Cushing: during the time period before the commencement of this action, Attorney Cushing served as counsel for APR in a variety of matters. Cushing was included in the train of letters and certain factual documents in this case during the 2001 time period. If called, Cushing is expected to testify about those documents, as well as all aspects of APR's operations including, but not limited to, the facts and circumstances surrounding APR's makeup, finances, income, policies, benefits, meetings, discussions, APR's cessation of active business under the SEC and NASD rules, the "so called" winding up of APR, and his responsibilities and authority over APR's employees and funding, the Plan and his fiduciary relationships to APR and the Plan, and his involvement in the decision not fund and not to terminate the Plan. Cushing can also rebut the claim by Regan that he ended all involvement in the activities of APR as f the Summer of 2001. Cushing will be called to testify about on going litigation he

16

continued to conduct on behalf of APR after July 2001 and into at least 2002, at the direction of Regan.

7.    Terri Spahn: a former employee of APR and before that eVision USA.Com, Inc. She was named the fiduciary administrator of the APR health Plan after APR took over eVision USA.Com, Inc.    Plaintiff will offer all of Spahn's deposition testimony on her involvement with the APR plan, her efforts to convince the individual defendants to terminate the Plan and notify the former APR employees that the Plan would not continue and had been suspended by Great West and her resignation from APR in June 2001.

8.    Patricia Frye: was a representative of Great West and her deposition testimony will be offered concerning the limited ministerial relationship Great West had to the management and operation of the APR Plan.

Defendants anticipate that the following witnesses may testify at trial either live or via deposition:

1.    Lewis Cohen, 62 Devonshire Drive, Somerset, New Jersey 08873. Mr. Cohen is expected to testify about his employment with Auerbach, Pollak & Richardson, Inc. ("APR"), including positions held and responsibilities in those positions.

2.    Robert Drake, 558 Lime Rock Road, Lakeville, Connecticut 06039. Mr. Drake is expected to testify about the business of APR, including the unwinding of APR's business in the Summer of 2001. Mr. Drake is also expected to testify about discussions he had with Plaintiff concerning the APR healthcare plan prior to the commencement of this lawsuit.

3.    Hugh Regan, 269 West 72nd Street, New York, New York 10023. Mr. Regan is expected to testify about the business of APR, including a transaction between APR and EVision USA.Com, Inc. in January 2001. Mr. Regan will also testify about responsibilities for

17

human resource related matters at APR before and after the EVision transaction. Lastly, Mr. Regan will testify about the reasons for the ultimate demise of APR.

    4.    A. Jones Yorke, Mr. Yorke is expected to testify about his experience in the securities industry. Mr. Yorke will also testify about his tenure on APR's Board of Directors and the business of APR.

### Deposition Witnesses

    1.    Terri Spahn. Testimony may be introduced from the deposition of Ms. Spahn concerning her role as the administrator of the APR Plan, including the payment of Great-West invoices and communications with Great-West and participants in the APR healthcare plan.

    2.    Patricia Fry, representative of Great-West Life and Annuity Insurance Company and One Health Plan. Testimony may be introduced from the Fed.R.Civ.P. 30(b)(6) deposition of Ms. Fry concerning the lack of communication between Great-West and the defendants, Great-West's knowledge of APR's financial difficulties in the Spring and Summer of 2001 and Great-West's role as the administrator of the APR Plan, including communications between Great-West and Ms. Spahn.

### (11)    PLAINTIFF'S EXHIBITS:

| | | Exhibits from Scovin Discovery | | |
|---|---|---|---|---|
| Exh No. | Date | Description | Bates No. Deposition exhibit references | Defendants' Objections |
| | | | | |
| 1 | 7/20/99 | Letter Agreement re terms of employment between Plaintiff and Auerbach | SCOV 0199 – 0205 APR 0066-0075 | No Objection |
| | | | | |
| 2 | 8/23/99 | Oxford Health Plans Member Enrollment and Physician Selection Form signed by William Scovin | SCOV 0056 | Relevance |

| 3 | | Guide to Your Oxford Coverage | SCOV 0060 – 0076 | Relevance |
|---|---|---|---|---|
| 4 | 3/20/00 | Letter from One Health Plan's Appeal Coordinator to State of New York Insurance Department re Scovin complaint | SCOV 0181 | Hearsay, authentication |
| 5 | 8/14/00 | William Scovin MRI views and One Day Surgery Instructions | SCOV 0058 – 0059 | Relevance |
| 6 | 9/20/00 | Healthcare Recoveries, Inc. Letter to Scovin | SCOV 0035 | Relevance |
| 7 | 4/5/01 | Letter from Scovin to T. Spahn enclosing COBRA Election Form and April premium check | SCOV 0219 – 0225 | No objection |
| 8 | 5/16/01 | Letter to Scovin from One Health Plan certifying 3 day hospital stay Admit date 5/23/01 | SCOV 0172 | No objection |
| 9 | 5/22/01 | Medical Records and Bills<br>1. Danbury Hospital:<br>$ 62,429.77<br>2. Interest @10% :<br>$ 5,847.98<br>3. Danbury Orthopedic<br>$ 21,065.00<br>4. Miscellaneous Medical Providers:<br>a. Candlewood Valley<br>$ 240.00<br>b. New Milford Ob/Gyn<br>$ 200.00<br>c. Dr. Richard Casden<br>$ 125.00<br>d. Village Square<br>$ 239.00<br>e. Quest Diagnostics<br>$ 364.90 | SCOV 0334 - 0442 | No objection |

19

| | | | | |
|---|---|---|---|---|
| | | f.  Apria Healthcare<br>$       195.84<br>g. Carlson Physical<br>Therapy$    940.00<br>h.  Danbury Office P.S.<br>$  2,573.00<br>Total Medical Bills<br>    $94,220.49 | | |
| 10 | 6/8/01 | Letter to Scovin from One Health Plan certifying 3 day hospital stay Admit date 7/12/01 | SCOV 0501 | No objection |
| 11 | 6/26/01 | Certificate of Group Health Plan Coverage | SCOV 0032 | Relevance |
| 12 | 7/9/01 | One Health Plan Benefit Information for William Scovin | SCOV 0502 – 0503 | No objection |
| 13 | 7/27/01 | Scovin's Checks sent to APR for COBRA Premiums:<br>Ck. #678 dated 4/5/01<br>Ck. #702 dated 4/20/01<br>Ck. #678 dated 5/17/01 directly to CobraServe<br>Ck. #756 dated 6/22/01 FedEx Airbill transmitting same<br>Ck. #774 dated 7/27/01 FedEx Airbill transmitting same | SCOV 0209<br>SCOV 0210<br>SCOV 0211<br>SCOV 0190<br>SCOV 0191<br>SCOV 0192<br>SCOV 0193 | No objection |
| 14 | 10/1/01 | Notes of Phone conversation with John Meyers of CobraServ | SCOV 0186 | Hearsay, relevance |
| 15 | 10/1/01 | Letter from Scovin to Consumer Services Bureau of New York State Insurance Department requesting investigation | SCOV 0528 - 0531 | Hearsay, relevance |
| 16 | 10/5/01 | CobraServ National Service | SCOV 0184 | No objection |

20

| | | Center letter to Auerbach re Participant (Scovin) Update ending coverage on 8/31/01 | | |
|---|---|---|---|---|
| 17 | 10/5/01 | CobraServ National Service Center letter to Scovin re Termination of COBRA Benefits with APR as of 8/31/01 | SCOV 0185 | No objection |
| 18 | 10/15/01 | Certificate of Group Health Plan Coverage for Scovin Family | SCOV 0505 | No Objection |
| 19 | 10/19/01 | Letter to Scovin from State of Colorado Division of Insurance | SCOV 0521 - 0522 | Hearsay, relevance |
| 20 | 10/24/01 | Letter from One Health Plan's Appeal Coordinator to Scovin re Administrative Hold on Auerbach's Plan | SCOV 0182 | Hearsay, relevance |
| 21 | 11/2/01 | Letter from Connecticut Attorney General to Hugh Regan re Complaint from Scovin | SCOV 0498 - 0499 | Hearsay, relevance |
| 22 | 12/5/01 | Letter from Danbury Hospital to Scovin seeking remittance of $48,901.30 | SCOV 0443 | No Objection |
| 23 | 2/21/02 | Letter to Scovin from One Health Plan Appeals Coordinator confirming receipt of 2/15/02 Scovin letter and directing any further appeal to T. Spahn | SCOV 0507 | No objection |
| 24 | 6/26/02 | Notice of Application for Prejudgment Remedy filed by Danbury Hospital vs. William Scovin | SCOV 0444 - 0472 | Hearsay, Relevance |
| 25 | | EVision USA.COM, Inc. | SCOV 0002 – 0030 | No objection |

21

|  |  | PPO/POS Booklet – August 1, 2000 | Fry Depo D's Exh 7 Spahn Depo Exh 16 |  |
|---|---|---|---|---|
| 26 | 2/15/02 | Letter from Scovin to Robert Drake re unpaid medical claims | SCOV 0156 - 0158 | No objection |
| 27 | 2/15/02 | Letter from Scovin to Lewis Cohen re unpaid medical claims | SCOV 0159 - 0162 | No objection |
| 28 | 2/15/02 | Letter from Scovin to Hugh Regan re unpaid medical claims | SCOV 0166 - 0168 | No objection |
| 29 | 3/3/02 | Spahn Conversation with Scovin | Scov 0214-0215 Spahn Depo Exh 18 | Hearsay |
| 30 | 3/4/02 | Letter from Hugh Regan to Scovin responding to 2/15/02 letter | SCOV 0163 APR 0010 | No objection |
| 31 | 2/20/02 | Email from Michael P. Considine to Scovin | SCOV 0164 | No objection |
| 32 | 4/4/01 | APR Check 7275 for Great-West Life Premium in the amount of $30,526.43 | GW 000219 | No objection |
|  |  | **Exhibits from Great West Discovery** |  |  |
| 33 | 3/21/01 | GW - APR Monthly Accounting Statement | GW 000223-225 Fry Depo Exh 23 | No objection |
| 34 | 4/27/01 | Renee Koogle emails re implementation of APR banking letters | GW 000874 – GW 000877 | No objection |
| 35 | 7/13/01 | Fax from T. Spahn to Jeff Scott of Great-West advising that she is no longer employed at APR and enclosing list of terminated employees | GW 000852 – GW 000856 GW 000208-212 Fry Depo D's Exh 19 Spahn Depo Exh 21 | No objection |

22

| | | | | |
|---|---|---|---|---|
| 36 | 7/17/01 | Email to Renee Koogle requesting all Auerbach correspondence and billing be sent to NY office w attachments | GW 000851 GW 000207 -212 Fry Depo Exh 27 | Hearsay relevance |
| 37 | 7/17/01 | Email from A Zellner to Koogle re still no APR letter | GW 000207-212 Fry depo Exh 27 | P. GW 207 Hearsay; Pgs. GW 208-212 no objection. |
| 38 | 7/19/01 | GW/One Health letter to Scovin | GW 000306 Fry Depo D Exh 20 | No objection |
| 39 | 8/1/01 | Services Contract Between Great-West and EVision USA.Com,Inc | GW 000267 – GW 000294 GW 000452 Fry Depo D's Exh 5 | No objection |
| 40 | 8/2/01 | Tania Myers emails re new contact for Auerbach Plan #390075 (may be same as  0457) | GW 000845 | Hearsay relevance |
| 41 | 8/21/01 | Renee Koogle emails re Auerbach Plan #390075 | GW 000841-844 Fry Depo D's Exh 16 Spahn Depo Exh 16 | Hearsay relevance |
| 42 | 8/31/01 | BILL Systems ADDRESS/PHONE INFORMATION for Plan Name:  APR, Inc. | GW 000235 | Hearsay relevance |
| 43 | 9/30/01 | GW Tansfer Report of APR for Oct 2001 | GW 000382-86 Fry Depo Exh 26 | Hearsay, relevance |
| 44 | 5/31/02 | Collection Referral to Loss Prevention | GW 000196 – GW 000197 | Hearsay relevance |
| 45 | 6/3/02 | Letter from Great-West Collections Specialist to APR advising that attempt to tap account for claims and premiums for May 2001 | GW 000868 | Hearsay relevance |

23

| | | | | |
|---|---|---|---|---|
| | | through October 2001 were unsuccessful due to NSF | | |
| 46 | | Compilation of Scovin's submitted claims for dates of service between 5/22/01 and 8/21/01 | GW 000007 | No Objection |
| 47 | | Transfer Report for the Month of July 2002 | GW 000139 | Hearsay relevance |
| 49 | | Great-West Transfer Reports and Claim Funding Detail Reports for the months of May 2001 through September 2001 and Claims Funding Detail Reports only for the months of October 2001 through June 2002 | GW 000141 – GW 000159 | Hearsay Relevance, and Authentication of handwriting on pgs 141-144 |
| 50 | | Great-West Statement #15 for Month Beginning October 1, 2001 (includes adjustments/payments processed to September 28, 2001) | GW 000213 | Relevance |
| 51 | | Great-West Statement #16 for Month Beginning October 1, 2001 (includes adjustments/payments processed to October 25, 2001) | GW 000162 | Relevance |
| 52 | | Great-West Statement #17 for Month Beginning November 2001 (includes adjustments/payments processed to October 31, 2001) Showing Term Admin fee reversal | GW 000160 – GW 000161 | Relevance |
| 53 | | Listing of Medicals of William Scovin | GW 000821 Fry Depo Exh 25 | No objection |

24

| | | Exhibits from APR Discovery | | |
|---|---|---|---|---|
| 54 | 1998 | Organizational Chart | APR 0078<br>Regan Depo Exh 13 | Relevance |
| 55 | 2000 | APR general Organizational Chart | APR 0061-63<br>Regan Depo Exh 21 | No Objection |
| | | Key Personnel Directory | APR 0088-93<br>Regan Depo Exh 17 | Relevance |
| 56 | 7/2/99 | APR Fleet Bank Check 5331 payable to The Park Avenue Bank, N.A. | 1430 | Relevance, and Authentication of handwriting |
| 57 | 3/28/00 | eVision's Application for Group Coverage from Great-West | 0326 | No Objection |
| 58 | 12/1/00 | eVision's Application for Amended Group Coverage – Name Change to APR | 0926 | No Objection |
| 59 | 12/12/00 | Share Purchase Agreement Among eVision USA.Com, Inc., American Fronteer Financial Corporation and APR | APR-0106 – APR-0118<br>Regan Depo Exh 20 | No Objection |
| 60 | 1/23/01 | APR Fleet check 7020 with handwritten notations on check stub | 0473<br>GW 000229<br>Fry Depo Exh 24 | No Objection |
| 61 | 1/24/01 | Memo from Terri Spahn to Hugh Regan re Vacation/Sick Time Policy (marked up) | 1232 – 1233 | Relevance |
| 62 | 1/24/01 | Memo from Terri Spahn to Hugh Regan re Vacation/Sick Time Policy (marked up) | 1234 – 1235 | Relevance |
| 63 | 1/24/01 | Memo from Terri Spahn to Hugh Regan et al re Update | 1499 – 1500 | Relevance |

25

| | | on transfer of policies to date | | |
|---|---|---|---|---|
| 64 | 1/24/01 | Memo from Spahn to Regan et al re Update Policies | 0381—0382 Spahn Depo Exh 20 | Relevance |
| 65 | 2/22/01 | Memo from Hugh Regan to All Employees re February 15th Payroll Checks | 1425 | Relevance |
| 66 | 2/27/01 | Letter from Hugh Regan to Oxford Health Plans to terminate group health insurance as of April 1, 2001 | 1494 Spahn Depo Exh 1 | No Objection |
| 67 | 3/6/01 | Great-West Arrears Memo re 2/23/01 NSF notification re APR | 0873 | Relevance |
| 68 | 3/19/01 | APR Fleet check 7180 with handwritten notations on check stub | 0471 | No Objection |
| 69 | 3/22/01 | Agreement Among APR, Auerbach Financial Group Inc., eVision USA.Com, Inc., and e2 Capital Investment Limited | APR-0119 – APR-0129 Regan Depo Exh 19 | No Objection |
| 70 | 4/4/01 | APR Fleet check 7275 with handwritten notations on check stub | 0470 Spahn Depo Exh 2 | No Objection |
| 71 | 4/4/01 | Memo from Lewis Cohen to Terri Spahn re 401(k) Company match | 1231 | Relevance |
| 72 | 4/10/01 | Employee Benefits – Letter naming Fleet Bank | 0334 – 0335 GW 0199 Fry Depo Exh 22 | No Objection |
| 73 | 4/17/01 | Terri Spahn Memo to Mike Benvenuto re Cobra checks for April payments | 1496 | No Objection |

CT01/MORIJA/256661.3

| 74 | 5/1/01 | Terri Spahn Memo to Mike Benvenuto and Lewis Cohen re Cobra checks for April & May payments | 1498 | No Objection |
|---|---|---|---|---|
| 75 | 5/10/01 | Regan Letter to Jeffrey Bush of eVision advising of eVision's right to contribute equity capital to APR to maintain pro rata equity interest. Cc: Koplik, Cushing | APR-0082 – APR-0083 Regan Depo Exh 14 | Relevance |
| 76 | 5/11/01 | Memo from Lewis Cohen to All Registered Personnel re Temporary Restriction of Activities | 1238 Spahn Depo Exh 3 | Relevance |
| 77 | 5/17/01 | APR Summary of Terms of Bridge Financing | APR-0079 – APR-0081 Regan Depo Exh 15 | No Objection |
| 78 | 5/28/01 | Letter to Ceredian from Spahn | 1240 Spahn Depo Exh 5 | Relevance |
| 79 | 5/29/01 | Emails between Renee Koogle and A. Zellner & M. Emore re APR 390075 payments | 0450 – 0451 | No Objection |
| 80 | 5/31/01 | Letter to G Cook from Regan | APR 0060 Regan Depo Exh 12 | No objection |
| 81 | 6/11/01 | Emails between Renee Koogle and Alison Zellner re APR 390075 | 0442 – 0443 | No objection |
| 82 | 6/18/01 | Focus Report of APR for Period 6/1/01 – 6/15/01 | APR-0094 – APR-0105 Regan Depo Exh 16 | No Objection |
| 83 | 6/18/01 | Fax Cover from Lewis Cohen to William St. Laurent of NASD Boston | 0051 | No Objection |

| 84 | 6/20/01 | Email between Renee Koogle and Terri Spahn re June Premium, Group #390075 | 0440 – 0441 | No Objection |
|----|---------|---------------------------------|--------------|--------------|
| 85 |  | Claims Hold Release Form re Non Payment Date: 6/22/01 | 0452 | No Objection |
| 86 | 6/28/01 | Fax transmission report for letter from Terri Spahn to Ceridian to end quarter on 6/29/01 without processing current pay period | 1239 | No Objection |
| 87 | 6/28/01 | Letter from Terri Spahn to Ceridian to end quarter on 6/29/01 without processing current pay period | 1240 | No Objection |
| 88 | 6/29/01 | Fax cover and transmission receipt for memo to Richard Cushing | 1510 – 1511 Spahn Depo Exh 7 | No Objection |
| 89 | 6/29/01 | Fax cover and transmission receipts for memo to Hugh Regan and Jones Yorke | 1504 – 1506 Spahn Depo Exh 6 Spahn Depo Exh 8 | No Objection |
| 90 | 6/29/01 | Memo from Terri Spahn to Hugh Regan re Employment Status and outstanding issues to be handled | 0384-0385

1502 – 1503 Spahn Depo Exh 6 | No Objection |
| 91 | 6/29/01 | Letter from Terri Spahn to Capital District Physicians' Health Plan cancelling group policy effective 6/30/01 | 1497 Spahn Depo Exh 20 p4 | No Objection |
| 92 | 7/01 | APR Premium Distribution Report | APR 0039-56 Regan Depo Exh 10 | Hearsay, relevance |
| 93 | 7/2/01 – 8/21/01 | Numerous Renee Koogle emails re financial problems at APR | 0453 – 0456 | No Objection |

| 94 | 7/11/01 | Capitation (Client Archive) Client: APR note to file | 0999 | No Objection |
|---|---|---|---|---|
| 95 | 7/13/01 | Great-West Employee Detail Section Listing of Employees Covered as of the Statement Date Jun3 1, 2001 | 0444 – 0446 | No Objection |
| 96 | 7/13/01 | Proof of Service to APR of filing of *Ceridian Corporation et al v American Frontier Financial Co. et al* | 1445 1447 | Hearsay Relevance |
| 97 | 7/13/01 | Memo from T. Spahn to Delta Dental advising she no longer employed with APR | 1227 | No Objection |
| 98 | 7/16/01 | Memo from Terri Spahn to Regan and Cohen re Recap of Outstanding Human Resource Issues | 0389-0391 1507 – 1509 Spahn Depo exh 9 | No Objection |
| 99 | 7/17/01 | A. Zellner Memo to R. Koogle re APR notice to send mailings to NY Office | 0520 | No Objection |
| 100 | 8/2/01 | Tania Myers' email from A. Zellner re contact for APR collections | 0457 | Hearsay Relevance |
| 101 | 8/4/01 | Great-West Statement for Month of July 2001 for period beginning Aug. 2000 | 04860 – 0489 | No Objection |
| 102 | 8/9/01 | CobraServe Premium Distribution Report as of 7/31/01 for APR | | No Bates range supplied. Defendants' reserve their rights to object to such time as the document is sufficiently identified to |

| | | | | allow a review of the document for purposes of asserting objections. |
|---|---|---|---|---|
| 103 | 8/9/01 | CobraServe Disbursement checks to APR | 1550 – 1553 | No Objection |
| 104 | 8/9/01 | CobraServe Participant Status Report Period of 7/1/01 to 7/30/01 for APR | APR-0086 | No Objection |
| 105 | 9/01 | APR Cobra Serve Status Report | 0028-35 Regan Exh 8 | Hearsay, relevance |
| 106 | 9/19/01 | Great-West letter to Regan advising that due to non-payment of amount due on 8/23/01 payment of claims has been discontinued | APR-0087 0058 Regan Depo Exh 2 | No Objection |
| 107 | 9/30/01 | APR premium Distribution report | 0026-27 Regan Depo Exh 7 | Hearsay, relevance |
| 108 | 10/1/01 | GW Final Bill to APR | APR oo56-59 Regan Depo Exh 11 | No objection |
| 109 | 10/5/01 | COBRA Serve Notice | 0059 Regan Depo Exh 3 | No objection |
| 110 | 10/10/01 | CobraServe Participant Status Report Period of 9/1/01 to 9/30/01 for APR | APR-0035 | No Objection |
| 111 | 10/01/01 | Cobraserv Disbursement Ck to APR #258495 | APR 0025 Regan Depo Exh 6 | No objection |
| 112 | 10/15/01 | Certificate of Group Health Plan Coverage | APR-0085 | No Objection |
| 113 | 10/21/01 | Email from Managedcare Ombudsman re Scovin – APR problem | 0081 – 0083 | Hearsay Relevance |

CT01/MORIJA/256661.3

| 114 | | Cobra Serv Notice | APR 0038<br>Regan Depo Exh 9 | Hearsay, relevance |
| --- | --- | --- | --- | --- |
| 115 | 10/21/01 | GWLA Reconciliation of APR Policy | 1541 | No Objection |
| 116 | 10/21/01 | GWLA Reconciliation of APR Policy with Total of Cash and Billing Differences | 1542 | No Objection |
| 117 | 10/31/01 | CobraServe notice to APR of termination of COBRA compliance services effective 11/30/01 | 0998 | No Objection |
| 118 | 11/01 | GW Notice to APR | 0068<br>Regan Depo Exh 4 | Relevance |
| 119 | 11/9/01 | CobraServe Disbursement check 279661 to APR | 1554 | No Objection |
| 120 | 11/28/01 | Allen Matkins fax cover and letter dated November 28, 2001 re *Ceridian Corporation et al v American Frontier Financial Co. et al* | 1432 – 1434 | Hearsay Relevance |
| 121 | 11/28/01 | Renee Koogle Memo from J. Withrow re 290075 APR Collections | 0507 | Relevance |
| 122 | 12/12/01 | Report of DOL Interview | 1206 – 1207 | Hearsay, authentication and Fed.R.Evid. 403 prejudice. Defendants will submit a written objection to this exhibit in accordance with the |

31

| | | | | | |
|---|---|---|---|---|---|
| | | | | | Court's May 16, 2008 Joint Pretrial Memorandum Order. |
| 123 | 12/12/01 | Report of DOL Interview | | 1210 – 1212 Spahn Depo Exh 10 | Hearsay, authentication and Fed.R.Evid. 403 prejudice. Defendants will submit a written objection to this exhibit in accordance with the Court's May 16, 2008 Joint Pretrial Memorandum Order. |
| 124 | 12/12/01 | Report of DOL Interview | | 1214 – 1216 | Hearsay, authentication and Fed.R.Evid. 403 prejudice. Defendants will submit a written objection to this exhibit in accordance with the Court's May 16, 2008 Joint Pretrial Memorandum Order. |
| 125 | 1/10/02 | Report of DOL Interview | | 1200 | Hearsay, authentication and Fed.R.Evid. |

32

| | | | | 403 prejudice. Defendants will submit a written objection to this exhibit in accordance with the Court's May 16, 2008 Joint Pretrial Memorandum Order. |
|---|---|---|---|---|
| 126 | 1/10/02 | Report of DOL Interview | 1213 | Hearsay, authentication and Fed.R.Evid. 403 prejudice. Defendants will submit a written objection to this exhibit in accordance with the Court's May 16, 2008 Joint Pretrial Memorandum Order. |
| 127 | 5/14/02 | Great-West Statement for Month of April 2002 for period beginning Aug. 2001 | 0481 – 0484 | No Objection |
| 128 | 5/21/02 | Report of DOL Interview | 1202 – 1205 | Hearsay, authentication and Fed.R.Evid. 403 prejudice. Defendants will submit a written objection to this exhibit in |

| | | | | accordance with the Court's May 16, 2008 Joint Pretrial Memorandum Order. |
|---|---|---|---|---|
| 129 | 6/27/02 | Report of DOL Interview | 1222 – 1225 Spahn Depo Exh11 | Hearsay, authentication and Fed.R.Evid. 403 prejudice. Defendants will submit a written objection to this exhibit in accordance with the Court's May 16, 2008 Joint Pretrial Memorandum Order. |
| 130 | 7/25/02 | Report of DOL Interview | 1201 | Hearsay, authentication and Fed.R.Evid. 403 prejudice. Defendants will submit a written objection to this exhibit in accordance with the Court's May 16, 2008 Joint Pretrial Memorandum Order. |
| 131 | 7/25/02 | Report of DOL Interview | 1195 – 1196 | Hearsay, authentication |

CT01/MORIJA/256661.3

| | | | | and Fed.R.Evid. 403 prejudice. Defendants will submit a written objection to this exhibit in accordance with the Court's May 16, 2008 Joint Pretrial Memorandum Order. |
|---|---|---|---|---|
| 132 | 8/9/02 | Group Benefit Issued Check Listing period 6/1/01 to 6/30/01 | 1120 | Relevance |
| 133 | 8/10/02 | Eligibility Listing by Policy – Active and Inactive, Medical/Vision | 0754 – 0850 | Relevance |
| 134 | 8/14/02 | HIPAA Certificates Issued Report – Plan Name:  APR | 0957 – 0965 | No Objection |
| 135 | 9/13/02 | Report of DOL Interview | 1217 – 1219 Spahn Depo Exh 14 | Hearsay, authentication and Fed.R.Evid. 403 prejudice. Defendants will submit a written objection to this exhibit in accordance with the Court's May 16, 2008 Joint Pretrial Memorandum Order. |
| 136 | 9/17/02 | Report of DOL Interview | 1197 – 1199 | Hearsay, |

CT01/MORIJA/256661.3

|  |  |  | Spahn Depo Exh 13 | authentication and Fed.R.Evid. 403 prejudice. Defendants will submit a written objection to this exhibit in accordance with the Court's May 16, 2008 Joint Pretrial Memorandum Order. |
|---|---|---|---|---|
| 137 | 9/26/02 | Report of DOL Interview | 1208 – 1209 Spahn Depo Exh 15 | Hearsay, authentication and Fed.R.Evid. 403 prejudice. Defendants will submit a written objection to this exhibit in accordance with the Court's May 16, 2008 Joint Pretrial Memorandum Order. |
| 138 | 12/6/02 | Letter from Francis C. Clisham, DOL Pension & Welfare Benefits Administration to APR enclosing Subpoena | 1178 – 1184 | No Objection |
| 139 | 7/11/03 | Letter from Francis C. Clisham, DOL Pension & Welfare Benefits Administration to Hugh Regan | 1185 – 1187 | Hearsay, authentication and Fed.R.Evid. 403 prejudice. |

36

| | | | | | Defendants will submit a written objection to this exhibit in accordance with the Court's May 16, 2008 Joint Pretrial Memorandum Order. |
|---|---|---|---|---|---|
| 140 | 7/11/03 | Letter from Francis C. Clisham, DOL Pension & Welfare Benefits Administration to Lewis H. Cohen | 1188 – 1190 | | Hearsay, authentication and Fed.R.Evid. 403 prejudice. Defendants will submit a written objection to this exhibit in accordance with the Court's May 16, 2008 Joint Pretrial Memorandum Order. |
| 141 | 7/16/03 | Letter to George Maul, DOL Employee Benefits Security Administration from Alexander T. Barkwin, Jr. | 1177 | | Hearsay Relevance |
| 142 | 7/17/03 | Report of DOL Interview | 1220 – 1221 Spahn Depo Exh 12 | | Hearsay, authentication and Fed.R.Evid. 403 prejudice. Defendants will submit a written objection to this exhibit in |

37

| | | | | accordance with the Court's May 16, 2008 Joint Pretrial Memorandum Order. |
|---|---|---|---|---|
| 143 | 7/23/03 | Letter to George Maul, DOL Employee Benefits Security Administration from Hugh Regan | 1175 – 1176 | No Objection |
| 144 | 7/24/03 | Letter to George Maul, DOL Employee Benefits Security Administration from Hugh Regan | 0308 – 0310 APR 0007-7 | No Objection |
| 145 | 9/5/03 | Letter to George Maul, DOL Employee Benefits Security Administration from Dennis L. Stein, Esq. | 1173 – 1174 | No Objection |
| 146 | | COBRA Notification Forms | 0985 – 0990 | No Objection |
| 147 | | APR checks # 7020, 7180 and 7275 (with backs) made payable to Great West | 1544 – 1549 GW 000225 Fry Depo Exh 23p 2 000229 Fry Depo Exh 24 | No Objection |
| 148 | | Memo from Terri Spahn to gaf658@aol.com re Memo to Hugh Regan – Items that need to be dealt with | 1493 Spahn Depo Exh 4 | Hearsay and Authentication |
| 149 | | Great-West Adjustment Section – Premiums Charged or Adjusted for Months prior to Statement Date 10/1/01 | APR-0058 | Relevance |
| | | | | |

38

| 150 | | Great-West Statement #5 for eVision for Month Beginning December 1, 2000 (includes adjustments/payments processed to November 29, 2000) including redacted Adjustment Section for Premiums Charged or Adjusted Prior to May 1, 2001 | 0598 | Relevance |
|---|---|---|---|---|
| 151 | | Great-West Statement #6 for eVision for Month Beginning January 1, 2001 (includes adjustments/payments processed to December 29, 2000) including attachments | 0591 – 0597 | Relevance |
| 152 | | Great-West Statement #7 for Month Beginning February 1, 2001 (includes adjustments/payments processed to January 30, 2001) including attachments | 0584 – 0590 | Relevance |
| 153 | | Great-West Statement #8 for Month Beginning March 1, 2001 (includes adjustments/payments processed to February 24, 2001) including attachments | 0578 – 0583 | Relevance |
| 154 | | Great-West Statement #9 for Month Beginning April 1, 2001 (includes adjustments/payments processed to March 30, 2001) including attachments | 0572 – 0577 | Relevance |
| 155 | | Great-West Statement #10 for Month Beginning May 1, 2001 (includes adjustments/payments processed to April 28, 2001) | 0566 – 0571 | Relevance |

| | | including attachments | | |
|---|---|---|---|---|
| 156 | | Great-West Statement #11 for Month Beginning June 1, 2001 (includes adjustments/payments processed to May 26, 2001) | 0560 | Relevance |
| 157 | | Great-West Statement #12 for Month Beginning July 1, 2001 (includes adjustments/payments processed to June 29, 2001) | 0554 | Relevance |
| 158 | | Great-West Statement #14 for Month Beginning September 1, 2001 (includes adjustments/payments processed to August 30, 2001) | 0550 | Relevance |
| 159 | | Great-West Statement #17 for Month Beginning November 2001 (includes adjustments/payments processed to October 31, 2001) | APR-0054 | Relevance |
| 160 | | APR General Organization Chart | APR-0061 – APR-0063 | Authentication (document is not dated) Relevance |
| 161 | | Great-West Adjustment Section – Premiums Charged or Adjusted for Months prior to Statement Date 10/1/01 | 0064 | Relevance |
| 162 | 2001 | 2001 W-2 from APR to Hugh Regan | 0039 APR 0105 Regan Depo Exh 18 | Relevance |
| 163 | 2000 | Individual Tax Return 2000 for Hugh Regan | 0257 – 0274 | Relevance |

40

| 164 | 2001 | Individual Tax Return 2001 for Hugh Regan | 0275 – 0292 | Relevance |
|---|---|---|---|---|
| 165 | 2001 | Individual Tax Return 2001 for Lewis H. Cohen | 0172 – 0183 | Relevance |
| 166 | 2000 | Individual Tax Return 2000 for A. Jones Yorke | 0184 – 0219 | Relevance |
| 167 | 2001 | Individual Tax Return 2001 for A. Jones Yorke | 0220 – 0245 | Relevance |
| 168 | | Annual Audited Report,Form x-17A-5, Part III for Period 7/1/99 – 6/30/00 | 0246 – 0256 | Relevance |
| 169 | | Fleet Small Business Platinum Statements from Dec. 2000 though November 30, 2001 | 1518 – 1538 | No Objection |
| 170 | | Statement re Receivables Outstanding | 1539 | No Objection |
| 171 | | Statement re Policy 290075 – APR Outstanding Balance due to (NSF) | 1540 | No Objection |
| 172 | 7/22/05 | Deposition Notice | Regan Depo Exh 1 | Hearsay, relevance |
| 173 | 10/30/06 | Declaration of Hugh Regan | | Relevance |
| 174 | 10/30/06 | Declaration of A Jones Yorke | | Relevance |

CT01/MORIJA/256661.3

| | | | | |
|---|---|---|---|---|
| 175 | 10/30/06 | Declaration of Lewis Cohen | | Relevance |
| | | **Produced from APR Secretary Marc S. Koplik** | | |
| 176 | April 6, 1999 | APR Minutes of Meeting | MK000002-03 | Relevance |
| 177 | October 25, 1999 | APR Minutes of Meeting | MK000005-06 | Relevance |
| 178 | May 3, 2000 | APR Minutes of Meeting | MK000007-08 | Relevance |
| 179 | June 5, 2000 | APR Minutes of Meeting | MK000009 | Relevance |
| 180 | July 1, 2000 | Employment Agreement By Hugh Regan  APR and A. Jones Yorke | MK000010-14 | Relevance |
| 181 | July 1, 2000 | Employment Agreement By John K. Sands APR and Hugh Regan | MK000015-23 | Relevance |
| 182 | August 7, 2000 | APR Minutes of Meeting | MK000039-40 | Relevance |
| 183 | Sept. 15, 2000 | APR Minutes of Meeting | MK000041 | Relevance |
| 184 | Dec. 12, 2000 | APR Minutes of Meeting | MK000042-43 | Relevance |
| 185 | Dec. 22, 2000 | APR Minutes of Meeting | MK000044 | Relevance |

CT01/MORIJA/256661.3

| 186 | January 18, 2001 | APR Minutes of Meeting | MK000045-46 | Relevance |
|-----|------------------|------------------------|-------------|-----------|
| 187 | February 10, 2001 | APR Minutes of Meeting | MK000047-48 | Relevance |
| 188 | February 14, 2001 | Action of Sole Shareholder & Sole Director of Hugh Regan APR | MK000049 | Relevance |
| 189 | February 26, 2001 | APR Annual Meeting | MK000050 | Relevance |
| 190 | February 26, 2001 | APR Unanimous Written Consent of Stockholders in Lieu of Annual Meeting | MK000051 | Relevance |
| 191 | Feb. 27, 2001 | Fax from R. Trapp to Hugh Regan, APR | MK000058-59 | Relevance |
| 192 | March 2, 2001 | Letter from Marc S. Koplik to Hugh Regan Re: Acknowledgement of receipt of certificates | MK000061 | Relevance |
| 193 | March 5, 2001 | Fax from Marc S. Koplik to Robert Trapp (AFFC) re: stock certificates | MK000062-63 | Relevance |
| 194 | March 5, 2001 | Fed Ex Letter from Marc Koplik to Robert Trapp (AFFC) enclosing stock certificates | MK000066 | Relevance |
| 195 | March 12, 2001 | APR Minutes of Meeting | MK000052-53 | No objection |
| 196 | June 20, 2001 | APR Unanimous Written Consent of Directors in Lieu of Meeting | MK000054-57 | No objection |

CT01/MORIJA/256661.3

## DEFENDANTS' EXHIBITS

| Ex. # | Date | Other ID | Description | Plaintiff's Objections |
|---|---|---|---|---|
| 1 | | SCOV 002-SCOV 0030 | EVision USA.Com, Inc.<br><br>PPO/POS Booklet | No objection |
| 2 | 2/15/02 | SCOV 0156-SCOV 0158 | Letter from W. Scovin to R. Drake | No objection |
| 3 | 2/15/02 | SCOV 0159-SCOV 0161 | Letter from W. Scovin to L. Cohen | No objection |
| 4 | 2/15/02 | SCOV 0166-SCOV 0168 | Letter from W. Scovin to H. Regan | No objection |
| 5 | 3/4/02 | SCOV 0163 | Letter from H. Regan to W. Scovin | No objection |
| 6 | 2/15/02 | SCOV 0151-SCOV 0152 | Letter from W. Scovin to M. Considine | No objection |
| 7 | 2/20/02 | SCOV 0164 | Email from M. Considine to W. Scovin | No objection |
| 8 | 3/3/02 | SCOV 0165 | Handwritten notes from conversation between W. Scovin and M. Considine | Hearsay |
| 9 | 2/15/02 | SCOV 0178-SCOV 0179 | Letter from W. Scovin to A. Zellner | No objection |
| 10 | 10/5/01 | SCOV 0185 | Letter from CobraServe to W. Scovin | No objection |
| 11 | 1/31/01 | SCOV 0198 | Terminated Broker Form | No objection |
| 12 | 4/30/01 | SCOV 0207-SCOV 0208 | Email from W. Knight to W. Scovin and C. Scovin | No objection |
| 13 | 2/15/01 | SCOV 0212-SCOV 0213 | Letter from W. Scovin to T. Spahn | No objection |
| 14 | 4/20/01 | SCOV 0217 | Letter from C. Scovin to T. Spahn | No objection |

| Ex. # | Date | Other ID | Description | Plaintiff's Objections |
|---|---|---|---|---|
| 15 | 5/16/01 | SCOV 0218 | Letter from C. Scovin to T. Spahn | No objection |
| 16 | 4/5/01 | SCOV 0219-SCOV 0225 | Letter from S. Scovin to T. Spahn attaching COBRA Election Forms | No objection |
| 17 | Undated | SCOV 0263 | Handwritten Notes | No objection |
| 18 | 10/24/01 | SCOV 0309 | Letter from W. Scovin to Danbury Hospital | No objection |
| 19 | 12/05/01 | SCOV 0372 | Letter from Danbury Hospital to W. Scovin | No objection |
| 20 | 3/18/02 | SCOV 0395-SCOV 0397 | Correspondence between W. Scovin and Quest Diagnostics seeking forgiveness of debts owed to Quest. | No objection |
| 21 | 5/16/01 | SCOV 0500 | Letter from One Health Plan to W. Scovin | No objection |
| 22 | 6/08/01 | SCOV 0501 | Letter from one Health Plan to W. Scovin | No objection |
| 23 | 7/09/01 | SCOV 0502 | Medical Benefits Fax from One Health Plan | No objection |
| 24 | 2/15/02 | SCOV 0509-SCOV 0510 | Letter from W. Scovin to Tanya F. Spector | No objection |
| 25 | 10/24/01 | SCOV 0517 | Letter from W. Scovin to Colorado Division of Insurance | No objection |
| 26 | 6/20/01 | GW 000205-GW 000206 | Email chain between T. Spahn and R. Koogle of Great West | No objection |

| Ex. # | Date | Other ID | Description | Plaintiff's Objections |
|-------|------|----------|-------------|------------------------|
| 27 | 7/13/01 | GW 000208-GW 000212 | Fax from T. Spahn to Great West attaching memorandum and list of terminated employees | No objection |
| 28 | 3/8/01 | GW 000218 | Email from T. Spahn to R. Koogle and J. Scott of Great West | No objection |
| 29 | 7/19/01 | GW 000295 | Letter from One Health Plan to Danbury Hospital | No objection |
| 30 | 7/19/01 | GW 000296 | Letter from One Health Plan to Craig Foster MD | No objection |
| 31 | 7/19/01 | GW 000297 | Letter from One Health Plan to W. Scovin | No objection |
| 32 | 6/08/01 | GW 000301 | Letter from One Health Plan to Danbury Hospital | No objection |
| 33 | 6/08/01 | GW 000302 | Letter from One Health Plan to Craig Foster MD | No objection |
| 34 | 10/01/01 | GW 000311-GW 000314 | Letter from W. Scovin to New York State Insurance Department | No objection |
| 35 | 12/26/00 | 0166 | Memorandum from M. Benvenuto to all employees | No objection |
| 36 | 08/01/00 | 0326 | Great West Life & Annuity Insurance Coverage Application for Group Coverage Policy | No objection |
| 37 | 06/29/01 | 0347 | Letter from T. Spahn to Capital District Physician's Health Plan canceling plan | No objection |
| 38 | 5/27/03 | 0907-0916 | Affidavit of William Scovin | No objection |
| 39 | 10/31/01 | 0998 | Letter from CobraServe to Gayle Fanelli | No objection |

46

| Ex. # | Date | Other ID | Description | Plaintiff's Objections |
|-------|------|----------|-------------|------------------------|
| 40 | 1/24/01 | 0381-0382 | Memorandum from T. Spahn to H. Regan, J. Padilla and M. Benvenuto | No objection |
| 41 | 07/01/01 | GW 000618-GW 000619 | Great-West Administrative Amendment Information Form | No objection |
| 42 | 07/02/01 | GW 000844 | Great-West internal email. | No objection |
| 43 | 08/01/00 | GW 000452-GW 000465 | Services Contract between Great West and EVision | No objection |
| 44 | 12/13/00 | Business Wire Press Release, available at http://findarticles.com/p/articles/mi_m0EIN/is_2000_Dec_13/ai_68013042 | Press Release announcing eVision USA.Com, Inc. Acquires Stake in New York-Based Investment Bank, Auerbach, Pollak & Richardson, Inc. | No objection |
| 45 | Unknown | | Settlement Agreement and Release Between W. Scovin, Great-West and One Health Plan. | Relevance; Rule 408 objection |
| 46 | 04/2001 | 0030-0031 | APR Phone Directory | relevance |
| 47 | 10/05/01 | 0060 | Certificate of Group Health Plan Coverage | No objection |
| 48 | 4/10/02 | 0014 | April 10, 2002 letter to T. Spahn | No objection |
| 49 | 9/22/00 | NASD Offer of Settlement | Offer of Settlement submitted to NASD by R. Drake. | No objection |
| 50 | 12/00 | NASD Notice to Members | Report of Resolution of Disciplinary Action | No objection |

47

| Ex. # | Date | Other ID | Description | Plaintiff's Objections |
|-------|------|----------|-------------|------------------------|
| 51 | | FINRA Printout | Individual Qualification and Registration | No objection |
| 52 | March 12, 2001 | MK000052-53 | APR Minutes of Meeting | No objection |

**(12)   DEPOSITION TESTIMONY:**

**Plaintiff's Deposition Designations**

    1.    Defendant : Hugh Regan: All

    2.    Defendant : Lewis Cohen: All

    3.    Defendant : A. Jones Yorke: All

    4.    Defendant : Robert Drake : All

    5.    Terri Spahn: Pages 5-104

    6.    Patricia Frye: Pages 96-154, line 1 through line 16.; and Page 165, line 1 through line 15.

**Defendants' Objections**
**To Plaintiff's Depositions Designations**

    General Objection- Defendants' object to Plaintiff's designation of the entire deposition transcript of Lewis Cohen, Hugh Regan, A. Jones Yorke and Robert Drake.  While Fed.R.Civ.P. 32 allows the admissible portions of a party's deposition to be used for any purpose, this Court's Standing Order Regarding Trial Memoranda in Civil Cases requires, for each witness that will testify by deposition, "designation by page references of the deposition transcript that each party proposes to read into evidence."  Standing Order at ¶12.  First, absent some unforeseen circumstance, it is likely that each of the defendants will testify live, at least on their own case-in-chief.  Second, even if a defendant testified by deposition, Plaintiff cannot

contend in good faith that he intends to read the entire deposition transcripts of Messrs. Cohen, Regan, Yorke and Drake into evidence.  Thus, since Plaintiff has failed to specify with any degree of particularity the portions of those transcripts he intends to read into evidence at trial, Defendants reserve their objections to the introduction of the deposition testimony of Messrs. Cohen, Regan, Yorke and Drake until such time as testimony from those depositions is proffered.

## Objections to Designated Testimony of Terri Spahn

| From: | | To: | | | |
|-------|------|------|------|-----------|--|
| Page | Line | Page | Line | Objection | |
| P. 22 | 22 | P. 25 | 9 | Relevance- Plaintiff is suing for medical benefits contending that Cohen was a functional fiduciary of the APR healthcare plan. Issues related to 401k plans have no relevance to the issue of whether Mr. Cohen was a functional fiduciary of the medical plan. | |
| | | | | | |
| P. 35 | 1 | P. 35 | 21 | Relevance | |
| | | | | | |
| P. 36 | 4 | P. 37 | 1 | Relevance, Fed.R.Evid. 403 prejudice. | |
| | | | | | |
| P. 36 | 15 | P. 37 | 1 | Lack of foundation concerning Cohen's authority to instruct Spahn regarding what Spahn should be telling employees concerning payroll. | |
| | | | | | |

| From: | | To: | | | |
|---|---|---|---|---|---|
| Page | Line | Page | Line | Objection | |
| P. 41 | 23 | P. 42 | 2 | Lack of Foundation-The issue of what authority Ms. Spahn had as the Plan Administrator is a legal question and there was no foundation laid to show her qualification to answer a question calling for a legal conclusion. | |
| | | | | | |
| P. 43 | 6 | P. 43 | 17 | Relevance. | |
| | | | | | |
| P. 45 | 13 | P. 47 | 5 | Relevance. | |
| | | | | | |
| P. 49 | 8 | P. 49 | 12 | Lack of Foundation- There was no testimony that Mr. Cohen directed Ms. Spahn not to process payroll. | |
| | | | | | |
| P. 55 | 2 | P. 55 | 21 | Relevance. | |
| | | | | | |
| P. 56 | 8 | P. 56 | 23 | Lack of personal knowledge, lack of foundation with respect to responsibility for payment of APR's payroll taxes. | |
| | | | | | |

50

| From: | | To: | | | |
|---|---|---|---|---|---|
| Page | Line | Page | Line | Objection | |
| P. 56 | 24 | P. 60 | 7 | Relevance- Plaintiff is suing for medical benefits contending that Cohen was a functional fiduciary of the APR healthcare plan. Issues related to 401k plans have no relevance to the issue of whether Mr. Cohen was a functional fiduciary of the medical plan. | |
| | | | | | |
| P. 56 | 24 | P. 58 | 4 | Fed. R. Evid. 403 unfair prejudice; lack of personal knowledge. | |
| | | | | | |
| P. 57 | 24 | P. 58 | 21 | Lack of Foundation-The questions called for legal conclusions and there was no foundation laid to show Ms. Spahn's qualification to answer questions calling for legal conclusions. | |
| | | | | | |
| P. 60 | 19 | P. 61 | 3 | Assumes facts- The question assumed that Mr. Cohen received the memorandum about which the witness was testifying. | |
| | | | | | |
| P. 61 | 4 | P. 61 | 25 | Relevance, lack of personal knowledge, Fed.R.Evid. 403 prejudice. | |

51

| From: | | To: | | |
|-------|------|-------|------|-----------|
| Page | Line | Page | Line | Objection |
| P. 62 | 1 | P. 62 | 6 | The question assumes that Mr. Cohen: (1) received the memorandum about which the witness was testifying, and (2) was aware of the purported non-payment of premiums to AFLAC. |
| P. 62 | 13 | P. 62 | 16 | Assumes facts- The question assumed that Mr. Cohen received the memorandum about which the witness was testifying. |
| | | | | |
| P. 64 | 9 | P. 64 | 13 | Lack of foundation- The question called for a legal conclusion and there was no foundation laid to show Ms. Spahn's qualification to answer a question calling for a legal conclusion. |
| | | | | |
| P. 70 | 7 | P. 71 | 1 | Hearsay. |
| | | | | |
| P. 74 | 4 | P. 74 | 15 | Foundation |
| | | | | |
| P. 78 | 14 | P. 78 | 20 | Foundation |
| | | | | |
| P. 80 | 22 | P. 81 | 5 | Lack of personal knowledge |
| | | | | |
| P. 81 | 23 | P. 82 | 6 | Foundation- The question called for a legal conclusion and there was no foundation laid to show Ms. Spahn's qualification to answer a question calling for a legal conclusion. |

| From: | | To: | | | |
|---|---|---|---|---|---|
| Page | Line | Page | Line | Objection | |
| P. 83 | 7 | P. 83 | 20 | Testimony should be stricken as non-responsive. | |
| | | | | | |
| P. 93 | 20 | P. 94 | 2 | Hypothetical. | |
| | | | | | |
| P. 94 | 18 | P. 94 | 23 | The question assumes that Messrs. Regan, Yorke and Cohen where aware of the existence of a claims hold. | |
| | | | | | |
| P. 94 | 24 | P. 95 | 18 | Hearsay. | |
| | | | | | |
| P. 95 | 24 | P. 104 | 22 | The Defendants are moving *in limine* to preclude the introduction of notes on interviews taken by a Department of Labor investigator in connection with an investigation into a complaint filed with DOL by plaintiff. The Notes of the DOL investigator constitute inadmissible hearsay, are heavily redacted and cannot be authenticated and are unduly prejudicial in violation of Fed. R. Evid. 403. The testimony of Ms. Spahn concerning notes taken of interviews she gave to the DOL investigator is inadmissible for the same reasons the notes are inadmissible. | |
| | | | | | |
| | | | | | |
| | | | | | |

53

**Objections to Designated Testimony of Patricia Fry, 30(b)(6)**
**Deponent for Great-West Life and Annuity Ins., Co.**

| From: | | To: | | Objection |
|---|---|---|---|---|
| Page | Line | Page | Line | |
| P. 98 | 19 | P. 99 | 1 | Lack of Personal Knowledge |
| | | | | |
| P. 99 | 2 | P. 100 | 4 | Relevance |
| | | | | |
| P. 100 | 11 | P. 100 | 15 | Lack of Personal Knowledge |
| | | | | |
| P. 101 | 1 | P. 101 | 20 | Lack of Personal Knowledge |
| | | | | |
| P. 101 | 9 | P. 101 | 20 | Relevance |
| | | | | |
| P. 104 | 4 | P. 105 | 15 | Relevance |
| | | | | |
| P. 111 | 2 | P. 111 | 7 | Question is argumentative and calls for a legal conclusion. |

54

| From: | | To: | | Objection |
|---|---|---|---|---|
| Page | Line | Page | Line | |
| | | | | |
| P. 112 | 16 | P. 112 | 22 | Lack of personal knowledge, speculation. |
| | | | | |
| P. 118 | 1 | P. 118 | 5 | Lack of personal knowledge, speculation. |
| | | | | |
| P. 120 | 9 | P. 122 | 25 | Relevance |
| | | | | |
| P. 122 | 14 | P. 122 | 25 | Lack of foundation for the witness to answer questions calling for legal conclusions. |
| | | | | |
| P. 123 | 6 | P. 123 | 9 | Assumes facts, hypothetical. |
| | | | | |
| P. 123 | 11 | P. 123 | 15 | Lack of foundation for the witness to answer questions calling for legal conclusions. |
| | | | | |
| P. 126 | 11 | P. 126 | 20 | Lack of personal knowledge. |
| | | | | |
| P. 128 | 4 | P. 128 | 18 | Lack of foundation for the witness to answer questions calling for legal conclusions. |
| | | | | |
| P. 129 | 15 | P. 129 | 19 | Speculation. |
| | | | | |
| P. 129 | 20 | P. 129 | 25 | Speculation. |

| From: | | To: | | Objection |
|---|---|---|---|---|
| Page | Line | Page | Line | |
| | | | | |
| P. 130 | 1 | P. 130 | 7 | Lack of foundation for the witness to answer questions calling for legal conclusions, hypothetical, speculation. |
| | | | | |
| P. 130 | 25 | P. 131 | 8 | Assumes that the document being discussed was received by Messrs. Regan and Cohen. |
| | | | | |
| P. 133 | 21 | P. 134 | 14 | Assumes facts. |
| | | | | |
| P. 148 | 15 | P. 148 | 18 | Assumes facts. |
| | | | | |
| P. 153 | 10 | 153 | 19 | Assumes facts, calls for legal conclusion. |
| | | | | |
| P. 153 | 20 | P. 153 | 25 | Hypothetical, assumes facts, speculation. |
| | | | | |
| P. 154 | 1 | P. 154 | 6 | Hypothetical, assumes facts, speculation. |
| | | | | |

**Defendants' Designated Testimony
from the Deposition of Terri Spahn**

| From: | | | To: | | |
|---|---|---|---|---|---|
| Page | Line | | Page | Line | Objection |
| P. 5 | 1 | | P. 5 | 5 | |
| P. 6 | 7 | | P. 7 | 2 | |

56

| From: | | | To: | | |
|---|---|---|---|---|---|
| Page | Line | | Page | Line | Objection |
| P. 7 | 6 | | P. 10 | 3 | |
| P. 10 | 15 | | P. 11 | 8 | |
| P. 13 | 22 | | P. 14 | 13 | |
| P. 18 | 8 | | P. 18 | 16 | |
| P. 34 | 14 | | P. 34 | 22 | |
| P. 75 | 23 | | P. 76 | 6 | |
| P. 105 | 3 | | P. 107 | 13 | |
| P. 107 | 21 | | P. 108 | 14 | |
| P. 112 | 20 | | P. 113 | 7 | |
| P. 113 | 8 | | P. 113 | 19 | |
| P. 114 | 17 | | P. 115 | 6 | |
| p. 138 | 14 | | p. 138 | 16 | |
| P. 139 | 10 | | P. 141 | 6 | |
| P. 143 | 4 | | P. 143 | 6 | |
| P. 145 | 20 | | P. 148 | 7 | |
| P. 166 | 10 | | P. 166 | 16 | |
| | | | | | |

**Defendants' Designated Testimony of Patricia Frye
from the 30(b)(6) Deposition of Great-West Life and Annuity Ins., Co.**

| From: | | | To: | | |
|---|---|---|---|---|---|
| Page | Line | | Page | Line | Objection |
| P. 4 | 6 | | P. 4 | 10 | |
| P. 4 | 20 | | P. 4 | 23 | |
| P. 6 | 22 | | P. 6 | 24 | |
| P. 7 | 12 | | P. 8 | 13 | |
| P. 9 | 3 | | P. 9 | 24 | |
| P. 42 | 10 | | P. 44 | 10 | |

| From: | | | To: | | |
|---|---|---|---|---|---|
| Page | Line | | Page | Line | Objection |
| P. 45 | 3 | | P. 45 | 18 | |
| P. 56 | 17 | | P. 57 | 7 | |
| P. 57 | 18 | | P. 57 | 22 | |
| P. 58 | 22 | | P. 59 | 24 | |
| P. 65 | 21 | | P. 67 | 13 | |
| P. 70 | 4 | | P. 71 | 11 | |
| P. 73 | 16 | | P. 75 | 8 | |
| P. 75 | 13 | | P. 76 | 22 | |
| P. 77 | 6 | | P. 77 | 17 | |
| P. 78 | 1 | | P. 78 | 8 | |
| P. 78 | 13 | | P. 80 | 6 | |
| P. 80 | 21 | | P. 81 | 16 | |
| P. 81 | 25 | | P. 83 | 9 | |
| P. 85 | 19 | | P. 87 | 7 | |
| P. 88 | 8 | | P. 90 | 22 | |
| P. 91 | 24 | | P. 92 | 9 | |
| P. 94 | 15 | | P. 94 | 24 | |
| P. 116 | 6 | | P. 117 | 12 | |
| P. 117 | 22 | | P. 117 | 25 | |

(13)    **REQUESTS FOR JURY INSTRUCTIONS:**

Not Applicable

(14)    **ANTICIPATED EVIDENTIARY PROBLEMS:**

1.    Defendants' anticipate that plaintiff will offer handwritten, redacted notes, purportedly of conversations between a Department of Labor investigator and various former APR employees. The notes constitute inadmissible double hearsay, cannot be authenticated and

any probative value the notes may have is substantially outweighed by the prejudice to defendants inasmuch as defendants will not have any opportunity to cross-examine the unidentified declarant or the author of the notes.

2.    Defendants anticipate that plaintiff will offer testimony of Terri Spahn concerning certain of the Department of Labor investigator's notes.  Since the investigator's notes must be precluded, any testimony concerning those notes must also be precluded.

3.    Defendants Cohen and Regan anticipate that plaintiff will offer letters sent to each of Cohen and Regan by the Department of Labor in July 2003 setting forth the DOL's preliminary investigative conclusions.  The letters constitute inadmissible hearsay, have no relevance because they contain preliminary findings and are unduly prejudicial because they speak to the ultimate issue in this litigation but the DOL never issued a final determination letter and the three year status of limitations within which the DOL could have pursued claims against any of the defendants ran in July 2006, if not earlier.

Defendants are submitting a Motion *In Limine* and Memorandum of Law in Support addressing the above evidentiary issues in more detail.

Plaintiff propose to respond to said motion within 21 days of filing as required by the local rules.

**(15)    PROPOSED FINDINGS AND CONCLUSIONS:**

**PLAINTIFF'S PROPOSED  FINDINGS OF FACT:**

1.    Plaintiff William Scovin ("Scovin") is an individual residing at 35 Canfield Drive, Bridgewater, Connecticut 06752.

2.    Scovin was employed by Auerbach, Pollak & Richardson, Inc. ("APR") as a research analyst from August 1999 to January 2001.

3.    APR was a Corporation principally engaged in the business of investment banking and buying and selling securities for retail brokerage customers.

4.    At all times relevant, Defendant Hugh Regan was the President, CEO and a Director of APR and for a period of time, was the Treasurer.

5.    Defendant Lewis Cohen was employed by APR from the fall of 1998 through the fall 2001.  During his tenure at APR Cohen served as Controller and Financial and Operations Principal ("FINOP").

6.    In his position as Controller and FINOP, and in addition to his banking and security financial obligations, Cohen was charged with handling and depositing funds, including COBRA payments from APR ex-employees, and paying APR bills including the bills and invoices for the company's medical Plan.

7.    In connection with these responsibilities, Cohen received invoices related to APR's health care Plan from its Denver office and caused APR to pay those invoices.

8.    At all relevant times, Defendant A. Jones Yorke served as a member of the Board of Directors of APR and was the COO.

9.    During his tenure at APR, Yorke worked at the New York City offices of APR and was a close adviser to Regan.

10.    Non party Marc Koplik, Esq. served as the secretary of the APR Board of Directors during 2000 and 2001.

11.    Non-party eVision USA.Com, Inc. ("eVision") was a Colorado Corporation and parent company of non-party American Frontier Financial Corporation ("AFFC").

12.    AFFC was a Colorado based corporation that was primarily engaged in the business of buying and selling securities for retail customer accounts.

13.     In approximately December 2000, APR entered into a transaction with eVision in exchange for APR acquiring assets of AFFC (hereinafter the "eVision Transaction").

14.     Beginning in approximately January 2001, APR took over the AFFC retail stock operations in various locations through out the western United States.

15.     Up through February 2001, APR provided health care coverage to its employees including Scovin, through Oxford Health Plans, and that coverage was provided through an insured product.

16.     On February 28, 2001, Regan sent a letter to Oxford Health Insurance Company cancelling Oxford's Plan with APR.

17.     After the cancellation of the Oxford Plan, APR went to a self-funded medical plan previously set up for eVision and used Great West as the third party administrator for that Plan for all of its employees including those APR employees formerly provided coverage under the Oxford Plan.  That Plan was renamed the APR Plan.

18.     Great West had no decision making power or financial control over APR's medical Plan.

19.     Non-party Terri Spahn ("Spahn") worked in the Human Resources Department of eVision and after the e-Vision Transaction, became responsible for overseeing the administrative tasks of the APR medical Plan.

20.     Terri Spahn was listed in the APR medical Plan as its Plan fiduciary during the period from April 2001 into June 2001.

21.     Terri Spahn had neither had financial control nor decision making authority over the Plan.

61

22.     Upon the termination of his employment from APR in January 2001, Scovin inquired about his health benefits and through Regan, APR agreed to provide Scovin with 2 months paid insurance coverage and in fact paid for his health care coverage for the two month period of February and March 2001 and then indicated Scovin could continue coverage through COBRA.

23.     Scovin was particularly concerned about continued medical coverage for himself and his family, because he had an existing medical condition of intensely painful hip dysplasia that he expected would require treatment and possible surgery.

24.     At the conclusion of the two month period during which APR paid for Scovin's health care coverage, Scovin determined to exercise his COBRA right to continue to participate in APR's health care Plan.

25.     Scovin was not advised by Regan or any other representative of APR before starting his COBRA coverage that APR had terminated its fully insured health coverage from Oxford and instituted a new "self-funded" plan administered by Great West.

26.     Under this Plan, APR was to fund on a monthly basis all of the claims administratively processed by Great West, whose primary function was to determine if the claims presented to the APR medical Plan were medically necessary and the costs were medically appropriate.

27.     Under this Plan, APR was only advised about treatment requests of its employees after the fact and APR had agreed with Great West to pay retroactively for medical treatments incurred by Plan beneficiaries if Great West had determined that the treatments were medically necessary and that the charges of the medical services were appropriate.

28.    In April 2001, Scovin contact APR about his COBRA coverage and was directed by the New York office to Contact MS. Spahn in APR's Colorado office.

29.    Spahn advised Scovin that APR had switched to eVision's existing health plan with Great West.

30.    Scovin confirmed by letter date April 5, 2001that he was proceeding with COBRA coverage  through the APR medical Plan provided by Great West and Scovin tendered his April 2001 COBRA premium in the amount of $ 729.79 per month to APR with that letter to Spahn.

31.    Scovin was not provide any of the APR Plan documents and never received a summary plan description for the APR plan administered by Great West until 2002.

32.    Scovin at the time of electing this COBRA coverage was not advised by Spahn that the APR medical Plan was not insured and that it was self-funded by APR.

33.    Scovin mailed his, May and June 2001 COBRA payments to APR and APR deposited the payments.

34.    At the direction of APR, Scovin made his July and August 2001 COBRA monthly payments of $ 729.79 to CobraServe, a company retained by APR to collect COBRA payments from former employees of APR and to process the related paperwork.

35.    Defendant Cohen received APR's former employee's COBRA payments directly from former employees and later from CobraServe, including Scovin's payments, and was responsible for their handling including the depositing into APR accounts.

36.    Defendant Cohen signed checks to Great West for the cost of the Plan's monthly benefit payments and administrative expenses.

37.    In May 2001, a NASD arbitration panel issued an award against APR in an aggregate amount of approximately $3,000,000.  APR booked this award as a liability on its financial balance sheet.  As a result, APR could no longer meet its net capital requirement and Regan, Cohen, Drake and Yorke caused APR to cease all trading activity in accordance with NASD rules.

38.    As a result of the arbitration award and subsequent net capital requirement issues, APR was unable to generate new income after it ceased trading in May 2001.

39.    Regan, Cohen, Drake and Yorke determined, despite APR's then inability to generate new income, to keep APR open in the hopes of reversing the negative arbitration award or of finding other off-setting sources of capital.

40.    APR's last payroll was requested for the week of June 15, 2001 but the total payroll did not clear.

41.    At the direction of Regan, Cohen, Drake and Yorke, the APR Medical Plan was not funded by APR after June 2001 and Great West received no monies from APR after June 2001.

42.    The APR board and Regan, Cohen, Drake and Yorke were aware in late May early June 2001 that APR could not continue to meet payroll or other financial obligations as they became due.

43.    In an e-mail that Spahn sent to Regan  prior to June 26, 2001, Spahn raised the issue of APR's problems funding the various APR employee benefit plans including the APR medical Plan.   In that e-mail Spahn specifically advised Regan that she had been advised that there insufficient funds in the account to pay Great West.

64

44.     In a telephone call between Spahn and Regan that followed that e-mail, Spahn asked specifically whether she should terminate the APR medical Plan because of the lack of funding and specifically recommended that the Plan be shut down appropriately, including notice to employees and working with Great West on the proper closure process.

45.     In that call Regan instructed Spahn not to terminate the APR medical Plan or the dental plan it had set up for its employees.

46.     On June 29, 2001, Spahn sent a memorandum to Regan, copied to Defendants Yorke and Cohen, and also faxed to APR's counsel Richard Cushing.

47.     In the June 29, 2001 memorandum, Spahn resigned from APR because she was not being paid.

48.     Spahn in the June 29, 2001 memorandum set forth APR's outstanding human resources' issues, including that the premiums to Great-West, and other insurance, tax, and 401K obligations, were outstanding.

49.     Prior to the time of that June 29, 2001 memorandum, APR had not met payroll at the express direction of Regan and its employees were resigning or deeming themselves to have been terminated.

50.     Spahn specifically advised Regan, Cohen Yorke and Richard Cushing that Great West was unsuccessful on June 22, 2001 in pulling funds for the monies owed on the APR medical Plan.

51.     Despite recommendation from Spahn to terminate the health care Plan and the failure to fund the Plan, Regan, Cohen, Drake and Yorke failed to instruct her to terminate the plan and failed to terminate the plan themselves.

65

52.     Regan, Cohen, Drake and Yorke failed to appoint anyone to replace Spahn as the Plan fiduciary after receiving notice that she was resigning immediately.

53.     After Terri Spahn resigned in June 2001, she was directed to and sent all of her documents in boxes to APR in New York, where Regan, Cohen, Drake and Yorke were still operating APR, with the specific intent that they would need these records since they had decided not to shut down the APR medical Plan.

54.     In late April or early May 2001, Scovin and his physicians determined he needed to undergo bilateral hip replacement.

55.     In May 2001, Scovin notified the APR Plan that he intended to pursue bilateral hip replacement surgery.

56.     The APR Plan, through Great West cleared Scovin for that surgery

57.     During May 2001, Scovin continued to be in contact with Spahn about his COBRA coverage and his potential need for treatment, but Spahn never advised Scovin of any problem with the Plan or any need to seek other medical coverage.

58.     Scovin sought to reconfirm that he was authorized to pursue that surgery in June and early July 2001 and sought formal pre-certification for the surgery from Great West to confirm Great West's determination that the procedure was medically necessary.

59.     Scovin received a letter dated June 8, 2001 from Great West, which certified Scovin for a three day stay at Danbury Hospital under the care of his attending physician, Craig Foster, M.D.

60.     Pursuant to that Certification Letter, Scovin understood he would need to call a specified telephone number in that Certification Letter to confirm his eligibility and coverage for the treatment immediately prior to his admission.

CT01/MORIJA/256661.3

61.    Scovin and his physicians arranged for his operation to proceed on July 12, 2001 at Danbury Hospital.

62.    In early July Scovin called the number in the Certification Letter and confirmed with a Great West representative that he was cleared to proceed with the operation.

63.    On July 12th just prior to his admission to Danbury Hospital, both the hospital and his physicians confirmed with the APR Plan that Scovin could proceed with the surgery and Scovin's surgeon's office was provided the specific authorization code from Great West of DOG4F6-01 confirming the treatment could proceed.

64.    On July 12, 2001, Scovin underwent successful bilateral hip replacement surgery at Danbury Hospital, followed by intensive physical therapy.

65.    Representatives of Danbury hospital confirmed with Great West that Scovin's post surgical physical therapy could be performed at the hospital and after obtaining such confirmation Scovin did in fact complete his course of physical therapy at Danbury Hospital.

66.    As a result of Regan, Cohen, Drake and Yorke's decision to halt APR's funding of the Plan in late June 2001, the Plan was put on administrative hold by Great West before Scovin's surgery on July 12, 2001.

67.    Prior to July 12, 2001, Regan, Cohen, Drake and Yorke did not notify Scovin that the Plan was placed on administrative hold or that it was not being funded and no other representative of APR was authorized by Regan, Cohen, Drake and Yorke to so notify Scovin.

68.    If Scovin had been notified of any of the financial problems with the Plan or the decision of Regan, Cohen, Drake and Yorke to stop funding the Plan, Scovin could have postponed the surgery to a later time when he had been able to secure new coverage.

69.     Scovin proceeded with his operation and subsequent treatment based on communications from representatives of APR and Great West, which caused him to believe he was covered for his hip surgery and that the Plan would pay for that treatment.

70.     Scovin would not have proceeded with that operation in July 2001, but for his belief based on communications from APR and Great West, that he had healthcare coverage under the Plan and the procedures were within the scope of that coverage.

71.     Scovin incurred the following medical expenses which were approved by but not paid by the APR medical Plan:

| | | |
|---|---|---|
| 1. Danbury Hospital | $ 62,429.77 |
| 2. Interest @10% : | $  5,847.98 |
| 2. Danbury Orthopedics | 21,065.00 |
| 4. Misc. Medical Providers: | |
|    a. Candlewood Valley | 240.00 |
|    b. New Milford Ob/Gyn | 200.00 |
|    c. Dr. Richard Casden | 125.00 |
|    d. Village Square | 239.00 |
|    e. Quest Diagnostics | 364.90 |
|    f. Apria Healthcare | 195.84 |
|    g. Carlson Physical Therapy | 940.00 |
| TOTAL Bills | $ 94,220.49 |

CT01/MORIJA/256661.3

72.    Scovin's COBRA payments were deposited by the individual Defendants into APR accounts through at least August 2001.

73.    After accepting and negotiating Scovin's COBRA payments in July and August 2001, the individual Defendants did not cause APR to make payments into the Plan and did not cause the Plan to pay any portion of Scovin's medical bills.

74.    As of the end of August 2001, Scovin still had received no notice from Regan, Cohen, Drake and Yorke, Great West, CobraServe, or any other representative of APR of any problem with the APR medical Plan, the Plan was on administrative hold with Great West, or that APR had stopped funding the Plan in June 2001.

75.    Scovin received further invoice for coverage from CobraServ for September 2001, but because he had secured alternate coverage for himself and family for September 2001, he decided not to continue the COBRA coverage from APR for September and he so notified CobraServ.

76.    In early September 2001, Scovin was called by a representative from Danbury Hospital's accounting department and was advised that Great-West was refusing to pay any of the bills Scovin had incurred with his hip surgery.

77.    Scovin then called Great-West but they would only state that the Plan was on "administrative hold" and Great-West was unable to provide him with any other information about why his claim was not being paid.

78.    Great West was not authorized by APR to explain the circumstances of the administrative hold to Scovin or other beneficiaries of the APR medical Plan.

CT01/MORIJA/256661.3

79.     Scovin attempted to obtain information from APR, but learned that Terry Spahn had left the company during the early summer and was unable to reach anyone else who could answer his questions about the Plan.

80.     After Scovin  submitted complaints to the Insurance Commissioners of Colorado, Connecticut, and New York and conferred with the Connecticut State Healthcare Ombudsman in the Attorney Generals Office, he received a letter from Great-West, dated October 24, 2001, stating that Great West's services under the Plan had been terminated in September 2001 because APR had not funded it.

81.     In that letter Great-West notified Scovin that it was only a "record keeper" and a "claims payment agent" for APR and Great-West also stated in that letter that it would process claims on APR's behalf "so long as they continued funding the claims."

82.     During this same time period, Scovin received a Certificate of Group Health Plan Coverage from Great West, dated October 15, 2001, which indicates his medical coverage and that of his family had continued through September 30, 2001.

83.     As late October 10, 2001, APR received monies by check from CobraServ, but APR failed to pay those monies to Great West for application to claims on the APR Plan.

84.     From July 1, 2001 through October 2001,  Regan, Cohen, Drake and Yorke were the sole decision makers for APR and they determined what was done with money received and what bills if any were paid.

85.     From July 1, 2001 through October 2001,  Regan, Cohen, Drake and Yorke received income for APR, including COBRA payments from former employees through CobraServ, and failed to deposit any funds into the APR medical Plan.

86.    In early 2002, Great West provided Scovin with a formal denial of any obligation to pay his medical expenses under the Plan, and Great West claimed it had no discretionary authority under the Plan and that responsibility for payment therefore rested solely with APR.

87.    The only reason Great West rejected the claim for reimbursement of Scovin's medical expenses under the APR Plan was that there were insufficient funds in APR's account to pay for the medical services that had been provided to Scovin.

88.    Great West never determined that Scovin's medical expenses were not medically necessary or were excessive.

89.    At the same time as providing Scovin a formal denial of his claim in early 2002, Great West for the first time provided Scovin with a copy of the SPD for the Plan.

90.    On or about February 15, 2002, Scovin made formal demand on Regan, Cohen and Drake for coverage under the Plan.

91.    Scovin subsequently contacted Spahn, the former Director of Human Resources for APR. Ms. Spahn advised Scovin of the following: That from May 2001 she was advised that APR was in severe financial distress and she resigned as the Director of Human Resources and the administrator of the Plan during June 2001. Before she left, Spahn was aware that Great West had sent Auerbach several demands for payment. In addition, she was aware that as of the time she left, Great West had placed the Plan on "administrative hold" but had not cancelled the Plan. In May-June 2001, she requested that APR close the Plan in an orderly fashion, but that Hugh Regan, as the Chairman of the Board and President and CEO of APR refused. Upon her resignation, Spahn shipped numerous boxes of documents containing all of the records of the Plan to Regan at his New York office.

92.    On or about March 4, 2002 Regan wrote to Scovin suggesting he direct his claim to the insurer and asserting that neither he, Cohen or Drake had any involvement in or records pertaining to the APR Plan.

93.    To date, Scovin's medical expenses have never been paid by the Plan.

94.    Great West never received any notice of termination of the medical Plan from APR or from Regan, Cohen, Drake or Yorke.

95.    Prior to Scovin's surgery, Great West did not receive any notice from APR, its representatives, or from Regan, Cohen, Drake or Yorke, that APR did not have the funds to continue the APR plan and did not continue to keep the Plan in operation.

96.    The Plan was never terminated by APR, its representatives, or by Regan, Cohen, Drake or Yorke.

97.    Danbury Hospital commenced a collection action against Scovin for his unpaid medical bills and sought an attachment against his family home.

98.    Regan continued to work on behalf of APR and continued to control assets and potential assets of APR after July 2001, and into at least 2002, including directing efforts by attorney Richard Cushing to recover claims for APR in certain pending litigations and appeals.

**PLAINTIFF'S PROPOSED  CONCLUSIONS OF LAW:**

1.    Each of  Regan, Cohen, Drake and Yorke exercised discretionary authority or discretionary control respecting management of the APR medical Plan or exercised any authority or control respecting management or disposition of its assets, and/or exercised discretionary authority or discretionary responsibility in the administration of such plan.

2.    Terry Spahn never had authority to determine which claims were paid by APR and had no authority to decide whether premiums of the Plan would be paid by APR.

72

3.    Terry Spahn in late June 2001 expressly recommended that the Plan should be formally terminated with the advice and guidance of Great West, but here advice was disregarded and she was instructed not to terminate the Plan.

4.    Regan, Cohen, Drake and Yorke in the period from June 2001 to October 2001 were the parties who decided not to fund the APR medical Plan when they were put on notice that there were insufficient funds in the designated account for Great West to draw its premium .

5.    Regan, Cohen, Drake and Yorke in the period from June 2001 to October 2001 had control of APR's funds but made the decision to use those funds for purposes other than funding the Plan.

6.    Regan, Cohen, Drake and Yorke in the period from June 2001 to October 2001 were responsible for APR diversion of Plan assets, specifically COBRA payments form plan beneficiaries, to APR uses other than the Plan.

7.    Regan, Cohen, Drake and Yorke in the period from June 2001 to October 2001were responsible for the decision not to terminate the Plan.

8.    The fact that they had control over the assets of the Plan and the decision not to terminate the Plan despite the Plan's insufficiency of funds,  is evidence that Regan, Cohen, Drake and Yorke in the period from June 2001 to October 2001 had direct control over the administration of the Plan and direct control over the disposition of the Plan's assets.

9.    "[W]hether ...an... entity is an ERISA fiduciary must be determined by focusing on the function performed, rather than on the title held." *Blatt v. Marshall & Lassman*, 812 F.2d 810, 812 (2d Cir.1987).

73

10.    Where an actor has any control over disposition of plan money, he is a fiduciary. *See  IT Corporation v. General American Life Insurance Co*. 107 F.3d 1415, 1421 (9th Cir. 1997).

11.    An actor has control over plan money where he can deplete the account by writing checks.   The right to write checks on plan funds is "authority or control respecting management or disposition of its assets." *See  IT Corporation v. General American Life Insurance Co*., 107 F.3d 1415, 1421 (9th Cir. 1997).

12.    A person need only have "sufficient control over at least a part of the [Plan] assets to create a fiduciary relationship." *United States v. Glick*, 142 F.3d 520, 528 (2d Cir.1998).

13.    An officer of a corporation that decides to use plan assets, such as employee plan contributions made to the corporation's general account, to pay other corporate obligations can be deemed to be a fiduciary under ERISA.   *Lopresti v. Terwilliger,* 126 F.3d 34, 40 (2d Cir. 1997).

14.    Based on the foregoing, pursuant to 29 U.S.C. § 1002(21)(A), Regan, Cohen, Drake and Yorke were plan fiduciaries of the APR medical Plan in the period from June 2001 through October 2001.  *See also* 29 C.F.R. § 2510.3-21; 29 C.F.R. § 2509.75-8.

15.    Regan, Cohen, Drake and Yorke breached their fiduciary duties to the Plan and its beneficiaries when they stopped funding the Plan without notifying its beneficiaries or Great West of that decision.

16.    The conduct of Regan, Cohen, Drake and Yorke constituted a misrepresentation to Plan beneficiaries when they purported to allow the Plan to remain in existence when they knew or should have known they were not going to fund the Plan after June 2001 and as result

beneficiaries would be mislead into believing they still had viable medical coverage when such coverage after June 2001 was wholly illusory.

17.    The misrepresentation of Regan, Cohen, Drake and Yorke constitutes a breach a of their fiduciary duty.

18.    Regan, Cohen, Drake and Yorke breached their fiduciary duties to the Plan when they failed to appoint a new Plan administrator when Terri Spahn resigned in late June 2001 and when they failed to notify Plan beneficiaries that there was no person administering  the Plan during the period after June 2001.

19.    Regan, Cohen, Drake and Yorke further breached their fiduciary duties to the Plan when they diverted Plan assets such as Cobra payments to other corporate uses and/or failed to ensure that such payments were delivered to the Plan.

20.    Regan, Cohen, Drake and Yorke, knew or should have known that between the four of them, one or more persons should have taken care to properly administer the termination of the Plan, to give notice to all Plan beneficiaries, and to ensure that all Plan assets were in fact deposited into the Plan accounts, but each of them failed to make any effort to ensure that any of their fiduciary obligations were met.

21.    The breaches of fiduciary duty by Regan, Cohen, Drake and Yorke proximately caused harm to Plaintiff in that such conduct resulted in Scovin not obtaining benefits to which he was entitled under the Plan and caused Scovin to incur medical expenses at a time when Regan, Cohen, Drake and Yorke knew or should have known they were not depositing funds into the Plan to meet on going claims by beneficiaries such as Scovin.

CT01/MORIJA/256661.3

22.    As a result of their violations of their fiduciary duties, Regan, Cohen, Drake and Yorke are in violation of their statutory obligations and are liable under ERISA.  *See*  29 U.S.C.A. §§  1104(a)(1)(A),(B) and (D), 1105(a), and 1106(a)(1)(B), (D) and (b)(1)

23.    Regan, Cohen, Drake and Yorke are now liable to Scovin under 29 U.S.C.A. § 1132(a)(2) to reimburse him for the medical benefits to which he was entitled to receive under the Plan in the amount of $ 94,220.49, together with prejudgment interest at the rate of 10%, from October 24, 2001 to the date of this judgment.   *See La Rue v DeWolff, Boberg & Associates, Inc.*, __U.S. 2008, 128 S.CT. 1020 (Feb 20, 2008).  *See also  Peterson v. Federal Exp. Corp. Long Term Disability Plan*,  525 F.Supp.2d 1125 (D.Ariz.2007)( allowing prejudgment interest to prevailing claimant).

24.    In the alternative Regan, Cohen, Drake and Yorke are now liable to fund the Plan under 29 U.S.C.A. § 1132(a)(2) for the amount of the medical benefits to which Scovin was entitled to receive under the Plan in the amount of $ 94,220.49, together with prejudgment interest at the rate of 10%, from October 24, 2001 to the date of this judgment.

25.    In the alternative, Regan, Cohen, Drake and Yorke are now liable to Scovin under 29 U.S.C.A. § 1132(a)(3) for an equitable order of reimbursement for the medical expenses he incurred in good faith reliance upon his belief that the Plan still was covering him as of July 2001, in the amount of $ 94,220.49, together with prejudgment interest at the rate of 10%, from October 24, 2001 to the date of this judgment.

26.    ERISA provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1).

76

27.    The purpose of such an award is "to vindicat[e] retirement rights, even when small amounts are involved." *Chambless v. Masters, Mates & Pilots Pension Plan,* 815 F.2d 869, 872 (2d Cir.1987), *cert. denied* 496 U.S. 905 (1990).

28.    Under *Chambless* the standard for determining whether to award attorney's fees: (1) the degree of the offending party's culpability or bad faith, (2) the ability of the offending party to satisfy an award of attorney's fees, (3) whether an award of fees would deter other persons from acting similarly under like circumstances, (4) the relative merits of the parties' positions, and (5) whether the action conferred a common benefit on a group of pension plan participants. *Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 450 (2d Cir.2006).

29.    "[A] defendant is 'culpable' under Chambless where it 'violated ERISA, thereby depriving plaintiffs of rights under a pension plan and violating a Congressional mandate.' " While "the culpability of the losing party and the relative merits of the parties' positions are not dispositive under the five-factor test .... these considerations weigh heavily in the balance...." *Anita Foundations, Inc. v. ILGWU Nat'l Retirement Fund,* 902 F.2d 185, 189 (2d Cir.1990)( internal citations omitted).

30.    The Court may place additional weight on such factors as  the culpability of the Defendants even if other factors do not weigh fully in favor of a fee award. *Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 450 (2d Cir.2006).

31.    Here the Defendants were culpable, they acted in bad faith,  Plaintiff has had a better position in this litigation and an award of fees will deter other fiduciaries from ignoring there obligations under ERISA.

CT01/MORIJA/256661.3

32.     Scovin should be entitled to an award of attorneys fees the amount of which shall be determined after hearing under Rule 54 upon a timely application by Scovin submitting the amount of his claimed fees.

33.     Costs are award in favor of Plaintiff Scovin.

## DEFENDANTS' PROPOSED  FINDINGS OF FACT:

### Defendants' Proposed Findings and Conclusions

1.     Auerbach, Pollak & Richardson, Inc. ("APR") was a small securities broker dealer and investment bank.

2.     Plaintiff William Scovin ("Scovin") was an APR employee from 1999 until January 2001.

3.     During the period of his employment, Scovin was a participant in APR's health insurance plan, as provided by Oxford  ("Oxford").

4.     In December, 2000, American Fronteer Financial Corporation ("AFFC"), a larger securities broker-dealer and investment bank based in Denver, Colorado owned by eVision USA.Com ("EVision"), a large public traded company, completed the first phase of a transaction with APR (the "EVision Transaction") whereby EVision acquired shares in APR in exchange for certain assets of AFFC.

5.     Pursuant to the terms of the EVision transaction, the Board of Directors of APR was expanded to include two representatives of EVision.

6.     Upon completion of the EVision Transaction, all supervisory, compliance, operational, administrative and human resource functions were conducted and overseen by the far larger staff of former AFFC executives in Denver, Colorado.

7.     Prior to the completion of the EVision Transaction, the APR healthcare plan was an insured plan through Oxford.

78

8.    Prior to the completion of the EVision Transaction, all of APR's human resources related work was performed by APR employee Alexander "Sandy" Baldwin in APR's Stamford, Connecticut office.

9.    Upon completion of the EVision Transaction, all human resource and benefits related-work was performed by former AFFC employees in Denver.

10.    Upon completion of the EVision Transaction, the Human Resource and Payroll Department was composed of Ms. Terri Spahn ("Spahn"), AVP/HR Manager; Ms. Jody Bobich, HR Generalist, Ms. Sandy Mitchell, Payroll Administrator and other support staff, all reporting to Mr. Jose Padilla ("Padilla"), EVP and Director of Brokerage Operations.

11.    At the time of the EVision Transaction, AFFC's employees were covered under a self-funded EVision healthcare plan administered by Great-West Life and Annuity Insurance Co. and One Health Plan (collectively "Great-West").

12.    After the completion of the EVision transaction, the decision was made by the Denver office to transfer APR legacy employees from APR's Oxford healthcare plan, which was expiring, to the existing EVision healthcare plan administered by Great-West and a transfer was affected by the Denver staff in April, 2001.

13.    Lewis Cohen ("Cohen") was APR's Financial and Operations Principal ("FINOP") and Comptroller, based in its New York office, reporting first to Mr. William Schloth, APR's Chief Financial Officer, and subsequently to Mr. Schloth's successor, Michael Benvenuto ("Benvenuto").

14.    Hugh Regan ("Regan") was APR's President and General Securities Principal based in its New York office, overseeing the investment banking activities and other business development.

15.     A. Jones Yorke ("Yorke") was an unpaid Director of APR, based in its New York office.

16.     Robert Drake ("Drake") was a member of APR's Compliance and Operations Department based in its Stamford, CT office.

17.     Cohen was employed by APR from October 1998 to early July 2001.

18.     Regan was employed by APR from March, 1993 to July, 2001.

19.     Yorke was not a paid employee of APR at any time and resigned from the Board of Directors in June, 2001.

20.     Drake was employed by APR from November 1998 to early July 2001.

21.     Neither Drake nor Cohen were a member of APR's Board of Directors and never attended an APR Board of Directors meeting.

22.     During his employment with APR Cohen primarily reported to and was supervised by APR's Chief Financial Officer who, during the relevant time period, was Benvenuto.

23.     Cohen, Drake, Yorke and Regan did not participate in the decision to move APR employees from the insured Oxford healthcare plan to the self-funded Great-West healthcare plan.

24.     Cohen, Drake, Yorke and Regan had no responsibility for transferring APR employees from the insured Oxford healthcare plan to the self-funded Great-West healthcare plan.

25.     At no time in their employment or association with APR were Cohen, Drake, Yorke or Regan involved in Human Resource, Benefits, Insurance, Plan Administration or related operations of APR.

CT01/MORIJA/256661.3

26.    At no time during their employment or association with APR were Yorke, Regan or Drake involved in the financial operations, payroll, regulatory reporting or accounting functions of APR.

27.    Beginning in April 2001 Scovin was covered under the APR health care plan (the "Plan") pursuant to COBRA.

28.    Spahn was the named Plan Administrator of the Plan during the relevant time period.

29.    As the Plan Administrator, Spahn was vested with "the exclusive and full discretion and authority to determine the benefits and amounts payable and to construe and interpret all terms and provisions of [the Plan]," and "[had] complete authority to control and manage the Plan[, including] . . . full discretion to determine eligibility, to interpret the Plan and to determine whether a claim should be paid or denied . . .".

30.    At no time did Cohen,  Drake,  Yorke or Regan administer, interpret or control the Plan and never made any decisions concerning a participant's eligibility for benefits, whether a claim should be paid or denied or any other matter concerning Plan administrators.

31.    Scovin communicated with Spahn beginning in April 2001 concerning the Plan and COBRA.

32.    All of Scovin's discussions with APR concerning the Plan and his entitlement to benefits thereunder in 2001 were with Spahn.

33.    Scovin never discussed the Plan, COBRA or any other employee benefit related matter with Cohen, Drake, Yorke or Regan.

34.    Cohen's duties as FINOP and Comptroller primarily included regulatory reporting and filings, annual audit and, secondarily, paying APR's bills.

81

35.     Cohen paid APR's creditors, including vendors who provided services to the Plan, out of APR's general operating funds.

36.     Cohen had no discretion as to what creditors were paid and in what order.

37.     At no time were Drake, Regan or Yorke involved in paying bills, discretion thereof or in decisions relating to such.

38.     All day-to-day decisions relating to the payment of payroll, benefits, operating bills, creditors and other business expenses were handled by Benvenuto, Padilla, Spahn and other officers in APR's Denver office during the time they were employed by APR.

39.     Prior to the transaction between EVision and APR, EVision entered into a contract with Great-West whereby Great-West would administer the EVision healthcare plan.

40.     The contract between Great-West and EVision required EVision to permit Great-West to access EVision's bank accounts to secure payment of amounts owed pursuant to the contract's terms.

41.     To satisfy this contractual requirement after the transaction between APR and EVision, Cohen, on behalf of APR and as instructed by his supervisors, executed a banking authorization that allowed Great-West to access APR's bank account to secure payments of amounts owed pursuant to the contract's terms.

42.     Cohen did not have discretion over the amounts paid to Great-West.

43.     Great-West issued an invoice to APR on a monthly basis. The invoice was sent to Spahn in the Denver officer. Spahn reviewed the invoice for accuracy and once she was satisfied that the invoice was accurate, she approved the invoice and instructed Cohen to make payment.

44.     Cohen did not have any discussions or communications with Great-West personnel regarding the Plan or any other matter.

45.     Drake, Yorke and Regan were at no time involved in any activity relating to Great West, payments  to Great West, COBRA, bank accounts relating to such or any other aspect of the Plan.

46.     In February 2001, APR and EVision signed a Letter of Intent with e2Capital Holdings and its designees ("e2Capital"), a Hong Kong-based investment bank owned in large part by Softbank and its designees ("Softbank"), a major Japanese venture capital group, whereby e2Capital/Softbank would acquire a major interest in APR as phase two of the EVision Transaction (the "Softbank Transaction")

47.     Pursuant to the terms of the Softbank Transaction and subsequent modifications in March, April and May, 2001, the Board of Directors of APR was expanded in April, 2001 to include two representatives of e2Capital.

48.     Pursuant to the final terms of the Softbank Transaction in May, 2001, e2Capital and Softbank would own 84% of APR, control all operations and the Board of Directors.

49.     Pursuant to the terms of the Softbank Transaction, Regan's employment with APR was to be terminated as of May 31, 2001.

50.     Pursuant to the final terms of the Softbank transaction in May, 2001, the Board of Directors of APR would be completely reconstituted.

51.     In connection with the Softbank Transaction, e2Capital and the Regan family arranged for interim internal funding needed by APR to sustain the overhead associated with the EVision Transaction from February to May 2001.

CT01/MORIJA/256661.3

52.     In May 2001, a NASD arbitration panel issued an arbitration award against a former registered representative of APR and APR totaling nearly $3,000,000.

53.     Pursuant to federal law APR was required to immediately book the arbitration award as a liability. As soon as that liability was booked, APR was out of compliance with its statutory net capital requirements and it had to cease its brokerage operations.

54.     On May 29, 2001, APR notified all necessary regulatory authorities that, as a result of its net capital deficiency, APR was taking a voluntary cease of its business pursuant to Rule 15c3-3.

55.     On May 29, 2001, all APR employees were notified of the voluntary cease.

56.     In May and June 2001 Scovin was pre-certified by Great-West for bilateral hip replacement surgery.

57.     By June 2001 Scovin was aware that APR had ceased operations.

58.     Scovin did not contact Cohen, Drake, Regan or Yorke in June 2001 to inquire as to the status of the Plan, the business of APR or any other matter.

59.     Scovin underwent bi-lateral hip replacement surgery on July 12, 2001.

60.     Great West was aware no later than July 2, 2001 that APR had ceased doing business, could not make payroll and would likely be in bankruptcy.

61.     Great West informed Scovin that his insurance coverage was intact through August 31, 2001 at which time Scovin had terminated the plan of his own initiative and switched to another provider.

62.     Scovin contacted Great-West in July 2001, prior to his surgery, to confirm coverage.

84

63.     Scovin was not informed by Great-West that the Plan had been placed on permanent hold and was told by Great-West to proceed with his surgical procedure.

64.     Cohen, Drake and Regan left the employ of APR in early July 2001.

65.     Great West never had direct communications with Cohen, Drake, Regan or Yorke.

66.     Scovin named Great-West as a defendant in this litigation.

67.     Scovin reportedly settled with Great-West for $70,000 and the claims asserted against Great-West were withdrawn by joint motion in May 2006.

68.     The Great West Plan allows for only a certain percentage of coverage on the costs incurred on the procedures undertaken by Scovin.

69.     The $70,000 paid to Plaintiff by Great-West constitutes payments in full for medical expenses related to Plaintiff's July 2001 bi-lateral hip replacement surgery, the basis for this action.

## Conclusions of Law

1.     The Plan is governed by the provisions of the Employee Retirement Income Security Act ("ERISA") 29 U.S.C. § 1001, *et seq.*

2.     In his Amended Complaint Plaintiff asserts numerous causes of action, all of which have been disposed of via summary judgment except for two causes of action asserted under ERISA.

3.     In Count II of the Amended Complaint Plaintiff asserts a cause of action for Denial of Benefits against APR, Cohen, Regan, Yorke and Drake.  A claim for denial of benefits arises under section 502 of ERISA, 29 U.S.C. §1132(a)(1)(B):

A civil action may be brought----

> (1) by a participant or beneficiary----
>
>> (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan; . . .

4.    In Count X of the Amended Complaint Plaintiff asserts a cause of action for Breach of ERISA Fiduciary Duty against Regan, Yorke, Cohen and Drake.  The remedy for a breach of ERISA fiduciary duty is equitable.  See 29 U.S.C. §1132(a)(3) permitting a cause of action by a plan participant, beneficiary or fiduciary to, among other things "obtain other appropriate equitable relief."  Del Greco v. CVS Corp., 337 F.Supp.2d 475, 486 (S.D.N.Y. 2004)("ERISA also allows a court to remedy a breach of fiduciary duty alleged by a plan participant, beneficiary or fiduciary by enjoining any act or practice that caused the breach or by providing 'other appropriate equitable relief.'").

5.    When a plaintiff alleges causes of action under both section 1132(a)(1)(B) for denial of benefits and a claim for breach of fiduciary duty, the breach of fiduciary duty claim may be pursued only if the plaintiff seeks relief for the alleged breach of fiduciary duty that is different from the relief sought for the denial of benefits.  Del Greco, 337 F.Supp.2d at 487("The question . . . is whether the type of relief sought by plaintiff is sufficiently equitable in nature to satisfy the requirements of §1132(a)(3)."); Borowski v. International Bus. Machines Corp., 165 F.3d 13, 1998 WL 777457, *2 (2d Cir, Oct. 27, 1998)("[W]hen an ERISA fiduciary duty claim seeks to recover the same relief requested by a denial-of-benefits claim, the fiduciary duty claim is precluded."); Kraus v. Oxford Health Plan, 517 F.3d 614, 630 (2d Cir. 2008)("Claims for money damages are . . . not cognizable under section 502(a)(3)."); Tritt v. Automatic Data Processing, Inc. Long Term Disability Plan Admin., 2008 WL 2228841, *5 (D.Conn., May 27, 2008)(granting

motion to dismiss section 502(a)(3) claim as duplicative of claim under section 502(a)(1)(B) to recover benefits).

6.    Plaintiff's Amended Complaint purports to seek equitable relief but it cannot be disputed that, regardless of the label, Plaintiff only seeks to recover unpaid benefits. Del Greco, 337 F.Supp.2d at 487 ("In determining the propriety of a remedy, we must look to the real nature of the relief sought, not its label.") quoting Gerosa v. Savasta & Co., Inc., 329 F.3d 317, 321 (2d Cir. 2003).

7.    Since Plaintiff's breach of fiduciary duty claim seeks the same relief as his claim for denial of benefits under section 1132(a)(1)(B), Plaintiff's breach of fiduciary duty claim fails as a matter of law and each defendant is entitled to judgment on that claim.

8.    Each defendants is also entitled to judgment on the claim for denial of benefits.  It is well settled in the Second Circuit that "[i]n a recovery of benefits claim, only the plan and the administrators and trustees of the plan in their capacity as such may be held liable." Leonelli v. Pennwalt Corp., 887 F.2d 1195, 1199 (2d Cir., 1989).  See also, Clark v. World Cable Communications, Inc., 166 F.3d 1199, 1998 WL 907904, **2 (2d Cir., 1998)(affirming summary judgment on ERISA denial of benefits of claim because plaintiff failed to submit any evidence demonstrating that the named defendant was the administrator or trustee of the ERISA plan at issue); Fenwick v. Merrill Lynch & Co., 2007 WL 703613 *2 (D. Conn., March 5, 2007)(dismissing ERISA denial of benefits claim because the plan at issue "unambiguously designates the Committee as the plan administrator and therefore the named defendants cannot be considered the proper defendants.").

9.    ERISA defines administrator as:

(i) the person specifically so designated by the terms of the instrument under which the plan is operated;

(ii) if an administrator is not so designated, the plan sponsor; or

(iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary may by regulation prescribe."

29 U.S.C. §1002(16)(A).

10.     The Summary Plan Description of the Auerbach, Pollak & Richardson, Inc. healthcare plan unambiguously designates Terri Spahn as the Plan Administrator.

11.     Since neither Cohen, Regan, Yorke nor Drake is the administrator of the Auerbach, Pollak & Richardson, Inc. healthcare plan, none of them are proper defendants on a denial of benefits claim and each of them is entitled to judgment on Plaintiff's denial of benefits claim. See, e.g., Fenwick, 2007 WL 703613, at *2.

12.     Even if Plaintiff could pursue a breach of fiduciary duty claim against each of the defendants, that claim would still fail because neither Cohen, Regan, Yorke nor Drake is a fiduciary of the Auerbach, Pollak & Richardson healthcare plan.

13.     A person is a fiduciary of an ERISA plan if:

(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. §1002(21)(A).

14.     A person who performs merely ministerial functions for an ERISA plan is not an ERISA fiduciary.  29 CFR §2509.75-8.

15.     The mere fact that an individual has authority to sign checks on behalf of his employer and issues checks to an administrator of an ERISA plan does not cloak that individual with fiduciary status. Lopresti v. Terwilliger, 126 F.3d 34, 40-41 (2d Cir. 1997)(finding that

88

corporate officer who owned 49% of closely held corporation and signed checks paying

corporation's general creditors with employee deductions earmarked for ERISA plan was not an

ERISA fiduciary because "he was primarily a production person with no responsibility for

determining which of the company's creditors would be paid or in what order."); Finkel v. Whiffen

Elec. Co., Inc., 2007 WL 1395562, *2 (E.D.N.Y., May 14, 2007)(adopting recommended ruling

dismissing ERISA claims against principal of plan sponsor because "there is no allegation that (1)

he had the authority to determine which company bills to pay and when; or (2) he exercised that

authority by using the money from the unpaid [employee] contributions for company payments [to

general creditors]"); Coleman v. BMC Const. Corp., 425 F.Supp.2d 477, 484 (S.D.N.Y.

2006)(denying summary judgment on ERISA claim because plaintiff failed to meet the LoPresti

standard by definitively establishing the defendant's necessary "degree of control over company

funds").

      16.     In any event, even if one or more of the defendants was found to be a

fiduciary and was further found to have breached a fiduciary duty owed to Plaintiff, Plaintiff

cannot recover money damages for a breach of fiduciary duty under section 1132(a)(3). Kraus v.

Oxford Health Plan, 517 F.3d, at, 630 ("Claims for money damages are . . . not cognizable under

section 502(a)(3)."). Moreover, Plaintiff is not entitled to restitution because there was no

evidence introduced that any defendant is in possession of Plaintiff's property. Del Greco, 337

F.Supp.2d at 488(the Supreme Court has held that "for restitution to lie in equity, the action

generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff

particular funds or property in the defendant's possession.") quoting Great-West Life & Annuity

Ins. Co. v. Knudson, 534 U.S. 204 (2002). Thus, each of the defendants is entitled to judgment on

Plaintiff's breach of fiduciary duty claim.

17.    Even if Plaintiff could recover against Regan, Yorke, Cohen or Drake on either a denial of benefits or breach of fiduciary duty claim, his recovery would be substantially reduced, if not eliminated, by settlements and judgments obtained against other defendants in this very same litigation.  In addition to the individual defendants, Plaintiff also sued APR and Great-West.  Plaintiff's claims against Great-West included a claim for Denial of Benefits under section 1132(a)(1)(A).  Plaintiff settled his claims with Great-West for $70,000.  Plaintiff also brought ERISA based claims against APR.  Plaintiff has obtained a default judgment against APR in excess of $400,000.  Defendants are entitled to at least set-off the $70,000 Plaintiff recovered from Great-West.

18.    Under well settled principles of law, "where a settlement and a judgment compensate a plaintiff for the same injury, a nonsettling defendant is entitled to a judgment reduction at least in the amount of a prior settlement."  In re. Masters Mates & Pilots Pension Plan and IRAP Litigation, 957 F.2d 1020, 1030 (2d Cir. 1992) (quoting, Louis P. Singer v. Olympia Brewing Co., 878 F.2d 596, 600 (2d Cir. 1989)).  In his November 1, 2005 Amended Complaint, Plaintiff asserts causes of action against Great-West, for, among other things, Denial of Benefits.  Scovin's claims against Great-West, regardless of the legal theory, seek to recover the same unpaid medical benefits Scovin seeks to recover against the individual defendants.  Since the Great-West settlement and any judgment entered against one or more of the individual defendants compensates Plaintiff for the same injury, the individual defendants are entitled to a set-off of the full amount of the Great-West settlement.

19.    The application of the "one satisfaction rule" articulated in Singer to ERISA cases makes eminent sense because it is also well settled that an ERISA plaintiff's recovery is limited to "benefits due him under the terms of his plan."  Clark, 166 F.3d 1199, 1998 WL 907904,

at **2.  Moreover, ERISA does not permit the recovery of compensatory or punitive damages.

Mass. Mutual Life Ins. Co.v. Russell, 473 U.S. 134 (1985).  Absent a set-off of the Great-West

settlement amount, Plaintiff would recover substantially more than the amount of denied benefits

and would, in essence, recover compensatory or punitive damages in direct contradiction of the

well-settled rule prohibiting those types of damages in an ERISA case.

**(16)   TRIAL TIME:**

The trial of this matter will take two to three days.

**(17)   FURTHER PROCEEDINGS:**

Plaintiff is unaware of any further proceeding which may be required at this time.

Defendants have requested that Plaintiff produce the settlement agreement between

Plaintiff and Great-West.  To date Plaintiff has refused defendants' request.  Defendants may file

a Motion to Compel to require plaintiff to produce the settlement agreement.

**(18)   ELECTION FOR TRIAL BY MAGISTRATE:**

Defendants object to trial before a Magistrate Judge

**PLAINTIFF,**
**WILLIAM SCOVIN**

By:_____

Peter M. Nolin (ct06223)
Kevin M. Greco(ct13195)
SANDAK HENNESSEY & GRECO LLP
707 Summer Street
Stamford, CT 06901-1026
(203) 425-4200 (telephone)
(203) 325-8608 (facsimile)
pnolin@shglaw.com
kgreco@shglaw.com

**THE DEFENDANTS**
**LEWIS COHEN, HUGH REGAN AND**
**A. JONES YORKE**

91

By:___/S/_____

James M. Moriarty (ct 21876)
Kelley Drye & Warren LLP
    Their Attorneys
400 Atlantic Street
Stamford, Connecticut 06901-3229
Telephone: (203) 324-1400
Facsimile: (203) 327-2669
E-mail: jmoriarty@kelleydrye.com

    and

Richard G. Cushing (ct15997)
Cushing Law Firm, P.C.
420 East 54th Street
New York, New York 10022
Telephone: (212) 371-8880
Facsimile: (212) 704-6288

**THE DEFENDANT
ROBERT DRAKE**

By:___/S/_____
Robert N. Drake
    *Pro Se*
558 Lime Rock Road
Lakeville, Connecticut 06039

## CERTIFICATION

I hereby certify that a copy of the foregoing was delivered by e-mail to Robert Drake and James Moriarty on July 19, 2008 and that a copy was mailed to each of them on July 21, 2008.

Peter M. Nolin

CT01/MORIJA/256661.3